UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| LAWRENCE LANE, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | No. Civ-06-1071-JB-ACT |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| | ) | AMENDED COMPLAINT FOR |
| vs. | ) | VIOLATION OF §§14(a) AND 20(a) OF THE |
| | ) | SECURITIES EXCHANGE ACT OF 1934 |
| BARBARA PAGE, et al., | ) | AND SEC RULE 14a-9 |
| | ) | |
| Defendants. | ) | |
| | ) | DEMAND FOR JURY TRIAL |
| | ) | |

**OVERVIEW OF THE ACTION**

1.      This is a shareholder class action brought by plaintiff on behalf of persons whose shares of Westland Development Company, Inc. ("Westland" or the "Company") were purchased by SunCal Companies Group and/or its affiliates (collectively, "SunCal") in connection with a 2006 agreement and plan of merger (the "Merger Agreement") entered into by and between Westland and SunCal. This action is brought against Westland, certain of its senior officers and directors and its merger partner SunCal arising out of defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act"), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.

2.      At the time of the consummation of the Merger Agreement, Westland held title to more than 50,000 acres of land which had originally been conveyed by the King of Spain in 1692 in what was known as the Atrisco Land Grant. The descendants of the original grantees of the Atrisco Land Grant include Court-appointed Lead Plaintiff Lawrence Lane and Westland's other former shareholders. Westland's assets included tens of thousands of acres of undeveloped property, master planned communities, retail properties, water rights and untapped oil and gas rights in and around Albuquerque. Defendants acknowledge that the "size and location of these real estate holdings adjacent to Albuquerque, New Mexico, makes these unique assets."

3.      On or about September 20, 2006, the defendants caused a definitive proxy statement (the "Proxy Statement") to be filed with the SEC and mailed to Westland shareholders, a true and correct copy of which is attached hereto as Exhibit A. The Proxy Statement described Westland, its assets and the process used by defendants to sell Westland, including the terms on which defendants had agreed SunCal would acquire Westland (the "SunCal Merger").

4.      The Proxy Statement falsely stated, among other things, that: *the SunCal Merger was "advisable and fair to, and in the best interests of Westland and Westland's shareholders*;" and

- 1 -

that "*Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement*."  In an attempt to convince Westland's shareholders of the legitimacy of the process used to sell Westland, the Proxy Statement also falsely stated that "*Westland's board of directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland*."  The Proxy Statement also omitted material facts necessary to make statements made therein not false or misleading. The true facts which were then known by, or available to, defendants included:

(a)    that the Individual Defendants had no basis to reasonably believe that the SunCal Merger was "advisable, fair to and in the best interest of Westland and its shareholders," as defendants have admitted *under oath* that they did not have Westland's assets appraised by a third party appraiser or financial advisor and did not know the value of the land, water or mineral rights that comprised Westland's assets at the time of the SunCal Merger;

(b)    that the Individual Defendants, including Benavidez, Chavez, Mares, Pena, Sanchez, Padilla and Page did not believe that the SunCal Merger was fair to or in the best interests of Westland's shareholders, but rather so stated in order to obtain the personal benefits promised to them in connection with the SunCal Merger, including SunCal's promises of: (i) continued employment after the SunCal Merger; (ii) termination payments; (iii) lucrative lifetime appointments as trustees and/or directors on the Boards of the Atrisco Heritage Foundation (the "Foundation") and Atrisco Oil & Gas LLC ("Atrisco LLC"); and/or (iv) equity grants in Atrisco LLC;

(c)    that in order to endorse the SunCal Merger, defendants Page and Padilla demanded that SunCal first agree to employment and/or consulting agreements which provided more than $777,000 for Page and $350,000 for Padilla as a reward to Page and Padilla for their agreement to engage in the unlawful conduct alleged herein; and

(d)       that the internal Westland valuation of the Company rendered by senior executive Brent Lesley and provided to the Board **after** defendants agreed to sell Westland for approximately $160 million, and **before** defendants executed the Merger Agreement, placed a $377 million, or $474 per share value on Westland, which valuation confirmed that defendants had no reasonable basis to believe and did not actually believe that the SunCal Merger was fair to or in the best interests of Westland or its shareholders.

5.       On or about November 6, 2006, defendants convened a shareholder meeting to obtain approval of the SunCal Merger.  On November 21, 2006, defendants confirmed that 72.4% of Westland's common shares and 97.75% of Westland's Class B shares had voted in favor of the SunCal Merger.  This exceeded the 66-2/3% which defendants stated was required under New Mexico law to approve the SunCal Merger.  On December 7, 2006, defendants announced the consummation of the SunCal Merger.

6.       On September 3, 2007, *Forbes* published an article titled, "Insider Deal on the Mesa," which asked, "[t]he 86-square-mile parcel outside Albuquerque was a pot of gold.  Who was going to get it?"  The article reiterates the sordid history and misconduct at Westland and discussed the unlawful process used by defendants in connection with the sale of Westland:

> Fast-growing Albuquerque, with a population of a half-million, is running out of room.  To the north and south are Native American pueblos.  To the east are the towering Sandia peaks.  Yet if you drive five minutes west from downtown, the sidewalk abruptly ends at a massive escarpment topped by a temptingly empty sagebrush-covered mesa.
>
> This 86-square-mile parcel of real estate, twice the size of Boston, is what's left of the Atrisco land grant, bequeathed in 1692 to a few loyal subjects of Charles II, the disfigured and inbred young king of Spain.  For three centuries the descendants of those settlers fought off Apache raids, land hustlers and attempts to take their land under both Mexican and American governments.
>
> Today a California developer is planning two brand-new neighborhoods with 5,000 homes, retail stores and a Tesla Motor factory that will make electric cars. Construction will likely continue for decades on the land.  But the once proud

- 3 -

Atrisquenos aren't sharing in the boom. Instead they are *left with modest payouts and bitter recriminations about their land corporation's board of directors, who walked away millionaires*.

If it sounds unfair and a little bit shady, then you haven't spent much time around Atrisco. Its history as a business is one long tale of stupidity, cupidity and *mismanagement* in roughly equal measure.

Corruption charges have swirled around Atrisco since early in the last century. In 1967, following years of infighting, the owners' holdings were incorporated into a for-profit business called Westland Development. Each heir got tradable stock proportional to his ancestors' land holdings. The company's 800,000 shares traded via an internal exchange.

Incorporation didn't stop allegations of chicanery. In the 1980s the state accused Westland president Gil Cordova of swindling Atrisquenos out of their shares through the trading committee. He signed a consent decree, admitting no wrongdoing, and was pushed out of office only after a series of bruising proxy fights.

A new president came to office in 1989: Barbara Page, a former Westland director who ran as a reform candidate. Previously a bank manager and motel owner, she brought chirpy optimism but little in the way of experience. Her board included a roofer, a florist and a used car salesman. "We're turning around," Page vowed in 1990. "We're on our way up. And we're determined to become a very successful company."

Westland Development, however, did little developing. Instead, as it had been doing for years, it sold several million dollars' worth of land each year to cover expenses (such as $50,000 bonuses for directors and $100,000 salaries for officers) and a $1-a-share dividend. Without the sales the company was barely profitable.

Atrisco had always attracted real estate barons hungry for raw land in the booming Southwest. The billionaire Hunt brothers made a run at it in the early 1990s. But buyers never got far because the thinly traded shares were difficult to amass and no one on the Westland board had enough shares to make a sale compelling. And Westland's bylaws limited share ownership to lineal heirs of the original grantees.

During the 1990s *board members amassed shares* through purchases and grants. In 1993 they *rewarded themselves with 5,000 shares apiece*. Page, company Chairman Sosimo Padilla and others *exercised options on thousands more* granted them in the early 1980s. The *grants were of Class B stock, which gave them veto power over a sale of the company*, since state law requires a majority of each share class to approve a sale.

*In 1998, without a public explanation, Westland's board passed an "antitakeover" provision that provided for a megagrant of B shares if Westland were ever the target of a hostile bidder – never mind that the board's existing*

- 4 -

*shares gave them veto power over any deal*.  By 2004 Page owned more than 14,000 shares. Padilla, who had been chairman since 1989, had 23,000.  Between 2003 and 2005 Page made between $155,000 and $275,000 in salary and other pay.

In late 2004 a Tucson, Ariz. developer named Philip Aries approached Westland on behalf of an investor group that included the Park family from Cleveland.  Aries had been after the land for 21 years.  "***Westland was like the Holy Grail of real estate deals***," he says.

Aries offered Westland $144 million.  Page came back with $160 million, or $200 a share, and Aries agreed.  Suddenly the board was rich, on paper.  The collective value of their holdings instantly jumped from $1 million to $10 million; they would split another $7 million from the antitakeover provision.  ***Page and Padilla also had six-year severances written in their contracts***.

***A few younger board members began to grouse that Westland should get more.  There could be hundreds of millions of barrels of oil and reserves of natural gas under the ground.  Westland's own vice president of sales told the board in private that the land was worth at least $377 million***. (Page now says that was an incorrect figure based on rough estimates.)

But ***Padilla and Page wanted a quick sale, having found a buyer who accepted the antitakeout payout, no questions asked***.  ***The company got a "fairness opinion" but never ordered a rigorous appraisal or solicited other bidders***.  (Asked later in a deposition if he ever considered seeking out offers, Chairman Padilla replied: "Of course not.  We don't do that.  We're not out waving the flag.")

When Page announced the sale in September, most of the 6,000 heirs of Atrisco, many of whom still live on Albuquerque's impoverished southwest side, were ecstatic.

Two weeks after the big announcement ***Page ordered Vincent Rivera, Westland's director of shareholder relations, to issue the $7 million in new B shares***. When a flabbergasted Rivera refused, Westland's attorney, Thad Turk, demanded he proceed. ***Rivera reluctantly took nine blank stock certificates, one for each director, from the company's safe and began typing in their names***.  Minutes after Rivera had loudly complained to officemates that the takeover wasn't hostile, Turk called again and told him to stop.  Page and Turk called Rivera into a meeting a few days later at which he called the share grant ***"free money" for the board***.  That meeting was the last he heard of the B shares.  "I never accused them of stealing," he recalls.  "That's what I thought, but I didn't say that."  (Page disputes his account and fired him a year later for allegedly being drunk on the job.  Rivera denies the charge.)



Details on the Aries deal, including the as-yet-unissued B shares, came out in December 2005. Meanwhile, Phil Aries started having problems coming up with the money. With Atrisco officially in play, developers from all over the West came running. By March 2006 several class actions had been filed, accusing the board of breaching its fiduciary duty.

Las Vegas home builder James Rhodes offered $212 million plus half of all future oil and gas royalties. While Rhodes insisted that Westland cancel the special change-of-control payout to the board, he did come up with a new carrot. He ***agreed to contribute to a "heritage fund" that would employ – for life – members of the current board***, a concession designed to appease several younger directors who owned almost no stock and were beginning to oppose a sale that would cost them their sinecures. Page and Padilla relinquished the B shares and set a date in June to vote on the sale.

On June 8, 2006 a thousand shareholders clutching paper proxies crammed into the Southwestern-style conference area of the Albuquerque Hotel. The sale was going to bring most of them more money than they had ever seen at one time. But ***what the crowd didn't know was that a new offer topping Rhodes' had come in just days before from SunCal***, a privately held California developer with financing from hedge fund operator D.E. Shaw & Co.

Quickly, word got around the room that the sale was canceled. Fearing that their long-awaited payoff was being scuttled, the crowd shouted the event's guest host, former New Mexico governor Tony Anaya, off the stage.

Page grabbed the microphone and began issuing threats: "We have police. We have undercover agents." When that failed to calm the audience, Turk, the company's imposingly large attorney, took over and began ejecting dissidents. Three

- 6 -

hours later Westland's board cut off discussion and called in security to separate itself from irate shareholders. "It is our money," one woman in the audience screamed at the board members. "And I want it."

The bidding for Westland continued. Three weeks later SunCal had emerged on top with a price of $250 million, plus the money for the heritage trust and a 50% cut of oil and gas royalties. In November 2006 a much smaller crowd showed up in a cavernous auditorium downtown for yet another vote. This time Page and the board were prepared. A mariachi band warmed up the audience as uniformed cops paced in front of the stage. Heirs who stood up to speak – some against the sale, others in favor – were closely flanked by SunCal employees in blazers.

When one shareholder asked that the board be polled on their stock holdings, only Chairman Padilla, who owned more than anyone, refused to give a number, eliciting a chorus of boos. Once again the meeting ended when the board cut off questions and called security to the front. Page left the building under police guard. Nevertheless, Westland's shareholders voted 75% in favor of selling.

In the end, *5,991 heirs got an average of $37,000 apiece, and Westland's nine board members took home $15 million*, $12 million of that split between Padilla and Page. It was a shade under what they would have made had the sweetheart Aries deal gone through. *Four of Westland's board members now sit on the boards of the oil and gas royalty company and the heritage foundation, the latter for life*. Their salaries have not been determined, says SunCal. Both Padilla's and Page's *severances were extended to seven years*, worth a total of $350,000 and $770,000, respectively.

7.    Based upon defendants' representations that 72.4% of Westland's common shares and 97.75% of Westland's Class B shares had reportedly voted in favor of the SunCal Merger, defendants consummated the SunCal Merger on or about December 7, 2006, which has resulted in substantial harm to Westland's former shareholders.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331, as plaintiff's claims arise in part out of the laws of the United States, §27 of the 1934 Act, §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

9.     Venue is proper in this District because Westland is located in this District, certain of the defendants reside in this District, defendants' wrongful acts occurred in this District and the harm caused by defendants emanated from and had effects in this District.

## PARTIES

10.     Lead Plaintiff Lawrence Lane is an heir of the Atrisco Land Grant and was the owner of approximately 50 shares of Westland common stock prior to consummation of the SunCal Merger.

11.     Defendant Westland was a New Mexico corporation that was formed in 1967. Westland was the successor in interest to tens of thousands of acres of land granted in 1692 by the King of Spain to the inhabitants and settlers of the Community of Atrisco.

12.     Defendant Barbara Page ("Page") was Westland's President and CEO and served on Westland's Board for most of the past 30 years.  After being challenged about her use of a secret agreement to divert assets to herself in connection with the proposed sale of Westland to SHNM Acquisition Corp. ("SHNM") pursuant to the SHNM Merger Agreement, Page agreed to waive certain rights delineated in her employment agreement.   Page then changed her position in connection with the SunCal Merger Agreement and demanded from SunCal its agreement that she receive seven times her salary on the date of termination (or more than $770,000), plus all employment benefits if she is "involuntarily terminated," which term is not defined in the Proxy Statement.  Page had direct participation in and oversight of over all of the corporate misconduct detailed herein.

13.     Defendant Sosimo S. Padilla ("Padilla") was a Westland Director for 35 years and at all relevant times herein served as the Chairman of the Board.  Like Page, Padilla initially agreed to waive his rights to a severance payment under the SHNM Merger Agreement.  In connection with the negotiation of the SunCal Merger Agreement, however, Padilla demanded that SunCal agree that

he receive seven times his annual salary on the date of termination (or more than $350,000) if he is "involuntarily terminated under the terms of the agreement." Padilla had direct participation in and oversight of over all of the corporate misconduct detailed herein.

14. Defendant Joe S. Chavez ("Chavez") was a Westland Director for over ten years and from 2003 also served as Westland's Secretary-Treasurer. As Secretary-Treasurer of the Company, Chavez had custody of the books and records of the Company and was in charge of the preparation and filing of reports, financial statements and returns as required by law.

15. Defendant Josie Castillo ("Castillo") was a Westland Director for over 20 years prior to consummation of the SunCal Merger.

16. Defendant Charles V. Pena ("Pena") was a Westland Director for 10 years prior to consummation of the SunCal Merger.

17. Defendant Georgia Baca ("Baca") was selected and appointed as a Westland Director by defendants Page, Padilla, Chavez, Castillo and Pena in 2004. Baca was employed by Westland for over a decade prior to consummation of the SunCal Merger.

18. Defendant Troy K. Benavidez ("Benavidez") was selected and appointed as a Westland Director by defendants Page, Padilla, Chavez, Castillo and Pena in 2004.

19. Defendant Ray Mares, Jr. ("Mares") was selected and appointed as a Westland Director by defendants Page, Padilla, Chavez, Castillo and Pena in 2004. Page, Padilla, Chavez, Castillo and Pena have longstanding social or business relationships with Mares and his family, including with Mares' father who served as a Westland director for over 20 years, from 1973 until he died in 1996.

20. Defendant Randolph M. Sanchez ("Sanchez") was selected and appointed as a Westland Director by defendants Page, Padilla, Chavez, Castillo and Pena in 2004.

21.     Defendant SunCal is comprised of SCC Acquisition Corp. ("SCC"), a Delaware corporation, formed solely for the purpose of acquiring Westland, its parent SCC Acquisitions, Inc., a California corporation ("SCC Acquisitions") and their affiliates of the SunCal Companies Group. SunCal acquires and develops property for sale to residential and commercial builders.

22.     Each of the defendants participated in the preparation, review and dissemination of the false and misleading Proxy Statement complained of herein.  The Individual Defendants abdicated their obligation to Westland and its shareholders to file and distribute to plaintiff and the class a Proxy Statement that was not false and misleading.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all Westland shareholders, and their successors-in-interest who suffered harm as a result of defendants' misconduct, except the defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

24.     This action is properly maintainable as a class action.

25.     The Class of stockholders is so numerous that joinder of all members is impracticable.  Pursuant to the Proxy Statement, Westland had approximately 794,927 outstanding shares held by approximately 6,100 shareholders.

26.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, but are not limited to, whether, in connection with the SunCal Merger:

        (a)     defendants violated §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing and disseminating a false and misleading Proxy Statement; and

        (b)     plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein.

- 10 -

27.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

28.     Plaintiff is committed to prosecuting this action, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

29.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

30.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

31.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND TO THE SUNCAL MERGER

### *Ultra Vires* Issuance of Class B Shares

32.     In the 1980s and 1990s, Page, Padilla and the rest of the Board began amassing common shares of Westland by purchasing shares for approximately $20 per share from other shareholders (often the families of deceased shareholders) and granting themselves additional shares. In order to acquire even larger quantities of shares, the Board decided in 1983 to grant themselves Class B shares, and sought shareholder approval of the Stock Bonus Plan which would have provided for the issuance of Class B shares.  The Stock Bonus Plan was brought to a shareholder vote in 1983 and Westland shareholders *overwhelmingly rejected* it.

33.     Not discouraged by shareholders' refusal to approve the Class B shares in 1983, the Board in 1984 created a new Stock Option Plan and once again sought shareholder approval. Shareholders again rejected the plan. However, this time, the Board resorted to forging shareholder votes and manipulating the election so that they could grant themselves the Class B shares as planned. As a result of this fraudulent vote, 25,000 Class B shares were issued *ultra vires*, which shares were used decades later to sway the November 6, 2006 vote and divert to defendants approximately $8 million in merger consideration for these unlawfully issued shares alone. As former Westland President Gil Cordova has declared, "the Class B shares issued pursuant to the 1984 stock plan were not lawfully issued, as the 1984 stock option plan was not approved by Westland's common shareholders."[1]

34.     In addition, in 1998, the Board passed (without explanation) an "anti-takeover" provision which provided for a "mega-grant" of 35,000 "change-in-control" shares if Westland were ever the target of a hostile bidder. This was despite the fact that the Board's existing share ownership gave them veto power over any deal. Defendants planned to take advantage of this, and in fact, ordered Vincent Rivera, Westland's shareholder relations director, to issue the 35,000 Class B shares (then worth $7 million) in August 2005. When Rivera refused – noting that the proposed ANM merger was not "hostile" – he was later fired.

---

[1]     In addition to these 25,000 unlawful Class B shares, defendants continued to grant themselves and others Class B shares. At the time of the vote on the Suncal Merger, 51 people owned 85,100 shares of Class B stock and received over $26.8 million for them, including the nearly $13 million received by Westland's directors and officers, who collectively owned 41,035 shares of Westland Class B stock.

**The Board's Failure to Hire Advisors or Solicit Other Bids**

35.    By April 2005, at least three different entities had expressed an interest in purchasing Westland – ANM, WestPac and Robson Communities.  Page had a longstanding relationship with ANM, as she had contemplated selling Westland to Phillip Aires, an ANM "consultant," since the 1980s.  In fact, as a result of her clandestine efforts to sell Westland to Aires in the mid-1980s without informing the full board or following proper procedures, Page was forced to leave Westland. When Aires returned in 2005, offering to buy Westland, Page and the rest of the Board refused to solicit any other bids or negotiate with any other potential buyers, preferring "to take the bird in hand" as their counsel Thad Turk described it, to advance their own pecuniary interests rather than honoring their fiduciary duty to maximize shareholder value.  Thus, defendants entered into a merger agreement with ANM at $200 per share which contained "no-talk," "no-shop" and other provisions designed to discourage other bidders.

36.    At the behest of Page and Padilla (who have controlled and dominated the Board for most of the past 35 years), the Board declined to even attempt to ascertain the value of Westland's assets or implement any sales process at all.  A few directors indicated that the Company should adopt a reasonable sales process: Sanchez "suggested hiring a financial advisor to solicit other bids," and the Company's in-house counsel, Thad Turk, advised the Board that "the best way to get the highest value to the shareholders for their stock" was to "let the market determine the price." Several board members expressed that they thought the price was too low (Westland's own Vice President of Sales, Brent Lesley, opined to the Board that Westland's land was worth at least $377 million).  Yet, the Board agreed to sell Westland to ANM without publicly announcing that Westland was for sale, let alone attempting to solicit any bids.  This decision was made despite the fact that two other entities stood ready to make offers for Westland.  When asked about the Board's supposed deliberations regarding the ANM offer, defendant Mares admitted "I don't recall having a

- 13 -

whole lot of discussion . . . ."  The Board did not know what the Company's assets (including land) were worth, or even what land Westland owned, but they did not hire an appraiser.  In fact, CBIZ did not issue its fairness opinion until **_two weeks after_** the ANM merger agreement was executed.

37.     On February 9, 2006, Westland received an offer from SHNM to purchase Westland. The Board then entered into a merger agreement with SHNM, once again without attempting to value Westland or its assets or first obtaining a fairness opinion.  On the eve of the June 2006 shareholder vote on the SHNM offer, SunCal came forward with a superior bid and the vote on the SHNM transaction was cancelled.  On July 18, 2006, the Board – yet again without the benefit of implementing a sales process or receiving a fairness opinion – agreed to sell Westland to SunCal. SunCal and Westland entered into a Merger Agreement on July 19, 2006, which provided for SunCal's purchase of the 794,927 outstanding shares of Westland at a price of $315 per share.

**THE FALSE AND MISLEADING PROXY STATEMENT**

38.     On September 20, 2006, defendants caused Westland to file the Proxy Statement setting the shareholder vote on the SunCal Merger for November 6, 2006.  Federal law requires that proxy materials shall not contain statements which are false or misleading with respect to any material fact, or which omit to state any material fact necessary in order to make the statements therein not false or misleading.  The Proxy Statement violated §14(a) because it misrepresents and/or omits material facts.

**The Proxy Statement Failed to Disclose Defendants' Conflicts of Interest**

39.     The Proxy Statement contained a section titled, "Interest of Westland's Officers and Directors in the Merger," at pages 29-30 which stated: "Since December of 1991, Ms. Page has been employed as Westland's president and chief executive officer under a renewable six year employment agreement, pursuant to which she is paid $110,000 per year.  If Ms. Page's employment is involuntarily terminated during the term of the agreement, the agreement provides that she will be

paid, in addition to any salary earned to the date of such termination, an amount of cash equal to seven times the amount of her annual salary on the date of termination (or $770,000 as of the date of this proxy) plus all employee benefits to which she is currently entitled." This statement was false and misleading. The true facts known by, or available to, defendants were that Page's existing employment agreement did not provide for a six year term or provide for payments to Page equal to seven times the amount of her annual salary, but rather the agreement had been secretly modified in connection with the sale of Westland to encourage Page's cooperation in the wrongdoing alleged herein. These facts were material and necessary for Westland's shareholders to ascertain Page's interest in the SunCal Merger, which interest was not disclosed.

40.     The Proxy Statement stated at page 30 that "Mr. Padilla, the chairman of Westland's board of directors and Westland's executive vice president, is retained by Westland as a consultant under a renewable six year consulting agreement, pursuant to which he is paid $50,000 per year for his services. Mr. Padilla has agreed that if his consultancy is involuntarily terminated by SCC during the term of the agreement as a result of the merger, he will be paid no termination agreement but if he is otherwise involuntarily terminated under the terms of the agreement, he will be paid, in addition to any compensation earned to the date of such termination, an amount of cash equal to seven times the amount of his annual compensation on the date of termination (or $350,000 as of the date of this proxy)." This statement was false and misleading. The true facts then known by, or available to, defendants were that Padilla's existing consulting agreement did not provide for a six year term or provide for payments to Padilla equal to seven times the amount of his annual compensation, but rather the agreement had been secretly modified in connection with the sale of Westland to encourage Padilla's cooperation in the wrongdoing alleged herein. These facts were

- 15 -

material and necessary for Westland's shareholders to ascertain Padilla's interest in the SunCal Merger, which interest was not disclosed.

41.    The Proxy Statement provides at page 30 that Padilla **may** be paid $350,000 by SunCal as part of a "consulting agreement" under certain undefined circumstances.  The facts concerning Padilla's financial interest in the SunCal Merger were necessary for Westland shareholders to understand the circumstances pursuant to which Padilla's severance and salary provisions were to be triggered and thereby assess Padilla's financial interest in the SunCal Merger. The Proxy Statement failed to provide that information to Westland shareholders.

42.    The Proxy Statement also omits the fact that, in exchange for their endorsement of the SunCal Merger, at least four Westland directors were promised lifelong trusteeships of the Foundation and/or as directors of Atrisco LLC, entities that were granted control over hundreds of millions of dollars in assets.[2]  The Proxy Statement states at page 31 only that these defendants "would be entitled to receive customary fees in connection with such service," claiming that the amounts had not been determined as of September 20, 2006.  The fact that Westland Board members were being rewarded with lifelong positions as trustees of the Foundation and/or as directors of Atrisco LLC with lucrative annual retainers is information that was unquestionably material to

---

[2]    The Foundation is to "be operated exclusively for the purposes of (i) promoting and preserving the ancestral and cultural heritage of the general community of Albuquerque, New Mexico and the shareholders of Westland prior to the merger, (ii) promoting and preserving the history of the church and the cemeteries located on Westland's property, (iii) promoting and preserving the ancestral history of the Atrisco Heirs, and (iv) preserving and strengthening the community of the heirs of the Atrisco Land Grant through community development, scholarship grants *and such other activities as the trustees may deem to be within the purposes described above*."  The Foundation trustees "shall serve in office until such trustee resigns or is replaced by a majority of the trustees."

shareholders' decision and shareholders would want to give more careful scrutiny to the terms of the Merger Agreement as a result thereof.[3]

**The Proxy Statement Failed to Disclose that Westland's CEO**
**Voted Against the SunCal Merger**

43.     The Proxy Statement included a "Questions and Answers" section at pages 5-12 that stated:

**Q: Why is Westland proposing the merger?**

A: Westland is proposing the merger to enable its shareholders to vote whether to receive, upon completion of the merger, $315.00 per share in cash. ***Westland's board of directors believes that the merger is in the best interests of Westland's shareholders based, in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders***. For a more detailed discussion of the conclusions, determinations and reasons of Westland's board of directors for recommending that Westland shareholders approve the merger on the terms of the merger agreement, see "Special Factors – Recommendation of Westland's Board of Directors".

*        *        *

**Q: Are Westland's directors and officers voting their shares in favor of the approval of the merger agreement?**

A: Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement.

*        *        *

**Q: What is the recommendation of Westland's board of directors with respect to the matters being voted upon?**

A: Based on a number of factors set forth in the section entitled "Special Factors—Recommendation of Westland's Board of Directors," Westland's board of directors recommends that Westland's shareholders vote FOR the approval of the merger agreement.

---

[3]     Notably, only *after* the Proxy Statement was distributed to Westland shareholders and 70% of the votes were tendered did defendants first communicate the identity of the directors of Atrisco LLC to Westland's shareholders in a Form 10-SB filed with the SEC by Atrisco LLC on September 29, 2006.

44.     The Proxy Statement also included the "Recommendation of Westland's Board of Directors," at pages 26-29 which stated:

> Westland's board of directors, by vote at a meeting held on July 18, 2006, determined:
>
> - the merger and the merger agreement are advisable and fair to, and in the best interests of Westland and Westland's shareholders;
>
> - to submit the merger agreement to Westland's shareholders to vote on its approval; and
>
> - to recommend to Westland's shareholders that they vote in favor of the merger agreement.
>
> *          *          *
>
> **Westland's board of directors recommends that you vote FOR approval of the merger agreement**.

45.     These statements were false and misleading. The true facts which were known by or available to defendants were that Page actually voted **against** adopting the Merger Agreement and Benavidez **abstained** from voting. In addition, despite the Board's recommendation in the Proxy Statement that shareholders vote in favor of the SunCal Merger and defendants' representation at page 10 that "Westland's directors and officers **plan to vote their shares in favor** of the approval of the merger agreement," nearly half – 4 of the 9 directors – **did not** vote their shares in favor of the SunCal Merger and a fifth voted less than half of his common shares in favor thereof.[4] Thus, while making statements to the shareholders that the SunCal Merger was fair to and in the best interests of Westland and its shareholders, the directors did not believe it to be so.

_____

[4]     Defendants Benavidez, Mares, Pena and Sanchez did not vote their Class A common shares in favor of the SunCal Merger and defendant Chavez voted only 100 of his 310 Class A common shares in favor of the SunCal Merger.

- 18 -

**The Proxy Statement Misrepresented the Sales Process**

46.    The Proxy Statement falsely characterizes the events transpiring after the Board's acceptance of the ANM Merger Agreement as a "market-check process," and at page 27 that "***Westland's board of directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland***." These statements were false and misleading as these statements would lead a reasonable investor to believe that defendants had shopped Westland to potential suitors in an effort to maximize shareholder value for Westland's shareholders.  The true facts which were then known by, or available to, defendants but were omitted from the Proxy Statement, were that the Individual Defendants did not engage in any form of a "market-check process," even after defendant Sanchez suggested hiring a financial advisor to actively solicit additional bids at an August 2005 board meeting.  Instead, when asked about whether a market-check process was used, defendants have admitted under oath that no such market check was used:

(a)    Q: "Did the board do anything to let potential customers or buyers know that Westland was for sale? . . . A: Not that I am aware of, no."  (Lesley Tr. at 72)

(b)    Q: "In August 2005 when you indicate that the board became aware of ANM's offer, did the board do ***anything*** to let other companies or ***potential buyers know that Westland might be for sale***?  A. ***No***.  (Mares Tr. at 26-27)

(c)    Q: "Did the board consider hiring someone to help solicit additional offers? A: No."  (Padilla Tr. at 107)

(d)    Q: "***Did the board consider attempting to get additional offers*** [after accepting ANM's offer]?  A: ***Of course not***.  We're not – we don't do that.  We're not out waving the flag."  (Padilla Tr. at 107)

**The Proxy Statement Failed to Disclose Westland's Value**

47.     The Proxy Statement provided that in concluding the SunCal Merger was fair to Westland's shareholders and recommending that Westland shareholders should "vote in favor of the merger agreement," the Individual Defendants "considered the interests of Westland and Westland's shareholders" and several other factors, which factors included the fact that Westland obtained an independent fairness opinion from a valuation expert in connection with the August 2005 ANM offer and that the valuation expert concluded that the $200 per share purchase price offered by the ANM group was fair, from a financial point of view, to Westland's shareholders.  This statement was false and misleading in that it omitted the true facts which were then known by, or available to, defendants, including the fact that less than 60 days before the issuance of that 2005 opinion the defendants had been internally apprised that Westland's land (exclusive of the Cordero Mesa interest) was actually fairly valued at $474 per share, or $377 million.

48.     The Proxy Statement also addressed historical valuation issues.  Page 16 of the Proxy Statement stated that "[f]rom time to time, Westland's board of directors has received inquiries from various parties indicating their interest in a possible acquisition of Westland or a significant portion of its assets.  Although prior to 2005 none of these inquiries ever materialized into a viable proposal, to better educate itself as to Westland's value, *in 2001 Westland's board of directors engaged an independent company specializing in evaluating businesses (the "valuation expert") to determine the value of Westland's stock. At that time, the valuation expert determined the value of Westland's stock at approximately $70 million (or approximately $87.00 per share)*."  This statement was false and misleading.  The true facts which were then known by, or available to, the Individual Defendants were that the July 2001 valuation report rendered by the "independent company specializing in evaluating businesses" yielded a valuation of Westland of $249 per share

before the valuation expert received a direct order by Page to reduce the valuation without justification, rationale or economic support to $87.59 per share.

**Defendants Lacked Any Basis to Assert that the SunCal Merger**
**Was Fair to or in the Best Interests of Westland or its Shareholders**

49.    The Proxy Statement includes a statement at page 26 by the Individual Defendants that the SunCal Merger is "***advisable and fair to, and in the best interests of Westland and Westland's shareholders***."  The Proxy Statement further stated at page 6 that "***Westland's board of directors believes that the merger is in the best interests of Westland's shareholders based, in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders***."   These statements were false and misleading.  The true facts which were either then known by, or available to, defendants were:

(a)    that defendant Page has admitted that in connection with the sale of Westland: (i) the Board didn't do "anything" to ascertain the value of what the Board was selling (*i.e.*, Westland and its assets); (ii) Page did not know the value of the Westland land being sold; (iii) defendants had not even hired a third-party appraiser or financial advisor to provide a good faith assessment of the value of Westland's land holdings, water rights or oil and gas rights; and (iv) defendants had "no knowledge" of the value of Westland's oil and gas reserves;

(b)    that defendants Mares, Padilla and Sanchez have admitted in sworn testimony that not only did they not attempt to assess the value of Westland and its assets before agreeing to sell the Company, they also failed to engage in any affirmative effort to maximize shareholder value; and

(c)    that, as detailed in ¶¶(a) and (b) above and attested to by several of the Individual Defendants, defendants entered into merger agreements with ANM, SHNM and SunCal

without any reasonable basis to assert that the Merger Agreement was "fair to" or "in the best interests of" Westland and its shareholders.

**The Proxy Statement Failed to Disclose the Existence
and Materiality of the "TIDD"**

50.    The Proxy Statement states that in reaching its determination that Westland shareholders vote in favor of the SunCal Merger and that the terms of the SunCal Merger and the Merger Agreement were advisable, fair to and in the best interest of Westland's shareholders, the Board considered as a material fact the substantial expense that would be required to develop Westland's land holdings.  Specifically, the Proxy Statement states at pages 27-28 that the Board's determination was due in part to the assertions:

- that "Westland's vast amount of undeveloped land, and the expense and time required to develop it, make an acquisition of Westland unattractive or unfeasible;" and

- that "the significantly increasing costs to Westland to develop its own land. Generally, infrastructure costs are borne by the City of Albuquerque; however, Westland recently has had to finance all such costs associated with any development it has undertaken. For example, in Westland's current efforts to develop an area for the construction of homes (called the Petroglyphs), the City of Albuquerque, which controls all water rights in the area, required Westland to build the water infrastructure for the Petroglyphs and transfer ownership of the infrastructure to the City of Albuquerque at no charge. The costs incurred by Westland in connection with such infrastructure were substantial, amounting to approximately $7.2 million."

51.    These statements were false and misleading.  The true facts which were then known by, or available to defendants, were that SunCal had arranged to take advantage of an October 2006 Tax Increment Development District ("TIDD") which allowed SunCal to utilize tax dollars to fund the infrastructure costs associated with the development of Westland.  The materiality of this fact was further confirmed by recent comments by SunCal regional president Bill Myers who was quoted in the August 8, 2007 edition of the *Albuquerque Tribune* addressing SunCal's effort to avoid losing access to the TIDD financing. Mr. Myers stated that if SunCal did not receive a TIDD similar to the

one granted Mesa Del Sol, "it would be *significant*" and in Mr. Myers' opinion would result in

SunCal not achieving the initial vision SunCal had.

**The Proxy Statement Failed to Disclose Material Information**
**Regarding Atrisco LLC**

52.     The Proxy Statement stated at page 7 that although "[n]either Westland nor

Westland's board of directors makes any representation as to the value of Class A units in Atrisco

LLC, or made any valuation of Atrisco LLC in connection with their approval of the merger

agreement," the "management team does not know whether there is oil, natural gas, coal bed

methane gas or any other natural resource under Westland's land," and defendants were "not aware

of any commercially successful drilling on the property."   These statements were false and

misleading.  The true facts which were then known by, or available to, defendants were:

        (a)     that the Board had been advised at an August 29, 2005 board meeting that 100

million to 500 million barrels of oil could be located on Westland's property;

        (b)     that at an August 29, 2005 board meeting defendant Sanchez had expressed

concerns about the loss of these potentially valuable water rights and mineral rights;

        (c)     that in March 2006, Savant Resources offered to pay substantial amounts to

lease all of Westland's property for oil and gas exploration, which lease payments would have inured

100% to Westland and its shareholders; and

        (d)     that in March 2006, Tecton Energy LLC offered to increase its lease of

approximately 7,000 acres of Westland's land to 30,000 acres for the purpose of exploring oil and

gas, which offer the Board concluded (as confirmed in the March 30, 2006 meeting minutes) should

be disclosed to Westland's shareholders in the Proxy.  It was not.

53.     The Board's refusal to secure the extension of the Tecton lease prior to the

consummation of the SunCal Merger was material as defendants knew or should have known that

executing the lease following the consummation of the SunCal Merger was effectively transferring 50% of the oil and gas royalties to SunCal as the Atrisco LLC formation documents required.[5]

54.    These facts would have taken on actual significance in the minds of Westland's shareholders in reaching their decision to vote because Westland shareholders were entitled to 100% of the profits of *existing* leases.  Westland shareholders were entitled to know that at least two entities attempted to negotiate leases prior to the close of the merger which would have allowed them to capture 100% of the profits of future royalties as compared to, at best, the 50% they may receive as members of Atrisco LLC from leases entered into after the SunCal Merger.

55.    The Proxy Statement stated at page 49 that "Atrisco LLC will issue to Westland *794,927* Class A units and one Class B unit" which equity interests "represent[ed] 100% of the units of Atrisco LLC."  The Proxy Statement further assured Westland shareholders that the equity interests in Atrisco LLC would be issued in connection with the merger "as a dividend *on a one-for-one basis* in accordance with such shareholders' respective ownership of Westland *common stock*."

---

[5]    The agreement between Atrisco LLC and Westland was described in an August 28, 2007 article entitled "Atrisco to Search for Gas on 50,000 Acres,"

Atrisco Oil & Gas LLC announced Monday it has made an agreement with Tecton Energy of Houston to search for natural gas on 50,000 acres that once were part of the Atrisco Land Grant.

"I think we're cautiously optimistic at what we might find there," said Peter Sanchez, executive director of Atrisco Oil & Gas.

Under the terms of this agreement, Atrisco will lease the remainder of its oil and gas mineral rights, which cover an estimated 50,000 acres, to Tecton for an undisclosed amount of cash and specific work commitments over the next five years.

Tecton already holds two other Atrisco oil and gas leases on the property. Sanchez said the new agreement gives Tecton control of oil and gas leases on all of the former Westland property, which totals more than 55,000 acres.

These statements were false and misleading.  The true facts which were then known by, or available to, defendants were that defendants Mares, Chavez and Pena received hundreds of extra Atrisco LLC Class A units as an inducement to not go public with their opposition to the SunCal Merger.

56.      These facts would have taken on actual significance in the minds of Westland's shareholders in reaching their decision to vote because Westland shareholders were entitled to a one-for-one distribution of the 794,927 shares in Atrisco LLC, and defendants knew or had access to facts that defendants Mares, Chavez and Pena had obtained distributions of Atrisco LLC Class A units far in excess of the one-for-one ratio represented in the Proxy Statement.

**The Proxy Statement Misrepresented It Was SunCal,
not Westland, Which Hired the Proxy Solicitors**

57.      The Proxy Statement stated at page 16 that "Westland expects to make arrangements with and compensate approximately 90 individuals to assist in the solicitation."  This statement was false.  The true facts then known by, or available to, defendants were that Westland did not hire *any* proxy solicitors but rather the buyer, *SunCal*, retained the proxy solicitors who secretly received lucrative payments for delivering votes in favor of the SunCal Merger.

58.      These facts would have taken on actual significance in the minds of Westland's shareholders in reaching their decision to vote because Westland shareholders were entitled to know that SunCal was actively paying individuals to solicit votes in favor of the SunCal Merger to ensure its approval.

## COUNT I

### Against All Defendants for Violations of §14(a) of the 1934 Act
and Rule 14a-9 Promulgated Thereunder

59.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

61.     Defendants disseminated the false and misleading Proxy Statement which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     As stated herein, the Proxy Statement contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, which Proxy Statement was an essential link in the consummation of the SunCal Merger.  The defendants have also failed to correct the Proxy Statement and the failure to update and correct false statements is also a violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

63.     The written communications made by the defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications are materially misleading and were provided in at least a negligent manner.

64.     As a result of the defendants' preparation, review and dissemination of the Proxy Statement, Westland's shareholders have suffered substantial harm.  By reason of such misconduct, the Individual Defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### Against the Individual Defendants and SunCal
### for Violation of §20(a) of the 1934 Act

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Westland within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of Westland, and their ownership of Westland stock, these defendants had the power and authority to cause, and did in fact cause, Westland to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

67.     SunCal is a controlling person of Westland and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  By reason of its contractual obligations with Westland and the Individual Defendants, SunCal possessed control over Westland and the Individual Defendants.  For example, Westland and the Individual Defendants were required by §6.1 of the Merger Agreement to refrain from doing any of the following, without the express written approval of SunCal: increase the compensation of any employee, acquire any material assets, enter into any material contracts, commit to any capital expenditures in excess of $1 million, incur any indebtedness, commence any new line of business, and transfer, mortgage or dispose of any property or assets.  Further, pursuant to §6.4 of the Merger Agreement, the defendants were required to, and did, work with SunCal "in the preparation of the Proxy Statement."  Thus, SunCal is liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class;

B.      Declaring that the Proxy Statement distributed by defendants to shareholders was materially false and misleading, in violation of Rule 14a-9 and §14(a);

C.      Awarding plaintiff and the member of the Class compensatory and/or rescissory damages against the Individual Defendants, including, but not limited to, pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E.      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 17, 2007              COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       DARREN J. ROBBINS
                                       RANDALL J. BARON
                                       AMBER L. ECK


                                       s/ Darren J. Robbins
                                       ────────────────────────
                                       DARREN J. ROBBINS

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       Lead Counsel for Plaintiff

                                       LAW OFFICES OF NICHOLAS
                                         KOLUNCICH III, LLC
                                       NICHOLAS KOLUNCICH III
                                       6501 Americas Parkway NE
                                       One Park Square – Suite 620
                                       Albuquerque, NM  87107-5375
                                       Telephone:  505/881-2228
                                       505/881-4288 (fax)

                                       Liaison Counsel

S:\CasesSD\Westland Derivative\CPT_Amended_Fed.doc

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 17, 2007.

s/ Darren J. Robbins
DARREN J. ROBBINS

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:darrenr@csgrr.com

- 30 -

# Mailing Information for a Case 1:06-cv-01071-JB-ACT

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randall J Baron**
  rbaron@csgrr.com

- **Juan L Flores**
  jg@ssslawfirm.com,jlf@ssslawfirm.com

- **Joe Kendall**
  jkendall@provostumphrey.com

- **Nicholas Koluncich**
  nkoluncich@newmexicoclassactions.com

- **Frank Martin**
  rsandoval@branchlawfirm.com

- **Brian K Nichols**
  bkn@modrall.com,doloress@modrall.com

- **Darren J Robbins**
  e_file_sd@csgrr.com

- **Richard A Sandoval**
  rsandoval@branchlawfirm.com,gwilliams@branchlawfirm.com

- **Douglas G Schneebeck**
  dschneebeck@modrall.com,susanb@modrall.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Amber L Eck
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 W Broadway
#1900
San Diego, CA 92101
```