## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LAWRENCE LANE, On Behalf of Himself,
and All Others Similarly Situated,

      Plaintiff,

vs.                                                            No. CIV 06-1071 JB/ACT

BARBARA PAGE, SOSIMO PADILLA,
JOE CHAVEZ, JOSIE CASTILLO, CHARLES
PENA, GEORGIA BACA, TROY BENAVIDEZ,
RAY MARES, JR., RANDOLPH SANCHEZ, and
WESTLAND DEVELOPMENT CO., INC.

      Defendants.

### <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on: (i) the Motion to Dismiss, filed December 3,

2007 (Doc. 53); and (ii) the Motion to Dismiss and Joinder in Director Defendants' Motion to

Dismiss, filed December 3, 2007 ( Doc. 52).  The Court held a hearing on the motions on May 23,

2008.  The primary issues are: (i) whether Lead Plaintiff Lawrence Lane's allegations are so

dependent upon alleged corporate mismanagement under New Mexico state law that they cannot

support a federal claim under § 14(a) of the Securities and Exchange Act of 1934 ("1934 Act"); (ii)

whether the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes heightened

pleading requirements on Lane's allegations and whether Lane's pleadings meet those requirements;

(iii) whether the omissions and misrepresentations Lane alleges the Defendants' proxy solicitation

contains are material; and (iv) whether Lane has properly stated a § 20(a) control-person claim.  The

---

[1] The Court issued an order granting in part and denying in part the motions at issue here, but indicated that it would later issue an opinion more fully detailing its reasoning.  <u>See</u> Order, filed September 15, 2008 (Doc. 81).  This opinion is the one promised.

Court finds that Lane's allegations do not turn on state law, but fit within the parameters of a § 14(a) claim; that the PSLRA does apply in part to Lane's allegations, but that Lane's pleadings are nonetheless sufficient; and that Lane has properly stated a § 20(a) claim.  The Court further finds that some of the alleged omissions and misrepresentations are material, but others are not, and will dismiss those that are not material.  Accordingly, the Court will grant in part and deny in part the motions to dismiss.

**<u>FACTUAL BACKGROUND</u>**

This case concerns a dispute over the merger of Westland Development Co., Inc. ("Westland") and SunCal Companies ("SunCal").  After a bidding war that involved offers from several different companies, Westland entered into a merger agreement with SunCal in which SunCal agreed to acquire Westland for a price of $315.00 per share.  Several plaintiffs challenged the merger in state court, but the cases were ultimately dismissed.  Lane then began a class action lawsuit challenging the merger under federal securities laws, alleging that the proxy statement issued in connection with the merger contained numerous material misrepresentations and omissions.

1.      **<u>Westland Development Co., Inc.</u>**

Westland was a New Mexico corporation that owned approximately 56,000 acres of land in and around western Albuquerque, New Mexico.  <u>See</u> Motion to Dismiss at 3; Amended Complaint for Violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed September 17, 2007 (Doc. 50)("Amended Complaint").  Westland acquired the land as the successor to the interests bequeathed under the Atrisco land grant, a seventeenth-century royal conveyance by the Spanish monarch.  <u>See</u> Motion to Dismiss at 3.

In 1692, when the area around Albuquerque was part of the Spanish empire, Charles II, the King of Spain, conveyed a large tract of land to several of his loyal subjects.  <u>See id.</u>  This land was

originally part of the town of Atrisco, and is on what is now the western edge of Albuquerque.  See id.  The heirs of the original grantees formed Westland in 1967, transferring their interests in the land to the corporation.  See Amended Complaint ¶ 6, at 4 (quoting "Insider Deal on the Mesa," Forbes, September 3, 2007).  The heirs became the shareholders of the new corporation.  For most of its existence, Westland's articles of incorporation prohibited the transfer of Westland stock to anyone other than an heir to the Atrisco land grant, and Westland stock was not publicly traded.  See Exhibit A to the Amended Complaint, SEC Schedule 14A Definitive Proxy for Westland Development Co., Inc. at 6 (issued September 20, 2006)("Proxy").

Westland owned about 46,400 acres of land from the Atrisco land grant.  See id.  Westland owned the mineral rights to that land, including the oil and gas rights.  See id.  Westland also owned another 10,000 acres of land located north of the original Atrisco land grant, but did not own the mineral rights to that land.  See id.  Westland was in the business of selling and developing portions of the land it held, and also leased retail property to businesses in Albuquerque and in El Paso, Texas.  See id.

### 2. **Prior Merger Offers.**

Westland had been approached several times by various parties interested in acquiring either Westland or a significant portion of its assets.  See id. at 16.  None of the inquiries ever materialized into a viable proposal, but Westland's board of directors engaged an independent company to value Westland's stock in 2001 and again in February of 2005.  See id. at 16.  The first valuation determined that Westland was worth about $70 million, or approximately $87.00 per share, while the second valuation four years later produced a figure of approximately $180.00 per share.  See id.  According to Lane, the first valuation reached a figure of $70 million only after Defendant Barbara Page, Westland's president, chief executive officer, and chief financial officer, contacted the

valuation company and ordered that the valuation be reduced.  See Amended Complaint at 20-21.

Sometime in early June or late July of 2005, Page met with Philip Aries, the head of Tucson, Arizona, based Aries Realty.  See Proxy at 17.  Aries was a representative of a group of investors interested in acquiring Westland.  See id.  The investment group and Westland embarked on a series of negotiations that ultimately resulted in a term sheet that Westland's board of directors approved on August 17, 2005.  See id. at 18.  The terms provided for the acquisition of Westland by way of merger into a newly formed company named ANM Holdings, Inc. ("ANM"), with Westland shareholders being cashed out for $200.00 per share.  See id.  The terms also permitted Westland to consider other offers in a post-signing market-check – a so-called fiduciary out.  See id.  On September 19, 2005, Westland approved the merger agreement.  See id. at 19.

Westland proceeded to consider a series of unsolicited offers that it received in the wake of publicity about the merger discussions and its filing with the Securities and Exchange Commission ("SEC") in connection with the proposed merger .  See id.  Westland determined that two of the offers it received, from Sedora Holdings, LLC ("Sedora") and Atrisco Heritage, were genuine "acquisition proposals" under the merger agreement with ANM.  See id. at 21.  Westland entered into negotiations with the companies making the offers and ultimately concluded that Sedora's offer of $255.00 per share was superior to either ANM or Atrisco Heritage's offers.  See id. at 22.  Westland exercised its rights under the fiduciary out, and ANM decided not to counter Sedora's offer.  See id.  Westland canceled its merger agreement with ANM and entered into a merger agreement with Sedora.  See id.

The new merger agreement with Sedora, like the one with ANM, had a fiduciary-out clause. On May 23, 2006, SunCal entered the picture and made a proposal to acquire Westland for $280.00 per share.  See id. at 23.

3.    **The Merger with SunCal.**

On May 31, 2006, Westland's board of directors determined that SunCal's offer was superior to Sedora's offer, and gave Sedora until June 5, 2006 to revise its offer.  See id.  After Westland's determination that SunCal's offer was superior, Westland continued to receive additional offers and Sedora also amended its offer in an effort to regain its status as the preferred buyer.  See id.  Bidding continued and SunCal increased its offer twice, ultimately arriving at a figure of $315.00 per share, an amount with which Sedora declined to compete.  See id.  Westland and SunCal formally entered into a merger agreement on July 19, 2006.  See id.

Under the terms of the merger agreement, each issued and outstanding share of Westland common stock would be converted into the right to receive $315.00 in cash, with an acquisition company created by SunCal becoming the owner of all of Westland's outstanding stock.  See id. at 26.  Additionally, a company called Atrisco LLC would be formed, which would be a vehicle for providing income from Westland's mineral rights to Westland's shareholders.  Atrisco LLC would receive all the income from Westland's existing oil-and-gas leases, plus half the income from future mineral leases on Westland property.  See id.  The agreement also provided for the creation of Atrisco Heritage Foundation ("Foundation"), a non-profit organization that was to be devoted to the cultural heritage of the Atrisco heirs.  See id. at 24, 26-27.

On September 20, 2006, Westland filed its definitive proxy statement for the merger with the SEC and mailed the Proxy to Westland's shareholders.  See Amended Complaint ¶ 3, at 1.  A shareholder meeting was convened on November 6, 2006, and on November 21, 2006, Westland announced that shareholders had approved the merger.  See id. ¶ 5, at 2.  On December 7, 2006, Westland "announced the consummation of the" merger.  Id.

4.      **Westland's Proxy Statement**.

The Proxy that Westland released in connection with the merger contained a number of statements and omissions that Lane alleges are false or misleading. These statements and omissions form the heart of this case, and are detailed individually below.

a.      **Conflicts of Interest**.

Lane alleges that the Proxy failed to fully disclose several conflicts of interest involving a number of Westland directors. The Proxy disclosed that two of Westland's board members had contracts that would result in severance payments for involuntary dismissal. According to the Proxy, Page was "employed as Westland's president and chief executive officer under a renewable six year employment agreement" that also provided for seven times her annual salary as a severance payment if her employment were involuntarily terminated. Proxy at 30. The Proxy also stated that Defendant Sosimo Padilla, Westland's chairman and executive vice president, had a consulting agreement with similar severance terms as Page's contract. See id.

In addition to those contracts, the Proxy stated that the existing Westland directors could receive future positions on the board of Atrisco LLC and as trustees of the Foundation. The existing Westland board of directors was given the power to appoint the Foundation's trustees from among Westland's shareholders, and it was considered likely that "one or more" of Westland's directors would be chosen as a trustee. Id. at 31. Atrisco LLC's board of directors was to be drawn from the Westland board of directors, although which directors would be picked was said to be undecided. See id.

According to Lane, the Proxy failed to mention that Page and Padilla's contracts were of recent vintage, having been secretly modified to secure their support for the merger. See Amended Complaint ¶¶ 39-40, at 15. He also asserts that the Proxy failed to disclose that "at least four

Westland directors were promised lifelong trusteeships" at the Foundation or on the board of Atrisco LLC, and that instead of receiving "customary fees" for their service, they were going to receive outsized "lucrative annual retainers." Id. ¶ 42, at 16.

### b.    Page's Vote Against the Merger.

Lane's complaint states that the Proxy contains nothing about the fact that Defendant Page voted against the merger at a board meeting on July 18, 2006, and that Defendant Troy Benavidez abstained from voting at the same meeting. See id. ¶¶ 44-45, at 18. The Proxy stated only, Lane notes, that Westland's board of directors recommended that the shareholders approve the merger. See id.

### c.    Westland's Directors Voting their Shares.

In a question-and-answer section about the merger, the Proxy stated that "Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement." Proxy at 10. According to Lane, despite this representation, four of the nine directors on Westland's board – Benavidez, Defendant Ray Mares, Jr., Defendant Charles Pena, and Defendant Randolph Sanchez – did not vote their Class A shares against the merger, while a fifth director – Defendant Joe Chavez – voted only 100 of his 310 Class A shares in favor of the merger. See Amended Complaint ¶ 45 & n. 4, at 18.

### d.    The Market-Check Process.

The Proxy stated that Westland was employing a market-check process in connection with the merger and that "Westland's board of directors had every reason to believe that the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland." Proxy at 27. The market check consisted primarily of the consideration of various different offers to acquire the company. See id. at 19-27. According to Lane, Westland

never actively solicited prospective bidders to secure the best value for the company. <u>See</u> Amended Complaint ¶ 46, at 19.

e.      **The Valuation of Westland.**

Lane alleges that there were two important flaws in the Proxy's disclosure of the valuations made of Westland.   The Proxy mentioned two separate valuations that the same independent valuation firm conducted – one performed in 2001, the other in 2005.   The 2001 opinion valued Westland at about $87.00 per share, <u>see</u> Proxy at 16, while the 2005 opinion valued Westland at about $180.00 per share, <u>see</u> Proxy at 27.   Lane alleges that the Proxy failed to disclose that an earlier valuation in 2001 originally valued Westland at $249 per share, but was lowered to $87 per share on Page's orders.   <u>See</u> Amended Complaint ¶ 48, at 20-21.   Lane also alleges that the 2005 opinion is undermined by the failure of the Proxy to mention an internal appraisal by Westland's vice president of sales that valued Westland at more than twice that of the 2005 opinion.   <u>See id.</u> ¶ 47, at 20.

f.      **Statement of Fairness by the Board.**

According to the Proxy, Westland's board of directors thought the merger was "fair to, and in the best interests of Westland and Westland's shareholders."   Proxy at 26.   The Proxy also states that the board held this belief, "in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders."   <u>Id.</u> at 6.

g.      **The Tax-Increment Development District.**

In discussing the board of directors' views on the merger, the Proxy asserted that Westland was a somewhat "unattractive" acquisition target because it held a "vast amount of undeveloped land" that would be very expensive and time consuming to develop.   Proxy at 27.   Additionally,

Westland was facing "significantly increasing costs . . . to develop its own land," because the City of Albuquerque would not bear infrastructure costs associated with recent Westland developments, such as the Petroglyphs.[2] Id. at 28.  Lane alleges the Proxy, however, failed to mention that "SunCal had arranged to take advantage of an October 2006 Tax  Increment Development District ("TIDD") which allowed SunCal to utilize tax dollars to fund infrastructure costs associated with the development of Westland."  Amended Complaint ¶ 51, at 22.

       h.      **Mineral Rights and Atrisco LLC.**

Lane alleges that the Proxy made four particular omissions regarding the mineral resources available to Westland and the creation of Atrisco LLC.  The Proxy stated that Westland  had no opinion as to the value of Class A stock in Atrisco LLC, and stated that Westland's management did not know if there was "oil, natural gas, coal bed methane gas or any other natural resource under Westland's land," and was "not aware of any commercially successful drilling on the property." Proxy Statement at 7.  Lane contends this statement ignores four important facts that should have been disclosed: (i) that Westland's board of directors had been informed that between 100 and 500 million barrels of oil could be located on Westland property; (ii) that Defendant Sanchez had expressed his concern at an August 29, 2005, board meeting about losing valuable water and mineral rights; (iii) that Westland had received an offer from Savant Resources to lease all of Westland's property for oil and gas exploration; and (iv) that Tecton Energy LLC had offered to expand its existing oil and gas exploration lease from 7,000 to 30,000 acres.  See Amended Complaint ¶ 52, at 23.

---

[2] The Petroglyphs are a Westland project for new home construction.  Westland was required to build the water infrastructure for the Petroglyphs and transfer title to the infrastructure to the City of Albuquerque.

i.      **Proxy Solicitors**

The Proxy included a segment dealing with proxy solicitors, which stated that "Westland expects to make arrangements with and compensate approximately 90 individuals to assist in the solicitation" of the proxies.  Amended Complaint ¶ 47, at 20 (quoting Proxy at 16).  Westland did not hire any proxy solicitors.  Lane alleges that the Defendants were aware that Westland never hired any proxy solicitors, but that SunCal retained all the proxy solicitors, "who secretly received lucrative payments for delivering votes in favor of the" merger.  Id. ¶ 57, at 25.

## PROCEDURAL BACKGROUND

Lane filed his Complaint on November 3, 2006.  See Complaint for Violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed November 3, 2006 (Doc. 1).  On the same day, Lane filed a motion for a temporary restraining order, seeking to enjoin the shareholder vote on the proposed SunCal merger.  See Request for Hearing on Motion and Memorandum of Law in Support of Plaintiff's Application for Temporary Restraining Order and Order to Show Cause why a Preliminary Injunction Should not Issue at 1, filed November 3, 2006 (Doc. 3)("Motion for TRO").  The Court held a hearing on the Motion for TRO and issued an order denying the motion.  See Order, filed November 8, 2006 (Doc. 7).

On January 19, 2007, Lane filed a motion to be appointed Lead Plaintiff and to approve his choice of lead counsel for the class.  See Lawrence Lane's Motion for Appointment as Lead Plaintiff and Approval of His Selection of Lead Counsel, filed January 19, 2007 (Doc. 27).  On February 5, 2007, Frank Martin moved to intervene in this case, seeking to challenge Lane's efforts to be appointed Lead Plaintiff.  See Motion to Intervene to Seek Order that Notice of Pendency of Action be Republished, filed February 5, 2007 (Doc. 29).  The Court denied Martin's efforts to intervene as moot, appointed Lane as Lead Plaintiff, and approved Lane's selection of Lerach Coughlin Stoia

-10-

Geller Rudman & Robbins LLP as lead counsel.  See Memorandum Opinion and Order at 23-24, filed July 2, 2007 (Doc. 43).  On September 17, 2007, Lane filed his Amended Complaint, and then on December 3, 2007, the Defendants filed their motions to dismiss.  Lane filed his response on February 18, 2008.  See Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Doc. 57)("Response").  On March 18, 2008, the director Defendants filed a reply.  See Directors' Reply in Support of their Motion to Dismiss, filed March 18, 2008 (Doc. 63)("Reply").

## STANDARDS FOR DISMISSAL UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, and view those allegations in the light most favorable to the non-moving party and draw all reasonable inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." Id. at 1965 (internal citation omitted). [T]he [United States Supreme] Court recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir.2007)(quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1967, 1969 (2007)). "The Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. at 1974.)(alterations omitted). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177.

In resolving a motion to dismiss brought under rule 12(b)(6), the court must determine whether the factual allegations are sufficient "to raise a right to relief above the speculative level," while assuming "that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 127 S.Ct. at 1965 (internal quotation marks omitted).

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." [Bell Atl. Corp. v. Twombly, 127 S Ct.] at 1974. The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).

> This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the

claim rests." [Bell Atl. Corp. v. Twombly, 127 S.Ct.] at 1965 n. 3.  See Airborne Beepers & Video, Inc. v. AT & T Mobility L.L.C., 499 F.3d 663, 667 (7th Cir. 2007) ("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.").  The Twombly Court was particularly critical of complaints that "mentioned no specific time, place, or person involved in the alleged conspiracies." 127 S. Ct. at 1971 n. 10. Given such a complaint, "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin."  Id.

Robbins v. Oklahoma, 519 F.3d at 1248.

## LAW REGARDING SANTA FE INDUSTRIES

In Santa Fe Industries, Inc. v. Green, 430 U.S. 462 (1977), the Supreme Court of the United States held that corporate mismanagement was not automatically actionable under § 10(b) of the Securities Exchange Act of 1934 ("1934 Act").  See 430 U.S. at 480.  The Supreme Court stated that it would "adhere to the position that 'Congress by 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.'" Id. at 479 (quoting Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971)).  Santa Fe Industries, Inc. v. Green involved the Delaware short-form merger law, which allowed a parent company owning at least ninety percent of the outstanding shares of a subsidiary corporation to merge with the subsidiary and cash out the minority shareholders without the prior notice or consent of the minority shareholders. See Santa Fe Industries, Inc. v. Green, 430 U.S. at 462.  The plaintiffs in the case challenged that the parent corporation had breached "its fiduciary duty to deal fairly with minority shareholders" of the subsidiary by concluding a short-form merger "without any justifible [sic] business purpose." Id. at 470 (internal quotation marks omitted).  The lower courts had found this event to create a cause of action under § 10(b) of the 1934 Act, see 430 U.S. at 470, but the Supreme Court reversed and held that the alleged breach of duty "was neither deceptive nor manipulative and therefore did not violate either" § 10(b) of the 1934 Act or SEC rule 10b-5.  430 U.S. at 474.  The Supreme Court

-13-

distinguished the situation before it from that in several others cases where a breach of fiduciary duty had been found to constitute a violation of § 10(b) of the 1934 Act, because those cases "included some element of deception."  430 U.S. at 475.

The scope of Santa Fe Industries, Inc. v. Green has been expanded to include other federal securities laws, including § 14(a) of the 1934 Act.  See Kas v. Financial General Bankshares, Inc., 796 F.2d 508, 513 (D.C. Cir. 1986).  Santa Fe Industries, Inc. v. Green "requires a court to distinguish between an actionable omission or misrepresentation of a material fact and a claim solely for breach of a state-law fiduciary duty."  Kas v. Financial General Bankshares, Inc., 796 F.2d at 513.  "A plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty."  Id. (internal quotation marks and citation omitted); In re Mesa Airlines Securities Litigation, 1996 WL 33419894 at *14 (D.N.M. 1996)(Conway, Chief J.)("[T]o be actionable the undisclosed information must be material for reasons other than mismanagement or bad faith.").

Santa Fe Industries, Inc. v. Green does not, however, "preclude an action under the Securities Exchange Act based on a material nondisclosure or misrepresentation simply because the undisclosed facts involved might also support a breach of fiduciary duty claim."  Kas v. Financial General Bankshares, Inc., 796 F.2d at 512.  The United States Court of Appeals for the District of Columbia Circuit, in Kas v. Financial General Bankshares, Inc., noted that "Santa Fe itself declares that 'the existence of a particular state-law remedy is not dispositive of the question whether Congress meant to provide a similar federal remedy' under section 10(b)."  796 F.2d at 512 (quoting Santa Fe Industries, Inc. v. Green, 430 U.S. at 478).  The proper test is that, "if the validity of a shareholder's claim of material misstatement or nondisclosure rests solely on a legal determination"

-14-

of state law, then <u>Santa Fe Industries, Inc. v. Green</u> bars the claim from being valid under federal

securities laws.  <u>Kas v. Financial General Bankshares, Inc.</u>, 796 F.2d at 513.

## LAW REGARDING SPECIFICITY REQUIRED BY THE PSLRA AND RULE 9(b)

The PSLRA amended federal securities laws and applied a heightened-pleading standard to

many securities lawsuits.  <u>See</u> PSLRA, Pub.L. No. 104-67, 109 Stat. 737, codified at  15 U.S.C. §§

78u-4 <u>et seq</u>. (2008).   The PSLRA provides that:

> (1) Misleading statements and omissions
>
> In any private action arising under this chapter in which the plaintiff alleges that the
> defendant–
>
>> (A) made an untrue statement of a material fact; or
>>
>> (B) omitted to state a material fact necessary in order to make the statements
>> made, in the light of the circumstances in which they were made, not
>> misleading;
>>
>> the complaint shall specify each statement alleged to have been misleading,
>> the reason or reasons why the statement is misleading, and, if an allegation
>> regarding the statement or omission is made on information and belief, the
>> complaint shall state with particularity all facts on which that belief is
>> formed.

15 U.S.C. § 78u-4(b)(1) (2008)("§ 78u-4(b)(1)").  The PSLRA further provides:

> (2) Required state of mind
>
> In any private action arising under this chapter in which the plaintiff may recover
> money damages only on proof that the defendant acted with a particular state of
> mind, the complaint shall, with respect to each act or omission alleged to violate this
> chapter, state with particularity facts giving rise to a strong inference that the
> defendant acted with the required state of mind.

<u>Id.</u> at § 78u-4(b)(2) ("§ 78u-4(b)(2)").  These two provisions of the PSLRA require that plaintiffs

in securities litigation, in appropriate circumstances, plead their allegations under a higher standard

than the Federal Rules of Civil Procedure would normally require.

-15-

1.    __Application of § 78u-4(b)(1) to § 14(a) Claims.__

The United States Court of Appeals for the Third Circuit has held that, under the PSLRA, "the complaint in a Section 14(a) action must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, all facts with particularity on which that belief is formed."   In re NAHC, Inc. Securities Litigation, 306 F.3d 1314, 1329 (3d. Cir. 2002)(citing and paraphrasing 15 U.S.C. § 78u-4(b)(1)).

Allegations against numerous corporate officers can raise special concerns.  The United States Court of Appeals for the Fifth Circuit has held that, when suit is filed against multiple defendants in a securities case, the PSLRA requires plaintiffs to "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud."   Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004)(internal quotation marks omitted).  The United States Court of Appeals for the Tenth Circuit, at least in context of rule 9(b) fraud pleading, has stated: "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers."  Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1254 (10th Cir. 1997).

The Tenth Circuit does not appear to have ruled yet whether the PSLRA applies to actions brought under 14(a).  Other circuits have weighed in on the issue, however, and they all seem to have uniformly concluded that § 14(a) actions are subject to the PSLRA provisions.  The United States Court of Appeals for the Ninth Circuit, for instance, has held that § 78u-4(b)(1) (as well as (b)(2)) applies to § 14(a) claims.  See Knollenberg v. Harmonic, Inc., 152 Fed.Appx. 674, 682-83

(9th Cir. 2005)(unpublished opinion).[3]   The Third Circuit has also held that the heightened requirements for pleading with particularity apply to § 14(a) claims, at least when they are based on allegations of fraud.   See California Public Employees' Retirement System v. Chubb Corp., 384 F.3d 126, 144-45 (3d Cir. 2004).

While the Tenth Circuit has not ruled on the applicability of the PSLRA to § 14(a) actions, it has elaborated on what the heightened-pleading requirements of § 78u-4(b)(1) require a plaintiff to do, although it did so in the context of an action brought pursuant to sections 10(b) and 20(a) of the 1934 Act.   See Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1087 (10th Cir. 2003).   The Tenth Circuit concluded that, "'notwithstanding the use of the word 'all,' paragraph (b)(1) [of § 78u-4] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based.'"   340 F.3d at 1098-99 (quoting Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000)).   Such a reading of 'all' would be virtually impossible for a court to implement, as no court could ever really be sure what 'all of the facts' a plaintiff was relying upon were.   Adams v. Kinder-Morgan, Inc., 340 F.3d at 1098.   Instead, the plaintiffs must "identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements. Generalized or conclusory allegations of fraud will not be sufficient." Id. at 1099.

The Tenth Circuit has adopted the United States Court of Appeals for the Second Circuit's approach to determine whether the plaintiff has pled sufficient specific facts.   This approach requires the court to evaluate "the facts alleged in a complaint to determine whether, taken as a whole, they

---

[3] The Tenth Circuit Rule 32.1(A) states: "Unpublished decisions are not precedential, but may be cited for their persuasive value."

support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." Id.  In applying this standard, the Tenth Circuit directs courts to evaluate six factors:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

Id.  After considering these enumerated factors and "measuring the nature of the facts alleged against these indicia, [if] a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." Id.  The Tenth Circuit rejected the approach that several other circuits have taken – requiring plaintiffs to disclose the source of their knowledge of the facts pled – and held that § 78u-4(b)(1) imposes no obligation for disclosure of sources on plaintiffs. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1100-02 (considering and rejecting alternate approaches by sister circuits).  "[B]y disclosing such sources plaintiffs can significantly strengthen their pleading. . . .", however, and in certain circumstances with very general allegations, it "may . . . be necessary to plead the source of the information in order to satisfy the particularity requirement of § 78u-4(b)(1)."  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1102.  Overall, the Tenth Circuit characterizes the proper approach to applying the heightened-pleading standards of § 78u-4(b)(1) as involving " a common-sense, case-by-case approach."  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1102.

### 2.     Application of § 78u-4(b)(2) to § 14(a) Claims.

Case law indicates that negligence can be an appropriate basis for a § 14(a) claim.  See, e.g., Wilson v. Great American Industries, Inc., 855 F.2d 987, 995 (2d Cir. 1988)(stating that "liability

can be imposed for a negligently drafted proxy statement"); New Jersey v. Sprint Corp., 531 F.Supp.2d 1273, 1285 (D. Kan. 2008)(finding that § 14(a) claim sounded in negligence).  The Tenth Circuit, however, has not ruled whether § 78u-4(b)(2) applies to § 14(a) actions that are brought pursuant to a negligence theory.  The United States Court of Appeals for the Eighth Circuit has recently reaffirmed its precedents holding that negligence is a state of mind and that § 78u-4(b)(2) applies to actions brought under § 14(a) alleging negligent misrepresentation.  See Little Gem Life Sciences, LLC v. Orphan Medical, Inc., __ F.3d __, 2008 WL 3266664, *3 (8th Cir. 2008)(finding argument that negligent misrepresentation actions do not involve a state of mind to be "unpersuasive and unsupported by precedent.")(citing United States v. Robinson, 429 F.3d 777, 780 (8th Cir. 2006)).  Other courts have held that § 78u-4(b)(2) applies to claims brought under a negligence theory.  See e.g., Knollenberg v. Harmonic, Inc., 152 Fed.Appx. at 682-83 (citing In re McKesson HBOC, Inc. Securities Litigation, 126 F.Supp. 2d 1248, 1267 (N.D. Cal. 2000));[4] In re JPMorgan Chase & Co. Securities Litigation, 2007 WL 4531794, at *7 (N.D. Ill. 2007)(unreported opinion)(noting that it agreed with the majority of circuit courts that had considered the issue in holding negligence to be a state of mind covered by § 78u-4(b)(2)).

Despite the lack of any controlling cases on the issue, the Tenth Circuit has held, albeit in a different context, that "negligence is conduct, and not a state of mind." United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005)(quoting W. Keeton, Prosser and Keeton on Torts § 31 (5th ed. 1984)).  United States v. Ortiz dealt with negligence under the Clean Water Act, and the Tenth Circuit found no reason to depart from the ordinary meaning of negligence, which did not involve

---

[4] The court in In re McKesson HBOC, Inc. Securities Litigation, however, was dealing with a situation in which the plaintiff had conceded that negligence was a state of mind, and the issue then was whether negligence was covered by the statute given that concession.  See id.

a state of mind element.  See id. at 1282-83.  The only opinion of which the Court is aware from any federal court within the Tenth Circuit dealing with this precise issue concluded that it was unnecessary to reach the issue, because the plaintiff's complaint would be able to satisfy the heightened requirements.  See New Jersey v. Sprint Corp., 531 F.Supp.2d at 1285-86.

       **3.**       **Rule 9(b) of the Federal Rules of Civil Procedure.**

Rule 9(b) imposes a heightened-pleading requirement for claims sounding in fraud that is independent of the pleading requirements for securities litigation under the PSLRA.  Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  A properly pled claim of fraud will "set forth the time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof."  Koch v. Koch Indus., 203 F.3d 1202, 1236 (10th Cir. 2000)(quoting In re Edmonds, 924 F.2d 176, 180 (10th Cir. 1991)).  "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud." United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 727 (10th Cir. 2006)(quoting Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997)).

It is unclear in the Tenth Circuit, however, whether rule 9(b) applies to all securities cases. The PSLRA pleading requirements for state of mind are more stringent than rule 9(b), so the "PSLRA supersedes [the] part of Rule 9(b)" allowing for general allegations of mental states. Adams v. Kinder-Morgan, Inc., 340 F.3d at 1096.  It is unclear whether the remainder of rule 9(b), requiring pleading the circumstances of fraud with particularity, imposes any burden beyond that already laid upon a plaintiff by § 78u-4(b)(1).

Moreover, the Tenth Circuit has not applied rule 9(b) to claims based on negligent misrepresentation.  See City of Raton v. Arkansas River Power Authority, No. CIV 08-0026 JB/WDS, Memorandum Opinion and Order at 16, filed September 17, 2008 (D.N.M.)(Browning, J.)(noting that only a single district court case has applied rule 9(b) to negligent misrepresentation claims).  Negligent misrepresentation and fraud claims have different elements.  Most notably, negligent misrepresentation focuses on what a defendant did and what a reasonable person in the defendant's circumstances would have done, while fraud claims focus on the actual knowledge that the defendant possessed.  See id. at 17-18.

## LAW REGARDING § 14(a) AND MATERIALITY OF STATEMENTS

Section 14(a) of the 1934 Act provides:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

15 U.S.C. § 78n(a) (2008)("§ 14(a)").  Rule 14a-9, which the SEC enacted pursuant to its authority to regulate proxy solicitations under § 14(a), provides the substantive content for many claims under § 14(a).  That rule provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9 (2008)("rule 14a-9").

-21-

The elements of a claim under § 14(a) of the 1934 Act and rule 14a-9 are threefold.  The plaintiff must establish that: (i) the proxy statement contained a material misrepresentation or omission; (ii) that the defendants were at least negligent; and (iii) that the proxy statement was an essential link in the completion of the transaction at issue.  See Mills v. Auto-Lite Co., 396 U.S. 375, 385 (1970); Boone v. Carlsbad Bancorp., Inc., 1988 WL 341347, at *10 (D.N.M. 1988)(citing Wilson v. Great American Industries, Inc., 661 F.Supp. 1555, 1562 (N.D.N.Y. 1987)).

The Supreme Court has made the definition of materiality in securities cases turn on a reasonable shareholder standard.  "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Garcia v. Cordova, 930 F.2d 826, 829 (10th Cir. 1991). As the Supreme Court has stated, this standard

> does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.

TSC Industries, Inc. v. Northway, Inc., 426 U.S. at 449.

A court must look to the contemporaneous facts surrounding a representation to determine whether it was false.  See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093-94 (1991). But corporations and corporate officers also have an ongoing duty to ensure that later events do not render a disclosure misleading.  The Second Circuit has held that management "'cannot lawfully sit by and allow shareholders to approve corporate action on the basis of a proxy statement without disclosing facts arising since its dissemination if these are so significant as to make it materially misleading, and we have no doubt that Rule 14a-9 is broad enough to impose liability for

non-disclosure in'" such situations.  SEC v. Parklane Hosiery Co., Inc., 558 F.2d 1083, 1089 n.3 (2d

Cir. 1977)(quoting Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1297 n. 15 (2d Cir. 1973).

 Corporate directors' opinions can be material.  See SEC v. Parklane Hosiery Co., Inc., 558

F.2d 1083 at 1090-91.  As the Supreme Court stated in Virginia Bankshares, Inc. v. Sandberg:

> Shareholders know that directors usually have knowledge and expertness far
> exceeding the normal investor's resources, and the directors' perceived superiority
> is magnified even further by the common knowledge that state law customarily
> obliges them to exercise their judgment in the shareholders' interest.  Naturally, then,
> the shareowner faced with a proxy request will think it important to know the
> directors' beliefs about the course they recommend and their specific reasons for
> urging the stockholders to embrace it.

501 U.S. at 1091. On the other hand, the Supreme Court also found "mere disbelief or undisclosed

motivation, standing alone,  insufficient to satisfy the element of fact that must be established under

§ 14(a)."  Id. at 1096.

 For a proxy statement to avoid being materially false or misleading, it does not need to reveal

all details at issue, or use any particular language, but must create only a "sufficiently accurate

picture so as not to mislead."  Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 2000

(2d Cir. 1978).  Among the information that need not be disclosed, according to the United States

Court of Appeals for the Sixth Circuit, is so-called "soft information."  In re Ford Motor Co.

Securities Litigation, 381 F.3d 563, 569 (6th Cir. 2004).  Soft information includes "information that

is uncertain and not objectively verifiable such as 'predictions, matters of opinion, and asset

appraisals.'"  Id. (quoting Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001)).

## LAW REGARDING § 20(a) CONTROL PERSON CLAIMS

 Section 20(a) of the 1934 Act provides for "control person" liability.  Section 20(a) claims

are essentially derivative of other securities claims – § 14(a) claims in this case.  Section 20(a)

provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (2008).  The Tenth Circuit has interpreted this statutory provision to require that, "to state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1270-71 (10th Cir. 2001)(quoting Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998)).

The Tenth Circuit has "expressly 'reject [ed] those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.'"  Maher v. Durango Metals, Inc., 144 F.3d at 1305 (quoting Central Bank of Denver v. First Interstate Bank of Denver, 969 F.2d 891, 897 (10th Cir. 1992), rev'd on other grounds by Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994)).  Instead, "once the plaintiff establishes the prima facie case, the burden shifts to the defendant to show lack of culpable participation or knowledge."  Maher v. Durango Metals, Inc., 144 F.3d at 1306.

## ANALYSIS

The Defendants argue that the Court should dismiss Lane's Amended Complaint pursuant to rules 9(b) and 12(b)(6).  Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, and view those allegations in the light most favorable to the non-moving party and draw all reasonable inferences in the plaintiff's

favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Housing Authority of Kaw

Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).  The Supreme Court recently

heightened the standards regarding the level of detail with which a complaint must be pled in Bell

Atlantic  Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).  These new pleading requirements are

not at issue, however, because, as explained below, the Court holds that the pleading standards of

the PSLRA are applicable to Lane's allegations, and those standards are stricter than the rule

12(b)(6) standards.  Despite the heightened standards, however, Lane remains entitled to have his

allegations assumed to be true for the purposes of these motions to dismiss.

The Defendants argue that there are several reasons why the Court should dismiss the

Amended Complaint: (i) Lane's § 14(a) claims are nothing more than repackaged state-law claims

that cannot be brought in a federal-securities action; (ii) the PSLRA applies a heightened-standard

of pleading with which the Amended Complaint does not comply; (iii) none of the statements or

omissions that Lane identifies are materially false or misleading; and (iv) Lane's § 20(a) claim

cannot remain once the Court dismisses the § 14(a) claim.

## I.        LANE'S CLAIMS ARE NOT IMPERMISSIBLE STATE LAW CLAIMS.

Santa Fe Industries, Inc. v. Green and its progeny bar a plaintiff from raising certain claims

in a federal-securities lawsuit that are essentially state-law claims of corporate mismanagement or

breach of fiduciary duties. 430 U.S. at 479 ("Congress by [§] 10(b) did not seek to regulate

transactions  which  constitute  no  more  than  internal  corporate  mismanagement." (quoting

Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. at 12 (internal quotation marks

omitted)).  The Defendants contend that "the heart" of Lane's claims "is that the Directors [of

Westland] did not believe that the merger was in the best of interests of shareholders."  Motion to

Dismiss at 8. Lane, the Defendants argue, is "impermissibly attempting to disguise [his] previously-

dismissed breach of fiduciary duty/mismanagement claims as a § 14(a) claim by essentially alleging that the Directors failed to disclose some alleged wrongdoing." Id. at 8-9.  Lane counters by stating the claims asserted meet the necessary elements in federal law and that because a claim may be asserted as a state law claim as well as a federal claim does not mean that the federal claim is an impermissible one.  See Response at 14, n. 20.  Lane is correct; the Amended Complaint raises claims that may also be asserted as state law-claims, but the claims are nonetheless  permissible in federal court because they fit within the requirements of § 14(a).

Santa Fe Industries, Inc. v. Green and the line of cases following it do not hold that claims cognizable as state-law causes of actions are disqualified from being raised as federal securities claims.  Instead, Santa Fe Industries, Inc. v. Green stands for the more modest proposition that corporate mismanagement or breach of fiduciary duty are not actionable under § 10(b) of the 1934 Act simply by virtue of being violations of state-corporate law.  See 430 U.S. at 480.  So long as the asserted claim meets the elements of a federal cause of action, it may be brought as a federal-securities claim, even though the underlying facts would also allow it to be brought as a claim under state-corporate law.  Santa Fe Industries, Inc. v. Green stated that the alleged breach of duty at issue "was neither deceptive nor manipulative and therefore did not violate either" § 10(b) of the 1934 Act or SEC rule 10b-5.  430 U.S. at 474.  The Supreme Court distinguished the situation before it from earlier cases from other courts which found breaches of fiduciary duties actionable because those breaches involved "some element of deception."  Id. at 475.  Notably, the Supreme Court did not distinguish those earlier cases on the basis that they involved impermissible claims.

The District of Columbia Circuit has elucidated a test that accurately captures what Santa Fe Industries, Inc. v. Green requires.  As the District of Columbia Circuit stated: "Santa Fe itself declares that 'the existence of a particular state-law remedy is not dispositive of the question

whether Congress meant to provide a similar federal remedy' under section 10(b)." Kas v. Financial General Bankshares, Inc., 796 F.2d at 512 (quoting Santa Fe Industries, Inc. v. Green, 430 U.S. at 478). The proper test is that, "if the validity of a shareholder's claim of material misstatement or nondisclosure rests solely on a legal determination" of state law, then Santa Fe Industries, Inc. v. Green bars the claim from being valid under federal-securities laws. Kas v. Financial General Bankshares, Inc., 796 F.2d at 513.

None of the claims raised by Lane would fall within the category of impermissible claims under Santa Fe Industries, Inc. v. Green and related cases. So long as a claim meets the elements of a federal cause of action, it is allowable, unless the claim's validity turns solely on an issue of state law. In other words, a claim would be barred if it required the Court to find a breach of fiduciary duties or some other violation of state-corporate law to find for Lane. But none of the claims in the Amended Complaint require such a determination. Several of the claims, such as the claim that the directors of Westland falsely stated that they believed the merger to be in the shareholders' best interests, rest on a foundation that could also support various state-law claims for corporate malfeasance. But such overlap is not fatal or relevant to the claims' validity as federal causes of action. A single factual scenario may be cognizable as both a violation of federal-securities law and a violation of state-corporate law. The Court will not be required to find that any of the Defendants are in violation of state-corporate laws for Lane's claims to succeed. The particulars of New Mexico state law are irrelevant to the Defendants' liability in this case, and the Court does not need to consider New Mexico's corporate law. Accordingly, Santa Fe Industries, Inc. v. Green is not an obstacle to the claims the Amended Complaint raises.

## II.    THE PSLRA APPLIES TO CLAIMS UNDER § 14(a).

There are two separate heightened-pleading provisions of the PSLRA that are at issue: §§ 78u-4(b)(1) and 78u-4(b)(2).  Lane contends that neither section is applicable to this case. The Defendants contend that Lane's pleadings must satisfy both sections.

### A.    SECTION 78u-4(b)(1) APPLIES TO CLAIMS UNDER § 14(a).

Section § 78u-4(b)(1)'s plain language requires that the Court apply it to claims brought pursuant to § 14(a).  Lane argues that there is no controlling Tenth Circuit precedent applying § 78u-4(b)(1) to § 14(a) claims, but any argument that the Court should treat § 14(a) actions differently from other securities actions, such as § 10(b) claims, is unpersuasive.  The absence of authority in the Tenth Circuit, of course, does not require the Court to find the PSLRA inapplicable.  Without any relevant case law or strong reasoning raised contrary to it, the Court must follow the statute's plain meaning, which would make § 78u-4(b)(1) of the PSLRA apply to Lane's claims under § 14(a).

Section 78u-4(b)(1) applies to "any private action arising under this chapter."  15 U.S.C. § 78u-4(b)(1) (2008).  "[T]his chapter" refers to Chapter 2B of Title 15, which is the codification of the 1934 Act, and which contains § 78n (§ 14(a) of the 1934 Act), the statutory basis for the claims that Lane is asserting.  Lane's claim is therefore a "private action arising under this chapter" by the statute's plain terms.

Before § 78u-4(b)(1) applies, however, a plaintiff must also be making an allegation that the defendants "made an untrue statement of material fact" or "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading."  15 U.S.C. § 78u-4(b)(1).  Once again, however, the statute's plain language embraces Lane's claims.  All of Lane's claims ultimately depend upon such statements or omissions.

-28-

Section 78u-4(b)(1) is noticeably devoid of any mental state requirement or other element which would prevent its application to negligently made statements or omissions.

That other courts have reached the same conclusion bolsters the conclusion that the statute's plain language covers negligently made statements or omissions. The Ninth Circuit, for instance, has held that § 78u-4(b)(1), as well as (b)(2), applies to § 14(a) claims. See Knollenberg v. Harmonic, Inc., 152 Fed.Appx. at 682-83. The Third Circuit has also held that the heightened requirements for pleading with particularity apply to § 14(a) claims, at least when they are based on allegations of fraud. See California Public Employees' Retirement System v. Chubb Corp., 384 F.3d 126, 144-45 (3d Cir. 2004). While the Third Circuit was not addressing a negligence claim, there is nothing in the language of § 78u-4(b)(1) to indicate why the Court should treat negligence and fraud claims differently under this particular provision.

The statutory language unambiguously encompasses claims such as the § 14(a) negligence claims that Lane asserts. There is no authority, either within the Tenth Circuit or elsewhere, indicating that such claims are not within § 78u-4(b)(1)'s purview. Accordingly, that provision of the PSLRA applies to Lane' allegations.

**B.    THE COURT NEED NOT DECIDE WHETHER SECTION 78u-4(b)(2) APPLIES TO CLAIMS UNDER § 14(a) THAT ARE BASED ON NEGLIGENCE.**

There is no Tenth Circuit precedent dictating that the Court rule one way or the other regarding the applicability of § 78u-4(b)(2) to § 14(a) claims premised upon negligence. To the Court's knowledge, no district court within the Tenth Circuit has squarely confronted the question either. Given the state of the law, the Court need not rule whether § 78u-4(b)(2) applies to a negligence claim asserted under § 14(a), because Lane's pleadings are sufficient even under the heightened standard, and thus the resolution of this point is not necessary to ruling on the motions.

-29-

Section 78u-4(b)(2) applies only where a defendant's "state of mind" is a relevant element of the claim. See 15 U.S.C. 78u-4(b)(2) ("In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind . . ." then subsection applies.). Tenth Circuit precedent indicates that negligence is not a state of mind, but rather is to be treated as conduct. See United States v. Ortiz, 427 F.3d at 1283. While the context of this precedent is the Clean Water Act and not the PSLRA, there is nothing in the PSLRA or the authorities from other circuits cited by the Defendants that indicates the statute itself meant to define "state of mind" in some unique way. Thus, the precedent in the Tenth Circuit would tend to point to § 78u-4(b)(2) not being applicable to a negligence claim under § 14(a).

This conclusion, however, would run contrary to the holding of a number of other courts. The Eighth Circuit has recently reaffirmed that negligence is a state of mind and that § 78u-4(b)(2) does apply to actions brought under § 14(a) alleging negligent misrepresentation. See Little Gem Life Sciences, LLC v. Orphan Medical, Inc., __ F.3d __, 2008 WL 3266664 at *3 (finding argument that negligent misrepresentation actions do not involve a state of mind to be "unpersuasive and unsupported by precedent.")(citing United States v. Robinson, 429 F.3d at 780). Other courts have reached a similar result. See, e.g., Knollenberg v. Harmonic, Inc., 152 Fed.Appx. at 682-83 (citing In re McKesson HBOC, Inc. Securities Litigation, 126 F.Supp. 2d at 1267); In re JPMorgan Chase & Co. Securities Litigation, 2007 WL 4531794, at *7 (noting that it agreed with the majority of circuit courts that had considered the issue in holding negligence to be a state of mind covered by § 78u-4(b)(2)).

These holdings are not, however, completely persuasive. In re McKesson HBOC, Inc. Securities Litigation, for example – which Knollenberg v. Harmonic, Inc. relies on exclusively for support for its holding – involved a situation where the plaintiff had already conceded that

negligence was a "state of mind."  In re McKesson HBOC, Inc. Securities Litigation, 126 F.Supp. 2d at 1267.

Moreover, the Court is not persuaded that negligence is a state of mind.  Negligence is associated with tort claims where the tortfeasor has acted unreasonably, not where they acted intentionally.  See, e.g., 65 C.J.S. Negligence § 5 (2008)("'Negligence' is characterized as mere thoughtlessness or inadvertence or simple inattention.  The essence of negligence is behavior creating an unreasonable danger to others.")(footnotes omitted); id. § 7 ("[N]egligence measures behavior against the objective standard without reference to defendant's state of mind.").  The Court is inclined to agree with the Tenth Circuit's statement in United States v. Ortiz that "negligence is conduct, and not a state of mind."  427 F.3d at 1283.  See City of Raton v. Arkansas River Power Authority, Memorandum Opinion and Order at 18.

Even though the Court is not completely persuaded by the reasoning of the Eighth Circuit cases, the Court declines to go against the apparent trend when it is not necessary to do so and will instead follow the example of the United States District Court for the District of Kansas.  See New Jersey v. Sprint Corp., 531 F.Supp.2d at 1285-86 (declining to rule on issue of § 78u-4(b)(2)'s applicability to negligence claims because allegations were sufficient under that standard).  The Amended Complaint would meet § 78u-4(b)(2)'s requirements.  Accordingly, the Court need not decide whether that standard applies to this case.

### C.   LANE'S ALLEGATIONS SATISFY THE PSLRA'S HEIGHTENED-PLEADING STANDARDS.

Lane's allegations are sufficiently pled to meet the requirements of both § 78u-4(b)(1) and of § 78u-4(b)(2).  Section 78u-4(b)(1) applies to Lane's pleading.  And for the purposes of this opinion, the Court will assume that § 78u-4(b)(2) does as well.

Section 78u-4(b)(1) requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity all facts on which" the statement is believed to be misleading. 15 U.S.C. § 78u-4(b)(1). The Tenth Circuit does not require a plaintiff to plead literally "all" the facts underlying the belief. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1098-99. The Tenth Circuit has noted that such a reading of 'all' would be virtually impossible for a court to implement, as no court could be sure upon what "all of the facts" a plaintiff was relying. Id. at 1098. Instead, plaintiffs are required to "identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements." Id. at 1099.

This approach requires the court to evaluate "the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." Id. In applying this standard, the Tenth Circuit directs courts to evaluate six factors:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

Id. After considering these enumerated factors and "measuring the nature of the facts alleged against these indicia, [if] a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." Id. A plaintiff is not required to plead the source of their facts, although such pleading can bolster the case. Id. at 1102. Overall, the Tenth Circuit characterizes the proper approach to applying § 78u-4(b)(1)'s heightened- pleading standards

-32-

as involving " a common-sense, case-by-case approach." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1102.

Following this approach, the Court concludes that the allegations which Lane makes in his Amended Complaint are sufficiently particularized. All of the allegations are detailed and plausible; while Lane does not always disclose the sources of his allegations, the Tenth Circuit does not require such disclosures. See id. at 1102. Lane specifies each omission or statement that he alleges to be false or misleading and provides details regarding why the statement or omission is false or misleading. See Amended Complaint ¶¶ 38-58, at 14-25.

For example, in laying out his allegations regarding Page's employment contract, Lane points to the specific statement in the Proxy he is challenging. See id. ¶ 39, at 14-15. Lane alleges that the statement is false and misleading, and gives his reasoning as to why it is false or misleading – because Page's employment contract had been modified in connection with the agreement. He gives a motive for the change – to gain Page's support for the merger. And finally, Lane states that the Defendants were aware of all these facts, or had access to these facts. See id. ¶ 29, at 15. All of the other allegations Lane makes are similarly detailed, and all are coherent and plausible.

Having considered each of the pleadings under the six-factor test laid down by the Tenth Circuit, and having considered the arguments the parties have made in their briefs and during oral argument at the hearing, the Court finds the pleadings to be made with sufficient particularity. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1099.

The Defendants argue that the allegations as a whole must fail because of their reliance upon group pleading. See Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d at 365 (holding that "the PSLRA requires plaintiffs to distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud.")(internal quotation marks omitted).

Whatever the merits of the doctrine against group pleading are, it is not a particularly apt standard to apply to this case.  All of the individual Defendants were involved in approving and issuing the Proxy.  Lane does not allege, with a few exceptions, that various individual Defendants had particular roles to play in issuing the Proxy.  Rather, his claim centers on an allegation that the Proxy contains false and misleading statements and omissions, and that each individual Defendant was negligent in allowing the Proxy to issue in such a state.  It is difficult to see how Lane could have pled this case differently.  He might have replaced each appearance of the phrase "the Defendants" with a list of names, or stated each paragraph of the Amended Complaint multiple times, each time mentioning a different named Defendant.  But requiring this form of pleading would be elevating form over substance.  Such a pleading style would not be particularly useful; in fact, it would likely make the complaint more cumbersome and confusing, making it harder for the individual Defendants to understand what violations they are alleged to have committed.  Lane's allegations are essentially that each Defendant is liable for the act of negligently allowing or causing the Proxy to be issued.  Given that the claim is the same regarding each Defendant, the pleading style adopted here is appropriate.

Moreover, the Tenth Circuit has not adopted the doctrine the Defendants urge.  Southland Securities Corp. v. INSpire Ins. Solutions, Inc. is a Fifth Circuit case.  The case law from the Tenth Circuit runs counter to the standard the Defendants propose, at least in cases similar to this action. The Tenth Circuit has stated, post-PSLRA, that: "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers."  Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1254.  Schwartz v. Celestial Seasonings, Inc. involved the pleading requirements for § 10(b) fraud claims under rule

9(b), but the underlying policy is the substantially similar.  There is no reason for the Court to impose a higher pleading standard in this case absent controlling precedent mandating it, and indeed, the Tenth Circuit case law suggests that the Court should not apply the standard that the Defendants advocate.

Lane's allegations are also sufficient under § 78u-4(b)(2).  This provision requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  In this case, the required state of mind, assuming for these purposes that it is a state of mind, is negligence.  The Defendants contend that Lane's claims are claims sounding in fraud.  See Motion to Dismiss at 8.  The Court disagrees.

Case law indicates that negligence can be an appropriate basis for a § 14(a) claim.  See e.g., Wilson v. Great American Industries, Inc., 855 F.2d at 995 (stating that "liability can be imposed for a negligently drafted proxy statement"); New Jersey v. Sprint Corp., 531 F.Supp.2d at 1285 (finding that § 14(a) claim sounded in negligence).  Lane is not required to bring his § 14(a) claim on a theory of fraud, and indeed, Lane casts his allegations as being based on negligence, not fraud. See Amended Complaint ¶ 63, at 26.  Lane's characterization is not dispositive, though, and indeed, many of the factual scenarios Lane details in his allegations could also reasonably support a claim of fraud.  But merely because Lane could have drafted his Amended Complaint to make a claim of fraud does not mean he must plead fraud.  See New Jersey v. Sprint Corp., 532 F.Supp. 2d at 1284-85 (holding that, although underlying facts also supported § 10(b) fraud claim, and plaintiff used language associated with fraud claims, § 14(a) claims were denoted as negligence claims and allowable as such).

What is required of Lane is that he "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  That

Lane has done.  The Defendants argue that Lane merely makes a conclusory allegation of negligence by the directors.  See Reply at 4.  This argument, however, takes one lone paragraph of the Amended Complaint as being the entirety of Lane's pleadings.  For each statement or omission, Lane has alleged certain facts "known by, or available to" the Defendants.  E.g., Amended Complaint ¶ 52, at 23.  Taken as a whole, Lane's allegations state the Defendants issued a Proxy containing numerous misrepresentations and omissions, that the Defendants had knowledge of or access to facts about the false or misleading nature of these misrepresentations and omissions, that these amounted to a violation of SEC rules and securities laws, and that nonetheless they issued the Proxy.  All of this detail gives rise to the requisite strong inference of negligence.

### D.   FEDERAL RULE OF CIVIL PROCEDURE 9(b) DOES NOT APPLY.

The Defendants also allege that rule 9(b) applies to Lane's allegations because his claims sound in fraud.  See Motion to Dismiss at 8.  For the same reason that the Court finds that the claims in the Amended Complaint are premised on negligence for purposes of the PSLRA, the claims sound in negligence and not fraud for rule 9(b)'s purposes.  This conclusion is bolstered by the fact that the Tenth Circuit has not applied rule 9(b) to cases of negligent misrepresentation.  See City of Raton v. Arkansas River Power Authority, Memorandum Opinion and Order at 16.  Negligent misrepresentation is concerned with whether a defendant acted reasonably, not with whether the defendant had a particular state of mind and was acting with the intent to deceive.  See id. at 17.

Even if Lane's allegations were subject to rule 9(b)'s pleading requirements, nothing in the Court's analysis would change.  In the Tenth Circuit, a properly pled claim of fraud will "set forth the time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof."  Koch v. Koch Industries., 203 F.3d at 1236 (quoting In re Edmonds, 924 F.2d at 80).  The PSLRA pleading requirements for state of mind are more

stringent than rule 9(b), so the "PSLRA supersedes [the] part of Rule 9(b)" allowing for general allegations of mental states.  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1096.  Section 78u-4(b)(1)'s particularity requirements also seem to impose a burden at least as onerous as rule 9(b).  Any claim capable of passing through the hoops of both § 78u-4(b)(1) and § 78u-4(b)(2) will necessarily be sufficiently pled to satisfy rule 9(b).  Because Lane's claims can satisfy the PSLRA requirements, rule 9(b) will not require their dismissal.

III.    **MATERIALITY OF STATEMENTS AND OMISSIONS IN THE PROXY.**

The core of Lane's § 14(a) complaint is a series of alleged misrepresentations and omissions in the Proxy Westland disseminated. The elements of a claim under § 14(a) of the 1934 Act and rule 14a-9 are that: (i) the Proxy contained a material misrepresentation or omission; (ii) that the defendants were at least negligent; and (iii) that the Proxy was an essential link in the completion of the transaction at issue.  See Mills v. Auto-Lite Co., 396 U.S. at 385; Boone v. Carlsbad Bancorp., Inc., 1988 WL 341347, at *10 (citing Wilson v. Great American Industries, Inc., 661 F.Supp. at 1562.

The Defendants challenge the various statements or omissions that Lane has singled out as being either not false or misleading, or not material.  The Supreme Court's definition of materiality in securities cases states: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Industries, Inc. v. Northway, Inc., 426 U.S. at 449.  See Garcia v. Cordova, 930 F.2d at 829.  Under this standard, several of the alleged misrepresentations or omissions are not materially false or misleading, and the Court will dismiss claims based on those misrepresentations or omissions, but many of the alleged misrepresentations and omissions are material and survive the motion for summary judgment.  The Court will address separately each individual statement or omission which the

-37-

Defendants argue the Court should dismiss.  While the Court will focus on the issue of materiality, it will also address some issues related to pleading requirements, as the two are inextricably linked in many situations.

### A. THE CONFLICT OF INTEREST DISCLOSURES WERE NOT OR MISLEADING AND ANY OMISSIONS WERE NOT MATERIAL.

As part of the Proxy's disclosure of potential conflicts of interest, it was revealed that Page was "employed as Westland's president and chief executive officer under a renewable six year employment agreement" that also provided for seven times her annual salary as a severance payment if her employment were involuntarily terminated.  Proxy at 30.  Lane contends that the Defendants knew, or had facts available to them, which would demonstrate that Page's employment agreement did not provide for six-year terms or a severance payment equal to seven years salary, "but rather the agreement had been secretly modified in connection with the sale of Westland to encourage Page's cooperation in the wrongdoing alleged" in the Amended Complaint.  Amended Complaint ¶ 39, at 14-15.  The Proxy also states that Padilla, Westland's chairman and executive vice president, had a consulting agreement with similar severance terms as Page's contract.  See Proxy at 30.  Lane alleges that this agreement was also secretly modified to gain Padilla's support for the merger.  See Amended Complaint ¶ 40, at 15-16.[5]

Lane alleges that, in addition to Page and Padilla's contracts, there was another undisclosed conflict of interest because the Proxy did not reveal that "at least four Westland directors were promised lifelong trusteeships" in the Atrisco Heritage Foundation or promised positions as

---

[5] Paragraph 41 of the Amended Complaint alleges that the Proxy says on page 30 that Padilla may be paid $350,000 per a consulting agreement under "undefined circumstances."  The Court cannot find any language on or around that page similar to what Lane alleges.

directors of Atrisco LLC to secure their support for the merger.  Amended Complaint ¶ 42, at 16. The Proxy indicates that Westland directors could become directors of Atrisco LLC and that some were likely to become Foundation trustees, but declares that no definite arrangements had been made.  See Proxy at 31.

The Defendants argue that there is nothing false or misleading about the employment and consulting agreement disclosures in the Proxy, that Lane's allegations of falsity and secret modifications are not particularized enough, and that any secret motivations were not material facts that the Proxy should have disclosed.  See Motion to Dismiss at 21; Kas v. Financial General Bankshares, Inc., 796 F.2d at 517.  Lane counters that the statements were false and that the Proxy should have informed the shareholders that the employment and consulting agreements were made to the Defendants "to gain their support in the Proxy for the Merger."  Response at 13.

With regards to the future positions with Atrisco LLC and the Foundation, the Defendants argue that the Proxy gave sufficient disclosure to put shareholders on notice of a potential conflict, and that the Proxy was completely accurate, because at the time, no decisions had been made of which the directors were aware about trusteeships or director positions at Atrisco LLC.  See Motion to Dismiss at 23.  At the hearing, the Defendants emphasized that the Proxy stated specifically that the initial directors of Atrisco LLC would all be Westland directors.  What had not been determined at the time of the Proxy was which directors would be selected.  See Tr. at 114-15 (Schneebeck).

The Proxy's disclosures regarding Page and Padilla's agreements, and regarding the trustee- and directorships, are sufficient.  The existence of the agreements and their terms are clearly spelled out, and Lane does not contend that the terms are different than those disclosed; they are preceded by a warning to the shareholders that the interests of the officers mentioned "are different from your interests as a shareholder and that may present actual or potential conflicts of interest."  Proxy at 29.

-39-

This disclosure is sufficient to put a reasonable shareholder on notice of possible conflicts of interest.

A proxy statement need not reveal every detail involved in a transaction; it only needs to paint a "sufficiently accurate picture so as not to mislead." Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d at 2000. The possibility of a conflict was disclosed in plain terms. The agreements may have been modified before the merger, but the new terms were fully disclosed. Any hidden motivations that the officers may have had are not material in these circumstances and need not have been revealed. See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. at 1096 (holding that "proof of mere disbelief or belief undisclosed should not suffice for liability under § 14(a)"). The important fact was the objective possibility of a conflict, not the subjective intentions and thoughts of the officers, and the Proxy disclosed the possibility of a conflict.

Similarly, the Proxy also clearly indicated that the initial board of directors of Atrisco LLC would be composed solely of former Westland directors, who would serve two-year terms. See Proxy at 31. The Proxy went on to say that it was "likely that one or more of Westland's current directors will be asked to serve as a trustee of the Foundation." Id. Moreover, the Westland board of directors was given the sole power to select the trustees of the Foundation. Again, this disclosure would be sufficient information to put a reasonable shareholder on notice of potential conflicts of interest. Lane's conclusory allegations that various positions and lucrative payments were promised in advance are insufficiently particular to require disclosure. Discovery may reveal more information that will change the situation, but for now, the Court finds that the alleged conflicts of interest were sufficiently disclosed and there are no material omissions regarding them.

**B.**   **THE STATEMENT THAT WESTLAND'S DIRECTORS INTENDED TO VOTE THEIR SHARES FOR THE MERGER WAS MATERIALLY MISLEADING.**

The Proxy stated that "Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement." Id. at 10.  Lane alleges that this statement was materially false and misleading, as four of the nine directors – Benavidez, Mares, Pena, and Sanchez – did not ultimately vote their Class A shares against the merger, while a fifth director – Chavez – voted only 100 of his 310 Class A shares in favor of the merger.  See Amended Complaint ¶ 45 & n.4, at 18. According to the Defendants, Lane's allegations are just "classic 'fraud by hindsight' and cannot support a 14(a) claim." Motion to Dismiss at 15. They argue that Lane has not made any allegations that the Defendants who ultimately did not vote their shares in favor of the merger were planning to so vote when the Proxy was actually issued.

At the hearing, Lane contended that the Proxy must be true at the time of the shareholders' vote, and that when the directors became aware that some directors were not going to vote their shares as the Proxy indicated, it was their obligation to the shareholders of Westland to amend the Proxy to reflect this new and pertinent information.  See Tr. at 94-95 (Robbins).  The Defendants conceded that they did have an ongoing obligation to correct the Proxy if events subsequent to its release rendered it false or misleading, but argued that the complaint was missing any "allegation that at some point in-between . . . [the directors] changed their minds and as of that date they needed to correct the proxy." Id. at 99 (Weiss).[6]

_____

[6] The Defendants also suggest that the directors may have only failed to vote their shares in favor of the merger, because non-votes are treated as votes against, and that thus the fact that some directors did not vote in favor of the merger would not make the statements in the proxy false.  See Tr. at 99 (Weiss).  The Proxy stated, however, that all the directors and officers of Westland planned to vote their shares in favor of the merger.  Even if the directors merely abstained from voting, rather than affirmatively voting their shares in opposition to the merger, it would still be a result different

Whether the directors and officers of Westland intended to vote their shares of stock for or against the proposed merger is material information. Any reasonable shareholder would want to know how corporate officials planned to vote their own stock, and if a number of officers intended to vote their own stock against it, that would be a signal to shareholders to closely scrutinize the merger. The timing of the Proxy and the lack of a disclosure of certain directors changing their vote at some time seems problematic, and as the Defendants conceded, directors are under an obligation to correct a proxy if later events render the proxy false or misleading. See SEC v. Parklane Hosiery Co., Inc., 558 F.2d at 1089 n.3. While Lane does not allege when the directors changed their minds, it is difficult to imagine how a plaintiff could be expected to plead more specifically than Lane did. Lane's Amended Complaint alleges that, after the Proxy was issued, not just one, but over half of the board of directors of Westland failed to vote all their shares in support of the merger. See Amended Complaint ¶ 45 & n.4, at 18.

If only one director had failed to vote his or her shares as expected, or one or two directors had not voted all their shares, it might be necessary for Lane to plead with greater detail. But such a large difference between the actual voting and the Proxy's expression of the directors' intent gives rise to a fair inference that either something occurred to change the minds of several directors between the issuance of the Proxy and the voting, which would be an event that needed to be disclosed, or else the directors never intended to vote in favor of the merger and the Proxy was false from the start. Just as directors and officers are not required to divulge their secret motives to shareholders, so too should plaintiffs not be required to be mind-readers who must be able to know exactly why something happened, especially at this early stage in proceedings. Lane has identified

from the scenario the Proxy predicted.

by name the Defendants he alleges changed their votes or never intended to vote for the merger originally, and has pled facts that logically lead to the conclusion that the Proxy was either false or became false at some point when Westland still had a duty to correct its statements. Because of this detail, Lane has made a sufficient showing that the Proxy is false and the statement regarding voting intents was material information.

### C. THE FAILURE TO DISCLOSE PAGE'S VOTE AGAINST THE MERGER AGREEMENT WAS A MATERIAL OMISSION.

The Proxy contains Westland's board of directors' recommendations that shareholders vote in favor of the merger. See Proxy at 8, 26 & 29. Lane alleges that these statements are materially misleading, because the Proxy implies that the entire board approved the recommendations, but "Page actually voted against adopting the Merger Agreement and Benavidez abstained from voting." Amended Complaint ¶ 45, at 18 (emphasis omitted). The Defendants do not seem to have challenged this particular allegation directly in their motions to dismiss, but they addressed the issue at the hearing in connection with their discussion of conflicts of interest. The Defendants argued that Lane was alleging that Page switched her vote because she received a quid pro quo from SunCal, which amounted to a claim of undisclosed motive. See Tr. at 84-87 (Weiss).

While Page's vote against the merger would not make it false to say that the board of directors recommended approving the merger, the failure to disclose this vote would be misleading. The Proxy does imply that there was no dissent in approving the merger. Perhaps not disclosing the negative vote of one or two directors of a large board would be acceptable, an issue that the Court need not decide, but not when one of the dissenting voices was the president and CEO of Westland. If Page had initially voted against the merger, that would be information that rational shareholders would want to know and would consider to be important in deciding how to cast their own votes.

The materiality of this omission does not turn on whether Page altered her position because of a quid pro quo she was promised or because of other, legitimate reasons.  The materiality is a result of the votes and opinions of a corporation's CEO being important information for shareholders faced with the decision whether to approve a merger.

### D.    THE MARKET-CHECK PROCEDURES DESCRIBED IN THE PROXY WERE NOT MATERIALLY FALSE OR MISLEADING.

The Proxy stated that Westland was employing a market-check process in connection with the merger and that "Westland's board of directors had every reason to believe that the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland."  Proxy at 27.  Lane alleges that this statement would mislead shareholders into believing "that defendants has shopped Westland to potential suitors in an effort to maximize shareholder value for Westland's shareholders."  Amended Complaint ¶ 46, at 19.  According to Lane, however, rather than shopping Westland around, the directors "did not engage in any form of a 'market-check process,' even after defendant Sanchez suggested hiring a financial advisor to actively solicit additional bids at an August 2005 board meeting."  Id.

The Defendants contend the "no-talk/no-shop" provisions in the merger agreement prohibit the active solicitation that Lane alleges the Proxy implies.[7]  Motion to Dismiss at 18.  The Defendants also accuse Lane of "cherry-picking language from the Proxy to make it seem as if the Directors stated they would personally solicit additional offers."  Id.  The Defendants point out that the language quoted by Lane's Amended Complaint is preceded by mention of the publicity surrounding the merger and the fact that the fiduciary-out provisions of the earlier merger

---

[7] The Defendants conceded at the hearing that Westland retained some ability to actively solicit offers, as they were allowed under the terms of the merger agreement to contact companies that had in the past expressed an interest in acquiring Westland.  See Tr. at 149 (Schneebeck).

agreements with ANM and Sedora had been public for ten months.  See id. at 19.  Moreover, the more passive fiduciary-out post-signing market-check approach that Westland had been pursuing "had already resulted in a 57.5% increase in purchase price, from $200 (ANM), to $305 (Sedora), to $315 (SunCal)."  Id.

The Court finds that the statements regarding the market check are not misleading in any material way.  The preface to the language that Lane considers false and misleading provides sufficient context to render the statement not materially misleading.  The preface makes clear that the publicity surrounding the merger was crucial to the directors' determination that the market check would protect the shareholders' interests.

Moreover, the language that Lane finds misleading is surrounded by significant detail regarding the way the market-check process for the prior two prospective mergers worked and how it lead to the SunCal offer.  Read as a whole, rather than focusing on a few words in isolation, the Proxy is not misleading in any material way about the market-check process.  Lane's contentions go more towards the possibility that Westland could have done a better job of soliciting offers or could have bargained harder with SunCal to give it more freedom to seek more prospective merger partners.

But the thoroughness of the market-check process is not at issue here, and the extent of the market-check process is revealed in the Proxy.  A shareholder could certainly find the process to have been deficient, but he or she could have come to that conclusion, or at least been suspicious, on the basis of the information divulged in the Proxy.  And that is § 14(a)'s purpose: to give shareholders the information needed to assess corporate action.  Section 14(a) is not a tool for directly attacking the sufficiency of corporate actions; it operates more indirectly, on the idea that information is power.  And sufficient information was disclosed here.

The directors' declaration of their belief in the adequacy of the market check does not change

that.  Section 14(a) requires the production of material information, and does not directly regulate

conduct.  Lane does not allege any information suggesting the directors' did not believe the market

check to be sufficient protection for the shareholders' interests.  Instead, he approaches it indirectly,

through the implication that a failure to actively solicit other bidders entails the directors' statements

being false or misleading.  The prefatory language and the surrounding information on the market

check process, however, cures any tendency of the statement to lead a shareholder astray.

It is also possible that a reasonable director, given the increased bids that a passive market

check had generated so far, would believe that the process was effective in maximizing shareholder

value.  There is nothing in the Proxy regarding the market check that is misleading enough to be

materially false or misleading.

E.  **THE FAILURE TO DISCLOSE THE INTERNAL VALUATION WAS NOT MATERIAL, BUT THE FAILURE TO DISCLOSE BARBARA PAGE'S INVOLVEMENT IN THE 2001 VALUATION WAS A MATERIAL OMISSION.**

Lane alleges that it was false and misleading for the Proxy to assert that Westland's directors

considered a 2005 valuation in concluding that the shareholders should approve the merger, without

disclosing an internal appraisal that valued Westland at more than twice that of the 2005 opinion.

See Amended Complaint ¶ 47, at 20.  Lane also alleges that the Proxy fails to disclose that an earlier

valuation in 2001 originally valued Westland at $249 per share, but was lowered to $87 per share

on Page's orders.  See id. ¶ 48, at 20-21.  The Defendants argue that the internal valuation was only

an opinion by Westland's vice president of sales and was "unverifiable soft information" that the

directors had no duty to disclose.  Motion to Dismiss at 17-18 (citing In re Ford Motor Co. Securities

Litigation, 381 F.3d at 569).  They further argue that the allegations about the 2001 valuation are

conclusory, and that they are immaterial because the SunCal offer exceeded the alleged initial valuation anyway.  See id. at 17.

At the hearing, the Defendants also argued that disclosing the internal valuation would potentially be a § 14(a) violation, because the valuation's unreliability could be misleading.  See Tr. at 54 (Weiss).  In response, Lane asserts that whether a valuation is "soft" is a factual question that should not be considered on a motion to dismiss, and that internal asset appraisals should be disclosed.  Response at 8-9.  Lane further contends that the earlier manipulations of the 2001 valuation needed to be disclosed, because the same valuation expert from the 2001 valuation rendered the 2005 valuation opinion, and the circumstances of the earlier valuation are material information the shareholders should have been apprised of.  Id. at 8.

The Court agrees with the Defendants that the internal valuation or appraisal was too speculative to have been subject to mandatory disclosure.  Not every internal opinion circulating in a corporation needs to be disclosed in a proxy statement.  See In re Ford Motor Co. Securities Litigation, 381 F.3d at 569-70 (stating that unverifiable soft information is not material information upon which a reasonable investor would rely).  If every piece of arguably relevant information needed to be disclosed in a proxy statement, investors and shareholders would be flooded with information and the purposes of disclosure would be defeated.  As such, while In re Ford Motor Co. Securities Litigation is from the Sixth Circuit and not binding on this Court, it will adopt the standard on soft information set out in that case. Valuations and appraisals that lack sufficient indicia of reliability are commonplace in business, and such speculation is not the kind of information upon which a reasonable person would rely.

Lane has not pled allegations about how the figure alleged was reached, about its reliability, or anything else that would make it material information.  The Court, however, disagrees with the

Defendants regarding the alleged 2001 manipulations.  Lane has specifically alleged that it was Page who caused the valuation to be reduced by calling the valuation firm.  While the Defendants contend that there is nothing to indicate why problems with the 2001 valuation would have any bearing on the 2005 valuation, <u>see</u> Reply at 7-8, there is a link.

First, the Defendants made a decision to disclose the 2001 valuation.  <u>See</u> Proxy at 16.  Once the Defendants chose to reveal the 2001 valuation, the Defendants had a duty to be accurate and complete in what it said about the valuation.  Second, the same firm was involved in both valuation opinions.  If Westland's president and CEO managed to manipulate the 2001 valuation, that would be information a reasonable shareholder would think was important.  Susceptibility to pressure by Westland would call into question the independence of the firm and the integrity and reliability of the valuation, and thus the information would be material.

### F.   THE STATEMENT THAT WESTLAND'S BOARD OF DIRECTORS THOUGHT THE MERGER WAS IN THE BEST INTERESTS OF WESTLAND'S SHAREHOLDERS WAS NOT MATERIALLY FALSE OR MISLEADING.

According to the Proxy, Westland's board of directors thought the merger was "fair to, and in the best interests of Westland and Westland's shareholders."  Proxy at 26.  The Proxy also states that the board held this belief, "in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders."  <u>Id.</u> at 6.  Lane alleges that these statements were false and misleading, because several directors admitted in depositions that they did not seek independent valuations in connection with the merger or otherwise endeavor to "ascertain the value of what the Board was selling," and took no affirmative actions to maximize shareholder value.  Amended Complaint ¶ 49, at 21.  The Defendants dispute these allegations, arguing that the merger price of $315.00 per share was a

significant premium over the valuation of $180.00 per share in 2005, and that therefore the directors had a firm basis for believing the merger was fair and in the shareholders' best interests. <u>See</u> Motion to Dismiss at 14-15.  Additionally, the Defendants argue that Lane failed to plead with particularity that the belief was both objectively and subjectively false at the time the statement was made. <u>See</u> <u>id.</u> at 14 (citing <u>In re McKesson HBOC, Inc. Securities Litigation</u>, 126 F.Supp. 2d at 1265).

Lane contends that the Amended Complaint did plead these details with particularity.  He argues that a "'statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed; (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement."  Response at 20 (quoting <u>In re Apple Computer Securities Litigation</u>, 886 F.2d 1109, 1113 (9th Cir. 1989)).  If any of these three implicit assertions is inaccurate, Lane argues, then the statement is false.  <u>See</u> Response at 20.  Because the allegations are that there was no reasonable basis for the belief, Lane asserts that he has alleged both the objective and subjective falsity of the statement.

If the board of directors did not in fact believe that the merger was fair and in shareholders' best interests, the failure to disclose that belief would be a material omission.  That much is beyond dispute.  <u>See</u> <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. at 1090-91 ("We think there is no room to deny that a statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it, can" be material.)  But Lane has not pled the required showing that the belief of the directors was both objectively and subjectively false.

Lane has made a sufficient showing at this stage of objective falsity.  The allegations of inaction and failure to obtain a valuation are sufficient to demonstrate falsity, given the favorable inferences that must be drawn in his favor on a motion to dismiss.  The Defendants' contention that

the premium obtained made the belief well-founded is an argument about the weight of evidence that is inappropriate under rule 12(b)(6).  Lane has not, however, made any allegation of subjective falsity.

The Amended Complaint makes no allegation that the Defendants did not believe in the fairness of the merger.  Lane relies instead on an inference from the alleged lack of a reasonable foundation to believe the merger was fair.  In support of this inference, Lane argues that any statement of belief contains an implicit assertion that the belief is reasonable.  See In re Apple Computer Securities Litigation, 886 F.2d 1109, 1113 (9th Cir. 1989).  Thus, whenever a statement of belief lacks a reasonable factual foundation, the statement is not only objectively false, but subjectively false.

Lane's contention is in tension with Virginia Bankshares, Inc. v. Sandberg, which held that a statement of belief was not actionable under § 14(a) upon a showing of mere subjective falsity without any allegations of objective falsity.  See 501 U.S. at 1096.  This situation is the opposite. There is an allegation of objective falsity, but none of subjective falsity.

There are certainly powerful reasons to distinguish the two situations.  In a situation of only alleged subjective falsity, it is likely that objective falsity is not alleged because the statement is not objectively false.  A statement of false belief in something that is true might be objectionable, but it is not actionable – there is not much risk from such a situation, and the Supreme Court has indicated that liability in this area does not turn on undisclosed thoughts and motives.  See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. at 1096 (holding that "proof of mere disbelief or belief undisclosed should not suffice for liability under § 14(a)"). In a situation like this one, with only objective falsity of a statement alleged, the risk of harm is greater, regardless of how subjectively pure and well intentioned the declarants are.

-50-

Nevertheless, imposing liability in such situations not only punishes good faith, if foolish, statements, it encroaches on the territory of state corporate law, which is the body of law entrusted with protecting against corporate mismanagement and incompetence. Only when an opinion is both objectively and subjectively false is it actionable under § 14(a). See In re McKesson HBOC, Inc. Securities Litigation, 126 F.Supp. 2d at 1265. Lane's argument turns every objectively false statement of belief into one that is also subjectively false. That legal principle goes too far.

This allegation, however, involves a material statement, and the deficiency is one of inartful drafting of pleadings. As such, the Court will not prevent Lane from amending his complaint to allege subjective falsity.

### G. THE FAILURE TO DISCLOSE INFORMATION REGARDING THE TAX-INCREMENT DEVELOPMENT DISTRICT WAS NOT MATERIAL.

The Proxy asserts that Westland was an "unattractive" acquisition target because it held a "vast amount of undeveloped land" that would be very expensive and time consuming to develop. Proxy at 27. Additionally, Westland was facing "significantly increasing costs . . . to develop its own land," because the City of Albuquerque would not bear infrastructure costs associated with recent Westland developments. Id. at 28. Lane alleges that the Proxy's statement was false and misleading, because the facts the Defendants knew or had available to them made it clear that "SunCal had arranged to take advantage of an October 2006 Tax Increment Development District ("TIDD") which allowed SunCal to utilize tax dollars to fund infrastructure costs associated with the development of Westland." Amended Complaint ¶ 51, at 22.

The Defendants argue that Lane fails to show that Westland had any opportunity to take advantage of the TIDD, that the allegations indicate only that SunCal, not Westland, had an opportunity to use a TIDD, and the "alleged October 2006 TIDD acquisition" occurred after the

Proxy was issued in September of 2006.  Motion to Dismiss at 24.  Lane counters that whether it

was Westland or SunCal that had the chance to take advantage of the TIDD would be a question of

fact inappropriate for a 12(b)(6) motion and that, even if the TIDD opportunity belonged to SunCal,

it would create "synergistic value to Westland shareholders."  Response at 16.  Lane further argues

that the timing of the Proxy is unimportant here.  Even if the TIDD acquisition was subsequent to

the issuance of the Proxy, the Defendants' obligations did not end with the issuance; the Defendants

remained under an obligation to correct any statements that later events rendered false or misleading.

See Response at 16 (citing SEC v. Parklane Hosiery Co., Inc., 558 F.2d at 1089 n.3).

        The allegations that Lane has laid out do not indicate that the possible TIDD was a material

issue.  While Lane contends that whether Westland had the opportunity to take advantage of the

TIDD is a factual question that should not be delved into on a motion to dismiss, Lane's own

Amended Complaint alleges that "SunCal had arranged to take advantage" of the TIDD.  Amended

Complaint ¶ 51, at 22.  The Court agrees that the Defendants would be under a continuing duty to

correct the Proxy Statement until the actual shareholder vote if events necessitated it.  They cannot

"sit by and allow shareholders to approve corporate action on the basis of a proxy statement without

disclosing facts arising since its dissemination if these are so significant as to make it materially

misleading."  SEC v. Parklane Hosiery Co., Inc., 558 F.2d at 1089 n.3.  But the Court is not

convinced that the October TIDD was a significant enough occurrence to be material.  The

opportunity was apparently speculative, and remains uncertain, as the Defendants indicated at the

hearing.  Tr. at 132-34 (Schneebeck).  Moreover, there is no allegation that the opportunity was

something Westland could exploit.[8]  The possibility of SunCal being able to eventually use its TIDD

_____

        [8] Lane cites Swanson v. American Consumer Industries, Inc., 415 F.2d 1326, 1331 (7th Cir.
1969), for his assertion that a corporate opportunity belonging to another company is material

to lower development costs on the land it acquired from Westland is too remote and too speculative to be material information that a rational shareholder would consider important in deciding how to vote.  See In re Ford Motor Co. Securities Litigation, 381 F.3d at 569.

At the hearing, Lane's counsel indicated that Westland and SunCal may have been cooperating on acquiring a TIDD when the Proxy was issued.  See Tr. at 134-36 (Robbins).  The Amended Complaint contains no such allegations, but such cooperation seems to be something that would be material information.  As such, the Court will not foreclose Lane from raising that issue later if he is able to plead it with sufficient, particularized facts.

### H.    THE FAILURE TO DISCLOSE OIL-RESERVE INFORMATION WAS NOT MATERIAL, BUT THE FAILURE TO DISCLOSE OFFERS FOR OIL AND GAS LEASES WAS A MATERIAL OMISSION.

The Proxy disclaimed any opinion as to the value of Class A stock in Atrisco LLC, and stated that Westland's management did not know if there was "oil, natural gas, coal bed methane gas or any other natural resource under Westland's land," and were "not aware of any commercially successful drilling on the property."  Proxy at 7.  Lane contends that these statements were false and misleading.  In support of this contention, he makes four specific allegations: (i) that Westland's board of directors had been informed that between 100 and 500 million barrels of oil might be located on Westland property; (ii) that Sanchez had expressed his concern at an August 29, 2005,

---

information that should be disclosed in a contemplated merger.  The case Lane relies on, however, involves the acquisition of a company in exchange for shares in the acquiring company.  Information on the opportunities available to an acquiring company and the "synergistic benefits" of a merger are more relevant in the context of share-exchange than a cash-out merger.  Westland shareholders were to receive only cash in exchange for their shares, with the exception of equity interests in Atrisco LLC.  Atrisco LLC, however, is only a vehicle for the mineral rights acquired from Westland, and the TIDD does not impact Atrisco LLC.  In a situation such as this, another company's corporate opportunity is not particularly relevant – it has little to say about the value of the company being acquired, and the opportunities of the acquiring company are even less relevant, because the shareholders are being bought out and will own no equity in the surviving company.

board meeting about losing valuable water and mineral rights; (iii) that Westland had received an

offer from Savant Resources to lease all of Westland's property for oil and gas exploration; and (iv)

that Tecton Energy LLC had offered to expand its existing oil and gas exploration lease from 7,000

to 30,000 acres.  See Amended Complaint ¶ 52, at 23.

The Defendants contend that these allegations are speculative, as they all relate to estimates

and exploration leases, and none of them demonstrate the existence of actual commercially viable

resource deposits.  See Motion to Dismiss at 25-26.  Lane disputes the Defendants' defense, arguing

that the offers for leasing could have been executed before the merger, with the benefits inuring to

Westland's shareholders, and that given that Westland specifically disclaimed knowledge of any

resources on Westland's property, shareholders should have been informed that the board was made

aware of the possibility of hundreds of millions of barrels of oil being on the property.  See

Response at 18.  The Defendants accuse Lane of changing tack by focusing on the offers for leasing

and note that Lane concedes the Proxy was "literally true."  Reply at 10-11.  They argue that the

Defendants were under no duty to disclose "possible future business transactions."  Id. at 11

(emphasis omitted).

At the hearing, the Defendants noted that SEC rules prohibit publicly held companies from

providing estimates for oil and gas reserves in their filings unless they are proved or probable

reserves.  See Tr. at 118 (Weiss).

Westland should have disclosed, if true, the leasing offers by Savant Resources and Tecton

Energy LLC.  The offers relate to possible future business, but Lane has pled very specific facts

about the timing, source, and basic content of the offers.  If the offers were executed, Westland's

shareholders would have fully captured the benefits of the leases.  The proposed leases were for

exploration, and exploration is naturally uncertain in its benefits, but the payments for the leases themselves would be a certain benefit that should have been disclosed.

There is no indication of the basis for the estimate of 100 to 500 million barrels.  Without further allegations regarding the accuracy and circumstances of the estimate, the estimate is simply speculation that need not have been disclosed.  The Court will not, however, foreclose Lane from re-pleading with more indicia of reliability that would make the omission material.  That Sanchez raised concerns at the board meeting, however, is something that reasonable shareholders would not consider important in deciding how to cast their votes.

## I.   THE FAILURE TO DISCLOSE THAT ONLY SUNCAL HIRED PROXY SOLICITORS WAS NOT MATERIAL.

The Proxy indicates that Westland expected to hire "approximately 90 individuals to assist in the solicitation [of proxies]."  Proxy at 16.  Lane alleges that the Defendants were aware that Westland never hired any proxy solicitors, but that SunCal retained all the proxy solicitors "who secretly received lucrative payments for delivering votes in favor of the" merger.  Amended Complaint ¶ 57, at 25.  The Defendants argue that SunCal hiring proxy solicitors was not material information, especially as the Proxy disclosed that SunCal "'may also be deemed a participant in the solicitations.'"  Motion to Dismiss at 26 (quoting Proxy at 16)).  Lane contends that reasonable shareholders would want to know that SunCal was hiring the proxy solicitors, and that the Proxy would have led shareholders to believe that the solicitors' interests "would be consistent with those of Westland and its shareholders."  Response at 19.

At the hearing, the Defendants emphasized that the Proxy used the phrase 'expects to,' that it was only later that Westland decided to not hire any solicitors, and that the allegation was "fraud by hindsight."  Tr. at 124 (Weiss).  In response, at the hearing, Lane elaborated that the information

-55-

was material because Westland-hired solicitors would be expected to be motivated by getting the "right result," while SunCal-hired solicitors would be motivated to "close the deal." Id. at 126 (Robbins).

It is possible that in certain situations who arranged for proxy solicitors and who paid them could be material information. Cf. In re MONY Group Inc. Shareholder Litigation, 853 A.2d 661, 675 (Del. Ch. 2004)("For example, . . . retaining proxy solicitors [is a decision] that directors are often called upon to make that could be seen as affecting the shareholder vote."). But this is not one of those situations. The Court agrees with Lane that, despite the conditional language of the Proxy – "expects to" – and the disclosure of SunCal's potential involvement in solicitation, reasonable shareholders might be misled by the Proxy's paragraph regarding proxy solicitors. A significant amount of detail about Westland's potential retention of solicitors is divulged, and SunCal is mentioned as what seems an afterthought. Shareholders could reasonably conclude that Westland's hiring of solicitors was all but certain. Two competing facts, however, undercut the strength of these points.

First, there is no indication in the Amended Complaint that any of the Defendants knew at the time of the Proxy's dissemination or making that Westland would not retain any solicitors. See Amended Complaint ¶¶ 57-58, at 25. Lane alleges that the Defendants knew that Westland never hired solicitors, but this seems to point toward what happened later – that ultimately Westland did not hire any proxy solicitors. It does not indicate any contemporaneous knowledge that Westland's intentions were falsely stated in the Proxy. To allow this claim to go forward would be a case of "fraud by hindsight," as the Defendants maintain.

More importantly, however, the information would not be material regardless. Westland was already clear about its support for the merger. This transaction was not a hostile takeover or similar

situation.  Reasonable shareholders, then, would expect that the motivations of the proxy solicitors would be similar, regardless whether Westland or SunCal hired them, and would not consider the information important in deciding how to vote.  See TSC Industries, Inc. v. Northway, Inc., 426 U.S. at 449.  As such, even if Westland was not in fact intending to hire proxy solicitors, that information would not be material information that needed to be disclosed.

## IV.    LANE'S COMPLAINT STATES A CLAIM UNDER § 20(a).

Claims for control-person liability under § 20(a) of the 1934 Act are largely derivative of other securities violations – in this case, alleged violations of § 14(a).  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

"[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  City of Philadelphia v. Fleming Cos., Inc., 264 F.3d at 1270-71 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305).  Thus, to the extent that Lane is unable to make a claim under § 14(a), he cannot make a related claim of control person liability under § 20(a), because there is no underlying violation upon which to rest the control-person liability claim.  To the extent that the Court grants the motions to dismiss for failure to state a proper claim under § 14(a), it must also grant the motions with respect to § 20(a).  In other words, none of the statements and omissions that the Court found not materially false or misleading above can be used to support a control-person claim.

Several of Lane's § 14(a) claims survive, however, and can form the basis of § 20(a) claims if he is able to cross the additional hurdle of "showing 'control' over the primary violator by the alleged controlling person." Maher v. Durango Metals, Inc., 144 F.3d at 1305.  Lane is able to make that further showing of control.  Lane alleges that SunCal's contractual obligations with Westland and the individual Defendants gave SunCal the "power to direct or cause the direction of the management and policies of a person." Amended Complaint ¶ 67, at 27.

The Tenth Circuit has "expressly 'reject [ed] those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.'" Maher v. Durango Metals, Inc., 144 F.3d at 1305 (quoting Central Bank of Denver v. First Interstate Bank of Denver, 969 F.2d 891, 897 (10th Cir. 1992), rev'd on other grounds by  Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994)). "[P]laintiff need only show the power to control the transaction underlying the alleged securities violation and not the exercise of that power." Maher v. Durango Metals, Inc., 144 F.3d at 1306 n.8.

Based upon the underlying securities violations Lane has sufficiently pled, and the showing of potential control through contractual relationships, Lane has made a sufficient showing for his § 20(a) claim to survive a motion to dismiss.

**THEREFORE**, as the Court ordered in its September 15, 2008 Order, the Motion to Dismiss, and the Motion to Dismiss and Joinder in Director Defendants' Motion to Dismiss, are granted in part and denied in part.

**IT IS ORDERED** that the Lead Plaintiff's claims based on the allegations in paragraphs 39-41 of the Amended Complaint regarding conflicts of interest are dismissed.  The Lead Plaintiff's claims based on the allegations in paragraph 42 regarding trusteeships and directorships are dismissed without prejudice to refiling if further facts support amendment.  The Lead Plaintiff's

claims based on the allegations in paragraph 46 regarding the market check are dismissed.  The Lead Plaintiff's claims based on the allegations in paragraph 47 regarding internal valuations are dismissed.  The Lead Plaintiff's claims based on the allegations in paragraph 49 regarding the board of director's opinion of the merger are dismissed without prejudice to him amending his complaint to cure the problems identified in this memorandum opinion.  The Lead Plaintiff's claims based on the allegations in paragraphs 50-51 regarding the Tax Increment Development District are dismissed without prejudice to refiling if further facts support amendment.  The Lead Plaintiff's claims based on the allegations in paragraph 52, parts (a) and (b), regarding Atrisco LLC are dismissed, without prejudice as to part (a), regarding the amount of oil reserves on Westland property.  The Lead Plaintiff's claims based on the allegations in paragraphs 57-58 regarding proxy solicitors are dismissed.  The motions to dismiss are denied with respect to claims based on the remaining allegations in the Amended Complaint.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Nicholas Koluncich
Albuquerque, New Mexico

– and –

Joe Kendall

Provost Umphrey Law Firm LLP
Dallas, Texas

– and –

Darren J. Robbins
Randall J. Baron
Amber L. Eck
Coughlin Stoia Geller, Rudman & Robbins LLP
San Diego, California

> *Attorneys for the Plaintiffs*

Taras Kick
The Kick Law Firm, APC
Los Angeles, California

– and –

Turner W. Branch
Richard A. Sandoval
Branch Law Firm
Albuquerque, New Mexico

> *Attorneys for the Intervenor-Plaintiff*

Douglas G. Schneebeck
Brian K. Nichols
Modrall Sperling Roehl Harris & Sisk PA
Albuquerque, New Mexico

> *Attorneys for the Defendants Westland Development Company, Inc.*
> *and SunCal Companies Group*

Lily H. Shanks
Evan P. Singer
Jones Day
Dallas, Texas

> *Attorneys for the Defendant SunCal Companies Group*

Juan L. Flores
Sheehan Sheehan & Stelzner
Albuquerque, New Mexico

– and –

Akin Gump Strauss Hauer & Feld LLP
Paul Bessette
Jesse Z. Weiss
Kimberly G. Davis
Yusuf A. Bajwa
Austin, Texas

> *Attorneys for Barbara Page, Sosimo Padilla, Joe Chavez,*
> *Josie Castillo, Charles Pena, Georgia Baca, Troy Benavidez,*
> *Ray Mares, Jr., and Randolph Sanchez*