# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LAWRENCE LANE, On Behalf of Himself,
and All Others Similarly Situated,

      Plaintiff,

vs.                                         No. CIV 06-1071 JB/ACT

BARBARA PAGE, SOSIMO PADILLA,
JOE CHAVEZ, JOSIE CASTILLO, CHARLES
PENA, GEORGIA BACA, TROY BENAVIDEZ,
RAY MARES, JR., RANDOLPH SANCHEZ,
WESTLAND DEVELOPMENT CO., INC,
SUNCAL COMPANIES GROUP, THE D.E. SHAW
GROUP, D.E. SHAW & CO. L.P., D.E. SHAW
REAL ESTATE PORTFOLIOS 1, L.L.C., D.E.
SHAW & CO., INC., D.E. SHAW INVESTMENT
GROUP, LLC, D.E. SHAW & CO. II, INC.,
GEORGE RIZK and ANNE DINNING,

      Defendants.

## MEMORANDUM OPINION AND ORDER
(Public Version)[1]

    **THIS MATTER** comes before the Court on: (i) the Director Defendants' Motion to Dismiss

Second Amended Complaint, filed February 5, 2009 (Doc. 142)("Directors' Motion"); (ii)

Defendants Westland's and Suncal's Motion to Dismiss and Joinder in the Director Defendants'

Motion to Dismiss, filed February 5, 2009 (Doc. 143)("Westland and SunCal Motion"); and (iii) The

D.E. Shaw Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, file February

26, 2009 (Doc. 152)("D.E. Shaw's Motion"). The Court held a hearing on April 3, 2009. In an

---

[1] On June 30, 2009, the Court filed a sealed version of this Memorandum Opinion and Order. See Doc. 173. All the parties have either affirmatively contacted the Court and stated that they did not propose any redactions to this opinion, or have not asked the Court to redact any information. This opinion is thus identical to the original version, except that this footnote replaces the footnote ordering the parties to submit any proposed redactions.

earlier opinion, the Court dismissed a number of allegations in this case, some with leave to amend and some without, and upheld the sufficiency of the remaining allegations.  See Lane v. Page, F.Supp.2d 1094, 1132 (D.N.M. 2008).  Since then, Lead Plaintiff Lawrence Lane has amended his Complaint to add new allegations and has also added new Defendants to this action.  The primary issues here are: (i) whether the Court should allow the new allegations which the Court has not given leave to amend; (ii) whether Lane has sufficiently pled the alleged damages of former shareholders; (iii) whether various allegations in the latest Complaint are material or otherwise actionable under § 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) ("§ 14(a)"); (iv) whether the statute of limitations bars the claims against the D.E. Shaw Defendants[2]; and (v) whether the claim against the D.E. Shaw Defendants under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("§ 20(a)"), is adequately pled.  The Court concludes that Lane's new allegations on topics which the Court dismissed without express leave to amend are properly before the Court.  Because a plaintiff must adequately plead economic loss, however, and because Lane's allegations in this respect are conclusory, the Court will dismiss the Complaint.  This deficiency, however, may be relatively technical, so the Court will give Lane ten days to seek leave to amend.  While the Court does not prejudge whether such amendment will be allowed, because there appears to be a likelihood that amendment would be proper and because the various other issues have already been briefed and argued, the Court will also address the remaining issues, and these rulings will apply if the Court allows Lane to amend his Complaint and revive his action.  Most of Lane's amendments are

---

[2] The D.E. Shaw Defendants are Defendants D.E. Shaw Group, D.E. Shaw & Co. L.P., D.E. Shaw Real Estate Portfolios 1, L.L.C. ("DESCO Real Estate"), D.E. Shaw & Co. LLC, D.E. Shaw & Co., Inc., D.E. Shaw Investment Group, LLC, D.E. Shaw & Co. II, Inc., George Rizk, the head of D.E. Shaw's real estate unit, and Anne Dinning, a member of the executive committee overseeing real estate.  When referring to the entities as a group, without the individuals, the Court will use the phrase D.E. Shaw.

insufficient to cure the deficiencies the Court has previously identified, but two sets of allegations have been sufficiently supplemented to support a claim: (i) the allegations regarding proxy solicitors; and (ii) the allegations regarding the fairness statement.  Additionally, the Court will not reverse its holding on those allegations that the Defendants again challenge, but which the Court has already found sufficient.  The Court also finds that the allegations about D.E. Shaw's role in the merger not being disclosed can support a claim.  Finally, with respect to the § 20(a) claim against the D.E. Shaw Defendants, the Court cannot, at this time, rule as a matter of law that the statute of limitations has run on the claim, and the Court finds that Lane's allegations will support a claim for control-person liability.

## FACTUAL BACKGROUND

This case concerns a dispute over the merger of Defendant Westland Development Co., Inc. and Defendant SunCal Companies Group.  Much of the background of this case and of the claims that Lane is bringing are laid out in detail in the Court's earlier opinion.  See Lane v. Page, 581 F.Supp.2d at 1099-1104.  The Court will not reiterate the history of the merger.  Many new allegations have been included in the latest Complaint, however, and the Court will describe those new allegations and their relationship to the earlier allegations.  Because this is a motion to dismiss, Lane's allegations are assumed to be true, and the Court will therefore describe the facts as if the allegations were true.

### 1.     Conflicts of Interest.

Lane alleges that the proxy statement circulated as part of the vote on the merger with SunCal ("Proxy") failed to adequately disclose conflicts of interests for various Westland directors. These allegations fall into two categories.  First, Lane alleges that the Proxy does not disclose that Defendants Barbara Page, Westland's president, chief executive officer, and chief financial officer

and Sosimo Padilla, Westland's chairman and executive vice president, had employment agreements that were sweetened to gain their support for the merger.  Second, Lane alleges that the Proxy did not properly disclose that several directors were promised lifelong trusteeships in the Atrisco Heritage Foundation or directorships in Atrisco Oil & Gas LLC ("Atrisco LLC").

        a.      **Employment Agreements.**

According to the Proxy, Page was "employed as Westland's president and chief executive officer under a renewable six year employment agreement" that also provided for seven times her annual salary as a severance payment for involuntary termination.  Exhibit A to Second Amended Complaint, SEC Schedule 14A Definitive Proxy for Westland Development Co., Inc. at 30 (issued September 20, 2006)(Doc. 145-2)("Proxy").  The Proxy also stated that Padilla, Westland's chairman and executive vice president, had a consulting agreement with similar severance terms. See id.  In his earlier Complaint, Lane alleged that the Proxy misrepresented or omitted information regarding these agreements, which Lane contends had "been secretly modified to secure [Page's and Padilla's] support for the merger."   Lane v. Page, 581 F.Supp.2d at 1102 (citing Amended Complaint for Violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 ¶¶ 39-40, at 15, filed September 17, 2007 (Doc. 50)("FAC")).

Lane has made new allegations in support of his contention that the Proxy inadequately disclosed Page's and Padilla's possible conflicts of interest.  First, Securities and Exchange Commission ("SEC") rules require accurate disclosure of Page's and Padilla's interests.  See Second Amended Complaint for Violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, ¶ 40, at 20, filed February 9, 2009 (Doc. 145)("SAC") (citing 17 C.F.R. § 240.14a-101, Item 5(a)(1)).  Second, during a May 2006 meeting, Westland's board "discussed additional items they needed to be included in SunCal's offer in order for it to be considered superior, which

specifically included defendants Page and Padilla's employment agreements." SAC ¶ 40(a), at 20. Third, Page's and Padilla's contracts did not originally contain the terms disclosed in the Proxy. Rather, the agreements "were modified to provide additional terms **after** Page voted against" the SunCal merger and after Padilla expressed concerns to the board about "numerous problems" with the SunCal merger.  Id.  ¶ 40(b), at 20 (emphasis in original, internal quotation marks omitted). These new terms were added to Page's and Padilla's agreements "as an inducement to obtain their endorsement" of the merger.  Id.

### b.   Trusteeships and Directorships.

The Proxy reveals that Westland directors could receive positions in either the Atrisco Heritage Foundation or Atrisco LLC.  Westland's existing board was given the power to appoint trustees to the Atrisco Heritage Foundation, and the Proxy opined that it was likely that "one or more" Westland directors would become a trustee.  Proxy at 31.  Additionally, Atrisco LLC's directors were to be drawn from Westland's directors, although the Proxy said that particular directors have not yet been chosen.  See id.  The First Amended Complaint asserted "that the Proxy failed to disclose that 'at least four Westland directors were promised lifelong trusteeships' at the Foundation or on the board of Atrisco LLC, and that instead of receiving 'customary fees' for their service, they were going to receive outsized 'lucrative annual retainers.'"  Lane v. Page, 581 F.Supp.2d at 1102 (quoting FAC ¶ 42, at 16).

Lane has two new allegations regarding the directorships and trusteeships.  Lane alleges:

According to internal correspondence, the D.E. Shaw Group and SunCal used these lifetime directorships in Atrisco LLC to their advantage and to the detriment of Westland shareholders.  In fact, the D.E. Shaw Group and SunCal offered to increase their contribution to Atrisco LLC by $200,000 to ensure the allegiance of these four directors: "The four young Board members have an interest in running the [Atrisco] LLC and if we go to them and tell them that we think they need more money to run it for the first couple of years we may get some real mileage out of that."  This

inducement was not disclosed in the Proxy Statement.

SAC ¶ 42(a), at 21.  Only after the Proxy was mailed and "70% of the votes were cast" were the Atrisco LLC directors disclosed to Westland shareholders.  Id. ¶ 42(b), at 21.  Nine days after the Proxy was distributed and five weeks before the shareholder vote, however, a Form 10-SB was filed with the SEC on behalf of Atrisco LLC identifying the Westland directors chosen for Atrisco LLC. See SAC ¶ 42(b), at 21.  This supplement was not filed under Westland's name, although between September 20 and November 6, 2006, the Defendants filed supplemental proxy materials in Westland's name.  See id.

### 2.   **Market-Check Process.**

Seven pages of the Proxy are devoted to describing what the Proxy calls the market-check process.  Another three pages detail the first contemplated merger with ANM Holdings, Inc.  The market-check  process began following the execution of the merger agreement between Westland and ANM.  As the Proxy describes the process, it consisted largely of Westland entertaining a series of competing offers to acquire the company.  See Proxy at 19-26.  The Proxy opined that "Westland's board of directors had every reason to believe that the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland." Id. at 27.  In his First Amended Complaint, Lane alleges that "Westland never actively solicited prospective bidders to secure the best value for the company." Lane v. Page, 581 F.Supp.2d at 1102 (citing FAC ¶ 46, at 19).

Several new allegations regarding the market check and the background of the merger are contained in the most recent Complaint. The "Background of the Merger" section of the Proxy describes board members raising concerns over the Westland-ANM merger, but the board minutes from the time do not reflect such concerns.  SAC ¶ 46(a), at 24-25.  According to Lane, this fact

establishes that either the minutes were falsified or that the Proxy is false. See id. D.E. Shaw Group and SunCal were aware of the lack of an effective process, observing that the "sales 'process has been mis-managed by a very unsophisticated board.'" SAC ¶ 46(b), at 25.

Westland's board did not attempt to value the company's assets or hire an appraiser. See id. ¶ 46(c), at 25. Board member and Defendant Ray Mares, Jr. admitted to not having much discussion about the possible ANM merger, and Defendant Randolph Sanchez, who worried about losing potentially valuable water and mineral rights, suggested hiring a financial advisor to solicit bids, but the proposal was dropped because a similar attempt was unsuccessful in the 1980's. See id. ¶ 46(d), (e) & (g), at 25-26. Westland's in-house counsel, Thad Turk, stated that he would not sell Westland "due to the Company's 300-year history." Id. ¶ 46(f), at 25. Five directors wanted to sell at a higher price, while Page and Padilla felt that Westland should sell, but wanted to wait to see if more offers came in. See id. ¶ 46(h)-(i), at 26. "As late as January 24, 2006, defendant Benavidez still had 'serious concerns with several issues in the amended merger agreement' with ANM and defendant Sanchez was 'still concerned about potential gas and oil reserves.'" Id. ¶ 46(j). When the process reached the merger agreement with SunCal, Page voted against the agreement. See id. ¶ 45(k).

### 3.    Valuation of Westland Stock.

Two different valuations of Westland stock are disclosed in the Proxy. The first opinion, from 2001, valued Westland at about $87.00 per share, see Proxy at 16, while the second opinion, from 2005, valued Westland at about $180.00 per share, see id. at 27. Both opinions came from the firm CBIZ Valuation Group. Initially, Lane alleged that two undisclosed facts undermined the reliability of these valuations and thus ultimately rendered false and misleading the Proxy's declaration that a price of $315.00 per share was fair: (i) that the 2001 opinion originally valued

Westland at $249.00 per share, before being lowered on Page's orders; and (ii) that Westland's vice president of sales, Brent Lesley, had made an internal appraisal that valued Westland at more than twice that of the 2005 opinion.  See Lane v. Page, 581 F.Supp.2d at 1102-03 (citing FAC ¶¶ 47-48, at 20-21).

In the Second Amended Complaint, Lane pleads several new facts regarding Lesley and his internal valuation.  After two decades working for Westland, Lesley "was the person at Westland primarily responsible for determining the value of Westland's land," and Page and Padilla both "routinely relied upon Mr. Lesley's analysis of Westland's land."  SAC ¶ 48(a), at 27-28.  In August 2005, at Page's request, Lesley prepared a "value menu" of Westland's land holdings.  Id. at 27.  This value menu concluded that Westland's land was worth $377 million, or $474.00 per share, not including Westland's interest in the Cordero Mesa.  See id.  An earlier internal valuation from June 16, 2005, which valued 2,500 acres of Westland property at $78 million, was incorporated into the August valuation Lesley prepared.  See id. at 28.  Westland relied upon this earlier June valuation when rejecting an offer to buy those 2,500 acres for $33 million.  See id.

### 4.  Proxy Solicitors.

According to the Proxy, "Westland expect[ed] to make arrangements with and compensate approximately 90 individuals to assist in the solicitation" of proxies from shareholders.  Proxy at 16.  Westland never hired any proxy solicitors.  In the First Amended Complaint, Lane alleged that most of the Defendants "were aware that Westland never hired any proxy solicitors, but that SunCal retained all the proxy solicitors, 'who secretly received lucrative payments for delivering votes in favor of the' merger."  Lane v. Page, 581 F.Supp.2d at 1103 (citing FAC ¶ 57, at 25).

Now Lane adds two new allegations.  He states that "SEC Regulations require[] the proxy statement to 'state the names of the persons by whom the cost of solicitation has been or will be

borne, directly or indirectly.'"  SAC ¶ 58, at 38 (quoting 17 C.F.R. § 240.14a-101, Item 4(2)).

Additionally, "just **two days** after the Proxy Statement was filed with the SEC, SunCal filed

additional proxy materials that included telephone call scripts for use by SunCal solicitors."  SAC

¶ 58, at 38 (emphasis in original).

     **5.**    <u>**Board's Statement of Fairness**</u>.

     According to the Proxy, Westland's board of directors thought the SunCal merger was "fair

to, and in the best interests of Westland and Westland's shareholders."  Proxy at 26.  The board held

this belief, "in part, because the cash consideration to be received by holders of Westland common

stock is fair, from a financial point of view, to the Westland shareholders."  <u>Id.</u> at 6.  Lane alleged

that "these statements were false and misleading, because several directors admitted in depositions

that they did not seek independent valuations in connection with the merger or otherwise endeavor

to 'ascertain the value of what the Board was selling,' and took no affirmative actions to maximize

shareholder value."  <u>Lane v. Page</u>, 581 F.Supp.2d at 1126 (quoting FAC ¶ 49, at 21).

     In the Second Amended Complaint, Lane adds several new allegations in connection with

his contention that the fairness statement was false and misleading.  Starting with the ANM offer,

the director Defendants did not believe that the $200.00 per share offered was enough, but

nonetheless declared it to be a fair price.  <u>See</u> SAC ¶ 49(a), at 29.  As with the ANM offer, the board

opined that the SHNM and SunCal offers were fair, despite believing otherwise.  <u>See id.</u> at 29-30.

The board members did not believe that the merger was fair because the merger price was less than

the price in Lesley's value menu.  <u>See id.</u> ¶ 49(b), at 30.  One reason that the board did not seek an

appraisal or hire outside help was that the board did not want to merge or be bought out.  <u>See id.</u>

Page voted against the SunCal merger agreement, Defendant Troy Benavidez abstained from voting,

and, during the shareholder vote, four of the nine directors did not vote their shares in favor of the

merger, while a fifth voted less than half his common shares for the merger.  See id.

### 6.    Oil and Gas Disclosures.

Land is Westland's primary asset.  For a lucky owner, with land may come oil, gas, and other valuable mineral deposits, but in the Proxy, Westland's management said they did not know if there was "oil, natural gas, coal bed methane gas or any other natural resource under Westland's land," and that they were "not aware of any commercially successful drilling on the property."  Proxy at 7.  Initially, Lane alleged that these statements were false and misleading because of four contrary facts that should have been disclosed:

> (i) that Westland's board of directors had been informed that between 100 and 500 million barrels of oil could be located on Westland property; (ii) that Defendant Sanchez had expressed his concern at an August 29, 2005, board meeting about losing valuable water and mineral rights; (iii) that Westland had received an offer from Savant Resources to lease all of Westland's property for oil and gas exploration; and (iv) that Tecton Energy LLC had offered to expand its existing oil and gas exploration lease from 7,000 to 30,000 acres.

Lane v. Page, 581 F.Supp.2d at 1103 (citing FAC ¶ 52, at 23).

Now that the Court has found these first two allegations immaterial, Lane has added several new allegations.  According to Lane, on August 29, 2005, Page told the board that oil broker Knute Lee had reported that 100 to 500 million barrels of oil could be found on Westland property, which could be worth hundreds of millions to Westland if recovered.  See SAC ¶ 52(a), at 34.  This estimate was based on a U.S. Geological Survey, and "Lee's firm planned to drill as soon as they can schedule a drilling rig."  Id. (internal quotation marks omitted).  To further support his allegations, Lane also points out that, in an August 2005 letter, Tecton Energy had written that it had "studied the Albuquerque Basin for years and believes substantial quantities of natural gas can be profitably recovered."  Id. ¶ 52(d), at 34 (internal quotation marks omitted).  Additionally, Lane adds an allegation that Westland's board concluded that Tecton Energy's offer to expand its lease should

be included in Westland proxy material.  See id.

### 7.     The Tax Increment Development District.

In discussing the board of directors' views on the merger, the Proxy asserted that Westland was a somewhat "unattractive" acquisition target because it held a "vast amount of undeveloped land" that would be very expensive and time consuming to develop.  Proxy at 27.  Westland also faced "significantly increasing costs . . . to develop its own land," because the City of Albuquerque would not bear infrastructure costs associated with recent Westland developments.  Id. at 28. Originally, Lane alleged that the Proxy "failed to mention that 'SunCal had arranged to take advantage of an October 2006 Tax Increment Development District ("TIDD") which allowed SunCal to utilize tax dollars to fund infrastructure costs associated with the development of Westland.'"  Lane v. Page, 581 F.Supp.2d at 1103 (citing FAC ¶ 51, at 22).

In his latest Complaint, Lane adds a significant number of allegations regarding the failure to disclose SunCal's plans for using a TIDD to help fund development.  Over the years, Westland has retained consultants and lawyers "to assist in efforts to take advantage of various public improvement district financing opportunities," SAC ¶ 51(a), at 32, and Westland Vice President Leroy Chavez "was intimately familiar with the City's procedures and public improvement financing opportunities" from his time on the Albuquerque City Council's Impact Fee Committee, id. ¶ 51(b), at 32.  In 2005, Westland hired lobbyists to work on its behalf on impact fees and public improvement financing, and was involved in litigation with the City of Albuquerque over the allocation of impact fees.  See id. ¶ 51(c) & (d), at 32.

An article appearing in New Mexico Business Weekly in February 2006 explained that Westland and ANM were working behind the scenes to get backing for development of Westland property and that Westland and the City of Albuquerque had been in development talks for nearly

a year. See SAC ¶ 51(e), at 32. SunCal expected that it would be able "to capitalize on and continue Westland's efforts to secure development entitlements," retaining "Westland employees familiar with the local political landscape for this task." Id. ¶ 51(g), at 33. Additionally, the merger agreement stated "that Westland would assist SunCal by continuing its efforts to obtain the entitlements." Id. ¶ 51(h), at 33.

### 8. Failure to Disclose D.E. Shaw's Involvement.

One set of allegations is new to the Second Amended Complaint. Lane alleges that D.E. Shaw was a participant in the merger and that the Proxy should have disclosed this fact. DESCO Real Estate, an entity affiliated with D.E. Shaw, owned 92.5% of SCC, the entity used to consummate the merger with Westland. See SAC ¶ 56, at 36. Correspondence between Page and Defendant Rizk reveals that Westland agreed not to disclose "*the involvement of DESCO Real Estate in the transaction*" to anyone except Westland employees directly involved in the merger or under compulsion "in a judicial or administrative proceeding or as other wise required by law." id. ¶ 56(b), at 37 (emphasis in original). The Defendants knew that D.E. Shaw's involvement needed to be disclosed. See id. ¶ 56(c), at 37-38.

### PROCEDURAL BACKGROUND

This is the second round of motions to dismiss in this case. On September 15, 2008, the Court issued an order granting in part and denying in part two motions to dismiss. See Order (Doc. 81). Soon thereafter the Court issued an opinion detailing its decision. See Memorandum Opinion and Order, entered September 24, 2009 (Doc. 83); Lane v. Page, 581 F.Supp.2d 1094.

The Court dismissed a number of allegations, some with leave to amend, others without. Other allegations the Court upheld, finding them adequately pled. Those allegations dismissed with leave to amend were: (i) the allegations regarding Page's and Padilla's employment agreement being

secretly modified, see Lane v. Page, 581 F.Supp.2d at 1132; (ii) the allegations regarding the board of directors' statements that the merger was fair, because Lane had not alleged that the statements were subjectively false, see id. at 1127; (iii) the allegations involving the failure to disclose SunCal's plans to use a TIDD, see id. at 1129; and (iv) the allegations involving the Proxy not mentioning that the board had been informed of a possible 100 to 500 million barrels of oil on Westland property, see id. at 1130.

Those allegations dismissed without leave to amend were: (i) the allegations that the Proxy failed to adequately disclose potential conflicts of interests regarding appointments to the board of Atrisco LLC or as trustees of Atrisco Heritage Foundation, see id. at 1121; (ii) the allegations regarding the market-check procedures, see id. at 1125; and (iii) the allegations regarding the failure to disclose that SunCal hired all the proxy solicitors, see id. at 1131. Those allegations the Court did not dismiss were: (i) the allegations involving how Westland directors intended to vote their shares, see id. at 1123; (ii) the allegations regarding Page's vote against the merger, see id.; (iii) the allegations regarding Page's involvement in the 2001 valuation, see id. at 1126; and (iv) the allegations regarding the leasing offers from Savant Resources and Tecton Energy, see id. at 1129-30.

After the Court's ruling, Lane sought to amend his Complaint. Although initially against any amendment, the Defendants later withdrew their opposition, and the Court granted Lane leave to amend. See Order Granting Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, entered February 5, 2009 (Doc. 144). The Second Amended Complaint retains many of the allegations from the previous Complaint, but also adds a number of new allegations and several new Defendants.

The Director Defendants[3] now move to dismiss all those allegations the Court has previously dismissed with or without leave to amend, and also ask that the Court dismiss certain allegations that it has previously allowed to remain in the case.  Westland and SunCal have joined in the Director Defendants' motion and also added some arguments.  The D.E. Shaw Defendants have filed a motion to dismiss the new allegations in the Second Amended Complaint that have recently brought them into the litigation and also join in the other motions.

## STANDARD FOR MOTIONS TO DISMISS

Under rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, and view those allegations in the light most favorable to the non-moving party and draw all reasonable inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the

---

[3] The Director Defendants are Page, Padilla, Joe. S. Chavez, Josie Castillo, Charles V. Pena, Georgia Baca, Benavidez, Mares, and Randolph M. Sanchez.

-14-

allegations in the complaint are true (even if doubtful in fact)."  Id. at 1965 (internal citation

omitted).  [T]he [Supreme] Court [of the United States] recently . . . prescribed a new inquiry for

us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to

relief that is plausible on its face.'"  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177

(10th Cir.2007)(quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1967, 1969 (2007)).  "The

Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible'

in order to survive a motion to dismiss."  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177

(quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. at 1974.)(alterations omitted).  "Thus, the mere

metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded

claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, L.L.C.

v. Schneider, 493 F.3d at 1177.

The Supreme Court has recently expounded upon the meaning of Bell Atl. Corp. v.

Twombly.

> Two working principles underlie [the] decision in *Twombly*.  First, the tenet that a
> court must accept as true all of the allegations contained in a complaint is
> inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of
> action, supported by mere conclusory statements, do not suffice. . . . Second, only
> a complaint that states a plausible claim for relief survives a motion to dismiss.
> Determining whether a complaint states a plausible claim for relief will . . . be a
> context-specific task that requires the reviewing court to draw on its judicial
> experience and common sense.

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009)(citation omitted).  Additionally, the Supreme

Court has commented:

> In keeping with these principles a court considering a motion to dismiss can choose
> to begin by identifying pleadings that, because they are no more than conclusions,
> are not entitled to the assumption of truth. While legal conclusions can provide the
> framework of a complaint, they must be supported by factual allegations.

Id. at 1950.

### RELEVANT LAW REGARDING MATERIALITY OF STATEMENTS OR OMISSIONS IN § 14(a) CLAIMS

Section 14(a) of the Exchange Act provides:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

15 U.S.C. § 78n(a) (2008). Rule 14a-9, which the SEC enacted pursuant to its authority to regulate proxy solicitations under § 14(a), provides the substantive content for many claims under § 14(a). That rule provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9 (2008)("rule 14a-9").

The basic elements of a claim under § 14(a) and rule 14a-9 are threefold. The plaintiff must establish that: (i) the proxy statement contained a material misrepresentation or omission; (ii) that the defendants were at least negligent; and (iii) that the proxy statement was an essential link in the completion of the transaction at issue. See Mills v. Auto-Lite Co., 396 U.S. at 385; Boone v. Carlsbad Bancorp., Inc., 1988 WL 341347, at *10 (D.N.M. 1988)(citing Wilson v. Great American Industries, Inc., 661 F.Supp. 1555, 1562 (N.D.N.Y. 1987)).

The Supreme Court has made the definition of materiality in securities cases turn on a

reasonable shareholder standard.  "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Garcia v. Cordova, 930 F.2d 826, 829 (10th Cir. 1991). As the Supreme Court has stated, this standard

> does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.

TSC Industries, Inc. v. Northway, Inc., 426 U.S. at 449.

A court must look to the contemporaneous facts surrounding a representation to determine whether it was false.  See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093-94 (1991). But corporations and corporate officers also have an ongoing duty to ensure that later events do not render a disclosure misleading.  The United States Court of Appeals for the Second Circuit has held that management "'cannot lawfully sit by and allow shareholders to approve corporate action on the basis of a proxy statement without disclosing facts arising since its dissemination if these are so significant as to make it materially misleading, and we have no doubt that Rule 14a-9 is broad enough to impose liability for non-disclosure in'" such situations.  SEC v. Parklane Hosiery Co., Inc., 558 F.2d 1083, 1089 n.3 (2d Cir. 1977)(quoting Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1297 n. 15 (2d Cir. 1973).

Corporate directors' opinions can be material.  See SEC v. Parklane Hosiery Co., Inc., 558 F.2d 1083 at 1090-91.  As the Supreme Court stated in Virginia Bankshares, Inc. v. Sandberg:

> Shareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest. Naturally, then, the shareowner faced with a proxy request will think it important to know the

-17-

> directors' beliefs about the course they recommend and their specific reasons for urging the stockholders to embrace it.

501 U.S. at 1091. On the other hand, the Supreme Court also found "mere disbelief or undisclosed motivation, standing alone, insufficient to satisfy the element of fact that must be established under § 14(a)." Id. at 1096.

For a proxy statement to avoid being materially false or misleading, it does not need to reveal all details at issue, or use any particular language, but must create only a "sufficiently accurate picture so as not to mislead." Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 2000 (2d Cir. 1978). Among the information that need not be disclosed, according to the United States Court of Appeals for the Sixth Circuit, is so-called "soft information." In re Ford Motor Co. Securities Litigation, 381 F.3d 563, 569 (6th Cir. 2004). Soft information includes "information that is uncertain and not objectively verifiable such as 'predictions, matters of opinion, and asset appraisals.'" Id. (quoting Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001)).

"As a matter of public policy, the SEC and the courts generally have not required the inclusion of appraised asset valuations, projections, and other 'soft' information in proxy materials or tender offers." Flynn v. Bass Bros. Enterprises, Inc., 744 F.2d 978, 985 (3d Cir. 1984)(collecting cases). "In assessing the need to disclose an appraised asset valuation courts have considered several indicia of reliability: the qualifications of those who prepared or compiled the appraisal; the degree of certainty of the data on which it was based; the purpose for which it was prepared; and evidence of reliance on the appraisal." Id. (footnotes omitted). "The factors a court must consider in making such a determination are: the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in

-18-

its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information." Id. at 988.

## LAW REGARDING CONTROL-PERSON LIABILITY

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1107 (10th Cir. 2003)(internal quotation marks omitted). The statute does not define what it means to be a controlling person. An SEC regulation gives some content to the term control: "The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. This regulatory definition of control is a broad definition that the United States Court of Appeals for the Tenth Circuit has cited "with approval," Maher v. Durango Metals, Inc., 144 F.3d at 1305, and the statute itself "'is remedial and is to be construed liberally,'" id. (quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971))(further internal quotation marks omitted). The Tenth Circuit "has expressly reject[ed] those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation. Rather, once the plaintiff establishes the prima facie case [of control], the burden shifts to the defendant to

-19-

show lack of culpable participation or knowledge."  Maher v. Durango Metals, Inc., 144 F.3d at

1305 (citation and internal quotation marks omitted, first alteration in original).

In Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985), the United States Court of Appeals

for the Eighth Circuit adopted a test for determining when control-person liability is satisfied.  First,

a plaintiff must show that the defendant "actually participated in (i.e., *exercised* control over) the

operations of the corporation in general."  Id. at 631 (internal quotation marks omitted).  Second,

a plaintiff "must prove that the defendant possessed the power to control the specific transaction or

activity upon which the primary violation is predicated, but he need not prove that this later power

was exercised."  Id.

The Tenth Circuit briefly mentions Metge v. Baehler in Maher v. Durango Metals, Inc., 144

F.3d 1302 (10th Cir. 1998).  There, the Tenth Circuit noted that there was a potential circuit split

on whether "a plaintiff must show that the alleged control person actually exercised control over the

primary violator's general affairs or whether it is sufficient to show that the control person had the

power to exercise such control."  Id. at 1305 n. 8.  The Tenth Circuit commented that, "although

perhaps disagreeing about whether a plaintiff must show actual control over the primary violator's

general affairs, courts generally agree that the plaintiff need only show the power to control the

transaction underlying the alleged securities violation and not the exercise of that power."  Id.

Ultimately, the Tenth Circuit declined to rule on the potential split.  To date, the Tenth Circuit

standard largely tracks the language of the regulation and requires a plaintiff to indicate that the

defendant "had possession, direct or indirect, of the power to direct or cause the direction of the

management and policies of a person, whether through the ownership of voting securities, by

contract, or otherwise."  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (internal quotation marks

omitted).

## ANALYSIS

After the Court ruled on the earlier motions to dismiss and granted Lane leave to amend some allegations, Lane filed his Second Amended Complaint.  This new Complaint takes the Court up on its offer to replead certain dismissed claims, retains the other dismissed claims with new facts, and adds new claims and Defendants.  In their motions, the Defendants urge the Court to dismiss the repled claims and the new claims, and also ask that the Court dismiss those claims that it has already found to be legally sufficient.  While much of the motions before the Court thus covers familiar ground, Westland and SunCal raise a new issue: they contend that Lane has failed to sufficiently plead what the damages in this case are.  The Court agrees with Westland and SunCal, and thus will dismiss the Second Amended Complaint.  On the other hand, the flaw requiring dismissal is relatively technical and likely to be easily remedied.  The Court will thus withhold entering final judgment and allow Lane ten days to file a motion to amend.  The Court will address the various other issues raised because of the possibility of the Court allowing amendment.  At the end of the day, however, the landscape on these allegations looks much as it did before this latest round of amendments and motions.  Two of the sets of allegations Lane has amended, however, have been sufficiently supplemented to make them actionable, should the Court in the future allow Lane to amend his Complaint to cure the fatal deficiency regarding damages.  Similarly, the new allegations regarding the failure to disclose D.E. Shaw's involvement will support a claim. Additionally, the Court finds that the allegations against the D.E. Shaw Defendants withstand a motion to dismiss and that the Court cannot determine, at this time, that these allegations are untimely.

I.     THE COURT WILL NOT DISMISS WITHOUT CONSIDERATION THE
       ALLEGATIONS ON WHICH THE COURT DID NOT GRANT LEAVE TO AMEND.

        Several allegations that the Court dismissed were dismissed without the Court indicating that
it would allow amendment of those claims.  Although they do not concentrate on this fact, the
Defendants briefly argue that, because the Court did not grant express leave to amend on some of
the allegations it dismissed, the Court should summarily dismiss those allegations. The Court does
not believe that approach is appropriate here and so will consider all the various allegations on the
merits.

        As Lane correctly notes, none of the allegations were dismissed with prejudice.  Rather,
some of the allegations were dismissed with express leave to amend given beforehand because the
Court viewed the deficiencies as tending to be technical in nature and more a matter of drafting than
substance.  For those claims not dismissed with leave to amend, Lane would be in the situation of
any other plaintiff who has claims dismissed: he would need to seek leave from the Court before he
could file any amendments.  This basic understanding was what the Court expressed during the
hearing on the first motions to dismiss.  The Court stated that it was "granting the motion without
prejudice to [Lane] amending, and then I think if there's other allegations that you wish to amend
you probably need to seek those from the Court."  Transcript of Hearing at 157:2-5 (Court)(taken
May 23, 2008, filed June 27, 2008)(Doc. 69).

        Lane has therefore complied with the Court's directions.  He has sought leave to amend and
it has been granted.  Leave to amend should be freely given "when justice so requires." Fed. R. Civ.
P. 15(a)(2).  A court should "generally refuse leave to amend only on a showing of undue delay,
undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by
amendments previously allowed, or futility of amendment." Duncan v. Manager, Dep't of Safety,

City and County of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(internal quotation marks omitted).

If the Defendants had procedural arguments against allowing amendment, then the appropriate time

to raise those arguments would have been when Lane moved to amend, rather than dropping their

opposition.   Regardless, given the early stages of this case, and the frequent presence of the

discovery stay under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court

cannot identify any prejudice in allowing amendment.  In the future, however, Lane should be aware

that the Court will not allow endless amending and, in particular, that "failure to cure deficiencies

by amendments previously allowed" is grounds for denial of amendment.   Duncan v. Manager,

Dep't of Safety, City and County of Denver, 397 F.3d at 1315.

## II.    LANE HAS NOT ADEQUATELY PLED INJURY.

Although most of the Defendants' arguments on the merits are aimed at specific allegations,

Westland and SunCal raise an issue that challenges Lane's § 14(a) claim -- and thus the § 20 claim

which rests on the § 14(a) claim -- as a whole.  According to Westland and SunCal, Lane has failed

to adequately plead how Westland's shareholders were harmed.  Lane counters that his pleadings

are sufficient and that damages are, in any event, a remedy for, and not an element of, a § 14(a)

claim.   Injury is something that a plaintiff must plead in a § 14(a) claim, and Lane has not

adequately pled that what the injury to Westland's former shareholders is.

It is not immediately clear from their argument whether Westland and SunCal are contending

that Lane has failed to plead the nature of the shareholders' injury, the cause of the injury, or both.

This opaqueness is not necessarily their fault, as the case law in this area is not always a model of

clarity.  After reviewing their arguments and the cases, however, the Court believes that Westland

and SunCal are challenging both the adequacy of Lane's pleading the nature of the shareholders'

injury and the cause of that injury.  To make matters more complicated, it is also not entirely clear

whether the term loss causation, which is the term generally employed with respect to damages in securities cases, covers both the nature and cause of the injury.[4]  Although the name loss causation implies that the term is largely about causal connections, courts seem to use the term to cover both nature and cause.  See, e.g., Jacobs v. Airlift Intern., Inc., 440 F.Supp. 540, 543 (D.C.Fla. 1977).  For the most part, the Court believes that drawing a distinction between the nature and the cause of an injury in a securities case is generally difficult and that the two will largely overlap.  When the injury involves economic loss, identifying the injury and identifying the cause of the injury will often be significantly interconnected.  The Court will thus use the term, as other courts do, to refer to both the nature and cause of the injury.

Westland and SunCal initially cite a pair of district court cases for the proposition that § 14(a) plaintiffs must plead how they were damaged.    The first case they cite, Jacobs v. Airlift Intern., Inc., held that a failure to allege the nature of the injury that the defendants had allegedly caused required dismissal of a § 14(a) claim because, by not pleading the nature of their injury, the plaintiffs had not pled that the proxy solicitation was an essential link between a securities violation and an injury.  See Jacobs v. Airlift Intern., Inc., 440 F.Supp. at 543.  Put differently, the complaint did not sufficiently demonstrate "loss causation."  Id.

_____

[4] To complicate matters even further, some courts seem to use the term transaction causation to cover what other courts would call loss causation. See, e.g., In re NAHC, Inc. Secs. Litig., 2001 U.S. Dist. LEXIS 16754 at *69-70 (E.D. Pa.)(dismissing § 14(a) claim for failing to sufficiently allege nexus between proxy statement and loss, and referring to deficiency as problem with transaction causation).  The Court will use the term loss causation to refer to the link between economic harm and the challenged action, which the Court believes is the more appropriate term. Loss causation refers to the cause of particular economic harm, while transaction causation refers to whether "the misrepresentations induced plaintiffs to engage in the subject transaction," which in this case is the merger.  Wilson v. Great American Industries, Inc., 979 F.2d 924, 931 (2d Cir. 1992).  In this case, transaction causation would refer to whether the proxy solicitation caused the shareholders to approve the merger, while loss causation would refer to any economic harm to the shareholders from the merger.

The other case first cited, In re Tyco Intern., Ltd., 2007 WL 1703023 (D. N.H.), dismissed a § 14(a) claim because the plaintiffs "failed to properly plead that their alleged damages were caused by misrepresentations in the proxy statements," but relied exclusively upon an earlier case from the same court, id. at *13.  That earlier case, In re Tyco Intern., Ltd., 2004 WL 2348315 (D. N.H.), grounded dismissal of a § 14(a) claim in a failure to show loss causation.  Given its later reliance on its decision in the 2004 case, the court apparently found persuasive General Electric Co. v. Cathcart, 980 F.2d 927 (3d Cir. 1992), which held "that damages that are subsequently caused by directors who are elected on the basis of misleading proxy statements are simply too remote from the misleading statements themselves to support a claim under § 14(a)."  In re Tyco Intern., Ltd., 2004 WL 2348315 at *15 (citing General Electric Co. v. Cathcart, 980 F.2d at 933).  In dismissing the claims, however, the district court stated that its reason was because the plaintiffs had "not attempted to respond to defendants' plausible causation argument, and thus they ha[d] waived their right to object to the dismissal of the § 14(a) claims on this basis."  In re Tyco Intern., Ltd., 2004 WL 2348315 at *15.

Lane briefly defends his decision not to give a fuller picture of his damages, arguing that "Westland's shareholders were denied a fully informed choice because the Proxy was materially false and misleading and was an essential link in the accomplishment of the SunCal Merger."  Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss Second Amended Complaint at 6, n.8, filed March 2, 2009 (Doc. 155)("Response").  Citing Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 386 (1970), Lane contends that, regardless, damages are a remedy for a § 14(a) claim, and not an element.  During the hearing, Lane contended that Westland's and SunCal's cases were largely inapposite here, either involving authority for 10(b) fraud claims or involving issues of expert testimony.  See Transcript of Hearing at 181:15-182:9 (Robbins)(taken April 3,

2009)("Tr.").[5]  He also maintained that it was clear from the Complaint that the damage to the shareholders from the merger was it being completed at too low a price per share.  See Tr. at 182:9-14 (Robbins).

Westland and SunCal argue that Mills v. Elec. Auto-Lite Co. was about "'what causal relationship must be shown between [a misleading proxy] statement and the merger to establish a cause of action'" under § 14(a), and not about what damages allegations were necessary.  Reply of Defendants Westland and SunCal in Support of Their Motion to Dismiss and Joinder in the Director Defendants' Motion to Dismiss at 5, filed March 20, 2009 (Doc. 166)(quoting Mills v. Elec. Auto-Lite Co., 396 U.S. at 377).  They maintain that Lane must still allege his injury or damages in a sufficient fashion.  Westland and SunCal also contend that Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), requires a sufficient pleading of loss.  They acknowledge that Dura Pharmaceuticals, Inc. v. Broudo was a § 10(b) case, but contend that its holding has been, and should be, applied to § 14(a) cases.

To recover damages, Lane will have to eventually demonstrate that the Defendants caused shareholders some loss.  See Grace v. Rosenstock, 228 F.3d 40, 47 (2d Cir. 2000); 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.").  Lane does not appear to challenge this point.  Rather, the issue is whether Lane must plead his theory of loss causation or whether that is a matter for a later date.

A number of courts have held that loss causation is an element of a § 14(a) claim that must

---

[5] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain different page and/or line numbers.

-26-

be pled.  See, e.g., DCML LLC v. Danka Business Systems PLC, 2008 WL 5069528 at *2 (S.D.N.Y.)("To state a claim under section 14(a), a plaintiff must plead loss causation, that is, the plaintiff must demonstrate that the economic harm that it suffered occurred as a result of the alleged misrepresentations.")(internal quotation marks omitted); Kelley v. Rambus, Inc., 2008 WL 1766942 at *2 (N.D.Cal.).  Other courts, without specifically stating that loss causation is an element, have considered whether loss is adequately pled under rule 12(b)(6) motions.  See, e.g., In re Tyco Intern., Ltd., 2007 WL 1703023 at *13.  However the courts express the matter, there appears to be a general consensus that plaintiffs must plead their injuries and the relationship of the injury to the proxy solicitation and transaction with at least some particularity.

There is at least some superficial tension between these recent cases and Mills v. Electric Auto-Lite Co., which Lane cites.  Upon closer inspection, however, the Court believes that this tension dissolves.  In Mills v. Electric Auto-Lite Co., the Supreme Court held that "a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." 396 U.S. at 385.  It is unclear whether this statement refers to what is known in securities litigation parlance as loss causation, as transaction causation, or as both.  For there to be a link to an injury, however, there must be an injury, which implies that Mills v. Electric Auto-Lite Co. does not relieve plaintiffs of a burden to plead what their injury is.  One of the few courts to have discussed loss causation in the context of Mills v. Electric Auto-Lite Co. has reached this conclusion.  See Jacobs v. Airlift Intern., Inc., 440 F.Supp. at 543 (holding that, under Mills v. Electric Auto-Lite Co., a § 14(a) must plead loss causation).

Additionally, the issue discussed in Mills v. Electric Auto-Lite Co. was the nature of the

causal relationship that needed to be proven between materially misleading statements in a proxy solicitation and the proposed merger that prompted the solicitation.  See 396 U.S. at 377.  The district court had found that approval of a substantial number of minority shareholders was necessary for approval of the merger, thus showing causation, while the court of appeals had ruled that if the merger were shown to be fair, then as a matter of law it would be presumed that the proxy solicitation would have obtained the requisite number of votes even if shareholders knew of the misrepresentations and there would be no liability.  See id. at 380.  Disagreeing with both tests, the Supreme Court held that showing that statements or omissions in the proxy solicitation were material was sufficient to prove causation because materiality meant that the statements or omissions were related enough to the transaction for which the solicitation was conducted.  See id. at 384.  Taking into account the procedural history of the case, the Court believes that the Supreme Court was holding that materiality was sufficient to establish transaction causation.  In other words, if the statements or omissions in a proxy solicitation are material, then a plaintiff has met his or her burden of showing that the misrepresentations or omissions caused the transaction at issue.  Thus, the Court does not believe that Mills v. Electric Auto-Lite Co. holds that plaintiffs need not plead damages in a 14(a) case.  Nor does Mills v. Electric Auto-Lite Co. require that they do so.  In the end, Mills v. Electric Auto-Lite Co. is not on point regarding that issue.

Moreover, after Dura Pharmaceuticals, Inc. v. Broudo, the Court believes that the pleading landscape has changed somewhat, at least in securities cases.  As Lane points out, Dura Pharmaceuticals, Inc. v. Broudo was a § 10(b) fraud case.  And the Court agrees that certain aspects of that case are concerned with § 10(b) cases and do not have a broader applicability.  But part of the Supreme Court's decision is cast at a much more general level and would apply, at a minimum, to other securities cases involving economic loss.

-28-

In a separate section, after discussing an issue involving the adequacy of a causation theory, the Supreme Court stated: "Our holding about plaintiffs' need to prove proximate causation and economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to allege these requirements."  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. at 346.  The Supreme Court assumed, "for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss," but nonetheless found a conclusory statement of damages -- that the plaintiffs "paid artificially inflated prices for Dura['s] securities and suffered damage[s]" -- inadequate.  Id. (internal quotation marks omitted, brackets in original).  Artificially inflated purchase prices were not relevant economic losses, based upon an earlier portion of the opinion, "[a]nd the complaint nowhere else provide[d] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation."  Id. at 347.  The Supreme Court observed:

> [O]rdinary pleading rules are not meant to impose a great burden upon a plaintiff. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 513-515, . . . (2002). But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid. *Cf.* H.R. Conf. Rep. No. 104-369, p. 31 (1995), U.S.Code Cong. & Admin.News 1995, pp. 679, 730 (criticizing "abusive" practices including "the routine filing of lawsuits . . . with only [a] faint hope that the discovery process might lead eventually to some plausible cause of action"). It would permit a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." *Blue Chip Stamps* [*v. Manor Drug Stores*], 421 U.S. [723] at 741 [(1975)].

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. at 347.

While Dura Pharmaceuticals, Inc. v. Broudo arose in the context of securities fraud, its

discussion of pleading standards is general and based upon no more onerous a standard than rule 8 of the Federal Rules of Civil Procedure.  Dura Pharmaceuticals, Inc. v. Broudo's holding about how to plead economic loss is thus applicable to this case.  And Dura Pharmaceuticals, Inc. v. Broudo instructs that Lane's "need to prove . . . economic loss" to recover damages requires him "adequately to allege" that loss.  544 U.S. at 346.  See Vogel v. Jobs, 2007 U.S. Dist. LEXIS 86996 at *14 (N.D. Cal.)(applying Dura Pharmaceuticals, Inc. v. Broudo to 14(a) claim)).  Given Dura Pharmaceuticals, Inc. v. Broudo's applicability, Mills v. Electric Auto-Lite Co.'s silence on this issue, and the numerous cases indicating that a plaintiff needs to plead loss causation in a § 14(a) case, the Court concludes that Lane must adequately plead "the economic loss and proximate cause" he has in mind.  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. at 347.

This conclusion does not end the matter.  At the hearing, Darren Robbins, Lane's attorney, argued that it was clear from the Complaint that the injury here was from an insufficient merger price.  While the Court agrees that there are facts from which one could draw this conclusion, reading the Complaint, without Mr. Robbins's commentary, would not indicate that this was necessarily the injury contemplated.  When it comes to discussing injury, the Second Amended Complaint states that "[a]s a result of the defendants' preparation, review, and dissemination of the Proxy Statement, Westland's shareholders  have suffered substantial harm."  SAC ¶ 64, at 39.  Under Dura Pharmaceuticals, Inc. v. Broudo, the Court cannot say that the pleadings are adequate.

An adequate pleading of economic loss would indicate what the loss contemplated is and the basic causal connection for the loss.  Such requirements will place some burdens on plaintiffs in securities cases.  Congress, however, has indicated its concerns about being stringent with securities litigation and the Supreme Court, in a similar vein, has laid down rules the Court is bound to follow.  It is likely that, in many cases, these pleading requirements will require a plaintiff only to allege the

basics of the expected theories of loss.  And plaintiffs can of course plead alternative theories, selecting among them if necessary as discover unfolds.  It seems unlikely that plaintiffs will be required to consult with an expert to be able to draft a complaint, unless a plaintiff plans to rely on a particularly exotic theory.  Pleading should not become a preview of expert testimony, but a plaintiff should inform the defendants what is the general nature of the loss and the reason for that loss.

Failing to plead loss causation fatally undermines Lane's claims as a whole, both his § 14(a) claim and his § 20(a) claim, which depends upon the § 14(a) claim.  The Court will therefore dismiss Lane's claims.  Lane has, however, asked for permission to amend again.  See Tr. at 183:20-84:4 (Robbins).  And the Court believes it is likely that Lane can cure this deficiency through re-pleading. The problem appears to be one of omission and not a substantive problem; based upon the allegations here it seems likely that Lane will be able to articulate one or more theories of loss causation.  The Court will not, however, guarantee that it will grant leave to amend.  Instead, the Court will refrain from entering judgment on this case.  The Court will give Lane ten days to move for leave to amend.  Assuming that Lane timely files a motion to amend, the Court will then hold the final judgment in abeyance during the motion's pendency and will not enter judgment at this time unless the Court denies the motion to amend, or Lane fails to timely move to amend.

Although the Court is dismissing the claims as a whole because of the deficiency in pleading loss causation, the Court will address the other issues the Defendants have raised.  Should Lane move to amend and should the Court grant Lane's motion, the sufficiency of the various allegations will again be a live issue.  Given that the issues have already been briefed and argued, the Court will proceed to address them.

## III.   MOST OF THE ALLEGATIONS THAT THE COURT DISMISSED WITHOUT LEAVE TO AMEND REMAIN NOT MATERIAL, BUT THE PROXY SOLICITOR ALLEGATIONS CAN SUPPORT A § 14(a) CLAIM.

Of the four sets of allegations at issue here that the Court dismissed without leave to amend, only the proxy-solicitor allegations are actionable.  Most of the allegations, despite Lane's amendments, remain not material.  Lane's new theory about the proxy solicitors, however, in which he contends that SunCal's funding proxy solicitors should have been disclosed under SEC regulations, is correct.[6]

### A.   THE ALLEGATIONS ABOUT PAGE'S AND PADILLA'S EMPLOYMENT AGREEMENTS ARE NOT MATERIAL.

The Court dismissed the allegations involving the employment agreements, stating that "[t]he existence of the agreements and their terms are clearly spelled out, and Lane does not contend that the terms are different than those disclosed; they are preceded by a warning to the shareholders that the interests of the officers mentioned 'are different from your interests as a shareholder and that may present actual or potential conflicts of interest.'" Lane v. Page, 581 F.Supp.2d at 1121 (quoting Proxy at 29).  The Court dismissed these allegations without prejudice.  See Lane v. Page, 581 F.Supp.2d at 1132.  The Defendants contend that Lane's new allegations fail to cure the problems

_____

[6] In a footnote, the Defendants also contend that negligence is a state of mind and that Lane has failed to plead with requisite particularity facts regarding each Defendant's state of mind. See Directors' Motion at 3 n.3.  In its earlier opinion, the Court found it unnecessary to decide whether the PSLRA's heightened pleading standard for state of mind, see 15 U.S.C. § 78u-4(b)(2), applied to a § 14(a) negligence claim because Lane's allegations were sufficient regardless.  See Lane v. Page, 581 F.Supp.2d at 115-16.  Once again, the Court finds those of Lane's pleadings that it sustains adequate even under a heightened standard.  The Court also reiterates, however, that it is likely that Tenth Circuit law indicates that negligence is not a state of mind. See id. at 115 (citing United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005)).  The Tenth Circuit is not alone in this view.  Recently, for example, the United States Court of Appeals for the Seventh Circuit held that, because negligence was not a state of mind, § 78u-4(b)(2) did not apply to a § 14(a) action premised on negligence.  See Beck v. Dobrowski, 559 F.3d 680, 682 (7th Cir. 2009).

-32-

with the allegations, contending that the allegations at most support a claim of hidden motivations that need not be disclosed.

Lane argues that SEC regulations require accurate disclose of Page's and Padilla's interests. According to Lane, he "now expressly alleges that the real terms" of the agreements are different than what was disclosed and that, regardless, the circumstances surrounding the improvement of the contracts, which Lane alleges occurred only after they expressed opposition to the SunCal merger, were not disclosed.  Response at 13.  At the hearing, Danielle S. Myers, Lane's attorney, noted that the Proxy specifically mentioned that the contracts of several executives were modified, but did not disclose the modification of Page's and Padilla's agreements.  See Tr. at 19:1-8 (Myers).  Jesse Z. Weiss, counsel for the Director Defendants, stated that he thought it was likely that the earlier SNM merger agreement, disclosing different contract terms, was a typographical error.  See id. at 20:6-18 (Weiss).

Although Lane contends that he is now expressly alleging that Page's and Padilla's agreements are different than what the Proxy discloses, the Court's reading of the Second Amended Complaint does not agree with Lane's.  Paragraph 40(b) of the Second Amended Complaint says:

> Neither Page's nor Padilla's existing agreements provided for six year terms or for payments equal to seven times the amount of annual compensation.  Rather, these agreements were modified to provide additional terms *after* Page voted against adopting the SunCal Merger Agreement and *after* Padilla expressed to the Board that there were "numerous problems" with the SunCal Merger Agreement.  These modifications were effected as an inducement to obtain there endorsement of the SunCal Merger.

SAC ¶ 40(b), at 20 (emphasis in original, footnoted omitted).  Standing alone, the first sentence would indicate that the allegation was that the employment agreements were not as lucrative as the Proxy indicated.  The next two sentence undercut this reading.  What the Second Amended Complaint seems to be alleging is that Page's and Padilla's agreements were the not the six-year,

seven-times-compensation agreements at the time the board vote on the SunCal merger, which was July 18, 2006, and that the agreements were modified after the vote. Not until September 20, 2006, however, was the Proxy disclosed. In between, the way the Court understands the allegations, the agreements were modified. Indeed, it would make little sense, if the plan was to entice Page and Padilla to support the merger, to wait until after the Proxy was sent out to sweeten their agreements and gain their support for the merger. Thus, the Court does not agree with Lane's contentions in the briefing that his new Complaint alleges that the Proxy did not accurately disclose the terms of Page's and Padilla's agreements. Rather, he is alleging that the agreements were modified to obtain Page's and Padilla's support, and the fact that the agreements were recent is not disclosed.

Such allegations, however, run into the same problem as those in the earlier Complaint. They remain allegations of "hidden motivations that the officers may have had . . . and need not have been revealed." Lane v. Page, 581 F.Supp.2d at 1121 (citing Virginia Bankshares, Inc. v. Sandberg, 501 U.S. at 1096). Lane has provided more detail, but he has not changed the basic premise of the allegations.

There are two new points Lane makes that could change the result, but ultimately the Court is unpersuaded. First, at the hearing, Ms. Myers pointed out that the Proxy discusses other officers, but not Page and Padilla, having their contracts modified. This difference in treatment implicates the principle that once something was revealed in the Proxy, the Defendants were under "a duty to be accurate and complete in what" they said. Lane v. Page, 581 F.Supp.2d at 1126. Even if the differing degrees of disclosure were misleading, however, they would remain misleading in a non-material way. Any tendency to mislead would still go to hidden motivations that need not be disclosed in light of the full disclosure about an objective possibility of a conflict of interest.

Second, Lane contends that the Proxy's oversights are a violation of SEC regulation and thus

per se material.  Item 5 of 17 C.F.R. § 240.14a-101 requires proxy statements to "[d]escribe briefly

any substantial interest, direct or indirect, by security holdings or otherwise, of" various people,

including directors and officers.  Assuming that the employment agreements amount to a substantial

interest, these provisions do not require disclosure of a change in interest, so long as the interest

itself is disclosed.  The Proxy discloses the terms of the agreements.  Even if the agreements were

modified shortly before the Proxy, § 240.14a-101 would not require that the fact the agreement was

modified, as opposed to the new terms of the agreement, be disclosed.  What the Proxy does,

disclosing the final terms, complies with the regulation.  In sum, the Court does not see any reason

to change its earlier ruling.  Lane's allegations might indicate some reason to doubt Page and Padilla

-- which can have relevance in other circumstances, such as the statements of fairness or other

situations involving them placing their personal judgment and credibility behind a situation -- but

the Court does not see that the conflict-of-interest disclosures in the Proxy could be considered

materially false and misleading.

### B.  THE MARKET-CHECK PROCESS WAS ADEQUATELY DISCLOSED.

Finding that the Proxy adequately described Westland's market-check process and noting

that "Lane does not allege any information suggesting the directors' did not believe the market

check to be sufficient protection for the shareholders' interests," the Court dismissed Lane's

allegations based on the market check.  Lane v. Page, 581 F.Supp. at 1124.  The Defendants argue

that Lane's new allegations, which largely relate to earlier merger agreements, do nothing to cast

doubt on the Court's observations that "Lane's contentions go more towards the possibility that

Westland could have done a better job of soliciting offers or could have bargained harder with

SunCal," and that "[a] shareholder could certainly find the process to have been deficient, but he or

she could have come to that conclusion, or at least been suspicious, on the basis of the information

divulged in the Proxy." <u>Id.</u>  Lane counters that his amendments demonstrate that the Defendants did not believe that the market-check process was adequate shareholder protection and also demonstrate the objective inadequacy of what Lane argues was no process at all.

The Court believes that Lane's new allegations fail to cure the fundamental problem with his contention on the market check: namely, that the Proxy spends several pages describing what the Proxy labeled the market-check process.  Substantial detail regarding the process or lack thereof is revealed in the Proxy.  What the Court said in its earlier opinion remains valid here:

> A shareholder could certainly find the process to have been deficient, but he or she could have come to that conclusion, or at least been suspicious, on the basis of the information divulged in the Proxy. And that is § 14(a)'s purpose: to give shareholders the information needed to assess corporate action. Section 14(a) is not a tool for directly attacking the sufficiency of corporate actions; it operates more indirectly, on the idea that information is power. And sufficient information was disclosed here.

<u>Lane v. Page</u>, 581 F.Supp. at 1124.  Several of Lane's new allegations involve allegations that SunCal and D.E. Shaw thought that Westland's board was bungling the merger process.  While these allegations help support the market-check process being objectively deficient, again, a shareholder reading the Proxy could come to that same conclusion.[7]

_____

[7] It may appear somewhat unusual to find that the allegations against the D.E. Shaw Defendants and SunCal are sufficient to bring them into the case as control persons, while also finding that a market check they thought insufficient was adequately disclosed.  This result, however, is a feature of control-person liability.  Control-person liability depends upon primary liability.  On the question of primary liability, the inquiry is into the actions and beliefs of the primary violators, which in this case is Westland and the Director Defendants.  Without further evidence, the Court cannot transfer the beliefs of SunCal and the D.E. Shaw Defendants, to Westland and the Director Defendants.  If SunCal and the D.E. Shaw Defendants were the issuers of the Proxy and being sued directly under § 14(a), then the allegations that they thought the market check was unsophisticated and minimal would provide support for a § 14(a) claim.  Here, however, SunCal and the D.E. Shaw Defendants are not the issuers of the Proxy, but are potentially liable only as control persons.  The structure of the law and the claims in this case means that they cannot be liable derivatively unless Westland and/or the Director Defendants are liable directly.  Thus, there can be some allegations, such as the market-check allegations, for which SunCal and the D.E. Shaw

-36-

Lane's main changes in the Second Amended Complaint, however, involve his allegations that the directors did not believe that the market check was adequate. This flaw was identified in the Court's opinion, but it was not a major point. Indeed, the Court observed that, given the extensive disclosure and the prefatory language about the check, the statement in the Proxy that the directors believed the market check was adequate did not change the adequacy of the disclosure. See Lane v. Page, 581 F.Supp. at 1124. Lane's new allegations almost entirely concern prospective mergers from before the SunCal merger. It is these mergers that were ultimately superseded by later merger offers. These allegations indicate that the directors may have had qualms about those earlier mergers, but those mergers were terminated for more favorable mergers. And the potentially misleading comment in the Proxy is that the process was adequate -- not whether directors thought some of the earlier mergers were not fair. The Court does not believe that the Second Amended Complaint adequately pleads facts supporting the contention that the directors subjectively did not believe that the market-check process was acceptable. Taken together with the thorough disclosures in the Proxy, the Court does not believe that a reasonable shareholder could find the Proxy false or misleading in any material way with respect to the market check.

**C.   THE ALLEGATIONS REGARDING THE 2005 VALUATION STILL FAIL TO SUPPORT A CLAIM, BUT THE COURT WILL NOT CHANGE ITS RULING ON PAGE'S ALLEGED INVOLVEMENT IN THE 2001 VALUATION.**

According to Lane, the Proxy misled shareholders because it stated that Westland's directors considered a 2005 valuation of the company in deciding to recommend approval of the merger to shareholders, without disclosing an internal valuation significantly higher than SunCal's bid and

---

Defendants cannot be liable in this case, under § 20(a) -- even though they might be liable under § 14(a) in a hypothetical case in which they were issuers of the Proxy -- because Westland and the Director Defendants cannot be liable under § 14(a).

without revealing that Page allegedly interfered with an earlier 2001 valuation by the same valuation company.  Finding no allegations about the internal valuation's reliability, the Court dismissed that claim, but held that Page's alleged actions would be material information if true.  See Lane v. Page, 581 F.Supp. at 1125-26.  Both Lane and the Defendants are dissatisfied with this outcome.  Lane has added new allegations to support the internal valuation claim, which the Defendants move to dismiss.  In turn, the Defendants contend that the Court should dismiss the allegations involving Page that it had previously allowed.

### 1.    The Internal Valuation Need Not Have Been Disclosed.

With respect to the internal valuation, the Court held that the valuation was speculative soft information because Lane had not alleged any information about how the figure was reached or other factors that would make the estimate reliable.  See id. at 1125.  In the Second Amended Complaint, Lane adds several new allegations that he asserts provide the necessary indicia of reliability for the internal valuation to survive dismissal.  He now alleges that, at Page's request, Lesley prepared a "value menu" in August 2005 that concluded that Westland's land, excluding the Cordero Mesa interest, was worth $377 million, or $474.00 per share.  SAC ¶ 48(a), at 27.  This value menu, Lane alleges, was reliable because Page and Padilla

> routinely relied upon Mr. Lesley's analysis of Westland's land throughout his more than two decades of employment with the Company and his resultant expertise and experience. This internal "value menu" was also reliable because it incorporated into the August 2005 "value menu" a June 16, 2005 valuation of 2,500 acres which Mr. Leslie estimated was worth $78 million. Defendants relied upon Mr. Leslie and the June 16, 2005, $78 million valuation (which was but one component of the comprehensive August 2005 "value menu") as the basis to reject a $30 million offer for those 2,500 acres of land.

Id. ¶ 48(a), at 27-28.

The Defendants contend that these new details add little to Lane's allegations and that there

is still an insufficient basis to find that the internal valuation was reliable and material information. Lane counters that the valuation has sufficient reliability because of Lesley's experience with Westland, because of the confidence the directors placed in him, and because of their reliance on some of the information included in the value menu in rejecting an offer to buy land. Citing Flynn v. Bass Brother Enterprises, Inc., the Defendants contend that the Lane has not identified sufficient indicia of reliability.

At the hearing, Mr. Robbins contended that the Flynn v. Bass Brother Enterprises, Inc. factors were met, arguing that Lesley was an experienced real estate appraiser and the senior official in charge of Westland's real estate, that Lesley's valuation was an internal valuation done at Page's behest, and that there was no indications of bias in the valuation. See Tr. at 35:1-16:11 (Robbins & Court); 38:24-39:7 (Robbins). Mr. Robbins also contended that cases like In re Ford Motor Co. Securities Litigation, which dealt with soft information not needing to be disclosed, were concerned more with puffery and other sales language, and not with valuations of the sort at issue here. See Tr. at 39:24-40:24 (Robbins). Mr. Weiss and Douglas Schneebeck, attorney for Westland and SunCal, argued that there were no allegations about what Lesley did and that the valuation failed to account for a number of facts, such as taxation and development costs. See id. at 41:7-21 (Weiss); 42:8-44:16 (Schneebeck).

While the new allegations provide some indicia of reliability regarding the internal valuation, the Court continues to believe that the allegations lack sufficient indicia to allow this claim to proceed. Lesley's status as a corporate executive with inside knowledge of Westland and the past reliance Westland directors had placed on his advice both provide some degree of reliability. Additionally, the incorporation of an estimate on which the board in fact relied in rejecting an offer to buy land provides some indicia of reliability as to at least part of the internal valuation. What the

-39-

allegations about the internal valuation are lacking, however, is any indication about how the number $377 million was reached.  This omission is fatal.

Mr. Weiss' and Mr. Schneebeck's comments about the flaws the internal valuation allegedly contained highlight the importance of indicia of reliability relating to the process or basis of a valuation.  Allegations about valuations need not be able to withstand all the criticism that might be leveled against them.  Delving into the particular ways in which a valuation might be flawed begins to drift  into summary judgment and trial issues, because they involve situating a valuation in the context of facts that might be in dispute or might be outside the pleadings.  For this reason, the Court does not think that the specific flaws Mr. Schneebeck raised at the hearing are necessarily fatal to the claim.  Rather, what is problematic is the fact that an evaluation with no disclosure about how the figure produced was reached gives little assurance of reliability.  Without understanding that at least some reliable procedure or basis supports a valuation -- even if that procedure or basis is ultimately somewhat flawed -- it is impossible to tell whether a reasonable shareholder would rely on that information in voting.  In other words, without more indicia of reliability, a court cannot determine that such an evaluation might be material.

Requiring such indicia of reliability might strike Lane as a heavy burden, but given the governing standard, such a requirement is appropriate.  "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Industries, Inc. v. Northway, Inc., 426 U.S. at 449 (emphasis added).  In formulating this test, the Supreme Court rejected a test which would be based on facts "which a reasonable shareholder *might* consider important." Id. (emphasis in original).  Under the test the Supreme Court has adopted, a plaintiff must show a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable

shareholder." Id.

"As a matter of public policy, the SEC and the courts generally have not required the inclusion of appraised asset valuations, projections, and other 'soft' information in proxy materials or tender offers." Flynn v. Bass Bros. Enterprises, Inc., 744 F.2d at 985 (collecting cases). "In assessing the need to disclose an appraised asset valuation courts have considered several indicia of reliability: the qualifications of those who prepared or compiled the appraisal; the degree of certainty of the data on which it was based; the purpose for which it was prepared; and evidence of reliance on the appraisal." Id. (footnotes omitted). "The factors a court must consider in making such a determination are: the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information." Id. at 988. Some of these factors are met here. What is missing, however, is "the degree of certainty of the data on which" the valuation was based.

Valuations can be highly important. They can provide a bottom-line basis for comparison and doubtless will be a major factor in the average shareholder's decision about how to vote. This same reason, however, also underscores the importance of information being reliable before it must be disclosed. Unreliable valuations that are disclosed out of a fear of liability could derail many economically beneficial deals. Without some basis in the allegations supporting the internal valuation having been performed by a reliable methodology, the Court does not believe that it needed to be disclosed in the Proxy.

## 2. Page's Alleged Manipulation of the 2001 Valuation.

Despite the Court's finding that Lane's allegations that Page manipulated the 2001 valuation

withstood a motion to dismiss, the Director Defendants ask the Court to revisit the issue.  They contend that this allegation is one of fraud, that Lane has failed to plead facts to make the claim specific or plausible, and that the information would not be important to shareholders deciding how to vote four years later regarding an offer that exceeded the alleged "untainted" 2001 valuation.  In response, Lane contends that the claim is not sounding in fraud, is adequately pled, and that the susceptibility of the valuation firm to pressure from Page makes what happened in 2001 material to the 2005 valuation's materiality.

The Court is unpersuaded by the Defendants' new arguments and will continue to hold that the allegations regarding Page's involvement in the 2001 valuation state a claim.  Although the Defendants attempt to recast Lane's allegations as fraud, he has sued based on negligence.  If the Defendants are held liable, it will be because Lane is able to prove that Page interfered with the valuation in 2001 and they failed to disclose the interference.  Lane will be required to show that interference, but will not need to establish any elements of fraud.

The Defendants also fail to explain why the Court's reasons for finding the alleged manipulation material are incorrect.  Unlike the internal valuation, the Defendants chose to disclose and rely upon the 2001 valuation in the Proxy.  In holding that the manipulation allegations were adequate, the Court stated:

> If Westland's president and CEO managed to manipulate the 2001 valuation, that would be information a reasonable shareholder would think was important. Susceptibility to pressure by Westland would call into question the independence of the firm and the integrity and reliability of the valuation, and thus the information would be material.

Lane v. Page, 581 F.Supp.2d at 1126.  Even though the offer price exceeded what Lane alleges was the un-manipulated 2001 valuation price, that fact does not break the link between the 2001 and 2005 valuations.  Shareholders would still be concerned about the adequacy of the second valuation,

four years after the first valuation.  Lane does not need to specifically allege that the 2005 valuation was manipulated or wrong to make the alleged manipulation information that shareholders would reasonably want to have.   Armed with information about a previous interference, shareholders might well more closely scrutinize that valuation.   The 2005 valuation might withstand such scrutiny; it might not.  Section 14(a) is concerned with transparency and providing information.  If true, shareholders should have been informed of Page's involvement with the 2001 valuation, and been given the information that would have put them on notice to conduct such an investigation.

### D.   THE ALLEGATIONS REGARDING THE PROXY SOLICITORS SUPPORTS A CAUSE OF ACTION UNDER § 14(a)

Regarding the proxy solicitors, Lane pleads a new factual allegation, but primarily advances a new legal theory.  Lane originally alleged that the Proxy failed to disclose that SunCal hired the proxy solicitors, and the Second Amended Complaint retains these allegations, with some modification.  The Court dismissed the allegations on two grounds.  First, there was no indication that "any of the Defendants knew at the time of the Proxy's dissemination or making that Westland would not retain any solicitors."  Lane v. Page, 581 F.Supp.2d at 1130.  Second, and "[m]ore importantly . . . the information would not be material regardless," because "Westland was already clear about its support for the merger."  Id. at 1131.

Now Lane argues that, by failing to disclose that SunCal was funding the solicitors, the Proxy was in violation of 17 C.F.R. § 240.14a-101, item 4(4) (2006).  The Defendants contend that SunCal's role was disclosed and that SunCal having hired the solicitors fails to cure the deficiency with the claim, namely that reasonable shareholders would not be concerned with the solicitors' motives or employers.  At the hearing, Mr. Schneebeck also pointed out that the Proxy stated that SunCal was going to retain Mellon Investor Services LLC to solicit proxies from shareholders.  See

Tr. at 53:17-23 (Schneebeck)(citing Proxy at 16).

Relying on Seinfeld v. Gray, 404 F.3d 645 (2d Cir. 2005), Lane contends that an omission of information that SEC regulations require to be disclosed is per se actionable.  The applicable regulation at the time of the merger requires a proxy statement to "[s]tate the names of the persons by whom the cost of solicitation has been or will be borne, directly or indirectly."  17 C.F.R. § 240.14a-101, item 4(4) (2006).  According to the Defendants, the Proxy meets this requirement.  In support of this contention, the Defendants note that the Proxy informs shareholders that "SCC [SunCal] may also be deemed a participant in the solicitation of the proxies."  Proxy at 16.  This quotation, however, is selective.  The next sentence reads: "Westland will bear the costs of solicitation of proxies . . . . "  Id.  This juxtaposition draws a distinction in the Proxy between being a potential participant and financing the solicitation.  Participation in solicitation and financing solicitation are also distinct concepts in the regulations.  Under the regulation, those financing a solicitation will generally be considered participants, see, e.g., 17 C.F.R. § 240.14a-101, item 4, instruction 3(a)(iv) (2006), but one can be labeled a participant without being a financier, see, e.g., id. instruction 3(a)(i)-(iii), (vi).

As Mr. Schneebeck pointed out, however, the Proxy disclosed that SunCal would hire a firm to do solicitation as well.  Lane's allegations, however, seem broader than the disclosure in the Proxy.  The Proxy indicates a limited role for one firm being paid $10,000.00 by SunCal, with Westland spending $70,000.00 to $150,000.00 on ninety solicitors.  See Proxy at 16.  Given Lane's allegations in the Second Amended Complaint, the Court cannot say that the Proxy disclosed, as Lane alleges, that SunCal hired all the proxy solicitors. Thus, Lane has alleged a potential regulatory violation.  The question becomes whether Lane is correct that this omission of required material automatically make the omission actionable under § 14(a).

-44-

Section 14(a) prohibits solicitation of proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."   Rule 14a-9 is one such enacted rule, proscribing false or misleading statements or omissions.  It is the most commonly cited rule, but it is not the only rule or regulation that the SEC has promulgated regarding proxy solicitations.  The regulation on which Lane relies is another example.  Section 14(a)'s plain language indicates that, although omission of information required under other SEC regulations is not necessarily per se material, it is nonetheless actionable because it is "in contravention of such rules and regulations as the Commission may prescribe."

This reading of § 14(a) is the same as the Second Circuit's reading of that section. "Omission of information from a proxy statement is actionable 'if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading.'" Seinfeld v. Gray, 404 F.3d at 650 (quoting Resnik v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002)).  Resnik v. Swartz, on which Seinfeld v. Gray relies, also states that an "omission of information from a proxy statement will violate these provisions if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." Resnik v. Swartz, 303 F.3d at 151.  The Second Circuit applied this rule, looking to whether the regulations required disclosure.  See id. at 151-53.  Other circuits have adopted Resnik v. Swartz's holding.  See Seinfeld v. Becherer, 461 F.3d 365 (3d Cir. 2006); Seinfeld v. Bartz, 322 F.3d 693 (9th Cir. 2003).

There is some indication that a violation of an SEC regulation on disclosures in proxy solicitations is per se material.  In quoting from Resnik v. Swartz, the United States Court of Appeals for the Third Circuit said: "The 'omission of information from a proxy statement will

violate [§ 14(a) and Rule 14a-9] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading.'" Seinfeld v. Becherer, 461 F.3d at 369 (quoting Resnik v. Swartz, 303 F.3d at 151 (2d Cir. 2002))(alteration added by Seinfeld v. Becherer). The alteration in Seinfeld v. Becherer strikes the Court as being somewhat incorrect. What was replaced from the Second Circuit opinion was the phrase "these provisions." It seems more a reasonable interpretation of both the statute and the Second Circuit's opinion in Resnik v. Swartz to state that a failure to follow a mandated disclosure or a material omission will violate § 14(a), and that a material omission will violate a specific regulation, rule 14a-9, without turning every failure to follow a different regulation into a rule 14a-9 violation as well.

Ultimately, the difference is semantic here. What is important is that a failure to disclose information required in a proxy solicitation is actionable under § 14(a). Case law from several circuits, as well as the statutory language, support this conclusion, and the Court is not aware of any decision to the contrary. The Defendants have principally sought to argue that the various regulations Lane cites do not apply. Thus, the allegation that the Proxy did not disclose SunCal's financing the proxy solicitation is an allegation that will support a § 14(a) claim.

The Court also notes that, as it observed during the hearing, the SEC requires many things to be disclosed and to some extent it seems excessive to make any misstep in following the regulations actionable without a materiality analysis. Regardless of the Court's concerns, the statutory language is clear, and the Court must follow the language. Additionally, however, the statutory scheme is tempered in light of the requirements of loss and transaction causation. Omissions that might ultimately be minor in a particular factual scenario, but which contravene an SEC regulation, need not pass the materiality test, but they still must satisfy causation requirements,

preventing insubstantial violations of disclosure requirements from becoming actionable claims for damages.

## IV.   MOST OF THE CLAIMS THAT WERE DISMISSED WITH LEAVE TO AMEND REMAIN IMMATERIAL DESPITE THE AMENDMENTS.

Several of the claims that the Court dismissed were dismissed with leave to amend. Accepting this invitation, Lane has added new allegations to these claims in his new Complaint. Only with respect to one set of allegations, however – the fairness statement -- has Lane cured the deficiencies in the allegations already dismissed.  Should the Court eventually allow Lane to amend his Complaint to cure the problem with the injury allegations, only those allegations, of those allegations dismissed with leave to amend, can be revived.

### A.   THE ALLEGATIONS REGARDING FAILURE TO DISCLOSE POTENTIAL CONFLICTS OF INTERESTS OVER TRUSTEE OR DIRECTOR POSITIONS REMAIN INSUFFICIENT.

The Court dismissed Lane's claims that the Proxy failed to adequately disclose possible conflicts of interest involving future directorships and trusteeships with Atrisco LLC and the Heritage Foundation.  The Court found that "Lane's conclusory allegations that various positions and lucrative payments were promised in advance are insufficiently particular to require disclosure," but did not foreclose Lane from repleading with more particularity.  Lane v. Page, 581 F.Supp.2d at 1121.  Lane's new allegations do not cure the problems.

The Defendants contend that Lane's new allegations remain conclusory, and fail to demonstrate that D.E. Shaw's and SunCal's internal discussions were ever communicated to Westland's directors.  The Defendants also maintain that they had no duty to disclose the particular directors who would be asked to serve and that, as soon as the names were known, a Form 10-SB containing the information was filed.  In particular, the Defendants point out that, in the Proxy,

shareholders were "urged to read the Form 10-SB registering the spin-off of the Class A units of Atrisco LLC under the Exchange Act, which will be filed by Atrisco LLC with the SEC prior to the completion of the spin-off." Proxy at 55. Lane contends that the Defendants are missing the point. He maintains that it is not important, particularly at this relatively early stage, whether the internal communications were disclosed, because the communications indicate that SunCal and D.E. Shaw were going to increase their contributions to Atrisco LLC to ensure the loyalty of the new Atrisco LLC appointees. At the hearing, Mr. Robbins contended that the Form 10-SB naming directors to Atrisco LLC was not incorporated by reference into the Complaint. See Tr. at 66:8-12 (Robbins).

Lane's two new allegations do not persuade the Court to change its earlier ruling. Lane's principal new allegation is that internal correspondence revealed D.E. Shaw and SunCal were planning "to increase their contribution to Atrisco LLC by $200,000 to ensure the allegiance" of the four new directors. SAC ¶ 42(a), at 21. While this allegation involves conduct that is somewhat troubling, the Court does not see it being material for the purposes of this case. What the Court indicated was necessary was specificity regarding promises of lucrative payments and positions to those who were going to be directors or trustees. The alleged correspondence does not indicate that any promises were made or positions offered to certain candidates before they were selected. The Proxy indicates that Atrisco LLC's directors would come from Westland's board and that Westland's board would select the Atrisco Heritage Foundation trustees, which would likely include "one or more" directors becoming trustees. Proxy at 31. To make these disclosures false and misleading, Lane must show something that would cast doubt on the truth or completeness of the disclosures. That D.E. Shaw and SunCal decided to increase contributions in an effort to ensure the loyalty of the already-appointed new directors does not undermine the Proxy's disclosure.

Lane also alleges that the Form 10-SB designating directors was filed nine days after the

Proxy disclaimed any knowledge about who had been selected and was not filed in Westland's name.  The timing here might be somewhat suspicious, but the Proxy stated that a Form 10-SB would be filed and urged shareholders to be on the look out.  Moreover, the Proxy stated that the form "will be filed by Atrisco LLC."  Proxy at 55.  Although Lane endeavors to surround the  Form 10-SB in a sinister aura, the Proxy disclosed that it would be filed and informed shareholders that it would be filed under Atrisco LLC and not under Westland's name.

**B.    THERE ARE SUFFICIENT ALLEGATIONS THAT THE DIRECTOR DEFENDANTS' OPINION THAT THE MERGER WAS IN THE BEST INTERESTS OF SHAREHOLDERS WAS SUBJECTIVELY FALSE.**

The Court dismissed Lane's allegations about the directors' statement that the SunCal merger was fair and in the shareholders' best interests because Lane did not sufficiently allege that the statement was subjectively false.  In doing so, the Court observed that "[t]his allegation, however, involves a material statement, and the deficiency is one of inartful drafting of pleadings. As such, the Court will not prevent Lane from amending his complaint to allege subjective falsity."  Lane v. Page, 581 F.Supp.2d at 1127.

Lane has added only a statement that the directors did not believe that the merger was fair and in shareholders' interests.  The Defendants contend that this addition is insufficient.  They argue that Lane must back up the allegation with particular, contemporaneous facts.  They contend that the facts Lane has pled indicate only that certain directors did not want to sell the company at various times in the process, that any resistance to selling or merging was based on sentimental rather than economic reasons, and that the allegations are not contemporaneous.

Lane responds that he has done what the Court directed him to do -- allege subjective falsity. He further argues that this allegation finds support in other allegations in the Second Amended Complaint, including in allegations that, during the board vote, Page voted against the merger and

Benavidez abstained, and that four of the nine directors, in the shareholder vote, did not vote their shares in favor of the merger, or, in the case of one director, voted less than half his shares for the merger. Lane emphasizes that, when the Court found that his allegations were sufficient regarding the Proxy's stating that the directors intended to vote their shares in favor of the merger, the Court observed that "such a large difference between the actual voting and the Proxy's expression of the directors' intent gives rise to a fair inference that either something occurred to change the minds of several directors between the issuance of the Proxy and the voting, which would be an event that needed to be disclosed, or else the directors never intended to vote in favor of the merger and the Proxy was false from the start." Lane v. Page, 581 F.Supp.2d at 1122-23.

At the hearing, Mr. Robbins emphasized that the Court found that the pleading was inartful, suggesting that the substance of the allegations were largely adequate. See Tr. at 78:20-79:7 (Robbins). Mr. Robbins argued that the allegation of subjective falsity was missing, but that the Complaint already contained the supporting facts in paragraphs 45 and 46. See Tr. at 79:8-80:12 (Robbins). Mr. Robbins also pointed to paragraphs 48 and 49 of the Second Amended Complaint, and observed that, when it came to underlying factual allegations, the line between subjective and objective falsity tends to blur. See Tr. at 80:21-81:22 (Robbins).

The Court agrees with Mr. Robbins. In its earlier opinion, the Court indicated that the problem with the pleadings was largely one of drafting. Nonetheless, Lane still needs to have sufficient factual allegations underpinning his subjective falsity allegation, and Lane has not added much in the way of new factual support for this contention. After reviewing the factual allegations, however, the Court believes that there is an adequate foundation.

In its earlier opinion, the Court highlighted the importance that statements regarding belief be both objectively and subjectively false to be actionable under securities law. See Lane v. Page,

581 F.Supp.2d at 1127.  Lane had argued that no express allegation of subjective falsity was needed because he alleged that there was no reasonable belief for the fairness statement.  The Court rejected this view on the grounds that it conflated objective and subjective falsity, rendering every objectively false statement subjectively false as well.  See id.  It remains important to distinguish between the two, but the Court agrees with Mr. Robbins that, when it comes to the underlying facts that will support a conclusion that a statement is objectively or subjectively false, there may be significant overlap.  Facts that would make something objectively false can, depending on the circumstances, support an inference that someone espousing an objectively false statement also subjectively believes that his or her statement is false.  Context is important.  The link is not an automatic one.  Circumstantial facts are necessary, however, because it will be a rare case where there is direct evidence that corporate officers did not believe in the truth of their statements.  Here, the Court believes that there are sufficient facts which can support an inference of subjective falsity.

The first set of supporting facts involves the shareholder and board votes on the SunCal merger.  As Lane emphasizes, the Court has already found that the allegation about the shareholder vote supports the Proxy's statement that the directors intended to vote their shares for the merger being false or misleading.  There is a difference between a statement that the directors intended to vote their personal shares in favor of the merger and a statement that they believed that the merger was fair to shareholders.  Nevertheless, there is a strong connection between the two.  How directors vote their own shares can provide circumstantial evidence whether they personally believe that the merger is a good idea.  And although the shareholder vote came after the Proxy's disclosure, there is an ongoing duty to correct any statements that later become false or misleading, and a later vote against the merger indicates either that there were intervening circumstances which should have been disclosed or that the statement was false from the beginning.  See Lane v. Page, 581 F.Supp.2d

at 1122-23.  The Defendants have pointed out that the votes of some directors against the merger can be attributed to an emotional attachment to the land making up the Atrisco land grant.  Personal doubts about the fairness of the merger, however, are also a highly plausible explanation.  Securities litigation imposes greater burdens on plaintiffs than most other litigation, but plaintiffs are still not required to rule out every alternative explanation in their pleadings.

Another set of factual allegations on which Lane relies includes allegations that several directors did not want to sell during previous mergers and allegations involving the market check. On these particular allegations, however, the Court tends to agree with the Defendants that they do little to support Lane's contention that the fairness statement was subjectively false.  That the Court has found that the Proxy discloses the market-check process tends to undercut the support these allegations provide for Lane's allegations about the fairness statement.  The various allegations about certain directors being resistant to selling earlier in the process are not directly relevant to whether they thought the SunCal merger fair.

Finally, the allegations under the heading of the Defendants lacking any basis to assert that the merger was fair provide some support for Lane's contentions.  Some of these allegations relate to the earlier merger offers, with Lane alleging that the directors, despite being reluctant about the mergers, proclaimed them fair.  While these allegations relate to earlier mergers, the Court believes that these allegations are relevant to whether the directors thought the SunCal merger fair.  These allegations indicate a willingness to publicly declare a merger fair, contrary to subjective feelings. These allegations therefore cast some doubt on the fairness statement and in particular support the possibility of subjective falsity.  Lane also alleges that Lesley's value menu, with a higher price than the Westland offer, supports his claim.  While the Court has found this internal valuation need not have been disclosed, it provides some support for subjective falsity given the directors' past reliance

on Lesley's work.

All these factual allegations, taken together, provide sufficient support for Lane's allegations of subjective falsity. Lane has thus alleged, with adequate support, both the objective and subjective falsity of the fairness statement. The Court will therefore hold that these allegations in the new Complaint state an actionable claim.

### C.   THE OIL AND GAS DISCLOSURES WERE SUFFICIENT, BUT THE COURT WILL NOT REVERSE ITS DETERMINATION THAT THE LEASING OFFERS WERE MATERIAL.

In the original Complaint, Lane made several allegations regarding oil and gas on Wetland land: (i) that Westland's directors had been informed that 100-500 million barrels of oil might be located on Westland property; (ii) that Sanchez voiced concerns over losing water and mineral rights; and (iii) that Savant Resources and Tecton Energy offered to lease Westland property for oil and gas exploration. The Court dismissed the first two claims, but upheld the sufficiency of the leasing claims. Lane has not added any new allegations regarding Sanchez, nor attempted to defend the retention of those allegations in either his briefing or at the hearing, so the Court will continue to consider that claim dismissed. The Defendants urge the Court to dismiss both the claim about oil on Westland property, which Lane has re-pled with further allegations, and the leasing claims that the Court has upheld.

When the Court dismissed the claim that Westland should have disclosed that the directors had information that Westland property might contain 100 to 500 million barrels of oil, it noted that the estimate, as pled, was "simply speculation that need not have been disclosed," but that Lane would not be foreclosed "from re-pleading with more indicia of reliability that would make the omission material." Lane v. Page, 581 F.Supp. at 1130. To bolster his claim that Westland should have divulged the estimate, Lane now alleges that an oil broker gave the directors the estimate,

which was based on a U.S. Geological Survey, and that the broker told the directors that his firm planned to drill as soon as a rig could be scheduled.  See SAC ¶ 52(a), at 34.  The Defendants continue to argue that this extra information fails to establish sufficient indicia of reliability and that SEC regulations barred them from disclosing the estimate.  Lane contends that he has now pled adequate indicia of reliability and that the Defendants are twisting the meaning of the regulation, which he asserts would not preclude disclosure.

While the new allegations provide more context for the estimate, they fail to give the estimate enough of a foundation to make it more than "soft information" on which reasonable shareholders would not rely when casting their votes.  In re Ford Motor Co. Securities Litigation, 381 F.3d at 569.  Having the source of the estimate identified is a step in the right direction, but naming the source and indicating that the broker's estimate was based on a U.S. Geological Survey is not enough.  This information does little to make the estimate more reliable. It does not allege how the estimate was based on the survey and is the statement of a broker.  If Westland had the land independently surveyed or sought to verify or evaluate the estimate, then there might be sufficient indicia of reliability.  An estimate from a broker seeking a lease, with little indication of how the estimate was achieved, lacks the kind of hard, quantifiable indicia that would transform the estimate from speculation into material information.

This result is especially the case in the context of oil and gas reserves.  The Court agrees with the Defendants that SEC regulations would prohibit disclosure.  Under 17 C.F.R. § 229.102 n.5 (2006), the regulation in force at the time of the merger, "[e]stimates of oil or gas reserves other than proved or, in the case of other extractive reserves, estimates other than proved or probable reserves, and any estimated values of such reserves shall not be disclosed in any document publicly filed with the Commission."  Proved reserves and probable reserves are terms of art in the oil and gas industry.

Proved reserves are "the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating  conditions."  17 C.F.R. § 210.4-10(a)(2) (2006).  Probable reserves are not specifically defined in the regulations in effect when the merger took place, but a not-yet-effective amended regulation tracks the general definition of a probable reserve: "Probable reserves are those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered."  17 C.F.R. § 210.4-10(a)(18) (effective January 1, 2010).

Lane stresses that a later part of the regulation allows disclosure "where such estimates previously have been provided to a person (or any of its affiliates) that is offering to acquire, merge or consolidate with the registrant or otherwise to acquire the registrant's securities."  17 C.F.R. § 229.102 n.5 (2006).  Lane contends that "[o]nly time (and discovery) will tell whether Westland provided this information" to SunCal or anyone else, Response at 30-31, but, difficult as that may be for Lane, until time does tell that such happened, the SEC regulation would bar disclosure.  The SEC has recently announced amendments to arguably liberalize disclosure of oil-and-gas reserves information, see http://www.sec.gov/news/press/2008/2008-304.htm, which Lane argues should be understood as giving the SEC's perspective on the subject.  The governing regulation for the merger was the 2006 regulation, however, even if Lane is correct about the SEC's current perspective, then the amendment indicates that the SEC likely viewed the old rules as unduly restrictive.  By amending its regulations, the SEC is in effect indicating that the restrictive reading of the then-extant regulations is appropriate.[8]  Finally, beyond the issue of an absolute prohibition on disclosure, the

---

[8] It is also not clear that the SEC is amending the language at issue here.

SEC regulations indicate that companies should not lightly disclose reserve estimates.  The regulation allows the SEC to request additional information about estimates, including the engineering reports on which the estimates are based, which presupposes that such reports will be available for the asking, thus indicating that the SEC contemplated a relatively rigorous degree of verification before reserve estimates would be publicly disclosed in filings.  See 17 C.F.R. § 229.102 n.4A (2006).  With the SEC regulations prohibiting disclosure in these circumstances, the Court cannot say that the Proxy's failure to disclose the estimate of 100 to 500 million barrels is material.  The Court will follow its past ruling dismissing those allegations.

In addition to seeking dismissal of the new allegations, the Defendants also ask that the Court reverse its previous ruling that the Proxy should have disclosed the lease offers from Savant Resources and Tecton Energy.  According to the Defendants, Westland shareholders would not have captured the benefits of those leases because, under the then-existing merger agreement with SHNM, SHNM had to approve any existing leases and termination of the agreement would have required a $15 million termination fee.  The Defendants argue that, because the Second Amended Complaint fails to give any indication that the leases would have been worth such a cost, the Court should dismiss those allegations.

This argument sounds like a summary judgment argument.  It relies upon the terms of the SHNM merger agreement and also assumes that SHNM would not have approved the leases, requiring a payment of the termination fee.  In short, this argument requires the Court to rely upon a document outside the pleadings and to draw inferences against the non-moving party.  Moreover, as Lane points out, the SHNM agreement did not give SHNM unfettered discretion to veto proposed leases.  SHNM's consent could "not be unreasonably withheld or delayed."  Exhibit 9 to Directors' Motion, Agreement and Plan of Merger by and among Westland Development Co., Inc., and SHNM

Acquisition Corp. art. 6.1 (dated February 24, 2006)(Doc. 142-3).  Drawing all reasonable inferences in Lane's favor, the Court cannot say that execution of the leases would be so speculative or impossible that they should not have been disclosed.  Accordingly, the Court will hew to its earlier ruling, that while "exploration is naturally uncertain in its benefits, . . .  the payments for the leases themselves would be a certain benefit that should have been disclosed."  Lane v. Page, 581 F.Supp. at 1130.

### D. THE ALLEGED OMISSIONS REGARDING THE TIDD ARE NOT MATERIAL.

The Court dismissed the TIDD allegation because it was "speculative, and remains uncertain," when SunCal could take advantage of a TIDD and because there was "no allegation that the opportunity was something Westland could exploit."  Lane v. Page, 581 F.Supp. at 1128.  Lane added allegations regarding Westland's past practice of seeking public financing and its promise to aid with continuing efforts to obtaining such funding after the merger.  These new allegations do not, however, persuade the Court that the result should be any different here.

The Defendants argue that these new allegations fail to address the reasons for dismissing the TIDD allegations that the Court outlined in its opinion.  Lane responds by pointing out that, during the earlier hearing, Lane's counsel brought up the possibility that SunCal and Westland "may have been cooperating on acquiring a TIDD when the Proxy was issued," and that the Court noted that "such cooperation seems to be something that would be material information," which was the reason the Court held that it would "not foreclose Lane from raising that issue later."  Lane v. Page, 581 F.Supp. at 1129.  Lane also contends that the Defendants' plans to take advantage of a TIDD, which they knew and were working toward before the Proxy issued, is material.  According to the Defendants, however, the Second Amended Complaint is conclusory about cooperation and fails to

identify relevant facts such as who was retained from Westland to work on acquiring funding or when they were retained.

At the hearing, Evan P. Singer, an attorney for SunCal, noted that the merger agreement, which provided that Westland would assist SunCal in efforts to obtain funding, was attached to the Proxy and thus provided to all shareholders. See Tr. at 104:2-12 (Singer). Ms. Myers contended that the new Complaint added allegations responsive to the Court's concerns: an allegation that Westland had been working behind the scenes, in response to the Court ruling that there was no allegation that the TIDD was something of which Westland might take advantage, and an allegation of cooperation, in response to the Court's indication that such might be material. See id. at 105:19-106:13 (Myers & Court). Ms. Myers also emphasized that successfully obtaining the TIDD was not necessary for materiality. Rather, the allegation is sufficient, she contended, because the allegation is that the TIDD was actively being sought.

What new allegations Lane has added are not sufficient to make the non-disclosure of the TIDD material. Most of the new allegations relate to Westland's past efforts to procure public financing. These allegations, however, are consistent with the disclosures made in the Proxy. These past efforts apparently never bore fruit, at least in any significant way, which tends to support rather than contradict the Proxy's saying that Westland was facing increasing development costs and would be required to bear infrastructure costs normally borne by the City of Albuquerque. Shareholders would generally be more interested in hearing that Westland had not been undertaking efforts to obtain public assistance of some kind. That Westland had been seeking such aid is both unsurprising and consistent with the Proxy.

Allegations regarding Westland's most recent efforts, involving behind the scenes talks with City officials, indicate some more intensive effort, but the allegations remain in the same vein as the

other allegations of past efforts.  Moreover, the allegations, while indicating more recent and possibly more extensive efforts, do not make acquisition of a TIDD any more certain.  Whether these negotiations would have any impact on Westland's value and whether a TIDD was otherwise something that Westland had any real hope of exploiting remains uncertain even in light of the new allegations.

Lane's final new allegations involve allegations about cooperation between Westland and SunCal to get a TIDD.  When this issue was brought up at an earlier hearing, the Court indicated that cooperation might be something that would be material.  The cooperation allegations Lane has pled, however, do not go to material issues.  SunCal expecting to continue Westland's efforts is again unsurprising and the Court does not see how its disclosure would make a difference to any reasonable shareholder.  And Lane's allegation that the merger agreement obligated Westland to assist SunCal does not help Lane because the merger agreement was attached to the Proxy.

## V.    THE ALLEGATIONS REGARDING A FAILURE TO DISCLOSE MERGER PARTICIPANTS SUPPORT A § 14(a) CLAIM.

With the Second Amended Complaint, Lane is for the first time alleging that the Proxy's failure to divulge D.E. Shaw's role in the merger was a material omission.  The Defendants argue that the SEC regulations, which Lane cites require disclosure of those funding proxy solicitations, while Lane's allegations are that D.E. Shaw funded the merger, not the solicitations.  Additionally, they contend that there are not particularized allegations, beyond a draft letter never sent to Westland, indicating that they were aware of D.E. Shaw's role.  Finally, they maintain that, because the merger was a cash-out merger not subject to financing contingencies, no reasonable shareholder would consider D.E. Shaw's identity material.

Lane counters that D.E. Shaw's ownership stake in SCC makes D.E. Shaw a participant in

-59-

the solicitation who should have been disclosed.  Lane contends that he has pled particularized facts regarding the directors' knowledge and that their characterization of the letter from D.E. Shaw as an unsent draft is an impermissible argument under the rule 12(b)(6) standard.  Finally, Lane argues that D.E. Shaw's identity was material because it was part of an attempt to avoid liability from litigation at the time and was necessary to shareholders being able to make an informed choice.  At the hearing, Mr. Robbins argued that calling the merger a pure cash-out merger was a mischaracterization, because shareholders would receive a stake in Atrisco LLC, which would then be jointly owned by the old Westland shareholders and SCC.  See Tr. at 138:22-139:14 (Robbins & Court).

The Court believes that D.E. Shaw's identity is material and thus need not decide whether other SEC regulations would independently compel disclosure.  Although the Defendants urge the Court to adopt the view that the purchaser's identity is unimportant in a cash-out merger, this view is flawed.  Even in a pure cash-out merger, the shareholders being cashed out will be concerned about who the buyer is.  A buyer's status and financial stability can affect its wherewithal to proceed with a merger.  Prudent shareholders would reasonably want to be able to investigate these matters.  If the merger breaks down, share values might drop and other opportunities might be missed.  A reasonable shareholder would want to know whether the entity that is proposing to buy out his or her stake is a small plumbing company from Idaho with a questionable balance sheet or Microsoft.

Particularly when there is one major player, reasonable shareholders will want to know the buyer's identity.  If the buyer was a consortium of firms and individuals, identities might matter less.  Here, however, according to the allegations, D.E. Shaw holds over ninety percent of SCC.  From most people's perspective, D.E. Shaw is the buyer of Westland.

Moreover, the merger here is not a pure cash-out merger.  Under the merger agreement, Westland shareholders received a stake in Atrisco LLC, which became the owner of Westland's oil-

and-gas interests.  SCC was the other stakeholder in Atrisco LLC.  Thus, part of the consideration Westland shareholders received for their shares was equity in a company jointly owned with SCC -- and therefore, ultimately, D.E. Shaw.  When a continuing joint operation is part of the picture, the identity of the purchaser gains increased importance.  In the circumstances alleged here, D.E. Shaw's identity was a material fact that should have been revealed.  Without D.E. Shaw's identity being disclosed, the Proxy's statements about SunCal being the purchaser of Westland could have been materially misleading.

These allegations provide an important example of the difference between materiality and causation.  Materiality is largely focused on the ex ante view of a prospective merger or other shareholder vote.  Material information is the information that reasonable shareholders would want to know when they are contemplating their votes.  Information that is not disclosed may later seem less important depending upon how things play out.  That ex post assessment, however, is not what materiality is about.  Causation, by contrast, is largely concerned with the ex post.  What actually happened is the province of causation.

Even if the allegations were material, however, there would be no basis for liability without the Defendants knowing of D.E. Shaw's involvement.  The Second Amended Complaint contains allegations of knowledge.  These allegations are supported with allegations about correspondence between Rizk of D.E. Shaw and Page, and between SunCal and D.E. Shaw.  Although the Defendants argue that the letter to Page was a draft, whether that contention is true is not something that appears in the Second Amended Complaint.  Based upon the pleadings, the Court believes there are sufficient allegations of knowledge.

VI.   **THE ALLEGATIONS AGAINST THE D.E. SHAW DEFENDANTS ARE ADEQUATE AND NOT, FROM WHAT THE COURT CAN DETERMINE AT THE PRESENT, <u>TIME-BARRED</u>.**

Lane potentially asserts both a § 14(a) claim and § 20(a) claim against the D.E. Shaw Defendants, although it is now apparent that only a § 20(a) claim is being advanced against them. To counter this claim, the D.E. Shaw Defendants have raised two defenses: (i) that the statute of limitations has run on the claim; and (ii) that the claim does not adequately plead that they are control persons. On the statute-of-limitations defense, the Court concludes that it lacks the ability to find the claim time-barred on the information the Court has. With respect to the sufficiency of the pleadings, however, the Court believes that Lane's allegations -- aside from the problem with the damages aspect of the underlying § 14(a) allegations -- satisfy the standard.

A.   **THE COURT CANNOT DETERMINE, AS A MATTER OF LAW, THAT THE STATUTE OF LIMITATIONS HAS RUN ON THE § 20(a) CLAIM AGAINST THE D.E. SHAW DEFENDANTS.**

The parties agree about many of the initial issues. Both Lane and the Defendants acknowledge that § 20(a) claims have the same statute of limitations as the underlying alleged violations. <u>See</u> <u>Teachers' Ret. Sys. of La. v. Qwest Communs. Int'l, Inc.</u>, 2005 U.S. Dist. Lexis 44756 at *10 (D. Colo.). It is also undisputed that the statute of limitations for a § 14(a) claim is one year. <u>See</u> <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilberson</u>, 501 U.S. 350, 360, 362 (holding, in the context of § 10(b), that a "a 1-year period after discovery combined with a 3-year period of repose," which applies to most express causes of action in the Securities Act of 1933 and the Exchange Act, are the appropriate limitations periods); <u>In re Exxon Mobil Corp. Securities Litigation</u>, 500 F.3d 189, 194 (3d Cir. 2007)(applying <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u> to § 14(a) claims). When the statute of limitations begins to run depends upon when a prospective plaintiff receives notice of his or her claims. This notice includes inquiry notice. A person is put on

inquiry notice when they become aware of "'sufficient storm warnings to alert a reasonable person

to the possibility that there were either misleading statements or significant omissions involved in

the'" events at issue.  Sterlin v. Biomune Systems, 154 F.3d 1191, 1196 (10th Cir. 1998)(quoting

Cook v. Avien, Inc., 573 F.2d 685, 697 (1st Cir. 1978)).

> Up to this point, the parties are in agreement about the legal landscape.  After the consensus

about inquiry notice, however, the parties' views begin to diverge.  The D.E. Shaw Defendants

identify several possible dates on which they contend Lane had inquiry notice.  They primarily urge

the Court to consider the relevant date December 13, 2006, when a Wall Street Journal article on the

purchase of Westland was published.  They also highlight several other possible dates: (i) December

19, 2006, when SunCal and DESCO Real Estate issued a joint press release; (ii) August 1, 2007, as

indicating actual notice because of questions Lane's counsel asked during a deposition; or (iii)

September 3, 2007, when the Forbes article that Lane refers to in his Complaint was published.

Under any of these dates, they contend, Lane's lawsuit is untimely.

> Lane first counters that the D.E. Shaw Defendants' motion improperly asks the Court to resort

to materials outside the Complaint.  On the face of the Complaint, Lane argues, his claims are timely

because DESCO Real Estate's 92.5% ownership interest in SCC was not revealed until SunCal's

TIDD application on October 31, 2007.  See Lead Plaintiff's Memorandum in Opposition to the D.E.

Shaw Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint at 12, filed March 20,

2009 (Doc. 167)("Response to D.E. Shaw")(citing SAC ¶ 21(a), at 11-12).  Next, Lane argues that

the articles the D.E. Shaw Defendants reference do not, in any event, give rise to inquiry notice

because the articles indicate that D.E. Shaw was simply a financier or underwriter, with SunCal being

the purchaser.  See Response to D.E. Shaw at 15.  According to Lane, the articles do not implicate

the D.E. Shaw Defendants in culpable activity, or explain "whether and to what extent the DESCO

Defendants had been involved in the dissemination of the false and misleading proxy statement." Id.  With respect to the deposition, Lane contends that it only highlights the obfuscation about D.E. Shaw's role because several Westland directors disclaimed any knowledge of D.E. Shaw.  See id. at 16-18.  In a footnote, Lane asserts that the relation-back doctrine would revive his claims even if the statue of limitations had run, because the D.E. Shaw Defendants had actual notice of Lane's potential claims.  See id. at 19 n. 16.  Finally, Lane argues that D.E. Shaw actively sought to conceal its involvement and that any "storm warnings" about its role were negated by these efforts.  Id. at 19 (internal quotation marks omitted).

In reply, the D.E. Shaw Defendants contend that Lane misstates the law regarding the specificity needed to trigger inquiry notice, and maintain that the articles and press releases disclose D.E. Shaw's role, which is adequate given that Lane's claims are under § 20(a).  See The DESCO Defendants' Reply in Further Support of Their Motion to Dismiss Plaintiff's Second Amended Complaint at 2-6, filed March 31, 2009 (Doc. 168)("D.E. Shaw Reply").  The D.E. Shaw Defendants interpret Lane's argument about D.E. Shaw trying to keep its role secret as being an argument that the statute should be tolled because of fraudulent concealment, and argue that Lane's attempt to invoke tolling involves misconstruing documents and fails to meet the elements of fraudulent concealment.  See id. at 6-8. The D.E. Shaw Defendants also contend that the Court can properly rely on articles at this stage without converting their motion into a motion for summary judgment.  See id. at 8-9.  Finally, they maintain that the relation-back doctrine under rule 15(c) does not provide for amending "a complaint to add a new, previously unknown party and, thus, effectively a new cause of action."  D.E. Shaw Reply at 10 (citing Graves v. General Ins. Corp., 412 F.2d. 583, 586 (10th Cir. 1969)).

At the hearing, in response to the Court's concerns about considering articles on a motion to

dismiss, John Lovi, counsel for the D.E. Shaw Defendants, argued that judicial notice would be appropriate here because such notice would not require the Court to determine the truth of the contents of the articles to rule on the statute of limitations. See Tr. at 114:6-115:11 (Court & Lovi). Mr. Robbins contended that the Wall Street Journal article referred to an underwriter and that it would put Lane on inquiry notice. Mr. Robbins observed that he had never had a securities case where he had sued an underwriter. See Tr. at 141:3-142:1 (Robbins & Court).

The Court first must determine whether it is appropriate to consider the Wall Street Journal article and other documents at this stage. Sterlin v. Biomune Systems indicates that the Court can. In that case, which involved a motion to dismiss, the Tenth Circuit held that an article in Barron's triggered inquiry notice. See 154 F.3d at 1203-04. Whether courts could take judicial notice of articles, however, was not an issue actually discussed in the Tenth Circuit's opinion, so the Court cannot say that Sterlin v. Biomune Systems establishes that looking to the Wall Street Journal article or press release would be permissible here.

Other circuits have addressed this question, however, and have approved of courts relying on certain information outside the four corners of a complaint when deciding when inquiry notice arose. In LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148 (2d Cir. 2003), the Second Circuit upheld the dismissal of a securities case on the grounds that it was time barred. In doing so, the Second Circuit relied on publicly disclosed SEC filings to help determine when inquiry notice arose, see id. at 155, and observed that it had frequently relied on documents integral to but not plead in a complaint when addressing the statute of limitations on a rule 12(b)(6) motion, see LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d at 156. Articles are included in the category of documents on which courts have relied. See Enterprise Mortg. Acceptance Co., LLC, Securities Litigation, 391 F.3d 401, 411 (2d Cir. 2004)(dismissing plaintiff's argument that "the question of

whether a reasonable investor was put on inquiry notice . . . by a series of articles published in *The New York Times* and *Newsday* . . . was an issue of fact" as being without merit).

The United States Court of Appeals for the Sixth Circuit follows a similar approach. According to the Sixth Circuit: "A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." New England Health Care Employees Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003). In New England Health Care Employees Pension Fund v. Ernst & Young, LLP, the Sixth Circuit looked to an earlier lawsuit that the plaintiff had filed against Ernst & Young, LLP's client on related issues. See id. at 498, 501-502. In Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275 (11th Cir. 2005), the United States Court of Appeals for the Eleventh Circuit approved the use of "articles of national distribution" on a motion to dismiss in determining whether prospective plaintiffs were put on inquiry notice in a securities case. Id. at 1291.

District courts have also used articles and other public materials on motions to dismiss when determining whether inquiry notice is triggered. Among those district courts are courts outside of circuits that have specifically held that this approach is appropriate. See In re American Funds Securities Litigation, 556 F.Supp.2d 1100, 1107 (C.D. Cal. 2008)(taking judicial notice of articles). The Court has located only one case in which a court rejected a defendant's proffered articles on a motion to dismiss in this context. In that case, the Middle District of North Carolina reasoned that articles not referenced in the complaint were not integral to the complaint and thus did not fall within the exception for such documents, and also declined to take judicial notice of the articles. See In re Cree, Inc. Securities Litigation, 333 F.Supp.2d 461, 468-71 (M.D. N.C. 2004).

Several circuits have thus held that reviewing public materials from outside the complaint is

appropriate in a rule 12(b)(6) motion based upon inquiry notice in securities litigation. At least two circuits have specifically included articles within the scope of permissible documentation, including the Second Circuit, whose experience with securities case is substantial compared with most other circuits. And the Tenth Circuit, although not specifically holding that reliance on articles was acceptable, used a magazine article on a motion to dismiss without a hint that such consideration would be wrong if the plaintiff had decided to press the issue. Only one case that the Court is aware of reached a different conclusion. That case, In re Cree, Inc. Securities Litigation, took a narrow view of what documents can be considered as part of a complaint, but also declined as a discretionary matter to take judicial notice of articles, without holding that the opposite approach -- exercising discretion -- would have been incorrect. See 333 F.Supp.2d at 468-71. Most cases acknowledge Lane's basic argument that looking to materials outside the pleadings is normally not allowed on a motion to dismiss, but nonetheless hold that, in the context of inquiry notice based on readily available documents, such an approach is the proper one.

The weight of the case law, as well as the Tenth Circuit's silence on the issue, which did not even involve an indication that reliance on articles was a potential problem, all favor following the approach taken by all the courts of appeal that have addressed the topic. Additionally, the article and press release here fall within the scope of judicial notice more generally. Courts may take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Here, Lane has not raised any dispute about the authenticity of the documents. More importantly, they are especially "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" because the important issue is the content of the materials. Because the question is

whether inquiry notice was triggered, it is immaterial whether the materials are factually accurate, and by taking judicial notice the Court would not be establishing whether the materials are accurate. What is important, and of what the Court would be taking notice, is that the matters were made public. True or false, the release of the information would be what triggers inquiry notice. Taking judicial notice would be appropriate here and most consistent with the practice of nearly every court -- including every court of appeals -- to have considered the issue.

There is also a policy reason based in securities law that should allow the Court to consider the articles on a motion to dismiss. Congress has, in the PSLRA, directed courts to scrutinize securities plaintiffs' complaints at the earliest possible stage, before any discovery takes place. See 15 U.S.C. § 78u-4(b)(3)(B). It would be somewhat in tension with the that direction for federal courts not to consider an article from the Wall Street Journal because the complaint did not mention it, requiring the defendant to suffer discovery, and require all statute-of-limitations issues to be resolved later in the case on a motion for summary judgment. Defendants should be able to raise a statute of limitations defense at the motion to dismiss stage if there is no dispute about the authenticity or genuineness of the articles allegedly triggering notice.

Because it is appropriate for the Court to consider, on a motion to dismiss, materials such as newspaper articles not referenced in a complaint, the Court must determine whether those articles would put Lane on inquiry notice. In the Tenth Circuit, determining when a cause of action in a securities case accrues is a two-part test. "[I]nquiry notice . . . triggers an investor's duty to exercise reasonable diligence and . . . the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." Sterlin v. Biomune Systems, 154 F.3d at 1201. Thus, while inquiry notice requires that an investor begin exercising reasonable diligence from the time of the notice, "the one-year limitations

-68-

period should not begin to run until a reasonable investor should have discovered the facts underlying

the alleged fraudulent activity." Id. at 1201-02.

The Wall Street Journal article reads, in its entirety:

Lots of Land

A big swath of land in Albuquerque, N.M. has a new owner.

SunCal Cos., a developer based in Irvine, Calif., and the real-estate unit of the D.E. Shaw group, a New York investment-management firm, are buying Westland Development Co. and the 57,000 acres it owns in and around Albuquerque.

They are paying $250 million for Westland, which means its roughly 6,000 shareholders will receive $315 a share, SunCal said.  Officials at Westland couldn't be reached to comment.  SunCal and D.E. Shaw group say Albuquerque is poised for significant expansion in coming years, and the 57,000 acres lie directly in the path of growth.

"We underwrote this acquisition with a long-term view.  We truly believe in the long-term viability of the (Albuquerque) market," says George Rizk, head of real-estate investment at D.E. Shaw group.  Much of the future development on the property will be residential.

The property was part of the Atrisco Land Grant, which the king and queen of Spain handed down to its settlers in the 17th century.  SunCal said most of Westland's shareholders are descendants of those settlers.

Exhibit B to D.E. Shaw's Motion, Ryan Chittum & Michael Corkery, Plots & Ploys, The Property

Report, The Wall Street Journal, December 13, 2006, at B4 (Doc. 152-3).

The Court believes that the Wall Street Journal article would likely give rise to inquiry notice.

Both SunCal and "the real-estate unit of the D.E. Shaw group" are reported to be "buying Westland."

Id.  According to the article, "[t]hey are paying $250 million for Westland."  Id. (emphasis added).

The article also quotes Rizk as saying that D.E. Shaw "underwrote this acquisition with a long-term

view.  We truly believe in the long-term viability of the (Albuquerque) market."  Id.  While this

commentary indicates that D.E. Shaw might have been acting as a passive underwriter, the article "as

-69-

a whole, created sufficient 'storm warnings' to put a reasonable investor on notice." Sterlin v. Biomune Systems, 154 F.3d at 1204.  In light of the earlier statements that D.E. Shaw was a buyer, joining SunCal in paying $250 million for Westland, the underwriter comments at best cast some doubt on D.E. Shaw's status, but inquiry notice does not require certainty.  Inquiry notice arises from possibilities, not probabilities or certainties.  "'[F]acts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence.'" Id. at 1203 (quoting Cook v. Avien Inc., 573 F.2d 685, 697 n. 25 (1st Cir. 1978))(further internal quotation marks omitted).  The nature of inquiry notice is that it a reasonable person has been given sufficient hints of a claim.

Soon after, on December 19, 2006, SunCal and DESCO Real Estate issued a joint press release.  The press release, like the Wall Street Journal article, said that Westland's shareholders were going to "sell their shares . . . to community developer SunCal Companies and a member of the D.E. Shaw group."  Exhibit C to D.E. Shaw's Motion, 300-Year-Old Spanish Land Grant Twice the Size of Boston Changes Hands in New Mexico; New Town Planned at 1 (dated December 19, 2006)(Doc. 152-4).  Combined with the earlier Wall Street Journal, this press release gives a firm indication of D.E. Shaw as a purchaser of Westland.  By December 19, 2006 then, Lane should have been aware that D.E. Shaw was potentially a purchaser along with SunCal.  At that time, Lane also had actual awareness of the underlying activity for the alleged primary violations, given that this lawsuit was initiated the month before.

Lane argues that the article fails to apprise readers of "whether and to what extent the DESCO Defendants had been involved in the dissemination of the false and misleading proxy statement."  Response to D.E. Shaw at 15.  This line of reasoning would be more compelling if Lane were asserting a § 14(a) claim against D.E. Shaw.  Lane's sole claim against the D.E. Shaw Defendants,

however, is that they are control persons liable under § 20(a).  Reading the Wall Street Journal article would not raise any alarm about D.E. Shaw being directly involved in fraudulent activity or other culpable behavior, but it would signal that D.E. Shaw was directly involved in the merger.  And that theory is the one on which Lane is now suing the D.E. Shaw Defendants.  The Wall Street Journal article would not trigger inquiry notice for a § 14(a) or a § 10(b) claim, but it would create inquiry notice for the § 20(a) claim that Lane is bringing.

Finding that the article can be considered does not end the issue.  Once inquiry notice is triggered, the statute does not automatically begin to run.  Instead, the investor's duty of reasonable diligence comes into play at that time, and "the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."  Sterlin v. Biomune Systems, 154 F.3d at 1201.  Although the Court finds that it can determine that inquiry notice was triggered, the Court cannot at this point find as a matter of law that this second part of the test is met.

Pursuant to the parties' stipulation, the Second Amended Complaint was filed on December 1, 2008.  Moreover, Lane and D.E. Shaw entered into a tolling agreement that had the effect of tolling the statute of limitations from September 15, 2008 to December 1, 2008, if the statute had not already run.  See Exhibit E to D.E. Shaw's Motion, Tolling Agreement ¶ 1 (dated October 31, 2008)(Doc. 152-6).  September 15, 2008, rather than the filing of the Second Amended Complaint, is therefore the important date.  Counting back one year from that date to account for the one-year statute of limitations yields the date September 15, 2007.  If Lane, "in the exercise of reasonable diligence, should have discovered" the relevant facts between the start of the inquiry notice in December 2006, and the September 15, 2007 date, then the action is untimely.  Sterlin v. Biomune Systems, 154 F.3d at 1201.  That determination is one that the Court cannot make here.

Approximately nine months is a relatively lengthy period of time as a general rule, but it is not necessarily a long period of time when it comes to litigation and to unraveling the details of corporate deals.  Taking judicial notice of documents outside the Complaint is somewhat of a departure, although an acceptable one, from standard practice on motions to dismiss, but it does not change the legal standards the Court applies.  And that entails the Court drawing all reasonable inferences in Lane's favor as the non-moving party.  Under that standard and the current record, the Court cannot say as a matter of law that Lane, exercising reasonable diligence, should have uncovered sufficient facts about D.E. Shaw's involvement by September 15, 2007.

The questioning at the deposition of Westland directors about D.E. Shaw on August 1, 2007, which the D.E. Shaw Defendants cite as supporting Lane having actual notice, in fact cuts against them on this point.  That questioning, and the lack of information that Lane's counsel was able to elicit, tends to show that Lane was investigating D.E. Shaw's role at that time, but was not necessarily getting anywhere.  Although the D.E. Shaw Defendants argue that Lane could have done exactly what he did here, engage in discovery about D.E. Shaw's role, it is not clear whether D.E. Shaw, as a non-party and relatively early on, when a statute of limitations would likely not even be plausible, would be willing to make the discovery easy on Lane.  Moreover, Lane's allegations, which the Court must accept, indicate that D.E. Shaw was working to keep its role a secret.  While the D.E. Shaw Defendants criticize Lane for improperly raising fraudulent concealment, the Court reads Lane's arguments as going towards whether he could have reasonably unearthed enough facts about D.E. Shaw's participation.  And on this point, Lane has a valid argument.

The upshot is that, given the allegations about D.E. Shaw's efforts at concealment, the possibility of slow discovery, the indications that Lane was looking into the allegations, and the Court's duty to draw all reasonable inferences in Lane's favor, the Court cannot say as a matter of

law that Lane "in the exercise of reasonable diligence, should have discovered" the necessary facts by September 15, 2007. <u>Sterlin v. Biomune Systems</u>, 154 F.3d at 1201. A more complete picture may emerge later, after discovery, allowing for the Court to make a determination as a matter of law. Or the issue might remain in material dispute, requiring resolution before a jury. With the information the Court has, however, it cannot determine as a matter of law that the Second Amended Complaint's claim against the D.E. Shaw Defendants is untimely. Thus, should the Court allow Lane to amend his Complaint and save it from dismissal for inadequate damages pleadings, the statute of limitations will not bar Lane from raising his claim against the D.E. Shaw Defendants at that time, although Lane's claims might ultimately be found untimely on summary judgment or during a trial down the road.

### B. LANE HAS ADEQUATELY PLED HIS CONTROL-PERSON CLAIM AGAINST THE D.E. SHAW DEFENDANTS.

In addition to raising a statute-of-limitations defense, the D.E. Shaw Defendants contend that Lane's allegations fail to establish that they are liable under § 20(a) as control persons. According to the D.E. Shaw Defendants, the proper test whether a person has potential control under § 20(a) is twofold. First, a plaintiff must show that the defendant "actually participated in (i.e., *exercised* control over) the operations of the corporation in general." <u>Metge v. Baehler</u>, 762 F.2d at 631 (internal quotation marks omitted; emphasis in original). Second, a plaintiff "must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this later power was exercised." <u>Id.</u> (internal quotation marks omitted). The D.E. Shaw Defendants contend that this test, adopted in part in the Tenth Circuit, is the proper test and that Lane's allegations are deficient under both prongs of the test.

Lane contends that the Tenth Circuit has never fully adopted the two-part test from <u>Metge v.</u>

Baehler and that it is inapplicable here.  Instead, Lane urges the Court to hold that he "'need only show the power to control the transaction underlying the alleged securities violation and not the exercise of that power.'" Lane v. Page, 581 F.Supp. 2d at 1131-32 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1306 n. 8).  Lane then argues that he has alleged not only that the D.E. Shaw Defendants had the power to exercise control over the merger and the proxy solicitations, but that they exercised their influence.

At the hearing, Mr. Lovi argued that, while the Tenth Circuit left the question open in Maher v. Durango Metals, Inc., the Tenth Circuit's view was otherwise consistent with Metge v. Baehler and should be read as favoring that position.  See Tr. at 157:25-158:6 (Lovi).  Mr. Robbins contended the opposite.  He argued that the Tenth Circuit had not and would not adopt the Metge v. Baehler standard, and that the Second Amended Complaint complied with what the Tenth Circuit and the Court had announced as the pleading standard and with what courts generally expected in his experience in a securities case.  See Tr. at  171:3-172:23 (Robbins).

Although the Court has previously addressed control-person liability, the earlier opinion did not delve far into the law in this area.  The D.E. Shaw Defendants urge the Court to adopt the Metge v. Baehler test and specifically its requirement that a control person participate in the general operations of the corporation.  See id., 762 F.2d at 631.  While the Court agrees that Tenth Circuit precedent does not foreclose this interpretation, it is less consistent with the Tenth Circuit's case law, and the statutory and regulatory language, than other alternatives.

The Tenth Circuit briefly mentioned Metge v. Baehler in Maher v. Durango Metals, Inc., 144 F.3d 1302 (10th Cir. 1998), when the Tenth Circuit noted that there was a potential circuit split on whether "a plaintiff must show that the alleged control person actually exercised control over the primary violator's general affairs or whether it is sufficient to show that the control person had the

power to exercise such control." Id. at 1305 n. 8.  The Tenth Circuit commented that, "although

perhaps disagreeing about whether a plaintiff must show actual control over the primary violator's

general affairs, courts generally agree that the plaintiff need only show the power to control the

transaction underlying the alleged securities violation and not the exercise of that power."  Id.

Ultimately, the Tenth Circuit declined to rule on the potential split.  Since then, the Tenth Circuit has

not mentioned Metge v. Baehler or directly commented on the issue.  Indeed, after Maher v. Durango

Metals, Inc., the Tenth Circuit has issued only one other decision with any significant discussion of

control-person liability.  See Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1107-09 (10th Cir.

2003).

> Section 20(a) provides:
>
> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable, unless the controlling person acted
> in good faith and did not directly or indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t(a).  The statute, however, does not define what controlling a person entails.  An SEC

regulation gives some content to the term: "The term control (including the terms controlling,

controlled by and under common control with) means the possession, direct or indirect, of the power

to direct or cause the direction of the management and policies of a person, whether through the

ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  This regulatory

definition of control is a broad definition that the Tenth Circuit has cited "with approval," Maher v.

Durango Metals, Inc., 144 F.3d at 1305, and the statute itself "'is remedial and is to be construed

liberally,'" id. (quoting Richardson v. MacArthur, 451 F.2d at 41)(further internal quotation marks

omitted).  The Tenth Circuit "has expressly reject[ed] those decisions that may be read to require a

-75-

plaintiff to show the defendant actually or culpably participated in the primary violation.  Rather, once the plaintiff establishes the prima facie case [of control], the burden shifts to the defendant to show lack of culpable participation or knowledge."  Maher v. Durango Metals, Inc., 144 F.3d at 1305 (citation and internal quotation marks omitted, first alteration in original).

Although Maher v. Durango Metals, Inc. leaves open whether a control person must actually exercise control over general affairs or need only have the potential to do so, the Tenth Circuit's earlier case law favors the latter.  Richardson v. MacArthur is the earliest Tenth Circuit case with any substantial discussion of control-person liability. That case involved an insurance company that had hired MacArthur to conduct business for it in California.  MacArthur's version of conducting business, however, led to a securities lawsuit over his activities and the Tenth Circuit was confronted with the question whether the company was a controlling person of MacArthur.  The Tenth Circuit observed that § 20(a) "has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable." Richardson v. MacArthur, 451 F.2d at 41 (internal quotation marks omitted).  Because the insurance company hired MacArthur and because MacArthur conducted the company's activities in California and reported back to the board, the Tenth Circuit held that "it cannot now be claimed that [the company] lacked the influence to control, direct or discipline MacArthur with regard to those dealings [leading to securities violations]."  Id.  This relationship outlined in Richardson v. MacArthur would pass the test that the D.E. Shaw Defendants advocate.  It is hard to imagine that the relationship could not be considered a relationship involving both potential and actual control.  Actual control, however, was not a point of inquiry for the Tenth Circuit, which looked into whether there was "some indirect means of discipline or influence short of actual direction," and held that the "the influence to control, direct or discipline" was sufficient.  Richardson v. MacArthur, 451 F.2d at 41 (internal quotation marks

-76-

omitted).

First Interstate Bank of Denver, N.A. v. Pring, 969 F.2d 891 (10th Cir. 1992), overruled in part on other grounds by Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), was the Tenth Circuit's next significant discussion of control-person liability. This case primarily established, with respect to § 20(a), that good faith was a defense that a control person could raise, but that a plaintiff need not show actual or culpable participation in the underlying violation as part of his or her case. See First Interstate Bank of Denver, N.A. v. Pring, 969 F.2d at 896-98. The Tenth Circuit also addressed, however, whether the plaintiff had produced sufficient evidence to defeat summary judgment. Based upon several pieces of evidence, such as the defendant's stock ownership, position as a director, and his wife's creditor status, all in the company directly controlling the primary violator, the Tenth Circuit held that the defendant "was in a position of at least indirect control" over the companies that operated the primary violation and thus the defendant's "at least indirect control extended to the" violator. Id. at 898. Again, the defendant in First Interstate Bank of Denver, N.A. v. Pring would likely pass the test the D.E. Shaw Defendants urge, but again the Tenth Circuit's emphasis on indirect control indicates that the Tenth Circuit does not require actual exercise of control over general affairs.

Lane's briefing cites both of these early cases and the Court agrees with Lane that these cases support Lane's position. The D.E. Shaw Defendants criticize Lane's use of these cases because they were "both decided before *Maher*" and "merely define the term 'control,'" but "do not establish the pleading standard for 'controlling person' liability" in the Tenth Circuit. D.E. Shaw's Reply at 11 n.8. While both cases were decided before Maher v. Durango Metals, Inc., Maher v. Durango Metals, Inc. was not some sea change in the law. It noted the possibility of a circuit split and remained agnostic about the split. Earlier cases are relevant -- and indeed provide much of the

guidance -- for determining how the Tenth Circuit would handle the issue if it did have to address the question.  Because Maher v. Durango Metals, Inc. did not overrule or modify the earlier law, this Court is bound to follow those cases where they lead.  Moreover, those cases' definition of control is highly relevant to the current issue, which involves what Lane needs to plead.  The cases establish, at least in part, the Tenth Circuit's pleading standard -- what Lane needs to prove indicates what Lane needs to plead and, at a minimum, it would make little sense to require Lane to plead additional elements at this stage of the case if those elements were not part of the definition of control.

Adams v. Kinder-Morgan, Inc., the Tenth Circuit's most recent significant pronouncement on control-person liability, provides some further indication that the Court should not adopt the two-step test from the Eighth Circuit.  In that case, the Tenth Circuit addressed whether three particular defendants were control persons. The Tenth Circuit found the allegations against one defendant inadequate, but held that the allegations against two defendants were sufficient, without discussing whether the defendant actually participated in the operations of the corporation.  See 340 F.3d at 1108-09. True, these two defendants were corporate executives.  This fact, however, was not the focus of the Tenth Circuit's analysis.  Instead, the Tenth Circuit was concerned with whether the defendants had "'the power to direct or cause the direction of the management and policies of [Kinder-Morgan].'" Id. at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305)(emphasis added, alteration in Adams v. Kinder-Morgan, Inc.).  Because of their executive status, the two defendants in Adams v. Kinder-Morgan, Inc. would likely satisfy the D.E. Shaw Defendants' proposed test, but again, as in Richardson v. MacArthur and First Interstate Bank of Denver, N.A. v. Pring, the Tenth Circuit upheld the § 20(a) claims on the grounds of potential or indirect control without discussing actual exercise of control.

Thus, while Maher v. Durango Metals, Inc. expressly leaves the question open, Tenth Circuit

case law from both before and after Maher v. Durango Metals, Inc. indicates that the Tenth Circuit would require only the potential to control general corporate matters and not the actual exercise of that control.  Particularly given the holdings in Richardson v. MacArthur, First Interstate Bank of Denver, N.A. v. Pring, and Adams v. Kinder-Morgan, Inc., which all focused on indirect or potential control, it would be difficult for a district court to reach a different conclusion, even if the Tenth Circuit has indicated that it not addressing a potential circuit split.  The Court will therefore apply the standard applied in Maher v. Durango Metals, Inc and Adams v. Kinder-Morgan, Inc., and ask whether Lane has pled that the D.E. Shaw Defendants had "the power to direct or cause the direction of the management and policies of [Westland],'" Adams v. Kinder-Morgan, Inc, 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305), and "the power to control the transaction underlying the alleged securities violation," Maher v. Durango Metals, Inc., 144 F.3d at 1305 n.8.

In addition to comporting better with the Tenth Circuit case law, this test also makes more sense and fits the regulatory language better.  Control is undefined in the statute, but is defined in the SEC regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  The regulation thus focuses on the power to direct, not on the exercise of that power.  Requiring that a defendant have actually exercised power over the primary violator's general operations would involve divining an exercise of power requirement from a regulation that mentions only the possession of power.  Moreover, in the Tenth Circuit, the potential to direct the particular transactions at issue, rather than actually exercising that power, is all that is required on that level.  A standard that requires actual exercise of power over general operations, but only the potential exercise of power over particular transactions, begins to stray from what the regulation defines as control.

Finally, the Court does not see the concerns that have apparently animated the Metge v. Baehler test as being strong enough for the Court to depart from the course indicated in the Tenth Circuit case law and the language of the regulations.  Although courts have applied Metge v. Baehler's test, those courts, and Metge v. Baehler itself, have surprisingly little discussion about why the test is superior.  Tracing back the roots of the test to the district court opinion effectively adopted in Metge v. Baehler reveals that the basis for drawing a distinction between general operations and specific transactions, and requiring that actual exercise of power be shown for the former but not the latter, is the concern that many, such as creditors, possess a broad potential power to influence corporate affairs, but that it is not reasonable to impose the burdens of securities law on such individuals unless that power is exercised.  As the district court wrote:

> A corporation's primary lender almost always possesses a measure of influence over the corporation, and this influence or power normally increases if the corporation becomes delinquent on its loan payments, due to the lender's ability to threaten declaration of default and acceleration of the loan. Most commercial loan agreements also give the lender the right to exercise certain powers over the borrower corporation in the event of default or upon the occurrence of other specified events. If the mere possession of such power and influence over a borrower were enough to impose on the lender the burden of proving its own good faith and non-inducement in the event of a securities law violation by the borrower, the heightened potential for liability could deter lenders from making loans to corporations involved in securities transactions. The mere making of such loans would impose on lenders an onerous duty of supervision over their borrowers' activities relating to securities. The imposition of such a duty is not reasonable unless and until the lender exercises its power by becoming involved in the general operations of the corporate borrower.

Metge v. Baehler, 577 F.Supp. 810, 818 (D.C. Iowa 1984), reversed in part on other grounds by Metge v. Baehler, 762 F.2d 621.

While this reasoning contains some valid concerns, the Court believes that they are excessive, and not sufficient to put aside the Tenth Circuit's language indicating otherwise and the regulation. It is not clear that the degree of potential power contained in such provisions as a right to exercise

control on default would even satisfy the test the Court will use here.  Such a right seems more like the "ability to acquire the power to control," which "is necessarily one step removed from the power to control and two steps removed from the actual exercise of control," and which is insufficient for liability.  Maher v. Durango Metals, Inc., 144 F.3d at 1306 n.8.  As the Court understands the potential to exercise direction or control, that potential must be immediately exercisable.  In other words, the only reason the potential controller has not exercised control is a decision to refrain from doing so, and not because some condition precedent precludes it.  Moreover, the requirement that a control person have the ability to control both general affairs and the specific transaction at issue will reduce the class of potential defendants.  Although many prospective defendants, such as major creditors, might gain broad powers in certain situations, they will not necessarily have the ability to influence the day-to-day matters of particular transactions.  Finally, the Eighth Circuit's standard would allow for an anomalous situation: a person who participated and exercised direct control over a particular transaction might escape § 20(a) liability by not exercising control more generally.

Applying a standard that does not require a showing of exercise of power over general affairs, the Court concludes that Lane has adequately pled a cause of action against the D.E. Shaw Defendants.  With respect to the potential power over general affairs, the Second Amended Complaint alleges that DESCO possessed a 92.5% ownership stake in SCC and, pursuant to a joint venture agreement with SunCal -- another controlling person who had contractual power to control or veto various significant decisions of Westland, had to approve major decisions involving the merger.  See SAC ¶¶ 67-68, at 40-41.  Regarding the potential power over the underlying transaction that forms the basis of the primary violation, Lane's allegations indicate that D.E. Shaw reviewed the Proxy and had the ability to influence its contents to at least some degree, and that, through SunCal, D.E. Shaw could participate in drafting the Proxy.  See SAC ¶¶ 56(c), 67, at 37, 40.  Lane's

allegations that D.E. Shaw obtained agreements to hide its role in the merger, and that D.E. Shaw and SunCal were considering increasing their contribution to the Atrisco LLC spinoff to ensure director loyalty there, provide further support. See id. ¶ 42(a), 68, at 21, 40-41. The allegations against Rizk and Dinning, the individuals among the D.E. Shaw Defendants, are also sufficient. Rizk was the head of D.E. Shaw's real estate unit, and Dining was Rizk's boss and had oversight of real estate at D.E. Shaw. The Second Amended Complaint alleges that they were architects of D.E. Shaw's role being kept secret and that they controlled D.E. Shaw's participation in disseminating the Proxy. See SAC ¶¶ 21(b)-(d), 69, at 12-14, 41. These allegations are sufficient at this stage to state a claim under § 20(a) against the D.E. Shaw Defendants.

At the present time, however, the Court is dismissing the Complaint, including the § 20(a) claim against the D.E. Shaw Defendants, because of the failure to adequately plead damages on the underlying claim. The claim is otherwise adequately pled, however, and the Court cannot find as a matter of law that the statute of limitations bars the claim. Should the Court allow Lane to revive his Complaint, the claim against the D.E. Shaw Defendants can also be reinstated.

In sum, the Court is dismissing the Complaint for failure to plead damages adequately. The Court will withhold entering final judgment for ten days. Within that time, Lane may move to amend his Complaint to cure that deficiency and, if Lane timely files such a motion, the Court will then enter final judgment only if it denies the motion. If the Court allows Lane to amend once again, then the other rulings in this opinion will be in effect and will define the scope of Lane's case.

**IT IS ORDERED** that: (i) the Director Defendants' Motion to Dismiss Second Amended Complaint;  (ii) the Defendants Westland's and  Suncal's Motion to Dismiss and Joinder in the Director Defendants' Motion to Dismiss; and (iii) The D.E. Show Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint are granted in part and denied in part as explained in this

memorandum opinion and order.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Nicholas Koluncich, III
Law Offices of Nicholas Koluncich
Albuquerque, New Mexico

-- and --

Joe Kendall
Provost Umphrey Law Firm, LLP
Dallas, Texas

-- and --

Darren J. Robbins
Brian O. O'Mara
G. Paul Howe
Randall J. Baron
David W. Mitchell
Danielle S. Myers
Coughlin Stoia Geller Rudman & Robbins, LLP
San Diego, California

      *Attorneys for the Plaintiffs*

Douglas G. Schneebeck
Brian K. Nichols
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

      *Attorneys for Defendants Westland Development Company, Inc.*
        *and SunCal Companies Group*

-83-

Greg L. Weselka
Evan P. Singer
Jones Day
Dallas, Texas

    *Attorneys for Defendant SunCal Companies Group*

Juan L. Flores
Sheehan Sheehan & Stelzner
Albuquerque, New Mexico

-- and --

Paul Bessette
Jesse Z. Weiss
Kimberly G. Davis
Christopher W. Ahart
Yusuf A. Bajwa
Greenberg Traurig, LLP
Austin, Texas

    *Attorneys for Defendants Barbara Page, Sosimo Padilla, Joe Chavez,*
      *Josie Castillo, Charles Pena, Georgia Baca, Troy Benavidez,*
      *Ray Mares, Jr., and Randolph Sanchez*

Trent A. Howell
Jacqueline E. Davis
Holland & Hart, LLP
Santa Fe, New Mexico

-- and --

John D. Lovi
Lara E. Romansic
Michelle M. Oliver
Steptoe & Johnson LLP
New York, New York

-- and --

John T. Neumann
Steptoe & Johnson, LLP
Phoenix, Arizona

*Attorneys for Defendants D.E. Shaw Group, D.E. Shaw & Co. L.P.,*
  *D.E. Shaw Real Estate Portfolios 1, L.L.C., D.E. Shaw & Co. LLC,*
  *D.E. Shaw & Co., Inc., D.E. Shaw Investment Group, LLC,*
  *D.E. Shaw & Co. II, Inc., George Rizk, and Anne Dinning*