UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

| | |
|---|---|
| LAWRENCE LANE, On Behalf of Himself and All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>      vs.<br><br>BARBARA PAGE, SOSIMO S. PADILLA, JOE S. CHAVEZ, JOSIE CASTILLO, CHARLES V. PENA, GEORGIA BACA, TROY K. BENAVIDEZ, RAY MARES, JR., RANDOLPH M. SANCHEZ, WESTLAND DEVELOPMENT COMPANY, INC., SUNCAL COMPANIES GROUP, THE D.E. SHAW GROUP, D.E. SHAW & CO. L.P., D.E. SHAW REAL ESTATE PORTFOLIOS 1, L.L.C. ("DESCO REAL ESTATE"), D.E. SHAW & CO., LLC, D.E. SHAW & CO., INC., D.E. SHAW INVESTMENT GROUP, LLC, D.E. SHAW & CO. II, INC., GEORGE RIZK and ANNE DINNING,<br><br>                        Defendants. | No. Civ-06-1071-JB-ACT<br><br><u>CLASS ACTION</u><br><br>THIRD AMENDED COMPLAINT FOR VIOLATION OF §§14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 14a-9<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

**REDACTED PUBLIC VERSION**

## OVERVIEW OF THE ACTION

1.      This is a shareholder class action brought by plaintiff on behalf of persons whose shares of Westland Development Company, Inc. ("Westland" or the "Company") were purchased by SunCal Companies Group and/or its affiliates (collectively, "SunCal") together with D.E. Shaw & Co., L.P. and its affiliates (collectively, the "D.E. Shaw Group") in connection with a 2006 agreement and plan of merger (the "Merger Agreement") entered into by and between Westland and SunCal.  This action is brought against Westland, certain of its senior officers and directors and its merger partners SunCal and the D.E. Shaw Group arising out of defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act"), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.

2.      At the time of the consummation of the Merger Agreement, Westland held title to more than 50,000 acres of land which had originally been conveyed by the King of Spain in 1692 in what was known as the Atrisco Land Grant.  The descendants of the original grantees of the Atrisco Land Grant include Court-appointed Lead Plaintiff Lawrence Lane and Westland's other former shareholders.  Westland's assets included tens of thousands of acres of undeveloped property, master planned communities, retail properties, water rights and untapped oil and gas rights in and around Albuquerque.  Defendants acknowledge that the "size and location of these real estate holdings adjacent to Albuquerque, New Mexico, makes these unique assets."

3.      On or about September 20, 2006, the defendants caused a definitive proxy statement (the "Proxy Statement") to be filed with the SEC and mailed to Westland shareholders, a true and correct copy of which is attached hereto as Exhibit A.  The Proxy Statement described Westland, its assets and the process used by defendants to sell Westland, including the terms on which defendants had agreed SunCal would acquire Westland (the "SunCal Merger").

4.      The Proxy Statement falsely stated, among other things, that: ***the SunCal Merger was "advisable and fair to, and in the best interests of Westland and Westland's shareholders***;" and that "***Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement***."  In an attempt to convince Westland's shareholders of the legitimacy of the process used to sell Westland, the Proxy Statement also falsely stated that "Westland's board of directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland."  The Proxy Statement also omitted material facts necessary to make statements made therein not false or misleading. The true facts which were then known by, or available to, defendants included:

(a)      That the employment and consulting agreements described in the Proxy Statement were altered in exchange for defendants Barbara Page ("Page") and Sosimo S. Padilla's ("Padilla") support of the SunCal Merger to overcome the serious reservations each had expressed regarding the SunCal Merger;

(b)      That a Westland "value menu" prepared by Westland senior executive Brent Lesley determined the Company and its land holdings were worth $377 million, or $474 per share – 50% more than the price offered by SunCal;

(c)      That the Individual Defendants had no reasonable basis to believe and did not in fact believe that the SunCal Merger was "advisable, fair to and in the best interest of Westland and its shareholders."  This fact is evidenced by defendant Page's vote ***against*** adopting the Merger Agreement and Troy K. Benavidez's ("Benavidez") refusal to vote in favor of the Merger.  In fact, ***more than half – 5 of the 9 directors – did not vote all of their shares in favor of the SunCal Merger***; four directors did not vote any of their shares in favor of the Merger; and a fifth director voted less than half of his common shares in favor thereof.  In addition, defendants failed to have

Westland's assets appraised by a third party appraiser or financial advisor and did not know the value of the land, water or mineral rights that comprised Westland's assets at the time of the SunCal Merger;

(d)     That the D.E. Shaw Group owned 92.5% of the equity interest in the entity that acquired Westland via the SunCal Merger and participated in the solicitation of proxies from Westland's shareholders;

(e)     ███████████████████████████████████████

████████████████████████████████████████████████

████

(f)     That the Individual Defendants, including Benavidez, Joe S. Chavez ("Chavez"), Ray Mares, Jr. ("Mares"), Charles V. Pena ("Pena"), Randolph M. Sanchez ("Sanchez"), Padilla and Page did not believe that the SunCal Merger was fair to or in the best interests of Westland's shareholders, but rather so stated in order to obtain the personal benefits promised to them in connection with the SunCal Merger, including SunCal's promises of: (i) continued employment after the SunCal Merger; (ii) termination payments; (iii) lucrative lifetime appointments as trustees and/or directors on the Boards of the Atrisco Heritage Foundation (the "Foundation") and Atrisco Oil & Gas LLC ("Atrisco LLC"); and/or (iv) equity grants in Atrisco LLC; and

(g)     That, while advising shareholders they "should make their own determination as to the value of the Class A units" of Atrisco LLC, the Board had been advised by defendant Page at an August 29, 2005 board meeting that Knute Lee, an experienced oil broker representing the entities holding lease contracts to drill on Westland's land, reported that "100 million to 500 million

barrels of oil could be located on Westland's property which, if recovered, could be worth hundreds of millions of dollars for the shareholders."

5.    On or about November 6, 2006, defendants convened a shareholder meeting to obtain approval of the SunCal Merger.  On November 21, 2006, defendants confirmed that 72.4% of Westland's common shares and 97.75% of Westland's Class B shares had voted in favor of the SunCal Merger.  This exceeded the 66 2/3% which defendants stated was required under New Mexico law to approve the SunCal Merger.  On December 7, 2006, defendants announced the consummation of the SunCal Merger.

6.    On September 3, 2007, *Forbes* published an article titled, "Insider Deal on the Mesa," which asked, "[t]he 86-square-mile parcel outside Albuquerque was a pot of gold.  Who was going to get it?"  The article reiterates the sordid history and misconduct at Westland and discussed the unlawful process used by defendants in connection with the sale of Westland:

> Fast-growing Albuquerque, with a population of a half-million, is running out of room. To the north and south are Native American pueblos.  To the east are the towering Sandia peaks.  Yet if you drive five minutes west from downtown, the sidewalk abruptly ends at a massive escarpment topped by a temptingly empty sagebrush-covered mesa.

> This 86-square-mile parcel of real estate, twice the size of Boston, is what's left of the Atrisco land grant, bequeathed in 1692 to a few loyal subjects of Charles II, the disfigured and inbred young king of Spain.  For three centuries the descendants of those settlers fought off Apache raids, land hustlers and attempts to take their land under both Mexican and American governments.

> Today a California developer is planning two brand-new neighborhoods with 5,000 homes, retail stores and a Tesla Motor factory that will make electric cars. Construction will likely continue for decades on the land.  But the once proud Atrisquenos aren't sharing in the boom.  Instead they are *left with modest payouts and bitter recriminations about their land corporation's board of directors, who walked away millionaires*.

> If it sounds unfair and a little bit shady, then you haven't spent much time around Atrisco.  Its history as a business is one long tale of stupidity, cupidity and *mismanagement* in roughly equal measure.

Corruption charges have swirled around Atrisco since early in the last century.  In 1967, following years of infighting, the owners' holdings were incorporated into a for-profit business called Westland Development. Each heir got tradable stock proportional to his ancestors' land holdings.  The company's 800,000 shares traded via an internal exchange.

Incorporation didn't stop allegations of chicanery.  In the 1980s the state accused Westland president Gil Cordova of swindling Atrisquenos out of their shares through the trading committee.  He signed a consent decree, admitting no wrongdoing, and was pushed out of office only after a series of bruising proxy fights.

A new president came to office in 1989: Barbara Page, a former Westland director who ran as a reform candidate. Previously a bank manager and motel owner, she brought chirpy optimism but little in the way of experience.  Her board included a roofer, a florist and a used car salesman.  "We're turning around," Page vowed in 1990.  "We're on our way up. And we're determined to become a very successful company."

Westland Development, however, did little developing.  Instead, as it had been doing for years, it sold several million dollars' worth of land each year to cover expenses (such as $50,000 bonuses for directors and $100,000 salaries for officers) and a $1-a-share dividend.  Without the sales the company was barely profitable.

Atrisco had always attracted real estate barons hungry for raw land in the booming Southwest.  The billionaire Hunt brothers made a run at it in the early 1990s.  But buyers never got far because the thinly traded shares were difficult to amass and no one on the Westland board had enough shares to make a sale compelling.  And Westland's bylaws limited share ownership to lineal heirs of the original grantees.

During the 1990s **board members amassed shares** through purchases and grants.  In 1993 they **rewarded themselves with 5,000 shares apiece**.  Page, company Chairman Sosimo Padilla and others **exercised options on thousands more** granted them in the early 1980s.  The **grants were of Class B stock, which gave them veto power over a sale of the company**, since state law requires a majority of each share class to approve a sale.

**In 1998, without a public explanation, Westland's board passed an "antitakeover" provision that provided for a megagrant of B shares if Westland were ever the target of a hostile bidder – never mind that the board's existing shares gave them veto power over any deal**.  By 2004 Page owned more than 14,000 shares. Padilla, who had been chairman since 1989, had 23,000.  Between 2003 and 2005 Page made between $155,000 and $275,000 in salary and other pay.

In late 2004 a Tucson, Ariz. developer named Philip Aries approached Westland on behalf of an investor group that included the Park family from

Cleveland. Aries had been after the land for 21 years. "*Westland was like the Holy Grail of real estate deals*," he says.

Aries offered Westland $144 million. Page came back with $160 million, or $200 a share, and Aries agreed. Suddenly the board was rich, on paper. The collective value of their holdings instantly jumped from $1 million to $10 million; they would split another $7 million from the antitakeover provision. *Page and Padilla also had six-year severances written in their contracts*.

*A few younger board members began to grouse that Westland should get more. There could be hundreds of millions of barrels of oil and reserves of natural gas under the ground. Westland's own vice president of sales told the board in private that the land was worth at least $377 million*. (Page now says that was an incorrect figure based on rough estimates.)

But *Padilla and Page wanted a quick sale, having found a buyer who accepted the antitakeover payout, no questions asked. The company got a "fairness opinion" but never ordered a rigorous appraisal or solicited other bidders*. (Asked later in a deposition if he ever considered seeking out offers, Chairman Padilla replied: "Of course not. We don't do that. We're not out waving the flag.")

When Page announced the sale in September, most of the 6,000 heirs of Atrisco, many of whom still live on Albuquerque's impoverished southwest side, were ecstatic.

Two weeks after the big announcement *Page ordered Vincent Rivera, Westland's director of shareholder relations, to issue the $7 million in new B shares*. When a flabbergasted Rivera refused, Westland's attorney, Thad Turk, demanded he proceed. *Rivera reluctantly took nine blank stock certificates, one for each director, from the company's safe and began typing in their names*. Minutes after Rivera had loudly complained to officemates that the takeover wasn't hostile, Turk called again and told him to stop. Page and Turk called Rivera into a meeting a few days later at which he called the share grant *"free money" for the board*. That meeting was the last he heard of the B shares. "I never accused them of stealing," he recalls. "That's what I thought, but I didn't say that." (Page disputes his account and fired him a year later for allegedly being drunk on the job. Rivera denies the charge.)



Details on the Aries deal, including the as-yet-unissued B shares, came out in December 2005. Meanwhile, Phil Aries started having problems coming up with the money. With Atrisco officially in play, developers from all over the West came running. By March 2006 several class actions had been filed, accusing the board of breaching its fiduciary duty.

Las Vegas home builder James Rhodes offered $212 million plus half of all future oil and gas royalties. While Rhodes insisted that Westland cancel the special change-of-control payout to the board, he did come up with a new carrot. He *agreed to contribute to a "heritage fund" that would employ – for life – members of the current board*, a concession designed to appease several younger directors who owned almost no stock and were beginning to oppose a sale that would cost them their sinecures. Page and Padilla relinquished the B shares and set a date in June to vote on the sale.

On June 8, 2006 a thousand shareholders clutching paper proxies crammed into the Southwestern-style conference area of the Albuquerque Hotel. The sale was going to bring most of them more money than they had ever seen at one time. But *what the crowd didn't know was that a new offer topping Rhodes' had come in just days before from SunCal*, a privately held California developer with financing from hedge fund operator D.E. Shaw & Co.

Quickly, word got around the room that the sale was canceled. Fearing that their long-awaited payoff was being scuttled, the crowd shouted the event's guest host, former New Mexico governor Tony Anaya, off the stage.

Page grabbed the microphone and began issuing threats: "We have police. We have undercover agents." When that failed to calm the audience, Turk, the company's imposingly large attorney, took over and began ejecting dissidents. Three

hours later Westland's board cut off discussion and called in security to separate itself from irate shareholders. "It is our money," one woman in the audience screamed at the board members. "And I want it."

The bidding for Westland continued. Three weeks later SunCal had emerged on top with a price of $250 million, plus the money for the heritage trust and a 50% cut of oil and gas royalties. In November 2006 a much smaller crowd showed up in a cavernous auditorium downtown for yet another vote. This time Page and the board were prepared. A mariachi band warmed up the audience as uniformed cops paced in front of the stage. Heirs who stood up to speak – some against the sale, others in favor – were closely flanked by SunCal employees in blazers.

When one shareholder asked that the board be polled on their stock holdings, only Chairman Padilla, who owned more than anyone, refused to give a number, eliciting a chorus of boos. Once again the meeting ended when the board cut off questions and called security to the front. Page left the building under police guard. Nevertheless, Westland's shareholders voted 75% in favor of selling.

In the end, *5,991 heirs got an average of $37,000 apiece, and Westland's nine board members took home $15 million*, $12 million of that split between Padilla and Page. It was a shade under what they would have made had the sweetheart Aries deal gone through. *Four of Westland's board members now sit on the boards of the oil and gas royalty company and the heritage foundation, the latter for life*. Their salaries have not been determined, says SunCal. Both Padilla's and Page's *severances were extended to seven years*, worth a total of $350,000 and $770,000, respectively.

7.      Based upon defendants' representations that 72.4% of Westland's common shares and 97.75% of Westland's Class B shares had reportedly voted in favor of the SunCal Merger, defendants consummated the SunCal Merger on or about December 7, 2006, which resulted in substantial harm to Westland's former shareholders.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331, as plaintiff's claims arise in part out of the laws of the United States, §27 of the 1934 Act, §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

9.      Venue is proper in this District because Westland is located in this District, certain of the defendants reside in this District, defendants' wrongful acts occurred in this District and the harm caused by defendants emanated from and had effects in this District.

## PARTIES

10.     Lead Plaintiff Lawrence Lane is an heir of the Atrisco Land Grant and was the owner of approximately 50 shares of Westland common stock prior to consummation of the SunCal Merger.

11.     Defendant Westland was a New Mexico corporation that was formed in 1967. Westland was the successor in interest to tens of thousands of acres of land granted in 1692 by the King of Spain to the inhabitants and settlers of the Community of Atrisco.

12.     Defendant Page was Westland's President and CEO and served on Westland's Board for most of the 30 years prior to consummation of the SunCal Merger. After being challenged about her use of a secret agreement to divert assets to herself in connection with the proposed sale of Westland to SHNM Acquisition Corp. ("SHNM") pursuant to the SHNM Merger Agreement, Page agreed to waive certain rights delineated in her employment agreement. Page then changed her position in connection with the SunCal Merger Agreement and demanded from SunCal its agreement that she receive seven times her salary on the date of termination (or more than $770,000), plus all employment benefits if she is "involuntarily terminated," a term which is not defined in the Proxy Statement. Page is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the corporate misconduct detailed herein.

13.     Defendant Padilla was a Westland Director for 35 years and at all relevant times herein served as the Chairman of the Board prior to consummation of the SunCal Merger. Like Page, Padilla initially agreed to waive his rights to a severance payment under the SHNM Merger Agreement. In connection with the negotiation of the SunCal Merger Agreement, however, Padilla

demanded that SunCal agree that he receive seven times his annual salary on the date of termination (or more than $350,000) if he is "involuntarily terminated under the terms of the agreement." Padilla is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the corporate misconduct detailed herein.

14.     Defendant Chavez was a Westland Director for over ten years and from 2003 also served as Westland's Secretary-Treasurer prior to consummation of the SunCal Merger.  As Secretary-Treasurer of the Company, Chavez had custody of the books and records of the Company and was in charge of the preparation and filing of reports, financial statements and returns as required by law.  Chavez is identified in the Proxy Statement as a participant in the solicitation of proxies.

15.     Defendant Josie Castillo ("Castillo") was a Westland Director for over 20 years prior to consummation of the SunCal Merger.  Castillo is identified in the Proxy Statement as a participant in the solicitation of proxies.

16.     Defendant Pena was a Westland Director for ten years prior to consummation of the SunCal Merger.  Pena is identified in the Proxy Statement as a participant in the solicitation of proxies.

17.     Defendant Georgia Baca ("Baca") was selected and appointed as a Westland Director by defendants Page, Padilla, Chavez, Castillo and Pena in 2004.  Baca was employed by Westland for over a decade prior to consummation of the SunCal Merger.  Baca is identified in the Proxy Statement as a participant in the solicitation of proxies.

18.     Defendant Benavidez was selected and appointed as a Westland Director by defendants Page, Padilla, Chavez, Castillo and Pena in 2004.  Benavidez served as a Director prior to

consummation of the SunCal Merger and is identified in the Proxy Statement as a participant in the solicitation of proxies.

19.     Defendant Mares was selected and appointed as a Westland Director by defendants Page, Padilla, Chavez, Castillo and Pena in 2004.  Page, Padilla, Chavez, Castillo and Pena have longstanding social or business relationships with Mares and his family, including with Mares' father who served as a Westland director for over 20 years, from 1973 until he died in 1996.  Mares served as a Director prior to consummation of the SunCal Merger and is identified in the Proxy Statement as a participant in the solicitation of proxies.

20.     Defendant Sanchez was selected and appointed as a Westland Director by defendants Page, Padilla, Chavez, Castillo and Pena in 2004.   Sanchez served as a Director prior to consummation of the SunCal Merger and is identified in the Proxy Statement as a participant in the solicitation of proxies.

21.     The purchasers of Westland participated in the preparation and dissemination of the SunCal Proxy.  The purchasers of Westland are referred to herein as the "Buyer Defendants" and include the persons and entities detailed herein:

(a)     Defendant SunCal acquires and develops property for sale to residential and commercial builders.  The Proxy Statement falsely represented at page 13 that defendant SunCal was comprised of SCC Acquisition Corp. ("SCC") (a Delaware corporation, formed solely for the purpose of acquiring Westland); its parent SCC Acquisitions, Inc. (a California corporation ("SCC Acquisitions")); and their affiliates of the SunCal Companies Group.  An organizational chart filed with SunCal's October 31, 2007 application for a Tax Increment Development District ("TIDD") represented that, immediately prior to the merger, SunCal and its affiliates consisted of SCC NM Member LLC and D.E. Shaw Real Estate Portfolios 1, L.L.C. ("DESCO Real Estate"), which were

7.5% and 92.5% owners, respectively, of SCC Westland Venture LLC (the parent of Westland Holdco, Inc.).  Westland Holdco, Inc. was, in turn, the parent of SCC, the entity that was merged into Westland.  Additionally, SCC owned and/or controlled two of its subsidiaries, Westland SPE GP, LLC and Westland DevCo, LP.  *See* Exhibit B attached hereto.  SunCal is identified as a participant in the solicitation of proxies in the Proxy Statement.

(b)     Defendant D.E. Shaw Group is an investment firm headquartered in New York City with tens of billions of investments and committed capital as of October 1, 2008.  The D.E. Shaw Group is comprised of several affiliated entities including, among other affiliates, D.E. Shaw & Co., L.P., DESCO Real Estate, D.E. Shaw & Co., LLC, D.E. Shaw & Co., Inc., D.E. Shaw Investment Group, LLC and D.E. Shaw & Co. II, Inc. (collectively, the "D.E. Shaw Group"). DESCO Real Estate is a Delaware limited partnership headquartered in New York City.  DESCO Real Estate is one of defendant D.E. Shaw Group's primary operating entities and was intimately involved in planning, executing and consummating the SunCal Merger.  DESCO Real Estate is the 92.5% owner of SCC Westland Venture LLC, the parent of Westland Holdco, Inc.  Westland Holdco, Inc. was, in turn, the parent of SCC, the entity that was merged into Westland.  Through its equity ownership and/or board representation, D.E. Shaw Group and its affiliates had the power and authority to cause and did in fact directly or indirectly cause Westland to engage in the wrongful conduct complained of herein.

(i)     The D.E. Shaw Group's participation in the solicitation of proxies from Westland's shareholders was not disclosed to shareholders prior to the closing of the SunCal Merger. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████    The D.E. Shaw Group insisted upon concealing its involvement from Westland's shareholders despite its participation in the preparation of the Merger Agreement and Proxy Statement between August and September 2006 – *before* the SunCal Proxy Statement was disseminated to Westland shareholders. ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

(c)    Defendant Rizk is the head of the real estate division at defendant D.E. Shaw Group ███████████████████████████████████████████████████. Defendant Rizk had the ability to control and did control D.E. Shaw Group's participation and dissemination of the Proxy.

(d)     Defendant Anne Dinning ("Dinning") ███████████████████████
██████████████████████████████████████████████████████.  As such, defendant Dinning had the power to direct or cause the direction of the D.E. Shaw Group's actions in connection with the SunCal Merger.  ████████████████████████████████████████████████████████████████████████████████████████████.  Defendant Dinning had the ability to control and did control D.E. Shaw Group's participation and dissemination of the Proxy.

22.     Each of the defendants participated in the preparation, review and dissemination of the false and misleading Proxy Statement complained of herein.  The Individual Defendants abdicated their obligation to Westland and its shareholders to file and distribute to plaintiff and the class a Proxy Statement that was not false and misleading.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all Westland shareholders, and their successors-in-interest who suffered harm as a result of defendants' misconduct, except the defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

24.     This action is properly maintainable as a class action.

25.     The Class of stockholders is so numerous that joinder of all members is impracticable.  Pursuant to the Proxy Statement, Westland had approximately 794,927 outstanding shares held by approximately 6,100 shareholders.

26.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, but are not limited to, whether, in connection with the SunCal Merger:

(a)     defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing and disseminating a false and misleading Proxy Statement; and

(b)     plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein.

27.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

28.     Plaintiff is committed to prosecuting this action, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

29.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

30.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

31.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND TO THE SUNCAL MERGER

### *Ultra Vires* Issuance of Class B Shares

32.     In the 1980s and 1990s, Page, Padilla and the rest of the Board began amassing common shares of Westland by purchasing shares for approximately $20 per share from other shareholders (often the families of deceased shareholders) and granting themselves additional shares. In order to acquire even larger quantities of shares, the Board decided in 1983 to grant themselves

Class B shares, and sought shareholder approval of the Stock Bonus Plan which would have provided for the issuance of Class B shares. The Stock Bonus Plan was brought to a shareholder vote in 1983 and Westland shareholders overwhelmingly rejected it.

33.     Not discouraged by shareholders' refusal to approve the Class B shares in 1983, the Board in 1984 created a new Stock Option Plan and once again sought shareholder approval. Shareholders again rejected the plan. However, this time, the Board resorted to forging shareholder votes and manipulating the election so that they could grant themselves the Class B shares as planned. As a result of this fraudulent vote, 25,000 Class B shares were issued *ultra vires*, which shares were used decades later to sway the November 6, 2006 vote and divert to defendants approximately $8 million in merger consideration for these unlawfully issued shares alone. As former Westland President Gil Cordova has declared, "the Class B shares issued pursuant to the 1984 stock plan were not lawfully issued, as the 1984 stock option plan was not approved by Westland's common shareholders."[1]

34.     In addition, in 1998, the Board passed (without explanation) an "anti-takeover" provision which provided for a "mega-grant" of 35,000 "change-in-control" shares if Westland were ever the target of a hostile bidder. This was despite the fact that the Board's existing share ownership gave them veto power over any deal. Defendants planned to take advantage of this, and in fact, ordered Vincent Rivera, Westland's shareholder relations director, to issue the 35,000 Class

---

[1]     In addition to these 25,000 unlawful Class B shares, defendants continued to grant themselves and others Class B shares. At the time of the vote on the SunCal Merger, 51 people owned 85,100 shares of Class B stock and received over $26.8 million for them, including the nearly $13 million received by Westland's directors and officers, who collectively owned 41,035 shares of Westland Class B stock.

B shares (then worth $7 million) in August 2005.  When Rivera refused – noting that the proposed ANM merger was not "hostile" – he was later fired.

**The Board's Failure to Hire Advisors or Solicit Other Bids**

35.     By April 2005, at least three different entities had expressed an interest in purchasing Westland – ANM, WestPac and Robson Communities.  Page had a longstanding relationship with ANM, as she had contemplated selling Westland to Phillip Aires, an ANM "consultant," since the 1980s.  In fact, as a result of her clandestine efforts to sell Westland to Aires in the mid-1980s without informing the full Board or following proper procedures, Page was forced to leave Westland.  When Aires returned in 2005, offering to buy Westland, Page and the rest of the Board refused to solicit any other bids or negotiate with any other potential buyers, preferring "to take the bird in hand" as their counsel Thad Turk described it, to advance their own pecuniary interests rather than honoring their fiduciary duty to maximize shareholder value.  Thus, defendants entered into a merger agreement with ANM at $200 per share which contained "no-talk," "no-shop" and other provisions designed to discourage other bidders.

36.     At the behest of Page and Padilla (who have controlled and dominated the Board for most of the past 35 years), the Board declined to even attempt to ascertain the value of Westland's assets or implement any sales process at all.  A few directors indicated that the Company should adopt a reasonable sales process: Sanchez "suggested hiring a financial advisor to solicit other bids," and the Company's in-house counsel, Thad Turk ("Turk"), advised the Board that "the best way to get the highest value to the shareholders for their stock" was to "let the market determine the price." Several board members expressed that they thought the price was too low (Westland's own Vice President of Sales, Brent Lesley, opined to the Board that Westland's land was worth at least $377 million).  Yet, the Board agreed to sell Westland to ANM without publicly announcing that Westland was for sale, let alone attempting to solicit any bids.  This decision was made despite the

fact that two other entities stood ready to make offers for Westland. When asked about the Board's supposed deliberations regarding the ANM offer, defendant Mares admitted "I don't recall having a whole lot of discussion . . . ." The Board did not know what the Company's assets (including land) were worth, or even what land Westland owned, but they did not hire an appraiser. In fact, CBIZ Valuation Group ("CBIZ")[2] did not issue its fairness opinion until two weeks after the ANM merger agreement was executed.

37.      On February 9, 2006, Westland received an offer from SHNM to purchase Westland. The Board then entered into a merger agreement with SHNM, once again without attempting to value Westland or its assets or first obtaining a fairness opinion. On the eve of the June 2006 shareholder vote on the SHNM offer, SunCal came forward with a superior bid and the vote on the SHNM transaction was cancelled. On July 18, 2006, the Board – yet again without the benefit of implementing a sales process or receiving a fairness opinion – agreed to sell Westland to SunCal. On July 19, 2006, SunCal and Westland entered into a Merger Agreement, which provided for SunCal's purchase of the 794,927 outstanding shares of Westland at a price of $315 per share.

## THE FALSE AND MISLEADING PROXY STATEMENT

38.      On September 20, 2006, defendants caused Westland to file the Proxy Statement setting the shareholder vote on the SunCal Merger for November 6, 2006. Federal law requires that proxy materials shall not contain statements which are false or misleading with respect to any material fact, or which omit to state any material fact necessary in order to make the statements therein not false or misleading.[3] The Proxy Statement violated §14(a) because it misrepresented

---

[2]        CBIZ was formerly known as Business Valuation Services ("BVS").

[3]        "Omission of information from a proxy statement is actionable 'if *either* the SEC regulations specifically require disclosure of the omitted information in a proxy statement, *or* the omission

and/or omitted material facts that a reasonable Westland shareholder would have considered important in deciding how to vote.

**The Proxy Statement Misrepresented and/or Failed to Disclose**
**Defendants' Conflicts of Interest**

39.    The Proxy Statement at page 3 explained that "[i]n considering the recommendations of Westland's board of directors, you should be aware that some of Westland's officers and directors have various relationships with Westland or interests in the merger that are different from your interests as a shareholder and that may present actual or potential conflicts of interest." The Proxy Statement contained a section at pages 29-30 titled, "Interest of Westland's Officers and Directors in the Merger," which stated:

- "Since December of 1991, Ms. Page has been employed as Westland's president and chief executive officer under a renewable *six year employment agreement*, pursuant to which she is paid $110,000 per year. If Ms. Page's employment is involuntarily terminated during the term of the agreement, the agreement provides that she will be paid, in addition to any salary earned to the date of such termination, an amount of cash equal to *seven times* the amount of her annual salary on the date of termination (or $770,000 as of the date of this proxy) plus all employee benefits to which she is currently entitled."

- "Mr. Padilla, the chairman of Westland's board of directors and Westland's executive vice president, is retained by Westland as a consultant under a renewable *six year consulting agreement*, pursuant to which he is paid $50,000 per year for his services. Mr. Padilla has agreed that if his consultancy is involuntarily terminated by SCC during the term of the agreement as a result of the merger, he will be paid no termination agreement but if he is otherwise involuntarily terminated under the terms of the agreement, he will be paid, in addition to any compensation earned to the date of such termination, an amount of cash equal to *seven times* the amount of his annual compensation on the date of termination (or $350,000 as of the date of this proxy)."

---

makes other statements in the proxy statement materially false or misleading.'" *Seinfeld v. Gray*, 404 F.3d 645, 650 (2d Cir. 2005) (quoting *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002)) (emphasis added).

40.    These statements, at the time and in light of the circumstances under which they were made, were materially false and/or misleading.  The SEC Regulations required accurate disclosure of Page's and Padilla's interests.  *See* 17 C.F.R. §240.14a-101, Item 5(a)(1).  The true facts then known by, or available to, defendants were that:

(a)    During a May 2006 Board meeting, the Board discussed additional items they needed to be included in SunCal's offer in order for it to be considered superior, which specifically included defendants Page and Padilla's employment agreements; and

(b)    Neither Page's nor Padilla's existing agreements provided for six year terms or for payments equal to seven times the amount of annual compensation.  Rather, these agreements were modified to provide additional terms ***after*** Page voted against adopting the SunCal Merger Agreement and ***after*** Padilla expressed to the Board that there were "numerous problems" with the SunCal Merger Agreement.  These modifications were effected as an inducement to obtain their endorsement of the SunCal Merger.[4]

41.    These omitted facts would have assumed actual significance in the reasonable Westland shareholder's deliberations, particularly when viewed contemporaneously with the fact that defendant Page initially voted against accepting the SunCal Merger Agreement when it was presented to the Board.  *See* ¶¶43-45 herein. In order for the Westland shareholders to assess defendants' conflicts of interest, as shareholders were instructed to do by the Proxy Statement, defendants' true interests in the SunCal Merger were required to be disclosed.

---

[4]    The Proxy Statement mailed to Westland's shareholders in connection with the SHNM Merger stated that defendant Page had a ***five year*** employment agreement and that she would receive payments equal to ***six times*** the amount of her annual salary.  And, the same Proxy Statement stated that defendant Padilla had a ***five year*** consulting agreement and that he would receive payments equal to ***six times*** the amount of his annual compensation.

42.     The Proxy Statement also omits the fact that, in exchange for their endorsement of the SunCal Merger, at least four Westland directors were promised lifelong trusteeships of the Foundation and/or as directors of Atrisco LLC, entities that were granted control over hundreds of millions of dollars in assets.  Page 31 of the Proxy Statement states only that these defendants "would be entitled to receive customary fees in connection with such service," claiming that the amounts had not been determined as of September 20, 2006.  The fact that Westland Board members were being rewarded with lifelong positions as trustees of the Foundation and/or as directors of Atrisco LLC with lucrative annual retainers is information that was unquestionably material to shareholders' decision and shareholders would want to give more careful scrutiny to the terms of the Merger Agreement as a result thereof.

(a)     According to internal correspondence, the D.E. Shaw Group and SunCal used ██████████████████████████████████ to their advantage and to the detriment of Westland shareholders.  ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████ This inducement was not disclosed in the Proxy Statement.

(b)     Only *after* the Proxy Statement was distributed to Westland shareholders and 70% of the votes were cast did defendants first communicate the identity of the directors of Atrisco LLC to Westland's shareholders.  The Proxy Statement was mailed to shareholders on September 20, 2006.  A mere *nine days later*, on September 29, 2006 – five weeks before the shareholder vote – defendants filed with the SEC  a Form 10-SB for "Atrisco Oil & Gas LLC" identifying for the first and only time the Westland directors who were awarded lifetime tenures as Atrisco LLC trustees.

Not only was this Form 10-SB not filed with the SEC under Westland's name, it was never mailed to Westland's shareholders even though defendants filed supplemental proxy materials *16* times with the SEC between September 20 and November 6, 2006 *under Westland's name* urging Westland's shareholders to vote in favor of the SunCal Merger, including one on the same day the Form 10-SB was filed.

**The Proxy Statement Misrepresented and/or Failed to Disclose That Westland's CEO Voted Against the SunCal Merger**

43.    The Proxy Statement included a "Questions and Answers" section at pages 5-12 that stated:

**Q: Why is Westland proposing the merger?**

A: Westland is proposing the merger to enable its shareholders to vote whether to receive, upon completion of the merger, $315.00 per share in cash. *Westland's board of directors believes that the merger is in the best interests of Westland's shareholders based, in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders*. For a more detailed discussion of the conclusions, determinations and reasons of Westland's board of directors for recommending that Westland shareholders approve the merger on the terms of the merger agreement, see "Special Factors – Recommendation of Westland's Board of Directors".

*         *         *

**Q: Are Westland's directors and officers voting their shares in favor of the approval of the merger agreement?**

A: Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement.

*         *         *

**Q: What is the recommendation of Westland's board of directors with respect to the matters being voted upon?**

A: Based on a number of factors set forth in the section entitled "Special Factors—Recommendation of Westland's Board of Directors," Westland's board of directors recommends that Westland's shareholders vote FOR the approval of the merger agreement.

44.     The Proxy Statement also included the "Recommendation of Westland's Board of Directors," at pages 26-29 which stated:

> Westland's board of directors, by vote at a meeting held on July 18, 2006, determined:
>
> - the merger and the merger agreement are advisable and fair to, and in the best interests of Westland and Westland's shareholders;
>
> - to submit the merger agreement to Westland's shareholders to vote on its approval; and
>
> - to recommend to Westland's shareholders that they vote in favor of the merger agreement.
>
>            *      *      *
>
> **Westland's board of directors recommends that you vote FOR approval of the merger agreement**.

45.     These statements, at the time and in light of the circumstances under which they were made, were materially false and/or misleading.  The true facts then known by, or available to, defendants were that defendant Page actually voted ***against*** adopting the Merger Agreement and Benavidez ***abstained*** from voting.[5]  In addition, despite the Board's recommendation in the Proxy Statement that shareholders vote in favor of the SunCal Merger and defendants' representation at page 10 that "Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement," ***nearly half – 4 of the 9 directors – did not vote their shares in favor of the***

---

[5]     In fact, defendant Page expressed her disapproval of the SunCal Merger on no less than three occasions, none of which were ever mentioned in the Proxy Statement: (1) Page told the Board that she "had serious concerns about the SunCal offer" in May 2006; (2) three weeks later, Page read a memorandum to the Board "listing her personal recommendations as a shareholder, to SunCal representatives listing items she would like to see in their acquisition proposal;" and (3) Page voted against adopting the SunCal Merger Agreement as a director.  These omitted facts would have assumed actual significance in a reasonable Westland shareholder's deliberations.

*SunCal Merger* and a fifth director voted less than half of his common shares in favor thereof.[6]

Thus, while making statements to the shareholders that the SunCal Merger was fair to and in the best

interests of Westland and its shareholders, the directors did not believe it to be so. This is material

information Westland shareholders would have considered important in deciding how to vote.[7]

**The Proxy Statement Misrepresented the "Market Check" Process**

      46.    Throughout the entire merger process, the Board declined to even attempt to ascertain

the value of Westland and its assets or to implement any true sales "process." What actually

transpired during the so-called "market check process," was much different than what was falsely

depicted in the Proxy Statement:

      (a)    The "Background of the Merger" section of the SunCal Proxy Statement at

pages 16-17 described numerous instances during June and July 2005 where "Westland's board of

directors" had concerns, and instructed defendants Page and Padilla on their negotiations with ANM.

These representations are either false or confirm that defendants falsified internal Westland

documents because during the relevant period none of the Board minutes mention any negotiations

with ANM. In fact, the ANM transaction was not mentioned in the Company's Board meeting

---

[6]    The Proxy Statement explained at page 3 that "[f]ailure to vote or an abstention will have the same effect as a vote against approval of the merger agreement." Defendants Benavidez, Mares, Pena and Sanchez did not vote their Class A common shares in favor of the SunCal Merger and defendant Chavez voted only 100 of his 310 Class A common shares in favor of the SunCal Merger.

[7]    Defendants had a duty to correct and update their representations concerning their intent to vote their shares. The Merger Agreement expressly provided that "[n]one of the information supplied or to be supplied by the Company for inclusion or incorporation by reference in the Proxy Statement will, at the date of mailing to shareholders *and at the time of the Shareholder Meeting*, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading." *See* Merger Agreement §§4.28, 6.4 (emphasis added).

minutes until August 5, 2005 – two months after "Westland's board of directors" purportedly had

"concerns" and "instructed" Page and Padilla in their negotiations with ANM.

(b)     The D.E. Shaw Group and SunCal knew in July 2006 that there was no market

check process: ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

(c)     The Board did not know nor bother to find out what the Company's assets

(including land) were worth, or even what land Westland owned, but they did not hire an appraiser.[8]

In fact, CBIZ did not issue its fairness opinion until **_two weeks after_** the ANM merger agreement

was executed.

(d)     When asked about the Board's supposed deliberations regarding the ANM

offer, defendant Mares admitted "I don't recall having a whole lot of discussion . . . ."

(e)     Defendant Sanchez was worried about losing potentially valuable water rights

and mineral rights.

(f)     In response to defendant Chavez's question of what Turk (Westland's in-

house counsel) would do if he were a director, Turk responded that he would not sell the property

due to the Company's 300-year history.

(g)     Defendant Sanchez stated that he felt more offers would be presented and

there are "major problems" with the merger agreement.  Defendant Sanchez also "suggested hiring a

---

[8]  ███████████████████████████████████████████████████████████
███████████

529675_1

financial advisor to solicit other bids." The idea was dropped because "this was done in the 1980's to no avail."

> (h)     Five of the directors indicated "their desire is to sell for a higher price."

> (i)     "When pressed, President Page and Chairman Padilla both said they felt the Company should sell, although Chairman Padilla said he found numerous problems with the merger agreement. He suggested waiting a few days to see if other offers come in."

> (j)     As late as January 24, 2006, defendant Benavidez still had "serious concerns with several issues in the amended merger agreement" with ANM and defendant Sanchez was "still concerned about potential gas and oil reserves."

> (k)     Defendant Page did not vote in favor of the SunCal Merger Agreement.

These omitted facts would have assumed actual significance in the reasonable Westland shareholder's deliberations because they would have been apprised that their officers and directors did not implement a "market check" process in connection with the sale of their Company.

**The Proxy Statement Misrepresented and/or Failed
to Disclose Westland's Value**

47.     Page 16 of the Proxy Statement explained that in 2001 the Board engaged a valuation expert, CBIZ, to determine the value of Westland's stock. CBIZ concluded that Westland's stock was valued $87 per share, or $70 million. Then, in February 2005, CBIZ updated its valuation, and concluded that the value of Westland's outstanding stock was $180 per share. The Proxy Statement explained on page 26 that, in concluding the SunCal Merger and the $315 per share price was "fair" to Westland's shareholders and recommending that Westland shareholders should "vote in favor of the merger agreement," the Individual Defendants considered several factors. One factor listed on page 27 of the Proxy Statement was that the $315 per share price represented a 75% premium over

the $180 valuation in February 2005.  These statements, at the time and in light of the circumstances under which they were made, were materially false and/or misleading.

48.     The true facts then known by, or available to, defendants were that in *2001*, CBIZ actually determined that the Company's value was ***$249 per share***.  Defendant Page ordered CBIZ to manipulate downward this $249 per share valuation by more than 60%, to just $87.59 per share. Only through this undisclosed manipulation of the 2001 valuation could CBIZ opine in 2005 – after four years of additional appreciation in Westland's valuable real estate assets – that a $200 per share offer for Westland was "fair."  This omitted fact would have assumed actual significance in the reasonable shareholder's deliberations because the valuation of the Company in *2001* was *less* than the amount deemed "fair" in *2005*.

(a)     Were the above misstatements omissions not false or misleading enough, CBIZ's opinion that the $200 per share ANM offer was "fair" was further undermined by an internal Westland "value menu" that was not only presented to the Board less than two months prior to CBIZ's opinion being rendered, but CBIZ was aware there was "something out there from Brent Lesley" but had not seen it.  The true facts then known by or available to defendants were that Westland Vice President Brent Lesley (who was the person at Westland primarily responsible for determining the value of Westland's land) prepared a "value menu" at defendant Page's request during the last week of August 2005 assessing the values of Westland's land holdings.  Mr. Lesley's August 2005 "value menu" represented that Westland's land (without including the Cordero Mesa interest) was worth $377 million, or ***$474 per share***.[9]  Both defendants Page and Padilla routinely

---

[9]     The Proxy Statement also informed shareholders on page 28 that a "material factor," regarding the acquisition of Westland was "the belief of Westland's board of directors and management team that Westland and its assets are more valuable in the ***aggregate***."  This statement was materially false and/or misleading because the true facts then known by or available to

relied upon Mr. Lesley's analysis of Westland's land throughout his more than two decades of employment with the Company and his resultant expertise and experience.  This internal "value menu" was also reliable because it incorporated into the August 2005 "value menu" a June 16, 2005 valuation of 2,500 acres which Mr. Leslie estimated was worth $78 million.  Defendants relied upon Mr. Leslie and the June 16, 2005, $78 million valuation (which was but one component of the comprehensive August 2005 "value menu") as the basis to reject a $30 million offer for those 2,500 acres of land.

(b)    If Westland's shareholders had been informed of the true value of the Company – which was then known by or available to defendants – the information available to shareholders at the time of the shareholder vote on the SunCal Merger would have been as follows:

| Date | Valuation |
|------|-----------|
| **July 2001** | **$249/share valuation by CBIZ** |
| **August 2005** | **$474/share valuation by Brent Lesley** |
| October 2005 | $200/share ANM offer – deemed "fair" by CBIZ |
| March 2006 | $255/share SHNM offer – deemed "fair" by CBIZ |
| September 2006 | $315/share SunCal offer – no opinion by CBIZ |

These omitted facts would have assumed actual significance in the reasonable Westland shareholder's deliberations because they would have been apprised that the foundation upon which subsequent "fairness" opinions were rendered was tainted.[10]

---

defendants were that Westland's *individual* assets were valued at $377 million, or $474 per share – *50% more* than the $250 million, or $315 per share offered by SunCal.

[10]



**Defendants Lacked Any Basis to Assert that the SunCal Merger**
**Was Fair to or in the Best Interests of Westland or its Shareholders**

49.     The Proxy Statement includes a statement at page 26 by the Individual Defendants that the SunCal Merger is "advisable and fair to, and in the best interests of Westland and Westland's shareholders."  The Proxy Statement further stated at page 6 that "Westland's board of directors believes that the merger is in the best interests of Westland's shareholders based, in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders."  These statements, at the time and in light of the circumstances under which they were made, were objectively and subjectively materially false and/or misleading and defendants knew or should have known that these statements were false and/or misleading.  The true facts then known by, or available to, defendants were:

(a)     The Individual Defendants did not subjectively believe the merger was "advisable and fair to, and in the best interests of Westland" because none of the directors wanted to sell the Company.  Rather, they wanted all the offers to "go away."  In fact, beginning with the first ANM offer, the Individual Defendants discussed informing "the shareholders that they had a $200 offer but in the opinion of this board of directors, these nine people, it wasn't enough."  Rather than candidly inform Westland's shareholders of their real opinions – that not even the first $200 per share offer from ANM was enough to dispose of a fundamental part of their heritage – the Individual Defendants represented to the shareholders that, in their opinion, the merger was "advisable and fair to, and in the best interests of Westland."  Just as they did with the ANM Merger, defendants repeatedly told Westland's shareholders that each of the SHNM and SunCal Mergers were

"advisable and fair to, and in the best interests of Westland." It was not, and the Individual Defendants did not believe it to be so.[11]

(b)    The Individual Defendants did not objectively believe the merger was "advisable and fair to, and in the best interests of Westland" because Mr. Lesley's "value menu" represented that Westland's land (exclusive of the Cordero Mesa interest) was worth $377 million, or $474 per share – 50% more than the consideration offered by SunCal. *See* ¶48(a). In addition, the Board failed to ascertain the value of Westland or its valuable assets. In fact, when asked whether the Board should have obtained an appraisal, defendant Page testified, "it might have been a good idea." When asked whether it would have been a good idea for the Board to have hired an investment banker, defendant Page testified "it might have been." And when asked if it would have been a good idea for the Board to have hired someone with mergers and acquisition experience, defendant Page testified, it "might have been, but as far as I know, the board didn't want to merge, and they didn't want to be bought out." The Individual Defendants also admitted that they had "no knowledge" of the value of Westland's oil and gas reserves. Finally, defendant Page voted against adopting the Merger Agreement, defendant Benavidez abstained from voting on the Merger Agreement, four of the nine directors did not vote their shares in favor of the SunCal Merger and a fifth director voted less than half of his common shares in favor thereof.

(c)    Defendants Mares, Padilla and Sanchez have admitted in sworn testimony that not only did they not attempt to assess the value of Westland and its assets before agreeing to sell the Company, but that they also failed to engage in any affirmative effort to maximize shareholder value.

---

[11]    That the Individual Defendants did not subjectively believe the merger was "fair" is further confirmed by the facts alleged at ¶¶43-45 herein.

(d)    As detailed above and attested to by several of the Individual Defendants, defendants entered into merger agreements with ANM, SHNM and SunCal without any reasonable basis to assert that the Merger Agreement was "fair to" and "in the best interests of" Westland and its shareholders.

**The Proxy Statement Misrepresented and/or Failed to Disclose
the Existence and Materiality of the "TIDD"**

50.    The Proxy Statement states that in reaching its determination that Westland shareholders vote in favor of the SunCal Merger and that the terms of the SunCal Merger and the Merger Agreement were advisable, fair to and in the best interest of Westland's shareholders, the Board considered as a material fact the substantial expense that would be required to develop Westland's land holdings.  Specifically, the Proxy Statement states at pages 27-28 that the Board's determination was due in part to the following:

- That "Westland's vast amount of undeveloped land, and the expense and time required to develop it, make an acquisition of Westland unattractive or unfeasible;" and

- That "the significantly increasing costs to Westland to develop its own land. Generally, infrastructure costs are borne by the City of Albuquerque; however, Westland recently has had to finance all such costs associated with any development it has undertaken. For example, in Westland's current efforts to develop an area for the construction of homes (called the Petroglyphs), the City of Albuquerque, which controls all water rights in the area, required Westland to build the water infrastructure for the Petroglyphs and transfer ownership of the infrastructure to the City of Albuquerque at no charge. The costs incurred by Westland in connection with such infrastructure were substantial, amounting to approximately $7.2 million."

51.    These statements, at the time and in light of the circumstances under which they were made, were materially false and/or misleading.  A reasonable shareholder would consider these omitted facts important in deciding how to vote.  The true facts then known by, or available to, defendants were that:

(a)     Since at least the late-1990s, Westland had retained consultants (namely, Padilla) and lawyers (primarily Modrall, Sperling, Roehl, Harris & Sisk) to assist the Company in its efforts to take advantage of various public improvement district financing opportunities designed to lower the costs associated with developing Westland's land.

(b)     Westland Vice President Leroy Chavez was a member of the Albuquerque City Council Impact Fee Committee in the mid-2000s and was intimately familiar with the City's procedures and public improvement financing opportunities.

(c)     During 2005, Westland employed lobbyists to advocate on Westland's behalf with respect to impact fees and public improvement financing.

(d)     Also during 2005, Westland was involved in litigation with the City of Albuquerque arising out of the City's unfair allocation of impact fees.

(e)     In February 2006, an article in *New Mexico Business Weekly* explained that one of Westland's prior suitors, ANM, and "***company representatives have been working behind the scenes for months*** trying to get city and county backing for the development and the infrastructure that will be necessary to complete it."  The article continued, stating that "***Westland*** and the city have been in discussions about how the land should be developed ***for nearly a year***."  And, "[i]f the development becomes part of the city, [Albuquerque's Economic Development Director Fred] Mondragon says he doesn't see any problems with extending Albuquerque's water supply or roads to the area."

(f)     SunCal had arranged to take advantage of an October 2006 TIDD which allowed SunCal to utilize tax dollars to fund the infrastructure costs associated with the development of Westland.  The materiality of this fact was further confirmed by recent comments by SunCal regional president Bill Myers who was quoted in the August 8, 2007 edition of the *Albuquerque*

*Tribune* addressing SunCal's effort to avoid losing access to the TIDD financing. Mr. Myers stated that if SunCal did not receive a TIDD similar to the one granted Mesa Del Sol, "it would be *significant*" and in Mr. Myers' opinion would result in SunCal not achieving the initial vision SunCal had.

(g)     In connection with the TIDD, SunCal expected to capitalize on and continue Westland's efforts described above with respect to securing development entitlements. ████

████████████████████████████████████████████████████████████████████████████████████

████████████████

(h)     Finally, the SunCal Merger Agreement provided that Westland would assist SunCal by continuing its efforts to obtain the beneficial entitlements, such as the TIDD. *See* §6.5 (The "Company will . . . afford representatives of Acquiror . . . access for the purpose of . . . preparing and coordinating programs, objectives and other information related to the integration of the business of the Company with the business of Acquiror and its Affiliates following consummation of the Cash Merger.").

**The Proxy Statement Misrepresented and/or Failed to Disclose
Material Information Regarding Atrisco LLC**

52.     The Proxy Statement stated at page 7 that although "[n]either Westland nor Westland's Board of directors makes any representation as to the value of Class A units in Atrisco LLC, or made any valuation of Atrisco LLC in connection with their approval of the merger agreement," the "management team does not know whether there is oil, natural gas, coal bed methane gas or any other natural resource under Westland's land," and defendants were "not aware of any commercially successful drilling on the property." These statements were false and misleading. The true facts which were then known by, or available to, defendants were:

(a)     That, while advising shareholders they "should make their own determination as to the value of the Class A units" of Atrisco LLC, the Board had been advised by defendant Page at an August 29, 2005 board meeting that Knute Lee, an oil broker representing the entities holding lease contracts to drill on Westland's land, reported that "100 million to 500 million barrels of oil could be located on Westland's property which, if recovered, could be worth hundreds of millions of dollars for the shareholders." This statement was based on a U.S. Geological Survey ("USGS"). Knute Lee's firm planned to drill "as soon as they can schedule a drilling rig."

(b)     That at this same board meeting, defendant Sanchez expressed concerns about the loss of these potentially valuable water rights and mineral rights.

(c)     That in March 2006, Savant Resources offered to pay substantial amounts to lease all of Westland's property for oil and gas exploration, which lease payments would have inured 100% to Westland and its shareholders.

(d)     That Tecton Energy, LLC ("Tecton") addressed an August 2005 letter to the Board in which it indicated it had "studied the Albuquerque Basin for years and believes substantial quantities of natural gas can be profitably recovered." And, in March 2006, Tecton offered to increase its lease of approximately 7,000 acres of Westland's land to 30,000 acres for the purpose of exploring oil. The Board itself concluded (as confirmed in the March 30, 2006 meeting minutes) that "[d]isclosure of this proposal will be included in the Company's proxy material so that shareholders will have this information prior to voting." It was not.

53.     The Board's refusal to secure the extension of the Tecton lease prior to the consummation of the SunCal Merger was material as defendants knew or should have known that

executing the lease following the consummation of the SunCal Merger had the effect of transferring 50% of the oil and gas royalties to SunCal as the Atrisco LLC formation documents required.[12]

54.    These facts would have taken on actual significance in the minds of Westland's shareholders in reaching their decision to vote because Westland shareholders were entitled to 100% of the profits of *existing* leases.  Westland shareholders were entitled to know that at least two entities attempted to negotiate leases prior to the close of the merger which would have allowed them to capture 100% of the profits of future royalties as compared to, at best, the 50% they may receive as members of Atrisco LLC from leases entered into after the SunCal Merger.

**The Proxy Statement Misrepresented and/or Failed to Disclose the Participants in the Merger**

55.    The Proxy Statement explained on page 1 that Westland was furnishing the Proxy Statement in connection with the solicitation of proxies by Westland's Board of directors.  The Proxy Statement further explained on page 13 that "Westland and its directors and executive officers are participating in the solicitation of proxies from Westland's shareholders with respect to the

---

[12]    The agreement between Atrisco LLC and Westland was described in an August 28, 2007 article entitled "Atrisco to Search for Gas on 50,000 Acres,"

Atrisco Oil & Gas LLC announced Monday it has made an agreement with Tecton Energy of Houston to search for natural gas on 50,000 acres that once were part of the Atrisco Land Grant.

"I think we're cautiously optimistic at what we might find there," said Peter Sanchez, executive director of Atrisco Oil & Gas.

Under the terms of this agreement, Atrisco will lease the remainder of its oil and gas mineral rights, which cover an estimated 50,000 acres, to Tecton for an undisclosed amount of cash and specific work commitments over the next five years.

Tecton already holds two other Atrisco oil and gas leases on the property. Sanchez said the new agreement gives Tecton control of oil and gas leases on all of the former Westland property, which totals more than 55,000 acres.

matters described in this proxy statement.  SCC may also be deemed a participant in the solicitation of such proxies."  And, the Proxy Statement contained a section titled "Participants in the Merger" on page 14 which identified and defined Westland, SCC, SCC Acquisitions and SunCal as participants in the SunCal Merger.  This statement, at the time and in light of the circumstances under which it was made, was materially false and/or misleading.

56.     SEC Regulations require that "[i]f the solicitation [of the proxies] is made otherwise than by the registrant, so state and give the names of the participants in the solicitation."  17 C.F.R. §240.14a-101, Item 4(2).  The SEC Regulations define "participant" to include "[a]ny person who finances or joins with another to finance the solicitation of proxies."  17 C.F.R. §240.14a-101, Item 4, Instruction 3.  The true facts then known by, or available to, defendants but which were omitted from the Proxy Statement were that an entity affiliated with the real estate division of the D. E. Shaw Group – specifically, DESCO Real Estate – was the **92.5% owner** of SCC, the entity that was used to consummate the SunCal Merger with Westland.  Thus, the Proxy Statement was false and misleading as SCC – by defendants' own acknowledgment in the Proxy Statement – was "a participant in the solicitation of such proxies" – and this information was required to be disclosed pursuant to SEC Regulations.

(a)     Defendants had a duty to correct their representations in the Proxy Statement concerning SCC's 92.5% ownership by DESCO Real Estate, but failed to do so, rendering the Proxy Statement false and misleading because, among other reasons, the Merger Agreement provided that:

(i)     "None of the information supplied or to be supplied by the Company for inclusion or incorporation by reference in the Proxy Statement will, at the date of mailing to shareholders **and at the time of the Shareholder Meeting**, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the

statements therein, in light of the circumstances under which they were made, not misleading." *See* Merger Agreement §4.28; and

> (ii)     "If at any time after the date of this Agreement ***and prior to the date of the Shareholders Meeting*** any event or circumstances relating to Acquiror, its officers or directors, should be discovered by Acquiror that should be set forth in an amendment or a supplement to the Proxy Statement, Acquiror will promptly inform the Company and, after consultation with the Acquiror, the Company will file such amendment or supplement with the SEC." *See* Merger Agreement §6.4(b).



Defendants' omission of the D.E. Shaw Group's involvement in the SunCal Merger rendered the Proxy Statement materially false and misleading.

> (c)     Defendants knew that the D.E. Shaw Group's involvement in the SunCal Merger needed to be disclosed in the Proxy Statement. ███████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

████████████████████████████████████

████████████████████████

**The Proxy Statement Misrepresented and/or Failed to Disclose
That SunCal, not Westland, Hired the Proxy Solicitors**

57.     The Proxy Statement explained that "Westland expects to make arrangements with and compensate approximately 90 individuals to assist in the solicitation."  This statement, at the time and in light of the circumstances under which it was made, was materially false and/or misleading.

58.     SEC Regulations requires the proxy statement to "state the names of the persons by whom the cost of solicitation has been or will be borne, directly or indirectly."  17 C.F.R. §240.14a-101, Item 4(2).  The true facts then known by, or available to, defendants were that Westland did not hire any proxy solicitors, but rather ***SunCal*** retained the proxy solicitors who secretly received lucrative payments for delivering votes in favor of the SunCal Merger which required approval by a super-majority (66 2/3%) of Westland's shareholders.  On September 22, 2006, just ***two days*** after the Proxy Statement was filed with the SEC, SunCal filed additional proxy materials that included telephone call scripts for use by SunCal solicitors.  This information was material and SEC Regulations required the information to be disclosed.

### COUNT I

**Against All Defendants
for Violations of §14(a) of the 1934 Act
and Rule 14a-9 Promulgated Thereunder**

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

61.     Defendants disseminated the false and misleading Proxy Statement which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     As stated herein, the Proxy Statement contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, which Proxy Statement was an essential link in the consummation of the SunCal Merger.  The defendants have also failed to correct the Proxy Statement and the failure to update and correct false statements is also a violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

63.     The written communications made by the defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner.

64.     As described herein, the Proxy Statement misrepresented and/or concealed material information.  As a direct result of the defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy Statement, plaintiff and the class were precluded both from exercising their right to seek appraisal pursuant to §53-15-4 of the New Mexico Business Corporation Act and were induced to vote their shares and accept inadequate consideration of $315 per share in connection with the SunCal Merger.  The false and/or misleading Proxy Statement used to obtain shareholder approval of the SunCal Merger deprived plaintiff and the class of their right to

a fully informed shareholder vote in connection therewith and the full and fair value for their Westland shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy Statement, defendants were aware of and/or had access to the true facts concerning the process involved in selling Westland and Westland's true value, which was between approximately $377 million, or $474 per share (based upon Westland's internal valuation), and as much as ███ ████████ (based upon SunCal and D.E. Shaw's appraisals ███████ ████████████████████████) – far greater than the $315 per share Westland's shareholders received.  Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy Statement defendants used to obtain shareholder approval of and thereby consummate the SunCal Merger, plaintiff and the class have suffered damage and actual economic losses (*i.e.*, the difference between the price Westland shareholders received and Westland's true value at the time of the SunCal Merger) in an amount to be determined at trial.  By reason of the misconduct detailed herein, the defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### Against the Individual Defendants, SunCal and the D.E. Shaw Group for Violation of §20(a) of the 1934 Act

65.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.    The Individual Defendants acted as controlling persons of Westland within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of Westland, and their ownership of Westland stock, these defendants had the power and authority to cause, and did in fact cause, Westland to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

67.     SunCal is a controlling person of Westland and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  By reason of its contractual obligations with Westland and the Individual Defendants, SunCal possessed control over Westland and the Individual Defendants.  For example, Westland and the Individual Defendants were required by §6.1 of the Merger Agreement to refrain from doing any of the following, without the express written approval of SunCal: increase the compensation of any employee, acquire any material assets, enter into any material contracts, commit to any capital expenditures in excess of $1 million, incur any indebtedness, commence any new line of business, and transfer, mortgage or dispose of any property or assets.  Further, pursuant to §6.4 of the Merger Agreement, the defendants were required to, and did, work with SunCal "in the preparation of the Proxy Statement."  Thus, SunCal is liable pursuant to §20(a) of the 1934 Act.

68.     The D.E. Shaw Group is a controlling person of Westland, the Individual Defendants and SunCal within the meaning of §20(a) of the 1934 Act.  By reason of its 92.5% equity ownership in the entity which merged with Westland, the D.E. Shaw Group possessed control over SunCal, Westland and the Individual Defendants.  Pursuant to its joint venture agreement with D.E. Shaw Corp., SunCal was required to obtain and did obtain approval and consent from the D.E. Shaw Group for all "major decisions" concerning the SunCal Merger.  Moreover, as mandated by the D.E. Shaw Group, SunCal ██████████████████████████████████████ ████████████████████████████████ and complied with the D.E. Shaw Group's directive that SunCal not ████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████ Finally, as mandated by the D.E. Shaw Group, Westland failed to disclose that ██████████████████████████████████████ ██████████████████████████████████████

██████████████████████ Thus, the D.E. Shaw Group is liable pursuant to §20(a) of the 1934 Act.

69.     Defendants Rizk and Dinning acted as control persons of the D.E. Shaw Group, SunCal, Westland and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  By reason of their positions as members of the executive committee and/or chief architects of the D.E. Shaw Group's undisclosed involvement in the SunCal Merger, these defendants had the power and authority to cause, and did in fact cause, D.E. Shaw Group, SunCal, Westland and the Individual Defendants to engage in the wrongful conduct complained of herein.  By reason of such conduct, defendants Rizk and Dinning are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class;

B.     Declaring that the Proxy Statement distributed by defendants to shareholders was materially false and misleading, in violation of Rule 14a-9 and §14(a);

C.     Awarding plaintiff and the member of the Class compensatory and/or rescissory damages against the defendants, including, but not limited to, pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E.     Awarding such other relief as this Court may deem just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 17, 2010                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            DARREN J. ROBBINS
                                            RANDALL J. BARON
                                            G. PAUL HOWES
                                            DAVID W. MITCHELL
                                            BRIAN O. O'MARA
                                            DANIELLE S. MYERS

                                                  s/ DARREN J. ROBBINS
                                                  DARREN J. ROBBINS

                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

                                            Lead Counsel for Plaintiff

                                            LAW OFFICES OF NICHOLAS
                                              KOLUNCICH III, LLC
                                            NICHOLAS KOLUNCICH III
                                            6501 Americas Parkway NE
                                            One Park Square – Suite 620
                                            Albuquerque, NM  87107-5375
                                            Telephone:  505/881-2228
                                            505/881-4288 (fax)

                                            Liaison Counsel

529675_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 17, 2010.

s/ DARREN J. ROBBINS
DARREN J. ROBBINS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:darrenr@rgrdlaw.com

29675_1

## Mailing Information for a Case 1:06-cv-01071-JB-ACT

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Christopher W. Ahart**
  ahartc@gtlaw.com

- **Yusuf A. Bajwa**
  bajway@gtlaw.com,worshamj@gtlaw.com,bartonr@gtlaw.com

- **Randall J Baron**
  rbaron@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Paul R. Bessette**
  bessettep@gtlaw.com,worshamj@gtlaw.com,daviskg@gtlaw.com,cisnerosc@gtlaw.com

- **Jacqueline E. Davis**
  jedavis@hollandhart.com,rsougstad@hollandhart.com,intaketeam@hollandhart.com

- **Kimberly G. Davis**
  daviskg@gtlaw.com,worshamj@gtlaw.com,bartonr@gtlaw.com

- **Juan L Flores**
  jgarcia@stelznerlaw.com,jflores@stelznerlaw.com

- **Trent A. Howell**
  tahowell@hollandhart.com,lortiz@hollandhart.com,intaketeam@hollandhart.com

- **G Paul Howes**
  paulh@rgrdlaw.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com,hlindley@kendalllawgroup.com

- **Nicholas Koluncich**
  nkoluncich@newmexicoclassactions.com,lisay@newmexicoclassactions.com

- **John D. Lovi**
  jlovi@steptoe.com

- **Frank Martin**
  rsandoval@branchlawfirm.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian K Nichols**
  bkn@modrall.com,doloress@modrall.com

- **Brian O. O'Mara**
  bo'mara@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michelle M. Oliver**
  moliver@steptoe.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Lara E. Romansic**
  lromansic@steptoe.com

- **Richard A Sandoval**

Rick@richardsandovallawoffice.com

- **Douglas G Schneebeck**
  dschneebeck@modrall.com,leanng@modrall.com,moliver@steptoe.com,jlovi@steptoe.com,ericp@modrall.com,erinm@modrall.com

- **Jesse Z. Weiss**
  weissjz@gtlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing).
You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)