# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LAWRENCE LANE, On Behalf of Himself,
and All Others Similarly Situated,

       Plaintiff,

vs.                                                                No. CIV 06-1071 JB/ACT

BARBARA PAGE, SOSIMO PADILLA, JOE S.
CHAVEZ, JOSIE CASTILLO, CHARLES V. PENA,
GEORGIA BACA, TROY K. BENAVIDEZ, RAY
MARES, JR., RANDOLPH M. SANCHEZ,
WESTLAND DEVELOPMENT COMPANY, INC.,
SUNCAL COMPANIES GROUP, THE D.E. SHAW
GROUP, D.E. SHAW & CO. L.P., D.E. SHAW
REAL ESTATE PORTFOLIOS 1, LLC, ("DESCO
REAL ESTATE"), D.E. SHAW & CO., LLC, D.E.
SHAW & CO., INC., D.E. SHAW INVESTMENT
GROUP, LLC, D.E. SHAW & CO. II, INC.,
GEORGE RIZK and ANNE DINNING,

       Defendants.

## MEMORANDUM OPINION AND ORDER

    **THIS MATTER** comes before the Court on the Lead Plaintiff's Opposed Motion for Joinder

of Parties, filed September 15, 2010 (Doc. 248)("Motion"). The Court held a hearing on October

12, 2010. The primary issue is whether, pursuant to rules 19(a) or 20(a)(2) of the Federal Rules of

Civil Procedure, the Court should join eight entities to this case: (i) SCC NM Member LLC; (ii)

SCC Westland Venture LLC; (iii) Westland Holdco, Inc.; (iv) SCC Acquisition Corp.; (v) SCC

Acquisitions Inc.; (vi) Westland SPE GP, LLC; (vii) Westland DevCo, LP; and (viii) Westland

DevCo, LLC. The Court grants the motion.

## FACTUAL BACKGROUND

Lane brings this shareholder class action on behalf of himself and the holders of common stock of Westland Development Co. ("Westland"), against Westland, certain of its senior officers and directors, its merger partner, SunCal Acquisition Crop. ("SunCal"), and the DESCO Defendants,[1] whom Lane contends were involved in planning, executing, and consummating the SunCal Merger. See Third Amended Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 ¶ 1, at 2, filed June 17, 2010 (Doc. 206)("TAC"). Lane alleges that, on or about September 20, 2006, the Defendants mailed to Westland shareholders a Proxy Statement that misrepresented and/or omitted material facts, and that this Proxy Statement was used to obtain shareholder approval of the sale of Westland to SunCal. See TAC ¶¶ 1, 3, at 2; SEC Schedule 14A Definitive Proxy Statement for Westland Development Co., Inc. at 6 (issued September 20, 2006), filed June 17, 2010 (Doc. 206-1)("Proxy Statement").

1. **Westland Development Co., Inc.**

In 1692, when the area around Albuquerque, New Mexico was part of the Spanish empire, King Charles II of Spain conveyed more than 55,000 acres of land to a few of his loyal subjects. See TAC ¶¶ 2, 6, at 2, 5 (quoting Peter C. Beller, Insider Deal on the Mesa, Forbes, Sept. 3, 2007); Director Defendants', Westland's, and Suncal's Joint Opposition to Plaintiff's Motion for Class Certification at 4, filed February 4, 2009 (Doc. 141)("Response"). This land, known as the Atrisco Land Grant, was originally part of the town of Atrisco, and now lies in and around western Albuquerque. See TAC ¶¶ 2, 6, at 2, 5 (citation omitted); Response at 3. The Atrisco Land Grant

---

[1] The DESCO Defendants are the D. E. Shaw Group, D. E. Shaw & Co. L.P., D.E. Shaw Real Estate Portfolios 1, LLC, D. E. Shaw & Co., LLC, D. E. Shaw & Co., Inc., D. E. Shaw Investment Group, LLC, D. E. Shaw & Co. II, Inc., George Rizk, and Anne Dinning.

is an eighty-six-square-mile parcel of real estate, which includes tens of thousands of acres of undeveloped property, master planned communities, retail properties, water rights, and untapped oil and gas rights in and around Albuquerque.  See TAC ¶¶ 2, 6, at 2, 5 (citation omitted).

The heirs of the original grantees formed Westland in 1967, transferring their interests in the land to the corporation.  See TAC ¶ 2, 6, at 2, 6 (citation omitted); Response at 4.  The heirs became the shareholders of the new corporation, receiving tradable stock proportional to their ancestors' land holdings.  See TAC ¶ 6, at 6.  For most of Westland's existence, its articles of incorporation prohibited the transfer of Westland stock to anyone other than an heir to the Atrisco land grant, and Westland stock was not publicly traded.  See Response at 3; Proxy Statement at 6.

Westland owned about 46,400 acres of land from the Atrisco Land Grant, including the mineral, oil, and gas rights.  See Proxy Statement at 6.  Westland also owned another 10,000 acres of land located north of the original Atrisco land grant, but did not own the mineral rights to that land.  See id.  Westland was in the business of selling and developing portions of the land it held, and it also leased retail property to businesses in Albuquerque and in El Paso, Texas.  See id.

2.      **Prior Merger Offers.**

Various parties approached Westland about acquiring either Westland or a significant portion of its assets.  See Proxy Statement at 16.  None of the inquiries ever materialized into a viable proposal, but Westland's board of directors engaged an independent company to value Westland's stock in 2001 and again in February of 2005.  See TAC ¶ 47, at 27; Proxy Statement at 16.  The first valuation determined that Westland was worth about $70 million, or approximately $87.00 per share, while the second valuation four years later produced a figure of approximately $180.00 per share.  See TAC ¶ 47, at 27; Proxy Statement at 16.  According to Lane, the first valuation reached

a figure of $70 million only after Defendant Barbara Page, Westland's president, chief executive officer, and chief financial officer, contacted the valuation company and ordered that the valuation be reduced.  See TAC at ¶ 48, at 28.

Sometime in early June or late July of 2005, Page met with Philip Aries, the head of Tucson, Arizona, based Aries Realty.  See TAC ¶ 6, at 7 (citations omitted); Proxy Statement at 17.  Aries was a representative of a group of investors interested in acquiring Westland.  See TAC ¶ 6, at 7 (citations omitted); Proxy Statement at 17.  The investment group and Westland embarked on a series of negotiations that ultimately resulted in terms that Westland's board of directors approved on August 17, 2005.  See TAC ¶ 6, at 7 (citations omitted); Response at 3; Proxy Statement at 18. The terms provided for the acquisition of Westland by way of merger into a newly formed company named ANM Holdings, Inc. ("ANM"), with Westland shareholders being cashed out for $200.00 per share.  See TAC ¶ 6, at 7 (citations omitted); Response at 3; Proxy Statement at 18.  The terms also permitted Westland to consider other offers in a post-signing market-check -- a so-called fiduciary out.  See Response at 3; Proxy Statement at 18.  On September 19, 2005, Westland's board of directors approved the merger agreement.  See Proxy Statement at 19.

Westland proceeded to consider a series of unsolicited offers that it received in the wake of publicity about the merger discussions, and of its filing with the Securities and Exchange Commission ("SEC") in connection with the proposed merger.  See TAC ¶ 6, at 8-9; Response at 4; Proxy Statement at 19.  Westland determined that two of the offers it received, from Sedora Holdings, LLC ("Sedora") and Atrisco Heritage, were genuine "acquisition proposals" under the merger agreement with ANM, which Westland could consider under the fiduciary out.  See TAC ¶ 48(b), at 29; Proxy Statement at 21.  Westland entered into negotiations with the companies

making the offers and ultimately concluded that Sedora's offer of $255.00 per share was superior to either ANM or Atrisco Heritage's offers.  <u>See</u> Response at 4; Proxy Statement at 22.  Westland exercised its rights under the fiduciary out, and ANM decided not to counter Sedora's offer.  <u>See</u> Response at 4; Proxy Statement at 22.  Westland canceled its merger agreement with ANM and entered into a merger agreement with Sedora.  <u>See</u> Response at 4; Proxy Statement at 22.  The new merger agreement with Sedora, like the one with ANM, had a fiduciary-out clause.  <u>See</u> Response at 4; Proxy Statement at 22.

     **3.**       <u>**The Merger with SunCal.**</u>

On May 23, 2006, SunCal entered the picture and made a proposal to acquire Westland for $280.00 per share.  <u>See</u> Proxy Statement at 23.  On May 31, 2006, Westland's board of directors determined that SunCal's offer was superior to Sedora's offer, and gave Sedora until June 5, 2006 to revise its offer.  <u>See</u> <u>id.</u>  After Westland's determination that SunCal's offer was superior, Westland continued to receive additional offers, and Sedora also amended its offer in an effort to regain its status as the preferred buyer.  <u>See</u> <u>id.</u> at 24.  Bidding continued, and SunCal increased its offer twice, ultimately arriving at a figure of $315.00 per share, an amount with which Sedora declined to compete.  <u>See</u> TAC ¶ 37, at 19; Response at 4; Proxy Statement at 24.  Westland and SunCal formally entered into a merger agreement on July 19, 2006.  <u>See</u> TAC ¶ 37, at 19; Response at 4; Proxy Statement at 25.

Under the terms of the merger agreement, each of the 794,927 issued and outstanding shares of Westland common stock would be converted into the right to receive $315.00 in cash, with an acquisition company created by SunCal becoming the owner of all of Westland's outstanding stock.  <u>See</u> TAC ¶ 37, at 19; Response at 4; Proxy Statement at 26.  Additionally, the merger agreement

-5-

entitled Westland's shareholders to receive an ownership interest in a newly formed company called Atrisco Oil and Gas LLC ("Atrisco LLC"), which would be a vehicle for providing income from Westland's mineral rights to Westland's shareholders.  See Response at 4-5; Proxy Statement at 24-25.  Atrisco LLC would receive all the income from Westland's existing oil-and-gas leases, plus half the income from future mineral leases on Westland property.  See Response at 4-5; Proxy Statement at 24-25.   The agreement also provided for the creation of Atrisco Heritage Foundation ("Foundation"), a non-profit organization that was to be devoted to promoting and preserving the cultural heritage of the Atrisco heirs.  See Response at 5; Proxy Statement at 24, 26-27.

On September 20, 2006, Westland filed its definitive Proxy Statement for the merger with the SEC and mailed the Proxy Statement to all Westland's shareholders.  See TAC ¶ 3, at 1; Proxy Statement at 3.  A shareholder meeting was convened on November 6, 2006, and on November 21, 2006, Westland announced that shareholders had approved the merger.  See TAC ¶ 5, at 5. Shareholders voted on the proposal, with 72.4% of Westland's common shares and 97.75% of Westland's Class B shares ultimately voting in favor of the SunCal Merger.  See id.  On December 7, 2006, Westland "announced the consummation of the" merger.  Id.  As a result of the merger, approximately 6,100 Westland heirs got an average of $37,000 apiece, while the nine members of Westland's Board of Directors received $15 million.  See id. ¶ 6, at 9.

### 4.    **Westland's Proxy Statement.**

Lane contends that the Defendants used the allegedly false and misleading Proxy Statement, which was disseminated to each Westland shareholder, to secure the votes needed to consummate the SunCal Merger.  Lane asserts that, in an attempt to convince Westland's shareholders of the legitimacy of the process used to sell Westland and the adequacy of the consideration given in

exchange for the Westland assets, the Proxy Statement falsely stated that "Westland's board of directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland." TAC ¶ 4, at 3 (quoting Proxy Statement at 27). Lane also asserts that the Defendants caused the Proxy Statement to omit material facts necessary to make the statements made therein not false or misleading. See TAC at ¶ 4, at 3. These statements and omissions form the heart of this case. See TAC ¶¶ 38-58, at 19-39.

            a.    **Conflicts of Interest**.

Lane alleges that the Proxy Statement failed to fully disclose several conflicts of interest involving a number of Westland directors. The Proxy Statement disclosed that "some of Westland's officers and directors have various relationships with Westland or interests in the merger that are different from your interests as a shareholder and that may present actual or potential conflicts of interest," TAC ¶ 39, at 20 (quoting Proxy Statement at 29), revealing that two of Westland's board members had contracts that would result in severance payments for involuntary dismissal, see TAC ¶ 39, at 20 (quoting Proxy Statement at 30). According to the Proxy Statement, Page was "employed as Westland's president and chief executive officer under a renewable six year employment agreement" that also provided for seven times her annual salary as a severance payment if her employment were involuntarily terminated. TAC ¶ 39, at 20 (quoting Proxy Statement at 30). The Proxy Statement also stated that Defendant Sosimo Padilla, Westland's chairman and executive vice president, had a consulting agreement with severance terms similar to those in Page's contract. See TAC ¶ 39, at 20 (quoting Proxy Statement at 30).

The Proxy Statement stated that, in addition to money due under those contracts, the existing

Westland directors could receive future positions on the board of Atrisco LLC and as trustees of the Foundation. See Proxy Statement at 31. The existing Westland board of directors was given the power to appoint the Foundation's trustees from among Westland's shareholders, and it was considered likely that "one or more" of Westland's directors would be chosen as a trustee. Id. Atrisco LLC's board of directors was to be drawn from the Westland board of directors, although which directors would be picked was said to be undecided. See id.

According to Lane, the Proxy Statement failed to mention that Page and Padilla's contracts were of recent vintage, having been secretly modified to secure their support for the merger. See TAC ¶¶ 40-41, at 21. Lane also asserts that the Proxy Statement failed to disclose that "at least four Westland directors were promised lifelong trusteeships" at the Foundation or on the board of Atrisco LLC, and that, instead of receiving "customary fees" for their service, they were going to receive outsized "lucrative annual retainers." TAC ¶ 42, at 22.

### b. Page's Vote Against the Merger.

Lane's TAC states that the Proxy Statement contains nothing about the fact that Page voted against the merger at a board meeting on July 18, 2006, and that Defendant Troy Benavidez abstained from voting at the same meeting. See TAC ¶¶ 44-45, at 24-25. The Proxy Statement stated only, Lane notes, that Westland's board of directors recommended that the shareholders approve the merger and planned to vote their share for the merger. See TAC ¶¶ 43-44, at 23-24 (quoting Proxy Statement at 5-12). Moreover, in a question-and-answer section about the merger, the Proxy Statement stated that "Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement." Proxy Statement at 10. According to Lane, despite this representation, four of the nine directors on Westland's board -- Benavidez, Defendant Ray Mares,

Jr., Defendant Charles Pena, and Defendant Randolph Sanchez -- did not vote their Class A shares in favor of the merger, while a fifth director -- Defendant Joe Chavez -- voted only 100 of his 310 Class A shares in favor of the merger.  See TAC ¶ 45 & n. 4, at 24-25.

### c.      The Market-Check Process.

The Proxy Statement indicated that Westland was employing a market-check process in connection with the merger and that "Westland's board of directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland." Proxy Statement at 27.  The market check consisted primarily of the consideration of various offers to acquire the company.  See id. at 19-27.  According to Lane, Westland never actively solicited prospective bidders to secure the best value for the company or otherwise determined the value of the shares at the time of the sale.  See TAC ¶ 46, at 25-27.  Lane further alleges that the negotiations with ANM detailed in the Proxy Statement "are either false or confirm that defendants falsified internal Westland documents because during the relevant period none of the Board minutes mention any negotiations with ANM." TAC ¶ 46(a), at 25.

### d.      The Valuation of Westland.

Lane alleges that there were two important flaws in the Proxy Statement's disclosure of the valuations made of Westland.  The Proxy Statement mentioned two separate valuations that the same independent valuation firm conducted -- one performed in 2001, the other in 2005.  The 2001 opinion valued Westland at about $87.00 per share, see Proxy Statement at 16, while the 2005 opinion valued Westland at about $180.00 per share, see Proxy Statement at 27.  Lane alleges that the Proxy Statement failed to disclose that 2001 valuation originally assessed Westland at $249.00 per share, but Page ordered the company performing the valuation to manipulate the valuation

downward to $87.00 per.  See TAC ¶ 48, at 28.  Lane also alleges that the 2005 valuation is undermined by the failure of the Proxy Statement to mention an internal appraisal by Westland's vice president of sales, Brent Lesley, which valued Westland at $474.00 per share, more than twice that of the 2005 opinion.  See TAC ¶ 48(a), at 28.

### e.       The Westland's Board of Directors' Statement of Fairness.

According to the Proxy Statement, Westland's board of directors thought the merger was "advisable and fair to, and in the best interests of Westland and Westland's shareholders."  TAC ¶ 49, at 30 (quoting Proxy Statement at 26).  The Proxy Statement also states that Westland's board of directors held this belief, "in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders."  TAC ¶ 49, at 30 (quoting Proxy Statement at 6).  Lane contends that these statements are subjectively and objectively materially false and/or misleading, because the offer was below Lesley's valuation, the directors did not have an independent valuation of the land, and Westland's board of directors did not know the value of the land's mineral rights, and some of the directors had expressed that they felt the offer was insufficient to justify selling part of their heritage.  See TAC ¶ 49, at 30-32.

### f.       The Tax-Increment Development District ("TIDD").

In discussing Westland's board of directors' views on the merger, the Proxy Statement asserted that Westland was a somewhat "unattractive" acquisition target, because it held a "vast amount of undeveloped land" that would be very expensive and time consuming to develop.  TAC ¶ 50, at 32 (quoting Proxy Statement at 27).  Additionally, the Proxy Statement asserted Westland was facing "significantly increasing costs . . . to develop its own land," because the City of Albuquerque would not bear infrastructure costs associated with recent Westland developments,

such as the Petroglyphs.[2]  TAC ¶ 50, at 32 (quoting Proxy Statement at 28).  Lane alleges the Proxy

Statement, however, failed to mention that Westland had expertise in and was pursing improving

public financing, including hiring consultants and lobbyists.  See TAC ¶ 51, at 33-34.  Lane also

contends that the Defendants failed to disclose that "SunCal had arranged to take advantage of an

October 2006 TIDD which allowed SunCal to utilize tax dollars to fund the infrastructure costs

associated with the development of Westland."  TAC ¶ 51, at 33-34.

        **g.**      **Mineral Rights and Atrisco LLC.**

Lane alleges that the Proxy Statement made four particular omissions regarding the mineral

resources available to Westland and the creation of Atrisco LLC.  The Proxy Statement represented

that Westland had no opinion as to the value of Class A stock in Atrisco LLC, and stated that

Westland's management did not know if there was "oil, natural gas, coal bed methane gas or any

other natural resource under Westland's land," and was "not aware of any commercially successful

drilling on the property."  TAC ¶ 52, at 34 (quoting Proxy Statement at 7).  Lane contends this

statement ignores four important facts that should have been disclosed: (i) that Westland's board of

directors had been informed that between 100 and 500 million barrels of oil could be located on

Westland property; (ii) that Sanchez had expressed his concern at an August 29, 2005, board

meeting about losing valuable water and mineral rights; (iii) that Westland had received an offer

from Savant Resources to lease all of Westland's property for oil and gas exploration; and (iv) that

Tecton Energy LLC had offered to expand its existing oil-and-gas-exploration lease from 7,000 to

30,000 acres.  See TAC ¶ 52, at 35.

---

[2] The Petroglyphs are a Westland project for new home construction.  Westland was required
to build the water infrastructure for the Petroglyphs and transfer title to the infrastructure to the City
of Albuquerque.  See TAC ¶ 50, at 32.

### h.   Participants in the Merger.

The Proxy Statement represented that Westland was furnishing the Proxy Statement in connection with the solicitation of proxies by Westland's board of directors, and that "Westland and its directors and executive officers [we]re participating in the solicitation of proxies from Westland's shareholders with respect to the matters described in this proxy statement.  SunCal may also be deemed a participant in the solicitation of such proxies."  TAC ¶ 55, at 36 (quoting Proxy Statement at 13).   The Proxy Statement further stated Westland, SCC Acquisition Corp., and SCC Acquisitions, Inc. were the "Participants in the Merger."  TAC ¶ 55, at 37 (citing Proxy Statement at 13).  Lane contends that these statements were misleading, because they omitted a number of relevant entities.  An organizational chart filed with SunCal's October 31, 2007 TIDD application represented that, immediately before the merger, SunCal and its affiliates consisted of SCC NM Member LLC and D.E. Shaw Real Estate Portfolios 1, LLC ("DESCO Real Estate"), which were 7.5% and 92.5% owners, respectively, of SCC Westland Venture LLC (the parent of Westland Holdco, Inc.).   See Westland Organizational Chart, filed February 9, 2009 (Doc. 145-2)("Organizational Chart").  Westland Holdco, Inc. was, in turn, the parent of SunCal, the entity that was merged into Westland.  Additionally, SunCal owned and/or controlled two of its subsidiaries, Westland SPE GP, LLC and Westland DevCo, LP.  See Organizational Chart at 1.

### i.   Proxy Statement Solicitors.

The Proxy Statement included a segment dealing with Proxy Statement solicitors, which stated that "Westland expects to make arrangements with and compensate approximately 90 individuals to assist in the solicitation" of the proxies.  TAC ¶ 57, at 39 (quoting Proxy Statement at 16).  Westland did not hire any Proxy Statement solicitors.  See TAC ¶ 58, at 39.  Lane alleges

that the Defendants were aware that Westland never hired any Proxy Statement solicitors, and that SunCal retained all the Proxy Statement solicitors, "who secretly received lucrative payments for delivering votes in favor of the" merger.  TAC ¶ 58, at 39.

<u>PROCEDURAL BACKGROUND</u>

Lane filed his initial Complaint on November 3, 2006, in which he asserted class-action claims under § 14(a) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a through 78oo ("Exchange Act").  Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed November 3, 2006 (Doc. 1).  On September 17, 2007, Lane filed his First Amended Complaint.  <u>See</u> Amended Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed September 17, 2007 (Doc. 50).  On December 3, 2007, the Defendants filed motions to dismiss the Amended Complaint.  <u>See</u> Motion to Dismiss and Joinder in Director Defendants' Motion to Dismiss, filed December 3, 2007 (Doc. 52); Motion to Dismiss, filed December 3, 2007 (Doc. 53).  The Court granted in part and denied in part those motions on September 15, 2008.  <u>See</u> Order, filed September 15, 2008 (Doc. 81); Memorandum Opinion, filed September 24, 2008 (Doc. 83).

On December 1, 2008, Lane filed a motion to amend his First Amended Complaint.  <u>See</u> Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedures, filed December 1, 2008 (Doc. 105).  The Court granted that motion on February 5, 2010.  <u>See</u> Order Granting Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, filed February 5, 2009 (Doc. 144).  Pursuant to the order granting the motion, Lane filed his Second Amended

Complaint.  See Second Amended Complaint for Violations of §§ 14(a) and 20(a) of the Securities

and Exchange Act of 1934 and SEC Rule 14a-9, filed February 9, 2009 (Doc. 145)("SAC").

On July 15, 2009, Lane filed a motion to amend his SAC.  See Lead Plaintiff's Opposed

Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil

Procedure (Doc. 176)("Motion to Amend").  On March 31, 2010, the Court issued an Order granting

Lane's Motion to Amend, see Doc. 199, and on June 17, 2010, Lane filed his TAC.  On July 1, 2010,

the SunCal filed its Answer to the Third Amended Complaint by SunCal ("SunCal TA").  See Doc.

208.  The party identified by counsel as responding to the TAC was "SunCal, improperly named as

SunCal Companies Group."  SunCal TA at 1.  One day later, on July 2, 2010, SunCal amended its

Answer to respond on behalf of "Defendant SCC Acquisition Corp. ('SCC'), improperly named as

SunCal Companies Group."   Amended Answer to the Third Amended Complaint by SCC

Acquisition Corp., filed July 2, 2010 (Doc. 211)("SunCal TAA").

At a status conference on August 4, 2010, Lane addressed the possibility of naming

additional parties.  The Court set a deadline of September 15, 2010 for Lane "to amend the pleadings

and to join additional parties."  Amended Second Scheduling Order at 1, filed September 28, 2010

(Doc. 253)("Scheduling Order"). On September 14, 2010, Lane's counsel contacted counsel for

Defendants in an effort to reach an agreement on the joinder of the parties and to inquire whether

the Defendants would oppose joinder.  Lane represents that the counsel for the Individual

Defendants do not oppose joinder, and counsel for the DESCO Defendants and SunCal did not

respond.  See Reply at 1.

Lanes moves the Court, pursuant to rules 19(a) and 20(a)(2) and the Scheduling Order, for

entry of an order joining eight entities in the action as Defendants: (i) SCC NM Member LLC; (ii)

SCC Westland Venture LLC; (iii) Westland Holdco, Inc.; (iv) SCC Acquisition Corp.; (v) SCC Acquisitions Inc.; (vi) Westland SPE GP, LLC; (vii) Westland DevCo, LP; and (viii) Westland DevCo, LLC.  Lane contends that each of these entities are already identified in the TAC as either participants in the SunCal Merger in the Proxy Statement or as controlling entities on the Westland Organizational Chart that was filed as Exhibit B to both the SAC and TAC.  See TAC ¶ 21(a), at 12; Organizational Chart at 1.

SunCal and the DESCO Defendants oppose Lane's Motion.  On October 4, 2010, SunCal filed its Response to Plaintiff's Motion for Joinder ("SunCal Response"), contending that the Motion is untimely and that Lane has been aware of the identity of these eight entities for months.  See Doc. 254.  That same day, the DESCO Defendants filed DESCO Defendants' Response in Opposition to Plaintiff's Motion to Join Additional Parties ("DESCO Response").  See Doc. 255.  The DESCO Defendants also contend that the Motion is untimely, and further argue that the additional entities are not necessary parties under rule 19, and that the parties should not be joined under rule 20, because doing so would result in undue delay and expense for this case.

On October 11, 2010, Lane filed his Reply Memorandum in Further Support of Lead Plaintiff's Opposed Motion for Joinder of Parties.  See Doc. 257.  Lane argues that his Motion is timely under the Scheduling Order.  He also contends that rule 20 permits liberal joinder of parties, making joinder appropriate because the parties are listed in the TAC.  He contends that despite the vintage of this case, fact discovery has only recently begun.  Lane further notes that SunCal only recently identified themselves as "SunCal, improperly named as SunCal Companies Group," on July 1, 2010, making joinder of the SunCal entities appropriate.  Reply at 4 (quoting SunCal TA at 1).

-15-

At the October 12, 2010 hearing, the DESCO Defendants' attorney, Mark Sheridan, argued that, because of the age of the case and Lane's awareness of the entities, Lane should have joined the entities earlier to avoid prejudicing the entities by requiring them to perform discovery on the case's current schedule, when the present parties have been engaged in ongoing discovery. Mr. Sheridan conceded, however, that he did not know of any specific prejudice that the DESCO Defendants would suffer. DESCO Defendants' other attorney, Mark Lovi, stated that some number of the entities, but not all of them, have a present relationship to D.E. Shaw through direct or indirect majority control of stock or some other nexus of general partners and limited partners. Mr. Lovi asserted that this relationship does not necessarily mean that D.E. Shaw controls the entities from an aiding and abetting or control-person liability, but Mr. Lovi conceded that he was uncertain what the exact relationship was between the entities. Doug Schneebeck, counsel for Suncal and Westland, stated that it appears that the entities with SCC in their names would have been created for the merger, but that the only entity named in the proxy was SCC Acquisition Corp. Mr. Schneebeck further stated that SCC Acquisition Corp. was a proper Defendant and that he would have no objection to joining it as a Defendant. Mr. Schneebeck further represented that the entities were created for financial reasons and not for operational purposes. The Individual Defendants did not oppose the Motion, unless granting the Motion would lead Lane to seek to redepose the individual Defendants.

## LAW REGARDING JOINDER OF REQUIRED PARTIES UNDER RULE 19

The rules distinguish between required and permissive parties. Rule 19 provides the requirements for joining required parties. Rule 19(a) states:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party.  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2) Joinder by Court Order.  If a person has not been joined as required, the court must order that the person be made a party.  A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

(3) Venue.  If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.

Fed. R. Civ. P. 19(a).  If a required party is not already joined, then "the court must order that the person be made a party."  Fed. R. Civ. P. 19(a)(2).  If the required party cannot be joined, then a court must consider the factors in rule 19(b) to determine whether it should dismiss the case or should allow the case to proceed with the existing parties.

Earlier case law generally describes those parties who should be joined under rule 19(a) as necessary parties, and those necessary parties whose absence requires that a case be dismissed under rule 19(b) as indispensable parties, or necessary and indispensable parties.  The 2007 amendments to the rules changed the term necessary parties to required parties.  These amendments were stylistic

only, however, and much of the case law interpreting rule 19 predates the amendments and refers to necessary and indispensable parties.

### 1. **Incomplete Relief.**

One basis on which a party may be a required, or necessary, party is if, "in that person's absence, the court cannot accord complete relief among existing parties."  Fed. R. Civ. P. 19(a)(1)(A).  A court is able to afford complete relief when a party's absence "does not prevent the plaintiffs from receiving their requested . . . relief."  Sac and Fox Nation of Missouri v. Norton, 240 F.3d 1250, 1258 (10th Cir. 2001).  As Moore's Federal Practice explains, this provision "requires joinder when nonjoinder precludes the court from effecting relief not in some overall sense, but between *extant parties*."  4 J. Moore & R. Freer, Moore's Federal Practice § 19.03[2][b], at 19-39 (3d ed. 2009).  "Properly interpreted, the Rule is not invoked simply because some absentee may cause future litigation. . . .  The fact that the absentee might later frustrate the outcome of the litigation does not by itself make the absentee necessary for complete relief."  4 J. Moore & R. Freer, supra § 19.03[2][b], at 19-39 to 19-41 (footnotes omitted).

Cases discussing the complete-relief segment of rule 19(a) look at whether a plaintiff or other claimant can be granted complete relief without adding parties.  For example, in Salt Lake Tribune Publishing Co., LLC v. AT & T Corp., 320 F.3d 1081 (10th Cir. 2003), the United States Court of Appeals for the Tenth Circuit analyzed whether the district court could grant the plaintiff all the relief that it was seeking on its claims.  See 320 F.3d at 1097.  In Associated Dry Goods Corp. v. Towers Financial Corp., 920 F.2d 1121 (2d Cir. 1990), the United States Court of Appeals for the Second Circuit held that an absent party was a necessary party to afford a counterclaimant complete relief, because the counterdefendant could not comply with the injunction that the counterclaimant

sought without the absent party's consent.  See 920 F.2d at 1124.  In Champagne v. City of Kansas City, 157 F.R.D. 66 (D. Kan. 1994), a number of paramedics filed suit against the City of Kansas City, alleging overtime-pay violations.  The City sought to join as plaintiffs other paramedics who had not sued.  See id. at 67.  The district court held:

> Complete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought.  The named plaintiffs in the present action would be able to obtain all the relief requested without the joinder of four additional paramedics.  Defendant's assertion that all persons whose claims are identical to the plaintiffs should be joined is not within the meaning of complete relief.

Champagne v. City of Kan. City, 157 F.R.D. at 67 (citation omitted).

### 2.     **Inconsistent Obligations.**

A party is also a required or necessary party if the "person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1)(B)(ii).  This clause "compels joinder of an absentee to avoid inconsistent *obligations*, and not to avoid inconsistent adjudications.  It is not triggered by the possibility of a subsequent adjudication that may result in a judgment that is inconsistent as a matter of logic."  4 J. Moore & R. Freer, supra § 19.03[4][d], at 19-59 to 19-60 (emphasis in original)(footnotes omitted).  This understanding is reflected in the United States Court of Appeals for the First Circuit's description of the rule:

> "Inconsistent obligations" are not . . . the same as inconsistent adjudications or results.  Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident.  Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum.  Unlike a risk of inconsistent obligations, a risk that a defendant who has successfully defended against a party may be found liable

to another party in a subsequent action arising from the same incident -- i.e., a risk of inconsistent adjudications or results -- does not necessitate joinder of all of the parties into one action pursuant to Fed.R.Civ.P. 19(a).

Delgado v. Plaza Las Americas, Inc., 139 F.3d 1, 3 (1st Cir. 1998)(citations omitted).

The United States Court of Appeals for the Ninth Circuit has recently adopted the First Circuit's approach to rule 19(a)(1)(B)(ii).  See Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California, 547 F.3d 962, 976 (9th Cir. 2008).  Accordingly, the Ninth Circuit held that there was no risk of inconsistent obligations in a situation in which the State of California might have to adhere to one interpretation of a compact when dealing with particular Indian tribes, while following a different interpretation in its dealings with other tribes, because California could consistently deal with each tribe according to the different judgments.  See Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California, 547 F.3d at 976.  Other circuits, as well as lower courts and leading treatises, have all taken the same approach.  See, e.g., Boone v. General Motors Acceptance Corp., 682 F.2d 552, 554 (5th Cir. 1982)(holding that, where "multiple litigation might result . . . [but there is] little possibility of inconsistent obligations," rule 19(a) is not implicated); Field v. Volkswagenwerk AG, 626 F.2d 293, 301 (3d Cir. 1980)(same); Fisherman's Harvest, Inc. v. United States, 74 Fed. Cl. 681, 688-89 (2006)(following Delgado v. Plaza Las Americas, Inc.); 4 J. Moore & R. Freer, supra § 19.03[4][d], at 19-59 to 19-61 (stating that inconsistent obligation occur only when a party cannot obey two conflicting order from different courts).  While the Tenth Circuit has not devoted extended discussion to inconsistent obligations, it has given, as an example of inconsistent obligations, a hypothetical scenario in which a federal district court orders a defendant to transfer stock to the plaintiff while a state court orders the same

-20-

defendant to transfer the same stock to a different party who is not involved in the federal litigation.

See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d at 1098.

### LAW REGARDING JOINDER OF PERMISSIVE PARTIES UNDER RULE 20

Rule 20 addresses permissive parties.  Joinder under rule 20 "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits."  League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency, 558 F.2d 914, 917 (9th Cir. 1977)(citing Mosley v. General Motors Corp., 497 F.2d 1330 (8th Cir. 1974)).  "Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).

Rule 20 provides:

(a) Persons Who May Join or Be Joined.

> (1) Plaintiffs.  Persons may join in one action as plaintiffs if:

>> (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

>> (B) any question of law or fact common to all plaintiffs will arise in the action.

> (2) Defendants.  Persons -- as well as a vessel, cargo, or other property subject to admiralty process in rem -- may be joined in one action as defendants if:

>> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

>> (B) any question of law or fact common to all defendants will arise in the action.

(3) Extent of Relief.  Neither a plaintiff nor a defendant need be interested in obtaining or defending against all the relief demanded.  The court may grant judgment to one or more plaintiffs according to their rights, and against one or more defendants according to their liabilities.

(b) Protective Measures.  The court may issue orders -- including an order for separate trials -- to protect a party against embarrassment, delay, expense, or other prejudice that arises from including a person against whom the party asserts no claim and who asserts no claim against the party.

Fed. R. Civ. P. 20.  Thus, rule 20(a) requires only (i) that the claims by or against the party to be joined arise from the same transaction, occurrence, or series of transactions or occurrences underlying the claims by or against the party it seeks to join; and (ii) the claims by or against the party to be joined share at least one question of law or fact with the claims by or against the party it seeks to join.  See Fed. R. Civ. P. 20(a).

## ANALYSIS

Lane asks the Court to join eight entities to this case: (i) SCC NM Member LLC; (ii) SCC Westland Venture LLC; (iii) Westland Holdco, Inc.; (iv) SCC Acquisition Corp.; (v) SCC Acquisitions Inc.; (vi) Westland SPE GP, LLC; (vii) Westland DevCo, LP; and (viii) Westland DevCo, LLC.  He contends that the TAC already identifies each of these entities as either participants in the SunCal Merger that the Proxy Statement identifies, or as controlling entities on the Westland Organizational Chart that was filed as Exhibit B to the SAC and the TAC.  The DESCO Defendants and SunCal respond that Lane's Motion is untimely, and that the Court should be deny the Motion because joining the entities would lead to expense and delay.  The Court is sympathetic to the Defendants' concerns, but thinks it better to join the entities now than to risk getting too far into proceedings and discovering that a required party is missing.  The Court therefore grants Lane's Motion.

I.      **THE MOTION IS TIMELY**.

SunCal asserts that the deadline for Lane to join additional Defendants was September 15, 2010.  SunCal contends "[t]he deadline was for actual joinder, not a motion to amend."  SunCal Response at 1 (citing Scheduling Order at 1 ("The Plaintiff shall be allowed until September 15, 2010 to amend the pleadings and to join additional parties.")).  SunCal further contends that Lane has not shown good cause why the Scheduling Order should be amended.

The DESCO Defendants argue in a similar vein that Lane needlessly delayed bringing his Motion.  They assert that Lane has known the facts and allegations that he presents against the entities since before he filed the TAC.  They contend that, because Lane delayed joining the entities until "the last minute," his burden to show that joinder is necessary here should be greater.  DESCO Response at 4.  The DESCO Defendants cite no authority in support of this contention, but reason that Lane's delay may cause the extension or duplication of discovery and other trial preparation.

Lane replies that the Scheduling Order expressly provides that he was permitted to join additional parties by September 15, 2010, and that he complied with this date when he filed his Motion on September 15, 2010.  He argues that his compliance with the Court's September 15, 2010 joinder date cannot fairly be construed as improper or prejudicial.  Moreover, Lane argues, even in the absence of the Scheduling Order's joinder provision, his motion would be timely.  He notes that the Advisory Committee Notes appended to rule 19 state: "A person may be added as a party at any stage of the action . . . and [joinder] may be made as late as the trial on the merits."  Fed. R. Civ. P. 19 advisory committee notes to the 1966 Amendments.

Lane further argues that, because fact discovery began only recently, no prejudice will accrue to any party if joinder is permitted.  Lane notes that SunCal began producing documents on

-23-

September 1, 2010.  Moreover, at the time Lane filed his Motion, the DESCO Defendants had not produced any discovery, and only one deposition has been taken.

Lane also notes that SunCal only recently began filing papers and pleadings on behalf of unnamed entities, which SunCal contends are "improperly named as SunCal Companies."  SunCal TA at 1.  Lane asserts that, to ensure that the proper parties were identified by September 15, 2010, his counsel had only two weeks to perform a cursory review of approximately 6,500 documents to ensure that -- based on the information reviewed to date -- Lane's Motion was comprehensive.  Lane also notes that the Defendants raised no objection when the Court set the September 15, 2010 joinder deadline at the August 4, 2010 status conference after Lane stated he would be seeking to clarify the identities of all entities involved in the preparation and dissemination of the Proxy Statement, making their present objections misplaced.

The Court agrees that Lane's Motion was timely.  He complied with the Court's Scheduling Order by filing the Motion on September 15, 2010.  See Scheduling Order at 1 ("The Plaintiff shall be allowed until September 15, 2010 to amend the pleadings and to join additional parties.").  Moreover, because Lane complied with the Scheduling Order, his Motion is not improper or prejudicial.  Cf. Krupski v. Costa Crociere S. p. A., 130 S. Ct. 2485, 2498 n.6 (2010)(expressing skepticism that the plaintiff could be "found dilatory for not accepting at face value the unproven allegations" in defendants' papers and pleadings, and when the plaintiff sought to add additional parties "within the time period prescribed by the District Court's scheduling order").  Despite the vintage of this case, merits discovery only began in September 2010.  At the time Lane filed his Motion, the DESCO Defendants had not produced any discovery, and only one deposition has been taken.  See Reply at 7.  Consequently, the Court finds that Lane's Motion is timely.

## II.   LANE HAS NOT SHOWN THE PARTIES ARE REQUIRED UNDER RULE 19.

The DESCO Defendants contend that Lane has not attempted to demonstrate that any of the eight entities meet the requirements of necessary joinder under rule 19(a). As a result, the DESCO Defendants argue, the Court should not permit the joinder of the eight new defendants under rule 19(a). Lane did not contest this argument in his Reply.

Lane does not present any argument that he would be unable to obtain complete relief without joining the entities. See Sac and Fox Nation of Missouri v. Norton, 240 F.3d at 1258; Wheeler Peak, LLC v. L.C.I.2, Inc., 2009 WL 2982817, at *6 ("One basis on which a party may be a required, or necessary, party is if, "in that person's absence, the court cannot accord complete relief among existing parties." (citing Fed. R. Civ. P. 19(a)(1)(A)). Nor has he presented any argument that he or the Defendants would be subjected to inconsistent obligations if the entities are not joined. See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d at 1098. Lane "has the initial burden of demonstrating that a missing party is necessary . . . ." Hood ex rel. Miss. v. City of Memphis, 570 F.3d 625, 628 (5th Cir. 2009). The Court therefore finds that Lane has not shown the entities are required parties under rule 19(a).

## III.   THE COURT GRANTS LANE'S REQUEST TO JOIN THE PARTIES UNDER RULE 20.

Lane also moves to join the entities under rule 20. The DESCO Defendants respond that the Court should deny joinder under rule 20, because Lane offers little more to support joining the entities than the appearance of their names on an organizational chart. The DESCO Defendants assert that, with no more substantial allegations against them, the entities are likely to want to test the viability of the TAC in a rule 12(b)(6) motion to dismiss. See DESCO Response at 3 (citing Crescent/Mach I Partners, L.P., v. Turner, 846 A.2d 963, 990-91 (Del. Ch. 2000)(granting a rule

12(b)(6) motion where the complaint failed to allege "well-pleaded facts to support imputing knowledge of wrongdoing" to each of multiple affiliated defendants).  The DESCO Defendants assert that such motions to dismiss would come due as fact discovery in this case is coming to a close and that, if the Court were to find the pleadings sufficient, the newly added parties would be entitled then to take and participate in discovery, which would have been completed by the time Court determines their status.  See Scheduling Order at 1 ("[T]he termination date for discovery is December 15, 2010 . . . .").  The DESCO Defendants argue that adding the entities would thereby result in undue delay and expense for this case.

The DESCO Defendants further contend that Lane has not shown why these additional parties need to be added as defendants, "other than claiming obliquely that all parties in a organizational chart are liable as control persons and aides and abettors."  DESCO Response at 4.  The DESCO Defendants note that Lane has not asserted that needed additional discovery cannot be obtained from these entities if they are not added as parties to the action nor that he will be unable to satisfy a judgment against the current Defendants without adding the entities.  The DESCO Defendants assert that the entities appear to be "incidental, intermediary entities" and not "the 'ultimate' parent entity."  DESCO Response at 4.  The DESCO Defendants contend that adding the entities will not promote trial convenience, but produce delay, confusion, undue expense and, therefore, prejudice to the current defendants.  Consequently, the DESCO Defendants argue, Lane has not met his burden under rule 20.

Lane replies that SunCal has, even before this action, held themselves out to the world at large and to this Court as the SunCal Companies and/or SunCal Companies Group.  Lane provides a number of examples of SunCal using the names "SunCal Companies" and "SunCal Companies

Group" in relation to the merger.  For example, he asserts that Westland issued a press release on July 5, 2006, announcing that the "SunCal Companies" had made a proposal to acquire Westland. Press Release, Westland Announces Receipt of Superior Proposal from SunCal Companies (dated July 5, 2006), filed October 11, 2010 (Doc. 257-1).  Lane also notes the Proxy Statement stated that the "SunCal Companies Group" was one of the "Parties Involved in the Proposed Transaction" and a "Participant[] in the Merger."  Proxy Statement at 2 ("SCC is a Delaware corporation and a wholly-owned subsidiary of SCC Acquisitions, Inc. ('SCC Acquisitions'), a California corporation and member of the SunCal Companies Group ('SunCal')."); id. at 13 ("SCC Acquisitions is the sole stockholder of SCC and a member of the SunCal Companies Group.").  Lane further notes the each of the fourteen proxy supplements filed with the SEC between September 22, 2006 and November 6, 2006 identified "SunCal Companies" as the entity urging Westland shareholders to vote "yes" on the merger.  Reply at 2 (citing Definitive Additional Materials, Exs. B-F to Reply, filed October 11, 2010 (Doc. 257-2 to -6).  The name "SunCal Companies" was also used on the letterhead of various shareholder communications, on a website SunCal developed for shareholders to visit, and in the opinion-editorial in the Albuquerque Journal on November 1, 2006 that Bill Myers, identified as SunCal Companies' Regional President, wrote.  Reply at 4-5 (citations omitted).  Lane contends that, based on this information and the SunCal Defendants' representations, he named "SunCal Companies Group" as a defendant in this action.  Reply at 5.

Lane also notes that, from November 3, 2006 until August 3, 2009, SunCal Companies and/or SunCal Companies Group has appeared and participated in this action.  Only on July 1, 2010, when the SunCal Defendants filed their SunCal TA, did SunCal party begin representing itself as "SunCal, improperly named as SunCal Companies Group."  SunCal TA at 1.  One day later, on July

2, 2010, SunCal amended its Answer to respond on behalf of "Defendant SCC Acquisition Corp. ('SCC'), improperly named as SunCal Companies Group." SunCal TAA at 1. Lane contends that he should be permitted to add entities, which participated in or controlled the Westland Merger and/or the dissemination of the Proxy Statement, particularly as one of the entities has begun participating in this litigation as a de facto defendant, having already answered the complaint.

The Court grants Lanes request to join the entities under rule 20. Joinder under rule 20 "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency, 558 F.2d at 917 (citation omitted). "Under the rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." United Mine Workers of Am. v. Gibbs, 383 U.S. at 724. With some trepidation, the Court joins the eight entities. Each of these entities are identified in the TAC as either participants in the SunCal Merger in the Proxy Statement or as controlling entities on the Westland Organizational Chart that was filed as Exhibit B to both the SAC and TAC. See TAC, ¶ 21(a), at 12; Organizational Chart at 1. Lane's claims against these entities arise from the same transaction -- their participation in the merger -- and share common questions of fact a law -- whether they are liable for misleading shareholders. Lane contends that the Proxy Statement misled shareholders, in part, because is misstated the participants in the merger. The Proxy Statement stated that Westland was furnishing the Proxy Statement in connection with the solicitation of proxies by Westland's board of directors, and that "Westland and its directors and executive officers [we]re participating in the solicitation of proxies from Westland's shareholders with respect to the matters described in this proxy statement. SunCal may also be deemed a

-28-

participant in the solicitation of such proxies." TAC ¶ 55, at 36 (quoting Proxy Statement at 13). The Proxy Statement further stated Westland and two of the entities Lane now seeks to join, SCC Acquisition Corp. and SCC Acquisitions, Inc., were the "Participants in the Merger." TAC ¶ 55, at 37 (citing Proxy Statement at 13). Lane contends that these statements were misleading, because they omitted the other six entities he now seeks to join. The Organizational Chart represents that, immediately before the merger, SunCal and its affiliates consisted of SCC NM Member LLC and DESCO Real Estate, which were 7.5% and 92.5% owners, respectively, of SCC Westland Venture LLC (the parent of Westland Holdco, Inc.). See Organizational Chart at 1. Westland Holdco, Inc. was, in turn, the parent of SunCal, the entity that was merged into Westland. Additionally, SunCal owned and/or controlled two of its subsidiaries, Westland SPE GP, LLC and Westland DevCo, LP. See Organizational Chart at 1. Because Lane's claims against the entities arise out of the same transaction and occurrence, and share common question of law and fact, see Fed. R. Civ. P. 20(a)(2), the Court joins the entities.

The Court appreciates that joining the entities at this stage of the case may create some complications for all of the parties, but the Court believes that rule 20's liberal joinder standard, which requires little more than some showing that these entities were involved in this transaction, weighs in favor of adding the parties, especially in light of the DESCO Defendants' and SunCal's uncertainty what the relationship is between the existing Defendants and these entities, and the possibility that the Lane may be unable to obtain complete relief if he discovers too late that he has not joined the correct parties. The Court realizes that adding the parities may bring motions to dismiss, may further delay this action, and may complicate discovery, but the Court hopes that these things will not come to pass and believes that prudence demands that parties be joined. Discovery

is not too advanced, with only one deposition taken at the time Lane filed his motion.  It is unclear

whether, and to what extent, depositions will need to be retaken or discovery will be delayed.

Moreover, SunCal conceded that SCC Acquisition Corp. is a proper Defendant.

**IT IS ORDERED** that Lead Plaintiff's Opposed Motion for Joinder of Parties, filed

September 15, 2010 (Doc. 248) is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Nicholas Koluncich, III
Law Offices of Nicholas Koluncich
Albuquerque, New Mexico

-- and --

Joe Kendall
Provost Umphrey Law Firm, LLP
Dallas, Texas

-- and --

Darren J. Robbins
Brian O. O'Mara
G. Paul Howe
Randall J. Baron
David W. Mitchell
Danielle S. Myers
Coughlin Stoia Geller Rudman & Robbins, LLP
San Diego, California

     *Attorneys for the Plaintiffs*

Richard A. Sandoval
Law Offices of Richard A. Sandoval
Albuquerque, New Mexico

     *Attorney for Plaintiff-Intervenor Frank Martin*

Douglas G. Schneebeck
Brian K. Nichols
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

     *Attorneys for Defendants Westland Development Company, Inc.*
       *and SunCal Companies Group*

Greg L. Weselka
Evan P. Singer
Jones Day
Dallas, Texas

     *Attorneys for Defendant SunCal Companies Group*

Juan L. Flores
Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Albuquerque, New Mexico

-- and --

Paul Bessette
Jesse Z. Weiss
Kimberly G. Davis
Christopher W. Ahart
Yusuf A. Bajwa
Greenberg Traurig, LLP
Austin, Texas

     *Attorneys for Defendants Barbara Page, Sosimo S. Padilla, Joe E. Chavez,*
       *Josie Castillo, Charles V. Pena, Georgia Baca, Troy K. Benavidez,*
       *Ray Mares, Jr., and Randolph M. Sanchez*

Trent A. Howell
Jacqueline E. Davis
Holland & Hart, LLP
Santa Fe, New Mexico

-- and --

John D. Lovi
Lara E. Romansic
Michelle M. Oliver
Steptoe & Johnson, LLP
New York, New York

> *Attorneys for Defendants D.E. Shaw Group, D.E. Shaw & Co. L.P.,*
> *D.E. Shaw Real Estate Portfolios 1, LLC, D.E. Shaw & Co. LLC,*
> *D.E. Shaw & Co., Inc., D.E. Shaw Investment Group, LLC,*
> *D.E. Shaw & Co. II, Inc., George Rizk, and Anne Dinning*