# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LAWRENCE LANE, On Behalf of Himself,
and All Others Similarly Situated,

      Plaintiff,

vs.                                  No. CIV 06-1071 JB/ACT

BARBARA PAGE, SOSIMO PADILLA, JOE S.
CHAVEZ, JOSIE CASTILLO, CHARLES V. PENA,
GEORGIA BACA, TROY K. BENAVIDEZ, RAY
MARES, JR., RANDOLPH M. SANCHEZ,
WESTLAND DEVELOPMENT COMPANY, INC.,
SUNCAL COMPANIES GROUP, THE D.E. SHAW
GROUP, D.E. SHAW & CO. L.P., D.E. SHAW
REAL ESTATE PORTFOLIOS 1, LLC, ("DESCO
REAL ESTATE"), D.E. SHAW & CO., LLC, D.E.
SHAW & CO., INC., D.E. SHAW INVESTMENT
GROUP, LLC, D.E. SHAW & CO. II, INC.,
GEORGE RIZK and ANNE DINNING,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

      **THIS MATTER** comes before the Court on the Plaintiff's Notice of Re-filing Lead

Plaintiff's Motion for Class Certification, filed August 5, 2010 (Doc. 218). The Court held a hearing

on October 12, 2010. The primary issues are: (i) whether the Court should certify Lead Plaintiff

Lawrence Lane as class representative under Federal Rule of Civil Procedure 23(a); (ii) whether

Lane has alleged sufficient facts concerning damages to enable the Court to characterize the

purported class as a damages class under rule 23(b)(3); and (iii) whether Coughlin Stoia Geller

Rudman & Robbins LLP ("Coughlin Stoia") should be appointed as class counsel. The Court

concludes that Lane meets the requirements of rule 23 and certifies the class. The Court also

appoints Coughlin Stoia class counsel. Accordingly, the Court grants Lane's motion.

## FACTUAL BACKGROUND

Lane brings this shareholder class action on behalf of himself and the holders of common stock of Westland Development Co. ("Westland"), against Westland, certain of its senior officers and directors, and its merger partner, SunCal Companies Group ("SunCal").  See Third Amended Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 ¶ 1, at 2, filed June 17, 2010 (Doc. 206)("TAC").  Lane alleges that, on or about September 20, 2006, the Defendants mailed to Westland shareholders a Proxy Statement that misrepresented and/or omitted material facts, and that this Proxy Statement was used to obtain shareholder approval of the sale of Westland to SunCal.  See TAC ¶¶ 1, 3, at 2; SEC Schedule 14A Definitive Proxy Statement for Westland Development Co., Inc. at 6 (issued September 20, 2006), filed June 17, 2010 (Doc. 206-1)("Proxy Statement").  Lane has chosen Coughlin Stoia to represent him in this litigation.  See Lead Plaintiff's Opposed Motion for Class Certification and Memorandum of Points and Authorities in Support Thereof at 4, January 5, 2009 (Doc. 117)("Motion").

### 1.    **Westland Development Co., Inc.**

In 1692, when the area around Albuquerque, New Mexico was part of the Spanish empire, King Charles II of Spain conveyed more than 55,000 acres of land to a few of his loyal subjects. See TAC ¶¶ 2, 6, at 2, 5 (quoting Peter C. Beller, Insider Deal on the Mesa, Forbes, Sept. 3, 2007); Director Defendants', Westland's, and Suncal's Joint Opposition to Plaintiff's Motion for Class Certification at 4, filed February 4, 2009 (Doc. 141)("Response").  This land, known as the Atrisco Land Grant, was originally part of the town of Atrisco, and now lies in and around western Albuquerque.  See TAC ¶¶ 2, 6, at 2, 5 (citation omitted); Response at 3.  The Atrisco Land Grant is an eighty-six-square-mile parcel of real estate, which includes tens of thousands of acres of

undeveloped property, master planned communities, retail properties, water rights, and untapped oil and gas rights in and around Albuquerque.  See TAC ¶¶ 2, 6, at 2, 5 (citation omitted).

The heirs of the original grantees formed Westland in 1967, transferring their interests in the land to the corporation.  See TAC ¶¶ 2, 6, at 2, 6 (citation omitted); Response at 4.  The heirs became the shareholders of the new corporation, receiving tradable stock proportional to their ancestors' land holdings.  See TAC ¶ 6, at 6.  For most of Westland's existence, its articles of incorporation prohibited the transfer of Westland stock to anyone other than an heir to the Atrisco land grant, and Westland stock was not publicly traded.  See Response at 3; Proxy Statement at 6.

Westland owned about 46,400 acres of land from the Atrisco Land Grant, including the mineral, oil, and gas rights.  See Proxy Statement at 6.  Westland also owned another 10,000 acres of land located north of the original Atrisco land grant, but did not own the mineral rights to that land.  See id.  Westland was in the business of selling and developing portions of the land it held, and it also leased retail property to businesses in Albuquerque and in El Paso, Texas.  See id.

### 2.    **Prior Merger Offers.**

Various parties approached Westland about acquiring either Westland or a significant portion of its assets.  See Proxy Statement at 16.  None of the inquiries ever materialized into a viable proposal, but Westland's board of directors engaged an independent company to value Westland's stock in 2001 and again in February of 2005.  See TAC ¶ 47, at 27; Proxy Statement at 16.  The first valuation determined that Westland was worth about $70 million, or approximately $87.00 per share, while the second valuation four years later produced a figure of approximately $180.00 per share.  See TAC ¶ 47, at 27; Proxy Statement at 16.  According to Lane, the first valuation reached a figure of $70 million only after Defendant Barbara Page, Westland's president, chief executive

officer, and chief financial officer, contacted the valuation company and ordered that the valuation be reduced.  See TAC at ¶ 48, at 28.

Sometime in early June or late July of 2005, Page met with Philip Aries, the head of Tucson, Arizona, based Aries Realty.  See TAC ¶ 6, at 7 (citations omitted); Proxy Statement at 17.  Aries was a representative of a group of investors interested in acquiring Westland.  See TAC ¶ 6, at 7 (citations omitted); Proxy Statement at 17.  The investment group and Westland embarked on a series of negotiations that ultimately resulted in terms that Westland's board of directors approved on August 17, 2005.  See TAC ¶ 6, at 7 (citations omitted); Response at 3; Proxy Statement at 18. The terms provided for the acquisition of Westland by way of merger into a newly formed company named ANM Holdings, Inc. ("ANM"), with Westland shareholders being cashed out for $200.00 per share.  See TAC ¶ 6, at 7 (citations omitted); Response at 3; Proxy Statement at 18.  The terms also permitted Westland to consider other offers in a post-signing market-check -- a so-called fiduciary out.  See Response at 3; Proxy Statement at 18.  On September 19, 2005, Westland's board of directors approved the merger agreement.  See Proxy Statement at 19.

Westland proceeded to consider a series of unsolicited offers that it received in the wake of publicity about the merger discussions, and of its filing with the Securities and Exchange Commission ("SEC") in connection with the proposed merger.  See TAC ¶ 6, at 8-9; Response at 4; Proxy Statement at 19.  Westland determined that two of the offers it received, from Sedora Holdings, LLC ("Sedora") and Atrisco Heritage, were genuine "acquisition proposals" under the merger agreement with ANM, which Westland could consider under the fiduciary out.  See TAC ¶ 48(b), at 29; Proxy Statement at 21.  Westland entered into negotiations with the companies making the offers and ultimately concluded that Sedora's offer of $255.00 per share was superior

to either ANM or Atrisco Heritage's offers.  See Response at 4; Proxy Statement at 22.  Westland exercised its rights under the fiduciary out, and ANM decided not to counter Sedora's offer.  See Response at 4; Proxy Statement at 22.  Westland canceled its merger agreement with ANM and entered into a merger agreement with Sedora.  See Response at 4; Proxy Statement at 22.  The new merger agreement with Sedora, like the one with ANM, had a fiduciary-out clause.  See Response at 4; Proxy Statement at 22.

### 3.      The Merger with SunCal.

On May 23, 2006, SunCal entered the picture and made a proposal to acquire Westland for $280.00 per share.  See Proxy Statement at 23.  On May 31, 2006, Westland's board of directors determined that SunCal's offer was superior to Sedora's offer, and gave Sedora until June 5, 2006 to revise its offer.  See id.  After Westland's determination that SunCal's offer was superior, Westland continued to receive additional offers, and Sedora also amended its offer in an effort to regain its status as the preferred buyer.  See id. at 24.  Bidding continued, and SunCal increased its offer twice, ultimately arriving at a figure of $315.00 per share, an amount with which Sedora declined to compete.  See TAC ¶ 37, at 19; Response at 4; Proxy Statement at 24.  Westland and SunCal formally entered into a merger agreement on July 19, 2006.  See TAC ¶ 37, at 19; Response at 4; Proxy Statement at 25.

Under the terms of the merger agreement, each of the 794,927 issued and outstanding shares of Westland common stock would be converted into the right to receive $315.00 in cash, with an acquisition company created by SunCal becoming the owner of all of Westland's outstanding stock.  See TAC ¶ 37, at 19; Response at 4; Proxy Statement at 26.  Additionally, the merger agreement entitled Westland's shareholders to receive an ownership interest in a newly formed company called

Atrisco Oil and Gas LLC ("Atrisco LLC"), which would be a vehicle for providing income from Westland's mineral rights to Westland's shareholders. See Response at 4-5; Proxy Statement at 24-25. Atrisco LLC would receive all the income from Westland's existing oil-and-gas leases, plus half the income from future mineral leases on Westland property. See Response at 4-5; Proxy Statement at 24-25. The agreement also provided for the creation of Atrisco Heritage Foundation ("Foundation"), a non-profit organization that was to be devoted to promoting and preserving the cultural heritage of the Atrisco heirs. See Response at 5; Proxy Statement at 24, 26-27.

On September 20, 2006, Westland filed its definitive Proxy Statement for the merger with the SEC and mailed the Proxy Statement to all Westland's shareholders. See TAC ¶ 3, at 1; Proxy Statement at 3. A shareholder meeting was convened on November 6, 2006, and on November 21, 2006, Westland announced that shareholders had approved the merger. See TAC ¶ 5, at 5. Shareholders voted on the proposal, with 72.4% of Westland's common shares and 97.75% of Westland's Class B shares ultimately voting in favor of the SunCal Merger. See id. On December 7, 2006, Westland "announced the consummation of the" merger. Id. As a result of the merger, approximately 6,100 Westland heirs got an average of $37,000 apiece, while the nine members of Westland's Board of Directors received $15 million. See id. ¶ 6, at 9.

### 4.    **Westland's Proxy Statement.**

Lane contends that the Defendants used the allegedly false and misleading Proxy Statement, which was disseminated to each Westland shareholder, to secure the votes needed to consummate the SunCal Merger. Lane asserts that, in an attempt to convince Westland's shareholders of the legitimacy of the process used to sell Westland and the adequacy of the consideration given in exchange for the Westland assets, the Proxy Statement falsely stated that "Westland's board of

directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland." TAC ¶ 4, at 3 (quoting Proxy Statement at 27).  Lane also asserts that the Defendants caused the Proxy Statement to omit material facts necessary to make the statements made therein not false or misleading.  <u>See</u> TAC at ¶ 4, at 3.  These statements and omissions form the heart of this case.  <u>See</u> TAC ¶¶ 38-58, at 19-39.

a.  <strong><u>Conflicts of Interest</u></strong>.

Lane alleges that the Proxy Statement failed to fully disclose several conflicts of interest involving a number of Westland directors.  The Proxy Statement disclosed that "some of Westland's officers and directors have various relationships with Westland or interests in the merger that are different from your interests as a shareholder and that may present actual or potential conflicts of interest," TAC ¶ 39, at 20 (quoting Proxy Statement at 29), revealing that two of Westland's board members had contracts that would result in severance payments for involuntary dismissal, <u>see</u> TAC ¶ 39, at 20 (quoting Proxy Statement at 30).  According to the Proxy Statement, Page was "employed as Westland's president and chief executive officer under a renewable six year employment agreement" that also provided for seven times her annual salary as a severance payment if her employment were involuntarily terminated.  TAC ¶ 39, at 20 (quoting Proxy Statement at 30). The Proxy Statement also stated that Defendant Sosimo Padilla, Westland's chairman and executive vice president, had a consulting agreement with severance terms similar to those in Page's contract. <u>See</u> TAC ¶ 39, at 20 (quoting Proxy Statement at 30).

The Proxy Statement stated that, in addition to money due under those contracts, the existing Westland directors could receive future positions on the board of Atrisco LLC and as trustees of the

Foundation.  See Proxy Statement at 31.  The existing Westland board of directors was given the power to appoint the Foundation's trustees from among Westland's shareholders, and it was considered likely that "one or more" of Westland's directors would be chosen as a trustee.  Id.  Atrisco LLC's board of directors was to be drawn from the Westland board of directors, although which directors would be picked was said to be undecided.  See id.

According to Lane, the Proxy Statement failed to mention that Page and Padilla's contracts were of recent vintage, having been secretly modified to secure their support for the merger.  See TAC ¶¶ 40-41, at 21.  Lane also asserts that the Proxy Statement failed to disclose that "at least four Westland directors were promised lifelong trusteeships" at the Foundation or on the board of Atrisco LLC, and that, instead of receiving "customary fees" for their service, they were going to receive outsized "lucrative annual retainers."  TAC ¶ 42, at 22.

### b.    Page's Vote Against the Merger.

Lane's TAC states that the Proxy Statement contains nothing about the fact that Page voted against the merger at a board meeting on July 18, 2006, and that Defendant Troy Benavidez abstained from voting at the same meeting.  See TAC ¶¶ 44-45, at 24-25.  The Proxy Statement stated only, Lane notes, that Westland's board of directors recommended that the shareholders approve the merger and planned to vote their share for the merger.  See TAC ¶¶ 43-44, at 23-24 (quoting Proxy Statement at 5-12).  Moreover, in a question-and-answer section about the merger, the Proxy Statement stated that "Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement."  Proxy Statement at 10.  According to Lane, despite this representation, four of the nine directors on Westland's board -- Benavidez, Defendant Ray Mares, Jr., Defendant Charles Pena, and Defendant Randolph Sanchez -- did not vote their Class A shares

in favor of the merger, while a fifth director -- Defendant Joe Chavez -- voted only 100 of his 310 Class A shares in favor of the merger.  See TAC ¶ 45 & n. 4, at 24-25.

### c.      **The Market-Check Process.**

The Proxy Statement indicated that Westland was employing a market-check process in connection with the merger and that "Westland's board of directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland." Proxy Statement at 27.  The market check consisted primarily of the consideration of various offers to acquire the company.  See id. at 19-27.  According to Lane, Westland never actively solicited prospective bidders to secure the best value for the company or otherwise determined the value of the shares at the time of the sale.  See TAC ¶ 46, at 25-27.  Lane further alleges that the negotiations with ANM detailed in the Proxy Statement "are either false or confirm that defendants falsified internal Westland documents because during the relevant period none of the Board minutes mention any negotiations with ANM."  TAC ¶ 46(a), at 25.

### d.      **The Valuation of Westland.**

Lane alleges that there were two important flaws in the Proxy Statement's disclosure of the valuations made of Westland.  The Proxy Statement mentioned two separate valuations that the same independent valuation firm conducted -- one performed in 2001, the other in 2005.  The 2001 opinion valued Westland at about $87.00 per share, see Proxy Statement at 16, while the 2005 opinion valued Westland at about $180.00 per share, see Proxy Statement at 27.  Lane alleges that the Proxy Statement failed to disclose that 2001 valuation originally assessed Westland at $249.00 per share, but Page ordered the company performing the valuation to manipulate the valuation downward to $87.00 per.  See TAC ¶ 48, at 28.  Lane also alleges that the 2005 valuation is

undermined by the failure of the Proxy Statement to mention an internal appraisal by Westland's vice president of sales, Brent Lesley, which valued Westland at $474.00 per share, more than twice that of the 2005 opinion.  See TAC ¶ 48(a), at 28.

### e.    The Westland's Board of Directors' Statement of Fairness.

According to the Proxy Statement, Westland's board of directors thought the merger was "advisable and fair to, and in the best interests of Westland and Westland's shareholders."  TAC ¶ 49, at 30 (quoting Proxy Statement at 26).  The Proxy Statement also states that Westland's board of directors held this belief, "in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders."  TAC ¶ 49, at 30 (quoting Proxy Statement at 6).  Lane contends that these statements are subjectively and objectively materially false and/or misleading, because the offer was below Lesley's valuation, the directors did not have an independent valuation of the land, and Westland's board of directors did not know the value of the land's mineral rights, and some of the directors had expressed that they felt the offer was insufficient to justify selling part of their heritage.  See TAC ¶ 49, at 30-32.

### f.    The Tax-Increment Development District ("TIDD").

In discussing Westland's board of directors' views on the merger, the Proxy Statement asserted that Westland was a somewhat "unattractive" acquisition target, because it held a "vast amount of undeveloped land" that would be very expensive and time consuming to develop.  TAC ¶ 50, at 32 (quoting Proxy Statement at 27).  Additionally, the Proxy Statement asserted Westland was facing "significantly increasing costs . . . to develop its own land," because the City of Albuquerque would not bear infrastructure costs associated with recent Westland developments,

such as the Petroglyphs.[1]  TAC ¶ 50, at 32 (quoting Proxy Statement at 28).  Lane alleges the Proxy

Statement, however, failed to mention that Westland had expertise in and was pursing improving

public financing, including hiring consultants and lobbyists.  See TAC ¶ 51, at 33-34.  Lane also

contends that the Defendants failed to disclose that "SunCal had arranged to take advantage of an

October 2006 TIDD which allowed SunCal to utilize tax dollars to fund the infrastructure costs

associated with the development of Westland."  TAC ¶ 51, at 33-34.

       **g.**    **Mineral Rights and Atrisco LLC.**

Lane alleges that the Proxy Statement made four particular omissions regarding the mineral

resources available to Westland and the creation of Atrisco LLC.  The Proxy Statement represented

that Westland had no opinion as to the value of Class A stock in Atrisco LLC, and stated that

Westland's management did not know if there was "oil, natural gas, coal bed methane gas or any

other natural resource under Westland's land," and was "not aware of any commercially successful

drilling on the property."  TAC ¶ 52, at 34 (quoting Proxy Statement at 7).  Lane contends this

statement ignores four important facts that should have been disclosed: (i) that Westland's board of

directors had been informed that between 100 and 500 million barrels of oil could be located on

Westland property; (ii) that Sanchez had expressed his concern at an August 29, 2005, board

meeting about losing valuable water and mineral rights; (iii) that Westland had received an offer

from Savant Resources to lease all of Westland's property for oil and gas exploration; and (iv) that

Tecton Energy LLC had offered to expand its existing oil-and-gas-exploration lease from 7,000 to

30,000 acres.  See TAC ¶ 52, at 35.

---

    [2] The Petroglyphs are a Westland project for new home construction.  Westland was required
to build the water infrastructure for the Petroglyphs and transfer title to the infrastructure to the City
of Albuquerque.  See TAC ¶ 50, at 32.

**h.** **Participants in the Merger.**

The Proxy Statement represented that Westland was furnishing the Proxy Statement in connection with the solicitation of proxies by Westland's board of directors, and that "Westland and its directors and executive officers [we]re participating in the solicitation of proxies from Westland's shareholders with respect to the matters described in this proxy statement. SunCal may also be deemed a participant in the solicitation of such proxies." TAC ¶ 55, at 36 (quoting Proxy Statement at 13). The Proxy Statement further stated Westland, SCC Acquisition Corp., and SCC Acquisitions, Inc. were the "Participants in the Merger." TAC ¶ 55, at 37 (citing Proxy Statement at 13). Lane contends that these statements were misleading, because they omitted a number of relevant entities. An organizational chart filed with SunCal's October 31, 2007 TIDD application represented that, immediately before the merger, SunCal and its affiliates consisted of SCC NM Member LLC and D.E. Shaw Real Estate Portfolios 1, LLC ("DESCO Real Estate"), which were 7.5% and 92.5% owners, respectively, of SCC Westland Venture LLC (the parent of Westland Holdco, Inc.). See Westland Organizational Chart, filed February 9, 2009 (Doc. 145-2)("Organizational Chart"). Westland Holdco, Inc. was, in turn, the parent of SunCal, the entity that was merged into Westland. Additionally, SunCal owned and/or controlled two of its subsidiaries, Westland SPE GP, LLC and Westland DevCo, LP. See Organizational Chart at 1.

**i.** **Proxy Statement Solicitors.**

The Proxy Statement included a segment dealing with Proxy Statement solicitors, which stated that "Westland expects to make arrangements with and compensate approximately 90 individuals to assist in the solicitation" of the proxies. TAC ¶ 57, at 39 (quoting Proxy Statement at 16). Westland did not hire any Proxy Statement solicitors. See TAC ¶ 58, at 39. Lane alleges

that the Defendants were aware that Westland never hired any Proxy Statement solicitors, and that

SunCal retained all the Proxy Statement solicitors, "who secretly received lucrative payments for

delivering votes in favor of the" merger.  TAC ¶ 58, at 39.

> ### 5.    Lane's Background.

Lane was the holder of Westland Class A common stock during the relevant period.  Lane

has a number of encounters with the law in his background.  He pled guilty to a felony charge of

marijuana possession in the early 1980s in Kentucky, and was on probation for three to five years.

See Deposition of Lawrence Lane at 158:4-23, 161:16-162:8 (taken December 18, 2008), filed

February 4, 2009 (Doc. 141-2).  Lane was also convicted of leaving the scene of a motor vehicle

accident that he caused in Santa Barbara, California in 2003 or 2004.  See id. at 162:9-164:19.  The

second conviction involved a accident in which Lane lost control of his friend's vehicle with which

he was entrusted and struck a tree.  See Lane Depo. at 163:8-24.  Lane did not pay the friend back,

and by the terms of a plea agreement, the County of Santa Barbara ordered Lane to make restitution.

See Lane Depo. at 162:9-164:19.  Lane has not made restitutionary payments in over two years and

still owes more than $10,000.00 in court-ordered restitution.  See Lane Depo. at 186:12-187:16.

The Defendants performed a background search using Lane's name, birth date, and social

security number.  See Response at 14.  The search revealed three other incidents in which Lane ran

afoul of the law: (i) in 1991, a Grand Jury indicted Lane for check fraud; (ii) in 1990, the New

Mexico Educational Assistance Foundation sued Lane for non-payment of a student loan, and

default judgment was entered against him; and (iii) in 1990, the Veterans Administration sued Lane

for recovery of payment of educational assistance for which Lane was not eligible, and default

judgment was entered against him.  See Response at 14 (citations omitted).  In the court file of the

1991 Grand Jury Indictment, there is a bench warrant commanding that Lane be arrested for failing to appear at his arraignment.  See Response at 14 (citations omitted).  And in the student-loan lawsuit, Lane was held in contempt of court for failing to appear for a deposition for which he had been served with a subpoena.  See Response at 14-15 (citations omitted).  In January 1991, Lane began his military service abroad with the French Foreign Legion, and he contends that, because he was abroad, he would have been unable to appear at his 1991 arraignment or deposition.  See Reply Lead Plaintiff's Reply Memorandum in Further Support of Motion for Class Certification at 9, filed September 7, 2010 (Doc. 242)("Reply").  Lane was never personally served in any of the lawsuits. See Reply at 11.

## PROCEDURAL BACKGROUND

Lane filed his initial Complaint on November 3, 2006, in which he asserted class-action claims under § 14(a) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a through 78oo ("Exchange Act").  Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed November 3, 2006 (Doc. 1).  On January 19, 2007, Lane moved the Court to appoint him as lead plaintiff and Coughlin Stoia as lead counsel.  See Lawrence Lane's Motion for Appointment as Lead Plaintiff and Approval of His Selection of Lead Counsel, filed January 19, 2007 (Doc. 27).  The Court granted both requests on July 2, 2007.  See Memorandum Opinion and Order at 24, filed July 2, 2007 (Doc. 43).

On September 17, 2007, Lane filed his First Amended Complaint.  See Amended Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed September 17, 2007 (Doc. 50).  On December 3, 2007, the Defendants filed motions to dismiss the Amended Complaint.  See Motion to Dismiss and Joinder in Director Defendants' Motion to

Dismiss, filed December 3, 2007 (Doc. 52); Motion to Dismiss, filed December 3, 2007 (Doc. 53). The Court granted in part and denied in part those motions on September 15, 2008. See Order, filed September 15, 2008 (Doc. 81); Memorandum Opinion, filed September 24, 2008 (Doc. 83).

On December 1, 2008, Lane filed a motion to amend his First Amended Complaint. See Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedures, filed December 1, 2008 (Doc. 105). The Court granted that motion on February 5, 2010. See Order Granting Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, filed February 5, 2009 (Doc. 144). Pursuant to the order granting the motion, Lane filed his Second Amended Complaint. See Second Amended Complaint for Violations of §§ 14(a) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9, filed February 9, 2009 (Doc. 145).

On January 5, 2009, Lane filed Lead Plaintiff's Opposed Motion for Class Certification and Memorandum of Points and Authorities in Support Thereof. See Doc. 117. Lane moves the Court to find this matter appropriate for certification as a class action under rule 23(a) and 23(b)(3). Specifically, Lane requests that this Court certify a class consisting of all persons who held the outstanding shares of Westland Development Co. no par value Class A common stock as of the close of business on September 18, 2006. Lane further requests that the Court appoint him as class representative and appoint Coughlin Stoia as class counsel. Lane contends that he held Westland Class A common stock during the relevant period and was damaged as a result of Defendants' alleged federal securities law violations.

On February 4, 2009, the Defendants filed Director Defendants', Westland's, and Suncal's Joint Opposition to Plaintiff's Motion for Class Certification. See Doc. 141. The Defendants

contend that Lane cannot meet his burden of establishing that class certification is appropriate under rule 23 and that the Court should deny his Motion for at least two reasons: (i) Lane is not an adequate class representative under rule 23(a), because he is not a fit fiduciary; and (ii) Lane has failed to allege sufficient facts concerning damages to enable the Court to characterize the purported class as a damages class under Rule 23(b)(3).

On July 15, 2009, Lane filed a motion to amend his Second Amended Complaint.  See Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure (Doc. 176)("Motion to Amend").  On March 30, 2010, Lane filed a Notice of Withdrawal of Class Certification Motion (Doc. No. 117), withdrawing his Motion without prejudice to re-filing upon the Court's decision on Lane's Motion to Amend.  See Doc. 198.  On March 31, 2010, the Court issued an Order granting Lane's Motion to Amend, see Doc. 199; Memorandum Opinion at 23-29, filed June 8, 2010 (Doc. 204)("MO")("[Lane] sets forth . . . a causal chain from the misrepresentations to the transaction, to the alleged damages; [i]t is not immediately apparent what more a defendant could desire at the pleading stage."), and on June 17, 2010 Lane filed his TAC.

On August 5, 2010, Lane filed his Notice of Re-filing Lead Plaintiff's Motion for Class Certification, in which he re-field his Opposed Motion for Class Certification as originally filed. See Doc. 218.  Also on August 5, 2010, the Defendants filed Notice of Re-filing Joint Opposition to Plaintiff's Motion for Class Certification, in which they re-filed their Joint Opposition to Plaintiff's Motion for Class Certification as originally filed.  On September 7, 2010, Lane filed his Reply, disputing the Defendants' challenges to his character and asserting that the Court's orders have mooted the Defendants' argument that he failed to allege sufficient facts concerning damages.

See Doc. 242.  At the October 12, 2010 hearing, the Defendants did not dispute that their damages argument is mooted by the Court's March 31, 2010 Order and June 8, 2010 MO.

### LAW REGARDING CLASS ACTIONS

Rule 23 provides the requirements for certifying a class under the federal rules.  All classes must satisfy the prerequisites under rule 23(a).  Additionally, a class must satisfy one of the three sets of requirements under rule 23(b).  The plaintiff bears the burden of showing that the requirements are met.  See Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988)("A party seeking to certify a class is required to show . . . that all the requirements of [Rule 23(a)] are clearly met.").  See also Shook v. El Paso County, 386 F.3d 963, 968 (10th Cir. 2004)("Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'" (quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982), and citing Reed v. Bowen, 849 F.2d at 1309).  The Court must accept a plaintiff's substantive allegations as true, but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  Shook v. El Paso County, 386 F.3d at 968 (citing J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Anderson v. City of Albuquerque,

690 F.2d 796, 799 (10th Cir. 1982).  See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").

### 1.    Class Prerequisites.

All classes must satisfy the prerequisites under rule 23(a):

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

### a.    Numerosity.

Rule 23(a)(1) requires that the class membership be sufficiently large to warrant a class action because the alternative of joinder is impracticable.  Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption."  Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  The Tenth Circuit has stated that there is "no set formula" to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion.  Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978).  Cf. Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In determining whether a proposed class

meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(citation omitted). See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "'strict numerical test'"; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous")(citation omitted); Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable." (citing 1 Herbert B. Newberg, Newberg on Class Actions § 3.05, at 141-42 (2d ed. 1985))). "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993). See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)("Impracticable does not mean impossible.").

### b.    Commonality.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Even "factual differences in the claims of the individual class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Group Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996). See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual class members

may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'")(citations omitted).

"The commonality requirement has been applied permissively in securities fraud litigation." In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 87 (S.D.N.Y. 2004).  "Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the commonality requirement."  5 J. Moore, D. Coquillette, G. Joseph, G. Vairo, J. Solovy & S. Schreiber, Moore's Federal Practice ¶ 23.23[4][b], at 23-77 (3d ed. 2004).  "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000).  Accord Initial Pub. Offering, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

### c.    Typicality.

Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. See Fed R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest.  See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 490 (D. Wyo. 2001).  The Supreme Court of the United States has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Southwest v. Falcon, 457 U.S. at 157 n.13.  "Provided the claims of Named Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality."  DG v. Devaughn, 594 F.3d 1188, 1198

(10th Cir. 2010)(citing Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)).  "[L]ike commonality, typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG v. Devaughn, 594 F.3d at 1199.  Factual differences among some of the class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988). See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of the plaintiffs and the other class members are based on the same legal or remedial theory.").  Accordingly, differences in the amount of damages will not defeat typicality. See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).  "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact." Gianzero v. Wal-Mart Stores Inc., No. 09-cv-00656-REB-BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982), cert. denied, 460 U.S. 1069 (1983)("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient."; Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory."  (citations omitted)).

        d.      **Adequacy.**

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement protects the due-process interests of unnamed class members -- who are bound by any judgment in the action. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)("Due process requires that the Court 'stringently' apply the competent representation requirement because class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings."). "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a) . . . ." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.). See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . ."). The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) will the named plaintiffs and their counsel vigorously prosecute the action on behalf of the class. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002). In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis. See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.

The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm.

to Stop the War, 418 U.S. 208, 216 (1974)).  Courts have found that intraclass conflicts "may negate

adequacy under Rule 23(a)(4)."  Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 n.28

(5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intraclass

conflicts).  See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that

representation was inadequate where the class included those "who claim harm from the very acts

from which other class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc.,

155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees who had an interest in the

continued viability of the franchiser had an inherent conflict with former franchisees whose only

interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574,

579 (W.D. Va. 1999)(holding that a class of all high school female athletes could not be

certified -- even if the alleged conduct of the defendant school system was discriminatory -- when

some female athletes did not share the same goals or interests as the named female plaintiffs,

because those unnamed female athletes were satisfied with and/or benefitted from the alleged

discriminatory treatment).

On the other hand, "only a conflict that goes to the very subject matter of the litigation will

defeat a party's claim of representative status.  Beyond that straightforward proposition, defining

the level of antagonism or conflict that should preclude class certification is a more difficult

proposition."  7A C. Wright, A. Miller & M. Kane, Fed. Prac. & Proc. § 1768, at 389-93

(3d ed. 2005).  "Though a plaintiff cannot be an adequate representative if he or she has a conflict

of interest with class members, not every potential disagreement between a class representative and

the class members will stand in the way of a class suit."  1 A. Conte & H. Newberg, Newberg on

Class Actions § 3:26, at 433-34 (4th ed. 2002).

## 2.   **Class Types**.

Once the court finds that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d at 675.  See DG v. Devaughn, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").  Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > (1) prosecuting separate actions by or against individual class members would create a risk of:
> >
> > > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
> >
> > (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
> >
> > (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> >
> > > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."  Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions.")).

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) instructs that the court should consider: (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  See Fed. R. Civ. P. 23(b)(3)(A)-(D).

The predominance criterion of rule 23(b)(3) is "far more demanding" than rule 23(a)(2)'s commonality requirement. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997); Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)("Although we do not rest our decision upon Rule 23(a), cases that interpret that the commonality requirement of Rule 23(a) illustrate the instant

Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate."). In Monreal v. Potter, the Tenth Circuit found: "The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a)."  367 F.3d at 1237.

### 3.    **Class Order.**

Rule 23(c) provides the requirements for a court order certifying a class:

(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.

(1) Certification Order.

(A) Time to Issue. At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

(B) Defining the Class; Appointing Class Counsel. An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

(C) Altering or Amending the Order. An order that grants or denies class certification may be altered or amended before final judgment.

Fed. R. Civ. P. 23(c). The United States Court of Appeals for the Third Circuit addressed the requirements of rule 23(c)(1)(B) after the 2003 amendments to the Federal Rules of Civil Procedure, holding that "Rule 23(c)(1)(B) requires district courts to include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment." Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d 179, 184 (3d Cir. 2006). The Third Circuit "noted that most district court opinions fell short of this standard." Nafar v. Hollywood Tanning Sys., Inc., 339 F. App'x 216, 219 (3d Cir. 2009).

-26-

> [T]he proper substantive inquiry for an appellate tribunal reviewing a certification order for Rule 23(c)(1)(B) compliance is whether the precise parameters defining the class and a complete list of the claims, issues, or defenses to be treated on a class basis are readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion.

Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d at 185.

### 4.     Security Class Actions.

"[T]he United States Court of Appeals for the Tenth Circuit has endorsed class actions as an appropriate means to resolve claims under the federal securities laws." Lerner v. Haimsohn, 126 F.R.D. 64, 65 (D. Colo. 1989)(citing T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth., 717 F.2d 1330 (10th Cir. 1983)). See In re Ribozyme Pharms., Inc. Sec. Litig., 205 F.R.D. 572, 577 (D. Colo. 2001)("In general, class actions are the favored method of litigating securities fraud actions in which numerous plaintiffs are involved."); City P'ship Co. v. Jones Intercable, Inc., 213 F.R.D. 576, 581 (D. Colo. 2002); Schwartz v. Celestial Seasonings, 178 F.R.D. 545, 550 (D. Colo. 1998); 7 A. Conte & H. Newberg, supra § 22:1, at 4-5 ("Actions under the federal securities laws are particularly well suited for representative litigation under Rule 23 . . . ."). Where plaintiffs allege that defendants violated federal securities laws through a common scheme or mechanism, uniformly perpetrated upon the shareholders, the action is appropriate for class treatment. See Pellman v. Cinerama, Inc., 89 F.R.D. 386, 390 (S.D.N.Y. 1981).

## ANALYSIS

Lane asks the Court to certify the class and appoint Coughlin Stoia as class counsel. The Defendants do not dispute that the class satisfies the requirements of rule 23(a)(1) through (3). The Defendants also do not dispute that the class satisfies the requirements of rule 23(b)(3). The

Defendants further present no argument against appointing Coughlin Stoia as class counsel.  The Defendants dispute only whether Lane has the character to act as a fiduciary to the class.

The Court finds that Lane will adequately and fairly represent that class, and that he has the character to stand as a fiduciary to the class.  The Court also finds there are approximately 6,100 class members, making joinder impracticable.  See Fed. R. Civ. P. 23(a)(1).  The Court further finds that Lane's claims present common questions of law and fact, and his claims are typical of other class members' claims, and predominate over individual concerns, making a class action the superior way to proceed.  See Fed. R. Civ. P. 23(a)(2), (3), (b)(3).  The TAC sets forth claims for Violation of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.  Lane alleges that Defendants disseminated a false and misleading definitive Proxy Statement to all Westland shareholders in violation of the federal securities laws, and therefore all class members are identically situated and are seeking identical relief, and the claims to be litigated present common questions of law and fact.  See Fed. R. Civ. P. 23(a)(2), (3); Pellman v. Cinerama, Inc., 89 F.R.D. at 386, 390 (stating that, where plaintiffs allege that defendants violated federal securities laws through a common scheme or mechanism, uniformly perpetrated upon the shareholders, the action is "especially appropriate" for class treatment).

Moreover, "the United States Court of Appeals for the Tenth Circuit has endorsed class actions as an appropriate means to resolve claims under the federal securities laws."  Lerner v. Haimsohn, 126 F.R.D. at 65 (citing T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth., 717 F.2d 1330).  See In re Ribozyme Pharms., Inc. Sec. Litig., 205 F.R.D. at 577 ("In general, class actions are the favored method of litigating securities fraud actions in which numerous plaintiffs are involved."); City P'ship Co. v. Jones Intercable, Inc., 213 F.R.D. at 581; Schwartz v.

Celestial Seasonings, 178 F.R.D. at 550; 7 A. Conte & H. Newberg, supra § 22:1, at 4-5 ("Actions under the federal securities laws are particularly well suited for representative litigation under Rule 23 . . . ."). Lane alleges that the Defendants violated federal securities laws through a common scheme or mechanism, uniformly perpetrated upon the shareholders, making the action appropriate for class treatment. See Pellman v. Cinerama, Inc., 89 F.R.D. at 390. Consequently, the Court certifies the class and appoints Coughlin Stoia as class counsel.

## I.   THE CLASS IS SO NUMEROUS THAT JOINDER OF ALL MEMBERS IS IMPRACTICABLE.

The Court finds that there are approximately 6,100 class members, making them so numerous that joinder would be impracticable. See Fed. R. Civ. P. 23(a)(1); Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d at 624 (finding that proposed class consisting of "100 to 150 members -- is within the range that generally satisfies the numerosity requirement"); Bittinger v. Tecumseh Prods. Co., 123 F.3d at 884 n.1 (rejecting as "frivolous" the "content[ion] that the plaintiffs failed to address the issue of whether joinder of all [1,100] members of the class [wa]s impracticable"); Robidoux v. Celani, 987 F.2d at 936 ("[T]he difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable."  (citing 1 H. Newberg, supra § 3.05, at 141-42)); Harrington v. City of Albuquerque, 222 F.R.D. at 509 (certifying a class of 300 members); Yazzie v. Ray Vicker's Special Cars, Inc., 180 F.R.D. 411, 415 (D.N.M. 1998)(Vázquez, J.)(certifying a class of approximately 210 persons who pawned their vehicles with an auto pawn business in Farmington, New Mexico); Olenhouse v. Commodity Credit Corp., 136 F.R.D. 672, 679 (D. Kan. 1991)(holding that joinder is shown to be impracticable where the class to be represented consisted of at least 50 members).

Moreover, many of the class members possessed modest holdings of Westland common stock. The burdens and costs of bringing separate actions outweigh the individual incentives for each class member to join in this action. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985)("Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually."). In light of the large number of class members, their relatively small individual damages, and the unlikelihood of class members seeking redress on an individual basis, this action satisfies Rule 23(a)(1).

## II.  THERE ARE QUESTIONS OF LAW AND FACT ARE COMMON TO THE CLASS.

The commonality requirement is also satisfied. See Fed. R. Civ. P. 23(a)(2). "[F]actual differences in the claims of the individual class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Group Sec. Litig., 169 F.R.D. at 148. "That the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy." See Adamson v. Bowen, 855 F.2d at 676. "Commonality requires only a single issue common to the class, and the fact that 'the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" Lopez v. City of Santa Fe, 206 F.R.D. at 289 (citations omitted). "The commonality requirement has been applied permissively in securities fraud litigation." In re Initial Pub. Offering Sec. Litig., 227 F.R.D. at 87. "Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the commonality requirement." 5 J. Moore, D. Coquillette, G. Joseph, G. Vairo, J. Solovy & S. Schreiber, supra ¶ 23.23[4][b], at 23-77. "Where the facts as alleged show that Defendants' course of conduct concealed material information from

an entire putative class, the commonality requirement is met." In re Oxford Health Plans, Inc. Sec.
Litig., 191 F.R.D. at 374.  Accord Initial Pub. Offering, 227 F.R.D. at 87 ("In general, where
putative class members have been injured by similar material misrepresentations and omissions, the
commonality requirement is satisfied.").

Lane alleges that the Defendants disseminated the same allegedly false and misleading Proxy
Statement to all Westland shareholders, thereby causing the same type of harm to all members of
the proposed class, for which the same relief is sought under the same provisions of the federal
securities laws. See Pellman v. Cinerama, Inc., 89 F.R.D. at 389 (finding it significant for purposes
of commonality that plaintiffs' §14(a) "claims turn upon one document sent to all shareholders,
rather than upon a multiplicity of acts or communications").  Lane's "claims involve a common
scheme affecting the entire class[,] which is the hallmark of securities fraud actions that are certified
as class actions."  In re Intelcom Group Sec. Litig., 169 F.R.D. at 148.  The TAC's allegations
present questions of law and fact common to the members of the class, including, in connection with
the SunCal Merger: (i) whether the Defendants violated §14(a) and/or §20(a) of the Exchange Act
and Securities and Exchange Commission Rule 14a-9; (ii) whether the Defendants omitted and/or
misrepresented material facts; (iii) whether the Defendants' statements omitted material facts
necessary to make the statements made, in light of the circumstances under which they were made,
not misleading; and (iv) whether Lane and the other members of the class have been damaged as a
result of the Defendants' conduct.  The Court thus finds "there are questions of law or fact common
to the class."  Fed. R. Civ. P. 23(a)(2).

III.     **LANE'S CLAIMS OR DEFENSES ARE TYPICAL OF THE CLASS.**

The Court finds that Lane's claims satisfy Rule 23(a)(3)'s requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that absent class members are adequately represented by evaluating whether the class representative's interests are sufficiently aligned with the class's interest. See Baby Neal for & by Kanter v. Casey, 43 F.3d at 57; Nicodemus v. Union Pac. Corp., 204 F.R.D. at 490. The essential characteristics of the class representative's claims must be the same or similar as the class' claims, but they need not be identical. The Tenth Circuit has affirmed that factual differences among some of the class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d at 676. See Penn v. San Juan Hosp., Inc., 528 F.2d at 1189 ("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of the plaintiffs and the other class members are based on the same legal or remedial theory."). "So long as there is a nexus between the class representatives' claims or defenses and the common questions of fact or law which unite the class, the typicality requirement is satisfied." Neiberger v. Hawkins, 208 F.R.D. at 315. See Milonas v. Williams, 691 F.2d at 938 ("[E]very member of the class need not be in a situation identical to that of the named plaintiff."). Lane's claims have a close nexus with those of the proposed class; both Lane and the proposed class challenge the Defendants' issuance of the allegedly false and misleading Proxy Statement under the same provisions of the federal securities laws, and allege to have suffered the same harm wrought as a result thereof. Specifically, the dispositive questions of law and fact upon which Lane's claims rest are identical to those upon

which the claims of the other class members depend, namely: (i) whether the Defendants violated §§14(a) and 20(a) of the Exchange Act and/or Securities and Exchange Commission Rule 14a-9 by filing a false or materially misleading Proxy Statement; and (ii) whether the members of the class have been damaged as a result of the Defendants' conduct.  Lane's claims do not appear to be premised on any unique theory or involve particularized facts that would make him atypical as compared to other class members.  Moreover, "[t]he United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact." Gianzero v. Wal-Mart Stores Inc., 2010 WL 1258071, at *3 (citing Milonas v. Williams, 691 F.2d at 938; Adamson v. Bowen, 855 F.2d at 676).  The Court thus finds that Lane's claims or defenses "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

## IV.   LANE WILL FAIRLY AND ADEQUATELY PROTECT THE INTERESTS OF THE CLASS.

Lane asserts that he is a satisfactory class representative.  Lane contends that he has no individual issues that cause him to be in any way antagonistic to the class, and he has hired well-qualified counsel to represent him and the class in this action.  Lane, therefore, requests that the Court certify his claims to proceed as a class action, appoint him as class representative, and appoint Coughlin Stoia as class counsel. See Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel . . . .").

The Defendants, however, contest whether Lane is a adequate class representative.  See Fed. R. Civ. P. 23(a)(4)("[T]he representative parties will fairly and adequately protect the interests of the class.").  The Defendants contend that Lane is a scofflaw and a ne'er-do-well, who is unworthy to represent the interests of lineal decedents of the loyal subjects of King Charles II of Spain.  The

Defendants contend that Lane is a convicted felon, financially irresponsible, and lacks credibility and candor in this action, making him unfit to be a class representative.

The Court finds that Lane can fairly and adequately protect the interests of the class. Lane and his counsel have no conflicts with other class members, and they have shown they will vigorously prosecute the action on behalf of the class. Moreover, the Court finds that, while the Defendant's concerns about Lane's ability to serve as a fiduciary have some force, his transgressions are mostly old, and his conduct in prosecuting this case demonstrate that he will vigorously and faithfully protect the class' interests. The Court thus finds that Lane is a suitable class representative.

### A. LANE AND HIS COUNSEL HAVE NO CONFLICTS WITH OTHER CLASS MEMBERS AND WILL VIGOROUSLY PROSECUTE THE ACTION ON BEHALF OF THE CLASS.

The Court finds that Lane will fairly and adequately protect the interests of the class. To protect the due-process interests of unnamed class members -- who are bound by any judgment in the action -- rule 23(a)(4) requires that the named representative provide fair and adequate protection for the class' interests. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. at 379 n.5 (characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d at 1277 ("Due process requires that the Court 'stringently' apply the competent representation requirement because class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings."). "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a) . . . ." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d at 1294. See Cobb v. Avon Prods., Inc., 71 F.R.D. at 654 ("Adequacy of the representative is of monumental importance since

-34-

representation demands undiluted loyalty to the class interests . . . .").  The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) will the named plaintiffs and their counsel vigorously prosecute the action on behalf of the class.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.  In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis. See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.  "Any doubt regarding adequacy of representation should be resolved in favor of . . . upholding the class." Schwartz v. Celestial Seasonings, Inc., 178 F.R.D. at 552; accord Neiberger v. Hawkins, 208 F.R.D. at 316.

Lane has common interests with the proposed class.  His claims are typical of those of the proposed class, and as such, he will directly benefit from a favorable resolution of the claims of the proposed class.  The typicality of Lane's claims and the community of interest presented by the common questions of law and fact support finding that he will adequately represent the proposed class.  Moreover, Lane has thus far vigorously prosecuted the interests of the proposed class through his chosen counsel and his work with them.  See Declaration of Lawrence Lane at ¶¶ 2-6, at 1 (executed January 5, 2009), filed January 5, 2009 (Doc. 117-1).  Through his attorneys, Lane has secured appointment as lead plaintiff and filed amended complaints in response to the discovery of new information concerning the allegedly false and misleading Proxy Statement and the Defendants' conduct.  He has also successfully defended the large majority of his claims against the Defendants' motions to dismiss, attended numerous hearings, and until merits discovery was held in abeyance, had begun an aggressive campaign to obtain discovery from defendants and third parties.  See Reply at 16.  Further, Lane has filed a declaration testifying to his active role in this litigation and his

commitment to serving zealously as a representative of the proposed class. See Lane Decl. ¶¶ 8-10, at 2. Lane has also engaged qualified, experienced, and capable attorneys for this type of litigation. See id. ¶ 11, at 2. See also Lopez v. City of Santa Fe, 206 F.R.D. at 289-90 (stating that the experience and competence of the attorney representing the class may inform the court's analysis). The Court thus finds that Lane has no conflicts with other class members and will vigorously prosecute the action on behalf of the class.

### B.   THE COURT FINDS LANE CAN OCCUPY THE ROLE OF FIDUCIARY TO THE CLASS.

"Even where [the requirements of adequacy of counsel and alignment of interests] are satisfied, however, named plaintiffs might not qualify as adequate class representatives because they do not possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative." Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 726 (11th Cir. 1987). Courts have characterized the class representative as standing as a fiduciary to the class. See, e.g., Robinson v. Gillespie, 219 F.R.D. 179, 186 (D. Kan. 2003)("Having a fiduciary obligation to the putative class, class representatives must have the character and means to carry out that obligation . . . ."); Edgington v. R. G. Dickinson & Co., 139 F.R.D. 183, 195 (D. Kan. 1991)(same); Kelley v. Mid-Am. Racing Stables, Inc., 139 F.R.D. 405, 409 (W.D. Okla. 1990)("[N]amed plaintiffs might not qualify as adequate representatives because they do not possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative."). In Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949), the Supreme Court stated:

> [A] stockholder who brings suit on a cause of action derived from the corporation assumes a position . . . of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all . . . are taken into his hands, dependent upon his diligence, wisdom and integrity.

-36-

Id. at 549-50.  The District Court for the Northern District of Illinois explained:

> We agree that it is crucial to consider with great care the suitability of the plaintiff to act as a class representative.  Such a representative serves as a guardian of the interests of the class and because of this fiduciary relationship he must be held to a high level of responsibility.  Such a representative owes to those whose cause he advocates a "duty of the finest loyalty" so eloquently defined by Judge Cardozo:
>
>> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior . . . .

Folding Cartons, Inc. v. Am. Can Co., 79 F.R.D. 698, 703 (N.D. Ill. 1978)(quoting Meinhard v. Salmon, 164 N.E. 545, 546 (1928)).

The Defendants contend that Lane is a scofflaw and a ne'er-do-well, unfit to stand as the representative of the lineal decedents of the loyal subjects of King Charles II of Spain.  Lane admits that he pled guilty to a felony charge of marijuana possession in the early 1980s in Kentucky, see Lane Depo. at 158:4-23, 161:16-162:8, and that he was convicted of leaving the scene of a motor vehicle accident which he caused in Santa Barbara in 2003 or 2004, see id. at 162:9-164:19.  Lane has not made payments towards his court-ordered restitution to his friend in over two years and still owes more than $10,000 in court-ordered restitution.  See id. at 186:12-187:16.  Lanes states that he wishes to make payments, but is financially unable, and has not worked with the court to make alternative arrangements.  See id. at 162:9-164:19.

Lane swore under oath that these two convictions were his only civil or criminal encounters with the law, but the Defendants performed a background search using Lane's name, birth date and social security number, which revealed three other incidents in which Lane ran afoul of the law: (i) in 1991, a Grand Jury indicted Lane for check fraud; (ii) in 1990, the New Mexico Educational

-37-

Assistance Foundation sued Lane for non-payment of a student loan, and default judgment was entered against him; and (iii) in 1990, the Veterans Administration sued Lane for recovery of payment of educational assistance for which Lane was not eligible, and default judgment was entered against him.  See Response at 14 (citations omitted).  In the court file of the 1991 Grand Jury Indictment, there is a bench warrant commanding that Lane be arrested for failing to appear at his arraignment.  See Response at 14 (citations omitted).  And in the student loan lawsuit, Lane was held in contempt of court for failing to appear for a deposition for which he had been served with a subpoena.  See Response at 14-15 (citations omitted).  The Defendants assert that there are therefore at least three documented instances between 1990 and 2005 in which Lane has either violated, disobeyed, or ignored Court orders, demonstrating that he does not have the necessary character to stand as a fiduciary to the class.

The Defendants further contend that counsel -- not Lane -- is driving this case.  Lane became involved in this case after responding to an attorney advertisement.  See Lane Depo. at 172:6-173:6. The Defendants note that Lane cannot say if any of the shareholders would have voted differently if they had known the information Lane contends was improperly withheld, and that he was aware of some of the information at the time of the vote, but did not attempt to distribute the information to other shareholders before the vote.  See Response at 12 (citing Lane Dep. at 114:7-118:22, 188:13-189:18, 207:4-17).[2]

------

[2] The Defendants also argue that, because Lane has admitted that he cannot pay for costs in this lawsuit and is financially vulnerable -- he has only $1,000.00 in his savings account and admitted he is almost insolvent -- the Court should not appoint Lane as the class representative.  See Response at 16-17 (citing Lane Depo. at 145:2-13, 160:1-3).  The Defendants further note, however, that "the Tenth Circuit Court of Appeals held in Sanderson v. Winner, 507 F.2d 477 (10th Cir. 1974) that a named plaintiff's financial condition was irrelevant."  Response at 17.  See Ditty v. Check Rite, 182 F.R.D. 639, 643 (D. Utah 1998)("Tenth Circuit long ago concluded that the personal

Lane replies that he has done nothing in this case to demonstrate he is a poor fiduciary, and that most of his past to which the Defendants point is twenty to thirty years old.  First, Lane asserts that, in January 1991, he began his military service abroad with the French Foreign Legion, rendering him unable to appear at his 1991 arraignment or deposition.  See Reply at 9.  Lane further contends that he was not personally served in any of the lawsuits.  See id. at 11.  Lane contrasts the incidents to which the Defendants point with his efforts in this case, where, Lane contends he has been a responsible and vigorous class representative, working closely with counsel late into the night, attending almost all of the hearings, participating in discovery, and attending the mediation.  See Reply at 1; Lane Decl. ¶¶ 3-5, at 1.  Lane contends that he has a command of the facts and claims, corresponds regularly with counsel, and has attended almost every hearing, showing that the class would be hard pressed to find a more dutiful representative.  See Reply at 2; Lane Decl. ¶¶ 3-6, at 1.  Lane also states that he selected his counsel after careful consideration, and his belief is that Coughlin Stoia will vigorously prosecute this matter.  See Lane Decl. ¶ 11, at 2.

The Court declines to find that Lane cannot fulfill the role of fiduciary to the class.  "[T]o defeat class representation, any allegations concerning the representative's adequacy must be relevant to the claims in the litigation."  Koppel v. 4987 Corp., 191 F.R.D. 360, 368 (S.D.N.Y. 2000).  While the Court finds Lane's failure to comply with court instruction troubling, the Court is not prepared to say that events from approximately twenty-years ago demonstrate that Lane is a poor fiduciary in light of his efforts in prosecuting this case.  The events are "too unsubstantiated

---

finances of class action plaintiffs are not even a relevant inquiry where the court . . . is otherwise satisfied that the costs of notice will be met."  (citing Sanderson v. Winner, 507 F.2d at 479-80)).  The Defendants do not suggest that class counsel will not advance the cost of notice to the class.  Consequently, the Court will not preclude Lane from acting as class representative because of his financial circumstances.

and attenuated, in time and subject matter, to seriously call into question his ability to pursue this litigation and protect the interests of the proposed class."  Koppel v. 4987 Corp., 191 F.R.D. at 368. Moreover, Lane's  failure to pay court-ordered restitution does not directly relate to this case. "According to a leading commentator on class actions, most courts have rejected challenges to class representatives based on allegations of 'unrelated unsavory, unethical, or even illegal conduct.'" McCall v. Drive Fin. Servs., L.P., 236 F.R.D. 246, 251 (E.D. Pa. 2006)(citing 1 Newberg, supra, §3:36).  Courts reason that such conduct is "irrelevant to the issue of adequacy to represent a class for particular claims or issues."  McCall v. Drive Fin. Servs., L.P., 236 F.R.D. at 251.  The Court does not believe Lane's past incidents -- most of which are fairly old -- are a good indication of how he will in his capacity of class representative.  Whatever Lane's past issues may be, he has been diligent in prosecuting this case, and The Court thus finds that Lane satisfies the requirements of 23(a)(4).

## V.    RULE 23(B)(3)'S REQUIREMENTS ARE SATISFIED.

Lane seeks class certification of this case under rule 23(b)(3), which permits "class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be excluded."  Amchem Prods. v. Windsor, 521 U.S. at 614-15.  The Defendants do not dispute that the class satisfies the requirements of rule 23(b)(3).  Under this subsection of rule 23, the Court must find that: (i) the questions of law or fact common to class members predominate over any questions affecting only individual members; and (ii) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  See Fed. R. Civ. P. 23(b)(3).  The Court finds that both of these requirements are satisfied here.

### A.    COMMON QUESTIONS OF LAW AND FACT PREDOMINATE.

In Amchem Products. v. Windsor, the Supreme Court held that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud."  521 U.S. at 625.  See Basic Inc. v. Levinson, 485 U.S. 224, 250 (1988)("It is not inappropriate to apply a presumption of reliance supported by the fraud-on-the-market theory[;] [t]hat presumption, however, is rebuttable."); 7 Newberg, supra, §22:55, at 248-49 ("In most cases, common issues of liability are deemed to predominate even when reliance and damages issues must be individually proved.").  For many of the same reasons that the class satisfies the commonality requirement, the Court finds that the predominance standard of rule 23(b)(3) is satisfied, as these numerous common questions predominate over any perceived or potential individual issues.  See Amchem Prods. v. Windsor, 521 U.S. at 625.  Specifically, the TAC's allegations present questions of law and fact common to the members of the class, including, in connection with the SunCal Merger: (i) whether the Defendants violated §14(a) and/or §20(a) of the Exchange Act and Securities and Exchange Commission Rule 14a-9; (ii) whether the Defendants omitted and/or misrepresented material facts; (iii) whether the Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (iv) whether Lane and the other members of the class have been damaged as a result of the Defendants' conduct.  The Defendants have not identified any individual questions of fact or law.  Accordingly, the Court finds that common questions, at least at this stage of proceedings, predominate over any individual questions.

### B.    A CLASS ACTION IS SUPERIOR TO OTHER METHODS FOR RESOLVING THIS DISPUTE.

"[T]he superiority of class actions in large securities fraud is well recognized."  In re Intelcom Group Sec. Litig., 169 F.R.D. at 149.  Lane alleges the Defendants made false and

misleading representations in the Proxy Statement that caused the same harm to the proposed class members, many of whose individual damage claims may not be sufficiently large to warrant individual litigation.  Under these circumstances, class action treatment is superior to a possible multiplicity of separate actions.  As the honorable Chief Judge Babcock of the United States District Court for the District of Colorado stated when certifying a class in a securities case:

> [T]he class action device is a superior vehicle for adjudicating this case.  Securities fraud actions of this type involve geographically disbursed plaintiffs and involve such costs that if this litigation was not brought via class action, the costs of litigation would likely outweigh any benefit obtained.  Through the class action device, I will be able to manage the issues effectively and efficiently and ensure a speedy resolution to all issues involved.

In re Ribozyme Pharms., Inc. Sec. Litig., 205 F.R.D. at 579.  Accord Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp., 183 F.R.D. 687, 695 (D. Colo. 1998).  Moreover, class certification in this case presents substantial efficiencies of time and expense to all parties involved.  Phillips Petroleum Co. v. Shutts, 472 U.S. at 809 ("Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually.").

> First, relitigation of the same issues and presentation of the same evidence in hundreds of individual actions . . . would be grossly inefficient and wasteful of judicial resources.  Second, maintenance of individual actions would be prohibitively expensive.  Many of the crucial issues in this case will require substantial discovery, expert testimony, and trial time, all of which would render uneconomical individual actions.

In re Intelcom Group Sec. Litig., 169 F.R.D. at 149 (internal quotation marks and citation omitted).  The Court thus finds that allowing this action to proceed as a class is superior under rule 23(b)(3).  See City P'ship v. Jones Intercable, Inc., 213 F.R.D. at 590 (finding superiority requirement for class certification was satisfied in securities fraud suit based on false and misleading statements in proxy statements).

-42-

## VI.     LANE HAS ADEQUATELY PLED DAMAGES.

The Defendants argued in their Response that "Plaintiff has failed to allege sufficient facts concerning damages to enable the Court to characterize the purported class as a damages class under Rule 23(b)(3)."  Response at 2, 18-22.  Lane contends, however, after their Response was filed, the Court comprehensively analyzed the issue of damages and plaintiff's facts alleged in support.  See MO at 23-29 ("[Lane] sets forth . . . a causal chain from the misrepresentations to the transaction, to the alleged damages. It is not immediately apparent what more a defendant could desire at the pleading stage.").  At the October 12, 2010 hearing, the Defendants did not dispute that the MO mooted their damages argument.  Because the Court has addressed and rejected in its MO the Defendants' argument that Lane failed to allege damages, it concludes that the argument against certifying the class is moot.

**IT IS ORDERED** that: (i) the Plaintiff's Notice of Re-filing Lead Plaintiff's Motion for Class Certification, filed August 5, 2010 (Doc. 218), is granted; (ii) the Court certifies the class of all persons who held the outstanding shares of Westland Development Co. no par value Class A common stock as of the close of business on September 18, 2006, excluding the Defendants;[3] (iii) the Court certifies Plaintiff Lawrence Lane as the class representative; (iv) the Court appoints

---

[3] Excluded from the class are: (i) Defendant Westland Development Company, Inc.; (ii) Defendants Barbara Page, Sosimo S. Padilla, Joe S. Chavez, Josie Castillo, Charles V. Pena, Georgia Baca, Troy K. Benavidez, Ray Mares, Jr., and Randolph M. Sanchez; (iii) Defendant SunCal, which is comprised of SCC Acquisition Corp., a Delaware corporation, formed solely for the purpose of acquiring Westland, its parent SCC Acquisitions, Inc., a California corporation, and the affiliates of the SunCal Companies Group; and (iv) Defendant D.E. Shaw Group, which is comprised of several affiliated entities including, among other affiliates, D.E. Shaw & Co., L.P., D.E. Shaw Real Estate Portfolios 1, LLC, D.E. Shaw & Co., LLC, D.E. Shaw & Co., Inc., D.E. Shaw Investment Group, LLC and D.E. Shaw & Co. II, Inc.; also excluded are all of the officers and directors of the aforementioned Defendants, their immediate families and their legal representatives, heirs, successors and/or assigns and any entity in which any defendant has a controlling interest.

Coughlin Stoia Geller Rudman & Robbins LLP as class counsel; and (v) the Court defines that class

claims as: (a) against all the Defendants for violations of §14(a) of the Securities Exchange Act of

1934, 15 U.S.C. § 78n(a), and rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; and (b)

against the individual Defendants, SunCal and the D.E. Shaw Group for violation of § 20(a) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78t.


_____

UNITED STATES DISTRICT JUDGE


*Counsel:*

Nicholas Koluncich, III
Law Offices of Nicholas Koluncich
Albuquerque, New Mexico

-- and --

Joe Kendall
Provost Umphrey Law Firm, LLP
Dallas, Texas

-- and --

Darren J. Robbins
Brian O. O'Mara
G. Paul Howe
Randall J. Baron
David W. Mitchell
Danielle S. Myers
Coughlin Stoia Geller Rudman & Robbins, LLP
San Diego, California

   *Attorneys for the Plaintiffs*

Richard A. Sandoval
Law Offices of Richard A. Sandoval
Albuquerque, New Mexico

     *Attorney for Plaintiff-Intervenor Frank Martin*

Douglas G. Schneebeck
Brian K. Nichols
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

     *Attorneys for Defendants Westland Development Company, Inc.*
       *and SunCal Companies Group*

Greg L. Weselka
Evan P. Singer
Jones Day
Dallas, Texas

     *Attorneys for Defendant SunCal Companies Group*

Juan L. Flores
Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Albuquerque, New Mexico

-- and --

Paul Bessette
Jesse Z. Weiss
Kimberly G. Davis
Christopher W. Ahart
Yusuf A. Bajwa
Greenberg Traurig, LLP
Austin, Texas

     *Attorneys for Defendants Barbara Page, Sosimo S. Padilla, Joe E. Chavez,*
       *Josie Castillo, Charles V. Pena, Georgia Baca, Troy K. Benavidez,*
       *Ray Mares, Jr., and Randolph M. Sanchez*

Trent A. Howell
Jacqueline E. Davis
Holland & Hart, LLP
Santa Fe, New Mexico

-- and --

John D. Lovi
Lara E. Romansic
Michelle M. Oliver
Steptoe & Johnson, LLP
New York, New York

*Attorneys for Defendants D.E. Shaw Group, D.E. Shaw & Co. L.P.,*
*D.E. Shaw Real Estate Portfolios 1, LLC, D.E. Shaw & Co. LLC,*
*D.E. Shaw & Co., Inc., D.E. Shaw Investment Group, LLC,*
*D.E. Shaw & Co. II, Inc., George Rizk, and Anne Dinning*