UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| LAWRENCE LANE, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | No. Civ-06-1071-JB-ACT |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | DECLARATION OF DARREN J. ROBBINS IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT |
| BARBARA PAGE, et al., | ) ) | |
| Defendants. | ) ) | |
| ———————————————— | ) | |

680449_1

**TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ...................................................................3

II.    HISTORY OF THE LITIGATION ............................................................5

     A.    The State Actions ........................................................................5

     B.    The New Mexico Court of Appeals.............................................12

     C.    The Federal Action ....................................................................13

III.   THE SETTLEMENT ..............................................................................20

     A.    The Parties' Settlement Negotiations.........................................20

     B.    Preliminary Approval of the Settlement and Mailing and Publication of Notice of Settlement ...............................................................23

IV.   FACTORS TO BE CONSIDERED IN SUPPORT OF FINAL APPROVAL OF THE SETTLEMENT ...............................................................................24

     A.    The Settlement Was Fairly and Aggressively Negotiated by Counsel .................24

     B.    Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt ......................................................25

     C.    The Judgment of the Settling Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement ...........26

V.    THE NEGOTIATED AMOUNT OF ATTORNEYS' FEES AND EXPENSES ARE REASONABLE .............................................................................26

VI.   CONCLUSION.......................................................................................31

I, DARREN J. ROBBINS, declare:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California and I have been admitted *pro hac vice* in this case.  I am a member of the law firm of Robbins Geller Rudman & Dowd LLP, Lead Counsel for Plaintiff and the Class in the above-captioned action.  I submit this declaration in support of Lead Plaintiff's Motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for: (a) final approval of settlement of this action; and (b) payment of attorneys' fees and expenses.  I have been actively involved in the initiation, prosecution and resolution of the State and Federal Actions (collectively, the "Litigation") and am familiar with the proceedings.  I have personal knowledge of the matters set forth herein based upon my active supervision and participation in the Litigation, including the negotiation of the Settlement.[1]

2.      This Action was brought by Lead Plaintiff Lawrence Lane on behalf of himself and all other shareholders of Westland Development Company, Inc. ("Westland" or the "Company") whose shares were purchased by SCC Acquisition Corp. and its affiliates (collectively, "SunCal") together with D.E. Shaw Real Estate Portfolios 1, L.L.C. and its affiliates (collectively, the "DESCO Defendants") in connection with the July 19, 2006 agreement and plan of merger entered into by and between Westland and SunCal (the "Merger Agreement").  Lead Plaintiff alleged violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 promulgated thereunder by the Securities and Exchange Commission ("SEC").  15 U.S.C. §§78n(a) and 78t(a); 17 C.F.R. §240.14a-9.

---

[1]      Unless otherwise indicated, all capitalized terms herein have the same meaning as in the Stipulation of Settlement previously filed with the Court on December 9, 2011.  *See* Dkt. No. 363.

- 1 -

3.      The Stipulation of Settlement dated as of November 11, 2011 (the "Stipulation"),
provides for the creation of an interest-bearing Escrow Account consisting of: (i) a cash payment of
$1,500,000 by the DESCO Defendants; and (ii) a cash payment of $2,278,702.41, as well as an
additional $14,806.84 deposited by Modrall Sperling (the "Remaining Merger Consideration").
Combined, the amounts deposited into the Escrow Account will total $3,793,509.25, plus accrued
interest.

4.      The Settlement resolves all claims asserted by Lead Plaintiff and the Class against all
Defendants, including: (i) Barbara Page, Sosimo S. Padilla, Joe S. Chavez, Josie Castillo, Charles V.
Peña, Georgia Baca, Troy K. Benavidez, Ray Mares, Jr., Randolph M. Sanchez (collectively, the
"Director Defendants"); (ii) Westland Development Company, Inc. ("Westland"); (iii) SCC
Acquisition Corp., SunCal Companies Group, SCC Acquisitions, Inc., SCC NM Member LLC, SCC
Westland Venture LLC, Westland DevCo, LLC, Westland DevCo, LP, Westland Holdco, Inc.,
Westland SPE GP LLC (collectively, the "SunCal Defendants");[2] and (iv) The D. E. Shaw Group,
D.E. Shaw & Co. L.P., D.E. Shaw Real Estate Portfolios 1, L.L.C., D.E. Shaw & Co., LLC, D.E.
Shaw & Co., Inc., D.E. Shaw Investment Group, LLC, D. E. Shaw & Co. II, Inc., George Rizk and
Anne Dinning (collectively, the "DESCO Defendants").[3]

---

[2]      These entities were named as defendants in one or more of the Federal and State Actions.
The SunCal Defendants have asserted that SunCal Companies Group was never a legal entity and
that one or more of these entities no longer exist.

[3]      The DESCO Defendants assert that although Plaintiff named "The D.E. Shaw Group" as a
defendant in the Federal and *Rael* Actions, no such legal entity exists.  Instead, the DESCO
Defendants assert that "The D.E. Shaw group" is an informal term sometimes used to refer to one or
more affiliated entities.

680449_1

5.     This Declaration sets forth the nature of the claims asserted, the principal proceedings to date, the legal services provided by Counsel for Lead Plaintiff Lawrence Lane and the Class, the parties' settlement negotiations, and demonstrates why the Settlement is fair, reasonable and adequate and in the best interests of the Class and why the attorneys' fee payment and reimbursement of expenses is reasonable and should be approved by the Court.

## I.     PRELIMINARY STATEMENT

6.     Prior to filing this Action on November 3, 2006, Plaintiffs' Counsel actively investigated, researched and litigated the State Actions, including the *Rael* Action, against the Initial *Rael* Defendants in the State Court.  Lead Counsel thoroughly reviewed and analyzed publicly available information regarding Westland, which included its SEC filings and financial statements as well as media reports and press releases about the Company.

7.     From the inception of the State Action in February 2006 through settlement in November 2011, the Litigation has been vigorously prosecuted.  Defendants asserted aggressive defenses at every stage of the Litigation.  The Settlement was achieved only after Lead Counsel: (i) moved for a preliminary injunction and temporary restraining order on the eve of the shareholder vote; (ii) successfully opposed two rounds of motion to dismiss briefing; (iii) convinced the New Mexico Court of Appeals, through extensive briefing and oral argument, to reverse the State Court's dismissal of the *Rael* Action and successfully opposed Defendants' Petition for Writ of Certiorari to the New Mexico Supreme Court;[4] (iv) obtained certification of the Class over Defendants' aggressive opposition; (v) conducted extensive discovery, including reviewing and analyzing over

---

[4]     *See Rael v. Page*, 2009 NMCA 123, 147 N.M. 306, 222 P.3d 678 (N.M. Ct. App. 2009), *writ denied*, *Rael v. Page*, 147 N.M. 422, 224 P.3d 649 (N.M. 2009).

250,000 pages of documents produced by Defendants and non-party witnesses; (vi) conducted 38 fact witness depositions; (vii) responded to discovery propounded by Defendants and produced thousands of pages of documents in response to Defendants' document requests; (viii) prepared lengthy, detailed responses to contention interrogatories and requests for admission; (ix) successfully litigated numerous complex discovery motions; (x) produced expert reports for three testifying experts; and (xi) commenced trial preparation, including the selection of exhibits and testimony to be used at trial.

8.      The substantial discovery, motion practice and trial preparation informed Lead Counsel and Lead Plaintiff that, while the Class's case had certain strengths, it also had significant weaknesses, which were conscientiously evaluated in determining the best course of action for the Class.  As set forth herein, despite the fact that certain of Plaintiff's allegations were supported by the documentary evidence as well as deposition testimony, there remained many uncertainties with respect to Plaintiff's case.  On balance, considering all of the facts and circumstances, including the risks faced if this Action continued to trial, Lead Plaintiff and Lead Counsel concluded that the settlement as memorialized in the Stipulation was fair, reasonable and adequate and in the best interests of the Class.

9.      For the past five years, Plaintiffs' Counsel have prosecuted the Litigation on a wholly contingent basis and have advanced all expenses associated with the Litigation.  In doing so, Plaintiffs' Counsel shouldered the risk of an unfavorable result.  To date, Plaintiffs' Counsel have received no compensation for their effort.

10.     Lead Counsel separately negotiated an attorneys' fee and expense reimbursement payment to be paid to Plaintiffs' Counsel for their substantial efforts on behalf of the Class in the Litigation.  As a result of those negotiations, the Director Defendants' directors and officers

- 4 -

("D&O") insurance carrier will, subject to approval of this Court, reimburse Plaintiffs' Counsel for expenses incurred in connection with the Litigation in an amount not to exceed $650,000. Lead Counsel also negotiated with the D&O insurance carrier to pay an attorneys' fee of $3.1 million. The reimbursement of expenses and attorneys' fee payment is warranted in light of the substantial pre- and post-merger benefits conferred on the Class, the risks undertaken, the quality of the representation, and the nature and extent of the legal services performed. This reimbursement of expenses and attorneys' fee payment represents a significant discount to the actual time and expense incurred by Plaintiffs' Counsel. Both the Settlement and the attorneys' fee payment and expense reimbursement are supported by the Lead Plaintiff.

11.     Lead Plaintiff seeks $4,725 as permitted under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), for the time he expended overseeing the this Action. Lead Plaintiff's investment of time and effort in overseeing this PSLRA action over the past five years is unprecedented in my experience. Lead Plaintiff helped draft and/or comment on almost every significant pleading, was present at nearly every hearing and attended many fact depositions. Lead Plaintiff's active participation in this case contributed significantly to the success of the Litigation.

12.     The following is a summary of the nature of the Class's claims, the principal events that occurred during the course of the Litigation, and the legal services provided by Plaintiffs' Counsel.

## II.     HISTORY OF THE LITIGATION

### A.     The State Actions

13.     Prior to the execution of a merger agreement with ANM Holdings, Inc. ("ANM") on February 1, 2006, Westland's no par shares were facially restricted to heirs of the Incorporators of the Atrisco Land Grant, and privately traded among these persons at approximately $20 per share.

14.     On February 1, 2006, Westland executed a merger agreement with ANM to sell Westland for $200 per share, or $166 million.

15.     A few weeks later, on February 21, 2006, plaintiff Rachel M. Stubbs filed a complaint in connection with the ANM merger in the State Court against the Initial *Rael* Defendants, captioned *Stubbs v. Page*, No. D-202-CV-2006-01453, alleging that the Director Defendants violated their fiduciary duties.  Among other things, the *Stubbs* complaint alleged that Westland's directors stood to gain $26 million (including $3.2 million worth of golden parachute termination payments and another $7 million via 35,000 "change in control" Class B shares they issued to themselves in anticipation of a merger) if the merger went forward.  The *Stubbs* complaint also alleged that the ANM merger agreement was unfair to Westland's shareholders because terms of the merger did not represent fair or full value for the Company's assets, including Westland's future oil and gas revenues.  The *Stubbs* complaint sought injunctive relief to compel defendants to comply with their fiduciary obligations and also sought to impose a constructive trust over the oil and gas rights then-owned by Westland, to require defendants to create and fund a permanent "cultural heritage committee" and set aside funds to operate the Atrisco cemetery's and historic churches in perpetuity.

16.     Shortly after the initial *Stubbs* action was filed, on February 24, 2006, Westland terminated its agreement with ANM and executed a merger agreement with SHNM, a wholly-owned subsidiary of Sedora Holdings, LLC.  The SHNM merger agreement provided that Westland's shareholders would be paid $255 per share.  In addition, SHNM agreed to contribute $1 million for 100 years following the closing of the merger into a trust for the charitable purpose of promoting and preserving the ancestral heritage of Westland's shareholders and history of the Atricso Land Grant and otherwise serving the local community.

680449_1

17.     Thereafter, three additional shareholder complaints were filed in the State Court: (i) the *Rael* Action; (ii) *Lane v. Page*, No. D-202-CV-2006-02055 (filed on March 13, 2006); and (iii) *Apodaca v. Pag*e, No. D-202-CV-2006-02144 (filed on March 16, 2006).  In the interests of efficiency and judicial economy, the parties deemed the *Rael* Action the lead case.  In addition to challenging the SHNM merger, the *Rael* Action also sought declaratory and injunctive relief ordering Westland to convene an annual meeting.[5]

18.     The *Rael* Action also challenged the issuance of 35,000 change-in-control Class B shares to the Director Defendants.  Subsequent to the filing of the *Rael* Action, SHNM and Westland amended the SHNM merger agreement on April 5, 2006, in order to clarify that the 35,000 Class B shares would not be issued and, because the aggregate merger consideration remained the same, the per share consideration to be paid with respect to all outstanding shares was therefore increased from $255.00 per share to $266.23 per share.  The existence of the *Rael* Action was a factor in the Westland Board's decision to waive the Director Defendants' claim to 35,000 "change-in-control" shares.  *See* Stipulation, §5.2.

19.     Between March and May 2006, many of the Initial *Rael* Defendants exercised *in seriatim* their peremptory election to excuse the judge(s) assigned to hear the State Actions.  The parties were largely unable to have substantive motions heard as the State Court reassigned the State Actions from judge to judge.  The parties also began negotiating an agreement to consolidate the State Actions before a single judge to enable the cases to proceed in an orderly and coordinated manner.

---

[5]     Westland had not held a shareholder meeting for nearly 16 months (since November 19, 2004) and New Mexico law requires New Mexico corporations to hold an annual meeting at least every 13 months.

20.     Also beginning in March 2006, Plaintiffs' Counsel served document requests, interrogatories, and deposition notices in the *Rael* Action on each of the Initial *Rael* Defendants. Plaintiffs' Counsel also served subpoenas on numerous third parties, including Jim Rhodes (principal with SHNM), Thad Turk (Westland's attorney), and Rick Jenson and Mike Conroy (representatives with Westland's valuation expert, CBIZ).  The discovery required numerous, weekly meet-and-confer sessions with defendants' counsel to, among other issues, attempt to narrow the scope of the requests and ensure a timely production well in advance of the shareholder vote. Many of the subpoenaed third-parties opposed the discovery by filing motions for protective orders, which Plaintiffs' Counsel opposed.  Between May and July 2006, the parties engaged in document and deposition discovery and litigated multiple motions to compel/quash subpoenas.  In light of the complexity of this Action, the significant number of parties and non-parties, and the volume of pleadings and discovery served, a Special Master was appointed to assist the parties and non-parties with the numerous issues that arose during the Spring and Summer of 2006.

21.     Throughout March and April 2006, Plaintiffs' Counsel repeatedly demanded, on behalf of plaintiff Rael, that Westland hold its annual shareholder meeting to vote on the election of Class C directors.  On April 24, 2006, Westland filed a definitive proxy statement with the SEC which set June 8, 2006 as the date for a shareholder vote on the Class C directors and on whether to approve the SHNM merger agreement.  The existence of the *Rael* Action was a factor in the Westland Board's decision to convene an annual shareholder meeting on June 8, 2006.  *See* Stipulation, §5.2.

22.     Also between April and June 2006, Plaintiffs' Counsel reviewed approximately 13 boxes of documents (roughly 33,000 pages) produced by defendants and third parties and took five

- 8 -

depositions, including the depositions of Barbara Page, Sosomo Padilla, Gil Cordova, and Westland's valuation experts (CBIZ).

23.    On May 23, 2006, Westland received a preliminary acquisition proposal from SunCal and on May 30, 2006 received a formal offer to acquire, through a merger with SCC, all of the outstanding shares of Westland's common stock for $280 per share.  On May 31, 2006, Westland's board of directors determined that the SunCal acquisition proposal was a "superior proposal" to the SHNM merger agreement and gave SHNM until June 5, 2006 to revise the merger agreement so that the SunCal offer would no longer be superior.

24.    The next day, on June 1, 2006, Westland issued a press release announcing that it had received the SunCal $280 per share offer which the Westland Board deemed "superior" to SHNM's $266.23 per share offer.  The press release also warned that because of the rapidly changing landscape regarding offers to acquire Westland, Westland did not believe a vote with respect to any merger agreement would occur on June 8, 2006, but that the Company intended to proceed with the election of directors at the special meeting of shareholders.

25.    On June 5, 2006, Westland and SHNM amended and restated the SHNM merger agreement whereby the merger consideration to be received by Westland shareholders was increased from $266.23 to $305 per share.  The revised agreement also provided that the surviving company in the merger would contribute to a newly formed charitable organization, the Atrisco Heritage Foundation at a rate of $1 million per year, and would also contribute to the Atrisco Heritage Foundation 100% of the royalties, if any, received under Westland's existing oil and gas leases and 50% of the royalties, if any, received from any oil and gas leases entered into subsequent to the merger.

26.    The next day, Westland received a new proposal from SunCal for $308 per share.

- 9 -

27.     On June 8, 2006, Westland held its special meeting of shareholders and three Class C directors were elected.

28.     On June 13, 2006, Plaintiffs' Counsel sent a written demand to Westland and its Board of Directors on behalf of plaintiff Rael to inspect the proxies submitted by shareholders during the June 8, 2006 special meeting.  Over the next month, the parties negotiated the terms of an inspection of the proxies by Plaintiffs' Counsel.  In July 2006, Plaintiffs' Counsel, as well as a proxy expert from Innisfree, inspected the proxies at the offices of Moss Adams.  The proxies were also tabulated and inspected by the Special Master.

29.     Between June 15, 2006 and June 30, 2006, Westland received several offers and counter-offers from SHNM and SunCal.  Ultimately, SunCal's $315 per share offer was deemed "superior" and the SHNM merger agreement was terminated.  SCC Acquisition Corp. considered the allegations in the *Rael* Action in connection with its May 23, 2006 $280 per share offer, its June 6, 2006 $308 per share offer, and its June 30, 2006 $315 per share offer.  *See* Stipulation, §5.5.

30.     On July 18, 2006, Westland's Board of Directors met to formally approve the SunCal Merger Agreement, which was entered into on July 19, 2006.  In determining that SunCal's acquisition proposal was a "superior proposal" over SHNM's acquisition proposal, the Westland Board was aware of the *Rael* Action and its claims that the SHNM offer significantly undervalued Westland.  *See id.*, §5.3.  The Director Defendants also acknowledge that SunCal's $315 per share offer that Westland shareholders voted on at the November 6, 2006 shareholder meeting was $60 per share higher than the SHNM $255 per share offer that the Director Defendants agreed to on February 24, 2006, prior to being named as defendants in the *Rael* Action for, among other things, failing to maximize shareholder value.  *Id.*, §5.4.

- 10 -

31.     On June 21, 2006, the Initial *Rael* Defendants filed a motion to dismiss the complaint. A week later, on June 28, 2006, certain of the Initial *Rael* Defendants moved to stay discovery until a new proxy was filed.  Plaintiffs' Counsel opposed their efforts to stay discovery.  The Initial *Rael* Defendants filed reply briefs on July 6, 2006.  On July 17, 2006, the Special Master issued a report granting the Initial *Rael* Defendants' motion to stay discovery until a new proxy was filed.

32.     On September 20, 2006, Westland filed its Proxy with the SEC in connection with the SunCal Merger.  The same day, Plaintiffs' Counsel began to meet-and-confer with defendants' counsel regarding scheduling of nine additional depositions and document production.   On September 27, 2006, plaintiff Rael filed an amended complaint.  Thereafter, during September, October and November 2006, Plaintiffs' Counsel reviewed an additional 25 boxes of documents (roughly 63,000 pages) and took six additional depositions of defendants Barbara Page, Tony Benavidez, Ray Mares and Randolph Sanchez as well as Westland's counsel Thad Turk and one of Westland's Vice Presidents, Brent Lesley.

33.     On October 10, 2006, Plaintiffs' Counsel prepared and served expert reports.  The Initial *Rael* Defendants served expert reports on or about October 27, 2006.  The Initial *Rael* Defendants took the depositions of plaintiff Rael's valuation expert, proxy/shareholder expert, and water rights expert. Plaintiffs' Counsel's extensive efforts to develop a comprehensive and detailed factual record throughout the summer and early fall of 2006 were, in large part, undertaken with the intent to seek a preliminary injunction and temporary restraining order to halt the sale of Westland until such time as the Initial *Rael* Defendants complied with their fiduciary obligations to maximize shareholder value and refrain from self-dealing and/or until full and accurate information could be disseminated to shareholders to allow a truly informed vote on the Merger.

34.     On October 5, 2006, the Initial *Rael* Defendants filed supplemental briefing requested by the State Court in connection with their motion to dismiss the complaint.  Plaintiffs' Counsel filed an opposition one week later, and the motion was heard on October 19, 2006.  On November 2, 2006 – two business days before the shareholder meeting which concluded voting on the Merger – the State Court issued a one-page order granting the Initial *Rael* Defendants' motion to dismiss because, among other grounds, plaintiff Rael lacked standing, the exclusive remedy for plaintiff Rael and the Class was the right of appraisal, and plaintiff Rael had failed to join an indispensable party.

**B.     The New Mexico Court of Appeals**

35.     On December 21, 2006, plaintiffs' *Rael* appealed the State Court's dismissal order.

36.     Briefing on appeal was suspended as a result of the parties' mediation efforts.  On January 22, 2008, Plaintiffs' Counsel in the *Rael* Action filed the opening brief, arguing, among other things, that (a) the New Mexico Supreme Court's controlling ruling in *McMinn* clearly established that New Mexico's appraisal statute did not foreclose plaintiff's claims for breach of fiduciary duty; (b) appraisal was not an adequate remedy; and (c) the *Rael* Complaint should not have been dismissed for failure to join SunCal as a necessary party.  Defendants' opposition brief was filed on July 21, 2008, and plaintiff Rael's reply brief was filed on October 6, 2008.

37.     Oral argument was held on March 13, 2009.  On August 13, 2009, the New Mexico Court of Appeals reversed the lower court's ruling on the issues of standing, the exclusivity and adequacy of appraisal pleadings, and failure to join parties.  *Rael v. Page*, 2009 NMCA 123, 147 N.M. 306, 222 P.3d 678 (2009).

38.     Thereafter, on September 2, 2009, defendants filed a Petition for Writ of Certiorari with the New Mexico Supreme Court.  Plaintiff Rael answered the petition on September 18, 2009, and the petition was denied by the New Mexico Supreme Court on September 30, 2009.

- 12 -

39.     The *Rael* Action was remanded back to State Court and a status conference was held on December 22, 2009.  In March 2010, plaintiff Rael filed a Second Amended Complaint to include additional parties and refine the post-merger allegations.   The parties also began engaging in discovery, including serving witness lists and requests for production of documents.  After multiple defendants began exercising their peremptory election to excuse the assigned judge, the parties also negotiated and ultimately agreed to the assignment of the State Actions to Judge Campbell.

40.     Plaintiffs' Counsel also issued a subpoena to Barclays Capital Real Estate, which Barclays moved to quash.  Plaintiffs' Counsel opposed the motion to quash, and a hearing was held in June 2010.  During the hearing, Plaintiffs' Counsel and Barclays' counsel were able to establish a framework for compromising on document production.  The negotiations continued over the next several weeks until the parties were able to finally agree on the terms of the production of documents.  Barclays ultimately produced about 4,500 pages of documents which Plaintiffs' Counsel reviewed in connection with a deposition of one of its representatives.

41.     Certain of the defendants answered the complaint, while others filed motions to dismiss which required full briefing by the parties.  The defendants also moved to stay the State Actions in favor of this Action, which plaintiff Rael opposed, preferring coordination between the two actions to the extent possible.  In April 2011, the State Court stayed the State Actions in favor of the Federal Action.

C.     **The Federal Action**

42.     On November 3, 2006, plaintiff Lawrence Lane filed a securities class action complaint in this Court in connection with the Merger asserting violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9.  *See* Dkt. No. 1. Also on November 3, 2006, plaintiff filed an emergency motion for a temporary restraining order

- 13 -

("TRO") to enjoin the shareholder vote on the Merger because he alleged that the Proxy was materially false and misleading.  The Court held a five-hour hearing on the TRO motion  on November 3, 2006, before denying the TRO application because, while plaintiff raised questions of fact and law, the Court determined that plaintiff did not meet the substantial burden of showing a clear and unequivocal right that there was a substantial likelihood plaintiff would prevail on the merits.

43.     At the close of voting on November 6, 2006, both classes of outstanding shares of Westland stock voted in excess of the two-thirds vote required for ratification of the Merger, with shares not voting counted against ratification.  The Merger closed on December 7, 2006.

44.     Pursuant to the PSLRA, Lead Counsel published notice of the right to move the Court to be appointed as lead plaintiff in *Investors' Business Daily* and the *Albuquerque Journal* on November 20, 2006.  *See* Dkt. No. 28, Ex. A.  Within the sixty day deadline, Lawrence Lane filed his Motion for Appointment as Lead Plaintiff and for Approval of His Selection of Lead Counsel. *See* Dkt. No. 27.  Mr. Lane was the only Class member who timely moved the Court for appointment as lead plaintiff.

45.     On February 5, 2007, Frank Martin filed a Motion to Intervene, seeking to have the PSLRA notice republished.  Dkt. No. 29.  Plaintiffs' Counsel opposed the Motion to Intervene, arguing that it was procedurally and substantively deficient.  Plaintiffs' Counsel also filed a Motion to Strike Mr. Martin's untimely reply brief.  Dkt. No. 36.

46.     The Court held an hour-long hearing on the Motion for Appointment as Lead Plaintiff and the Motion to Intervene on June 20, 2007.  Thereafter, on July 2, 2007, the Court appointed Lawrence Lane as Lead Plaintiff and approved Lead Plaintiff's selection of counsel now known as

Robbins Geller Rudman & Dowd LLP as Lead Counsel.  *See* Dkt. No. 43; *see also Lane v. Page*, 250 F.R.D. 634 (D.N.M. 2007).

47.     Over the next several months, Lead Plaintiff and Plaintiffs' Counsel reviewed the factual materials gathered throughout 2006 and prepared an amended complaint.  On September 17, 2007, Lead Counsel filed a detailed, 67-paragraph amended complaint on behalf of all persons whose shares of Westland were purchased by SCC Acquisition Corp. in connection with the Merger Agreement against Westland, the Director Defendants, and certain SunCal Defendants, for disseminating an allegedly materially false and misleading proxy statement in violation of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder ("Amended Complaint").  *See* Dkt. No. 50.

48.     On December 3, 2007, certain defendants filed motions to dismiss the Amended Complaint.  *See* Dkt. Nos. 52 and 53.  Pursuant to the PSLRA, all proceedings were stayed during the pendency of defendants' motions to dismiss.

49.     On May 23, 2008, the Court heard oral argument on defendants' motions to dismiss. In June 2008, the Settling Parties (except for the DESCO Defendants, who at the time were not parties to the State Actions or this Action) conducted a mediation session before a retired judge in California.  The mediation was not successful.

50.     While not a party to the Litigation, a representative of the D.E. Shaw group attended the mediation in June 2008.  Thereafter, Lead Plaintiff and Lead Counsel began negotiating a tolling agreement and document preservation protocol with the DESCO Defendants.  On August 22, 2008, Lead Counsel filed a Motion for an Order Granting Limited Expedited Discovery of the DESCO Defendants because of the possibility of the statute of limitations cutting off potential claims against these defendants.  *See* Dkt. No. 72.  All of the defendants and the DESCO Defendants (who were

- 15 -

then third parties) opposed this Motion.  The Court held a hearing on September 15, 2008 and granted the Motion.  *See* Dkt. No. 84; *Lane v. Page*, 2008 U.S. Dist. LEXIS 90987 (D.N.M. Sept. 26, 2008).

51.     Also on September 15, 2008, the Court granted in part and denied in part defendants' motions.  *See* Dkt. No. 81; *Lane v. Page*, 581 F. Supp. 2d 1094 (D.N.M. 2008).  On December 1, 2008, Lead Plaintiff filed an opposed motion, pursuant to the Court's September 15, 2008 order, to amend the Amended Complaint seeking, among other things, the addition as defendants of the DESCO Defendants.  *See* Dkt. No. 105.

52.     On January 5, 2009, Lead Plaintiff filed a motion for class certification.[6]  *See* Dkt. No. 117.  Defendants opposed this motion on February 4, 2009.  *See* Dkt. No. 141.

53.     On February 9, 2009, Lead Plaintiff filed his Second Amended Complaint for violations of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 ("Second Amended Complaint").  *See* Dkt. No. 145.

54.     On February 5, 2009, certain SunCal Defendants, Westland and the Director Defendants filed motions to dismiss the Second Amended Complaint.  *See* Dkt. Nos. 142 and 143.  On February 26, 2009, the DESCO Defendants filed their motion to dismiss the Second Amended Complaint.  *See* Dkt. No. 152.  On April 3, 2009, the Court heard approximately five hours of oral argument on Defendants' motions to dismiss.  On June 30, 2009, the Court issued an Opinion granting in part and denying in part these motions.  *See* Dkt. No. 177; *Lane v. Page*, 649 F. Supp. 2d 1256 (D.N.M. 2009).

---

[6]     As a result of the pendency of Defendants' opposition to Lead Plaintiff's motion to amend, Lead Plaintiff's motion for class certification was withdrawn without prejudice to re-filing on March 30, 2010.  *See* Dkt. No. 198.

55.     On July 15, 2009, Lead Plaintiff filed an opposed motion to amend the Second

Amended Complaint.  *See* Dkt. No. 176.  This Court heard arguments on the motion for

approximately two hours, and on March 31, 2010, issued an Order granting the motion to amend.

*See* Dkt. No. 199; *Lane v. Page*, 727 F. Supp. 2d 1214 (D.N.M. 2010).  On June 17, 2010, Lead

Plaintiff filed the Third Amended Complaint for violations of §§14(a) and 20(a) of the Exchange Act

and SEC Rule 14a-9 ("Third Amended Complaint").  *See* Dkt. No. 207.  In July 2010, the Director

Defendants, certain SunCal Defendants, and the DESCO Defendants filed their respective answers to

the Third Amended Complaint.  *See* Dkt. Nos. 208, 209, 211, 212, 214.

56.     On August 4, 2010, the Court held an Initial Scheduling Conference and established

the deadlines for all future proceedings, including the following: a September 15, 2010 deadline to

amend the pleadings and join additional parties; a December 15, 2010 discovery cut-off; plaintiff's

expert report deadline of February 15, 2011; Defendants' expert report deadline of March 15, 2011;

rebuttal expert report deadline of April 15, 2011, with expert discovery being conducted from April

15, 2011 through May 15, 2011; hearing on plaintiff's motion for class certification was scheduled

for October 12, 2010; pretrial motion deadline of June 1, 2011; a pretrial conference on September

19, 2011; and jury selection/trial on a trailing calendar beginning on October 17, 2011.  *See* Dkt.

Nos. 239, 253.

57.     On August 5, 2010, Lead Plaintiff re-filed his motion for class certification.  *See* Dkt.

No. 218.  Also on August 5, 2010, the Defendants filed their Notice of Re-filing Joint Opposition to

Plaintiff's Motion for Class Certification, in which they re-filed their Joint Opposition to Plaintiff's

Motion for Class Certification as originally filed.  On September 7, 2010, Lead Plaintiff filed his

reply.  *See* Dkt. No. 242.  The Court held a hearing on October 12, 2010.  On January 10, 2011, the

Court granted the motion, certifying a class of all persons who held the outstanding shares of

- 17 -

Westland common stock as of the close of business on September 18, 2006, and certifying Lawrence Lane as Class Representative and the law firm now known as Robbins Geller Rudman & Dowd LLP as Class Counsel.  *See* Dkt. No. 284; *Lane v. Page*, 272 F.R.D. 558 (D.N.M. 2011).

58.     On August 9 and 10, 2010, Lead Plaintiff filed Opposed Motions to Strike Certain of the DESCO Defendants' and Director Defendants' Affirmative Defenses, which these defendants opposed.  *See* Dkt. Nos. 221, 223.  The Court held a hearing on these motions on October 12, 2010, and granted in part and denied in part the motions.  *See* Dkt. No. 292; *Lane v. Page.*, 272 F.R.D. 581 (D.N.M. 2011).

59.     On September 15, 2010, Lead Plaintiff moved to join certain SunCal Defendants to this Action, some of which had been named in the *Rael* Action.  The motion was opposed and the Court granted Lead Plaintiff's motion on January 10, 2011.  *See* Dkt. No. 283; *Lane v. Page*, 2011 U.S. Dist. LEXIS 14429 (D.N.M. Jan 10, 2011).

60.     Between Summer 2010 and Spring 2011, Lead Plaintiff conducted additional discovery, seeking documentary and testimonial evidence from Defendants and certain third parties. In total, Lead Plaintiff received and reviewed over 250,000 pages of documentary evidence in the Litigation.  Lead Plaintiff conducted 38 fact witness depositions, including each of the Director Defendants and former Westland President and CEO Barbara Page.  Lead Plaintiff also deposed senior executives affiliated with SunCal (including Bruce Elieff and Stephen Elieff) and DESCO (including Co-CEO Anne Dinning and Managing Director George Rizk).

61.     Lead Plaintiff also filed multiple motions to compel, including a motion to compel documents that the SunCal Defendants had improperly withheld as privileged.  Additionally, Lead Plaintiff filed numerous oppositions to protective orders sought by certain defendants which sought to prevent the depositions of these defendants' senior executives.

- 18 -

62.     Also on the eve of the discovery deadline, the DESCO Defendants attempted to subpoena and notice the depositions of Lead Counsel regarding the DESCO Defendants' statute of limitations affirmative defense.  Lead Counsel vigorously opposed this discovery on the basis that it was untimely served, would constitute a violation of numerous privileges, and was largely unnecessary given the pending contention discovery responses.  The Court held a telephonic hearing on this motion on February 17, 2011 and granted Lead Counsel's motion.  *See* Dkt. No. 336; *Lane v. Page*, 273 F.R.D. 665 (D.N.M. 2011).

63.     While simultaneously attempting to take Lead Counsels' depositions, certain of the DESCO Defendants and representatives of SunCal sought to avoid their own depositions, requiring Lead Plaintiff to file motions to compel their testimony.  These motions were also granted on March 4, 2011.  Dkt. No. 336.

64.     On April 4, 2011, counsel for all Settling Parties met in Dallas, Texas in an effort to reach a global settlement of the Litigation.  Thereafter, negotiations to resolve the Litigation continued.

65.     The Litigation continued parallel to the settlement negotiations.  On May 6, 2011, Lead Counsel served numerous expert reports on Defendants on the issues of real estate valuation, water rights valuation and common stock valuation.  On May 10, 2011, Lead Counsel served his supplemental responses and objections to Defendants' various interrogatories, requests for admission, and document requests.  As part of these responses, Lead Counsel created and served a redlined version of Westland's September 20, 2006 Definitive Proxy Statement, in which Lead Counsel included (along with annotations to the document and deposition evidence developed in the Litigation) the additional factual information which Lead Plaintiff alleged was legally required to be disclosed in order for investors to make a fully informed decision to approve the Merger Agreement.

- 19 -

66.     On May 20, 2011, the Settling Parties appeared before the Court and Westland requested that $2,278,702.41 in unpaid shareholder proceeds from the Merger be placed in *custodia legis* and transferred to the federal court registry to be overseen by the Court pending resolution of the Litigation.  On May 23, 2011, the Court granted the Settling Parties' request and the funds were transferred to the federal court registry.  Dkt. No. 352.

67.     The Settling Parties continued working on settlement throughout the summer and fall of 2011.  The Settling Parties exchanged numerous drafts of the Stipulation of Settlement and convened a substantial number of telephonic settlement conferences.  On November 11, 2011, the Settling Parties confirmed their agreement to settle the Litigation as detailed herein and executed the Stipulation.

## III.    THE SETTLEMENT

### A.    The Parties' Settlement Negotiations

68.     Very early in the Litigation, the parties attempted to informally resolve the claims in the State Action.

69.     In June 2008, the Settling Parties (except for the DESCO Defendants, who, at the time, were not parties to the State Action or Federal Action), participated in a mediation session before a retired judge in California.  Although substantial effort went into preparing for and participating in the mediation, the parties remained very far apart and did not come close to reaching a resolution of the case.  While the mediation was not successful, the parties periodically thereafter broached the topic of settlement.

70.     On April 4, 2011, after the conclusion of fact discovery and just prior to the commencement of expert discovery and pre-trial motions, counsel for the Settling Parties met in

person in Dallas, Texas in an effort to reach a global settlement of the Litigation. Intense negotiations to resolve the Litigation continued thereafter.

71.    As part of the negotiations, the Settling Parties appeared before the Court and Westland requested that $2,278,702.41 in unpaid shareholder proceeds from the Merger be placed in *custodia legis* and transferred to the federal court registry to be overseen by the Court pending resolution of the Litigation.

72.    On November 11, 2011, the Settling Parties confirmed their agreement to settle the Litigation as detailed in the Stipulation despite their diametrically opposed views on the merits.

73.    The Settlement is the product of hard-fought litigation and takes into consideration the significant risks specific to the case. It was negotiated by experienced counsel with a firm understanding of both the strengths and weaknesses of their respective cases. The Settlement of $3,793,509.25 represents a substantial recovery, particularly in light of the risks and the insolvency and/or defunct status of the primary corporate defendants and the foreclosure of the former Westland property.

74.    In deciding to settle the Litigation, Lead Plaintiff considered the significant risks associated with continuing to prosecute the Class's claims. For example, Defendants repeatedly (and vigorously) contended that Lead Plaintiff and the Class could not demonstrate loss causation or damages because the Merger price, $315 per share, was a dramatic premium over the $20 per share price Westland's shares had traded at in the years leading up to the Merger and a premium of more than 50% to the initial ANM merger consideration. This argument would have been presented to the jury with the present-day backdrop in which the former Westland property had been foreclosed upon, entities involved in the purchase of Westland were no longer financially viable and the southwest region continues to suffer through one of the weakest property markets in recent history.

While Lead Plaintiff disagreed with Defendants' contentions concerning loss causation and damages, there was a substantial risk of recovering limited or no damages if the Court or jury agreed with any of Defendants' arguments. Compounding these factors was the risk that the Court could exclude the opinion and testimony of Lead Plaintiff's experts.

75.     The DESCO Defendants also asserted a statute of limitations defense that, if successful, could have put at risk the single largest potential source of payment of damages. Although Lead Plaintiff disagreed with the DESCO Defendants' arguments in this regard, there was a possibility that the Court could have limited or even eliminated entirely Lead Plaintiff's claims against the DESCO Defendants on the basis of the expiration of the statute of limitations.

76.     The Settling Parties also strongly disagreed on the import and meaning of many of the documents produced and witness testimony. There was no way to predict which interpretations and inferences the Court or a jury would accept. Lead Plaintiff and the Class risked a substantial narrowing of their claims in the event the Court accepted Defendants' interpretation of the evidence.

77.     In deciding to settle the Litigation, Lead Plaintiff and Lead Counsel weighed the witness testimony and documents they believed supported the allegations against the testimony of other witnesses and documents that Defendants believed undercut those allegations. These issues, and the risks associated therewith, were considered by Lead Plaintiff and Lead Counsel in deciding to settle this Action on the agreed terms.

78.     Since entering into the Stipulation, Lead Counsel has used reasonable best efforts to identify, locate, and make payment of the $315 per share cash consideration to the Unpaid Class Members. In connection with the Settlement, Lead Counsel was provided a list of the 287 Unpaid Class Members' names, last known addresses, and number of shares held as of 2006. Of these 287, approximately 87 were listed as deceased. Using various services, including Accurint, Lexis and

- 22 -

Google, we were able to locate telephone numbers for 88 of the Unpaid Class Members who were not identified as deceased. Using the telephone numbers we identified, we then called the numbers for all 88 former shareholders. Many of the numbers were either disconnected, went unanswered despite repeated calls on different days at different times, or were for people who had never heard of Westland. We left multiple messages on answering machines. Lead Counsel's representatives successfully contacted approximately 18 Unpaid Class Members who collectively held approximately 391 shares of Westland stock worth roughly $123,165 who acknowledged they did not exchange their share certificates for payment in 2006. Lead Counsel invested approximately 131 hours of time after agreeing to the Settlement to identify, locate and contact the Unpaid Class Members. But for the diligent efforts of Lead Counsel, these Unpaid Class Members likely would never have been found or have the renewed opportunity to receive $315 per share in exchange for their Westland shares.

79.     Lead Counsel respectfully submits that the Settlement represents a favorable outcome for the Class and provides Class Members with significant benefits now without the very real risk of no recovery if the Litigation were to continue.

80.     Lead Counsel are actively engaged in complex civil litigation, particularly litigation of securities class actions. We believe our reputation as zealous advocates willing to prosecute a meritorious case through trial and post-trial appeals allowed the Lead Plaintiff to be in a strong position throughout all aspects of the prosecution of the case, including the settlement negotiations with Defendants.

### B.      Preliminary Approval of the Settlement and Mailing and Publication of Notice of Settlement

81.     On December 19, 2011, the Court issued an order preliminarily approving the terms of the Settlement and directed the mailing of the Notice of Pendency and Settlement of Class Action

- 23 -

(the "Notice") and the Proof of Claim and Release form (the "Proof of Claim") to all potential Class Members identifiable with reasonable effort (the "Notice Order").

82.     As part of the Settlement, Lead Counsel agreed to use reasonable best efforts to identify and locate Unpaid Class Members who, subject to tendering valid share certificates, will be paid $315 per share from the Remaining Merger Consideration portion of the Escrow Account.

83.     The Court's Notice Order also directed that the Summary Notice for publication ("Summary Notice"), to be published in both the *Albuquerque Journal* and the *Los Angeles Times*. Submitted herewith is the Declaration of Carole K. Sylvester of Gilardi & Co. LLC, the Settlement Administrator, which attests that Notices have been mailed to 7,409 potential Class Members, and that the Summary Notice was published on January 5, 2012, as directed by the Court.  The Notice informed Class Members of the terms of the Settlement, the allocation of the settlement proceeds and that Lead Counsel would seek approval of an attorneys' fees payment of $3.1 million and expense reimbursement not to exceed $650,000.

## IV.     FACTORS TO BE CONSIDERED IN SUPPORT OF FINAL APPROVAL OF THE SETTLEMENT

### A.     The Settlement Was Fairly and Aggressively Negotiated by Counsel

84.     As set forth above, the terms of the Settlement were negotiated by the Settling Parties at arm's length.  The Settlement was the product of seven months of protracted, contentious negotiations which included an in-person meeting, numerous teleconferences and several comprehensive or follow-up e-mail communications.  Throughout the course of those negotiations, the Settling Parties were represented by counsel with extensive experience in securities litigation in general and securities class actions in particular.  The Settlement was the result of an adversarial process designed to produce a fair, reasonable and adequate compromise.

- 24 -

B. **Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt**

85.     Another factor considered in assessing the merits of a class action settlement – whether serious questions of law and fact exist – supports the conclusion that the Settlement is fair, reasonable, and adequate to the Class.  Lead Plaintiff faced formidable obstacles to recovery, both with respect to liability and damages.  During the course of this Litigation, Lead Counsel came to realize that significant hurdles existed such that prevailing at trial would be very difficult.

86.     Defendants argued at every stage of the Litigation that the Class's claims lacked merit and, even if the claims were meritorious that the Class did not suffer any economic harm.  *See, e.g.*, Dkt. Nos. 52, 53, 62, 63, 142, 143, 152, 208, 209, 211, 212.  The DESCO Defendants asserted a statute of limitations defense, which if granted at summary judgment or during trial could have precluded the Class from recovering any damages against them.  The Court denied their motion to dismiss but noted that "[Lead Plaintiff's] claims might ultimately be found untimely on summary judgment or during a trial down the road."  *Lane v. Page*, 649 F. Supp. 2d 1256, 1304 (D.N.M. 2009).

87.     For example, Defendants repeatedly contended that Lead Plaintiff and the Class could not demonstrate loss causation or damages because the Merger price, $315 per share, was a dramatic premium over the $20 per share price Westland's shares had traded at in the years leading up to the Merger and a premium of more than 50% to the initial ANM merger consideration.  This "bird-in-the-hand" argument would have been presented to the jury in a present-day backdrop in which the former Westland property had been foreclosed upon, many of the entities involved in the purchase of Westland were no longer financially viable and the southwest region is suffering through one of the weakest property markets in recent history.  While Lead Plaintiff disagreed with Defendants' contentions concerning loss causation and damages, there was a substantial risk of recovering

- 25 -

limited or no damages if the Court or jury agreed with any of Defendants' arguments.  Compounding these factors was the risk that the Court could exclude the opinion and testimony of Lead Plaintiff's experts.

88.     The Settling Parties also strongly disagreed on the meaning and evidentiary impact of many of the documents produced and witness testimony.  There was no way to predict which interpretations and inferences the Court or a jury would accept.  Lead Plaintiff and the Class faced the risk of failing to prove their claims in the event the Court and/or jury accepted Defendants' interpretation of the evidence presented.

      **C.**    **The Judgment of the Settling Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement**

89.     Another factor in considering whether to approve a class action settlement is the judgment of the parties that the settlement is fair and reasonable.  As outlined above, the Settlement was the product of arm's-length negotiations between adversaries with significant experience in securities litigation.  Moreover, the Settlement was reached after consultation with and subsequent approval by, Lead Plaintiff.  During the negotiations, Lead Plaintiff participated in numerous discussions with Lead Counsel in which the status of negotiations was reported and the appropriate settlement strategies discussed.

90.     Lead Counsel believe that the Settlement is fair, reasonable, and adequate in all respects and should be approved by the Court.

**V.**    **THE NEGOTIATED AMOUNT OF ATTORNEYS' FEES AND EXPENSES ARE REASONABLE**

91.     Plaintiffs' Counsel have not received any payment for their services in prosecuting the Litigation over the past five years, nor have they been reimbursed for any expenses incurred in connection with their prosecution of the Litigation.  Lead Counsel respectfully requests that the

Court approve the separately negotiated reimbursement of $650,000 in expenses and $3.1 million attorneys' fees payment. These amounts were negotiated with the Director Defendants' D&O insurance carrier which has agreed to pay these amounts to Lead Counsel, subject to the Court's approval. When these amounts were separately negotiated, Lead Counsel knew its lodestar was many multiples of the range that the D&O insurance carrier contemplated offering in connection with a settlement of the Litigation. Lead Counsel was also cognizant that its actual expenses incurred over the past five years would likely exceed the amounts the D&O insurance carrier was willing to pay.

92.     The attorneys' fees and expense amounts are reasonable considering the extensive efforts of Plaintiffs' Counsel during the past five years of litigation in this Court as well as in the State Court, the substantial monetary and non-monetary benefits conferred upon members of the Class both pre- and post-merger and the contingent nature of the representation.

93.     Lead Counsel's experience in securities class actions enabled them to successfully and effectively prosecute this Litigation on behalf of the Class. Plaintiffs' Counsel were unwavering in their dedication to the interests of the Class by investing the necessary time and resources to vigorously prosecute the Litigation and negotiate the settlement. The pre- and post-merger benefits achieved as a result of the prosecution and settlement of this Litigation were not the result of mere happenstance or fortuity. Defendants were ably represented by multiple sets of highly qualified and resourceful counsel who fought vigorously every step of the way.

94.     The extensive efforts of Plaintiffs' Counsel to bring this matter to a resolution are detailed above and include successfully opposing two rounds of motions to dismiss; certifying a class over Defendants' determined opposition; conducting extensive discovery, including the review and analysis of over 250,000 pages of documents and conducting 38 fact witness depositions;

- 27 -

successfully litigating numerous discovery motions; assisting in producing three testifying expert reports; preparing for the upcoming trial; and engaging in extensive arm's-length negotiations with Defendants' counsel.  As shown in the declarations of Plaintiffs' Counsel submitted herewith, counsel in the aggregate have spent in excess of 18,000 hours of attorney and paraprofessional time in the prosecution of the Litigation for the benefit of the Class, resulting in a lodestar of more than $9 million.[7]  The separately negotiated fee of $3.1 million represents a discount of approximately two-thirds the time actually invested in the case by Plaintiffs' Counsel.

95.    The actual expenses incurred in the prosecution of the Litigation are set forth in the accompanying Declarations of Plaintiffs' Counsel, who contributed to the successful prosecution of the Litigation.  Each firm has declared that the expenses reflected in the books and records maintained by their respective firm are an accurate record of the expenses incurred.  In total, Plaintiffs' Counsel have incurred almost $700,000 in expenses, which is greater than the $650,000 that the D&O insurance carrier has agreed to reimburse.

96.    The attorneys' fee amount is also reasonable considering the substantial benefits obtained for Class Members as a result of the Plaintiffs' Counsel's efforts in the prosecution of the Litigation.  The prosecution of the Litigation together with the Settlement has provided substantial monetary and non-monetary benefits to the Class, including more than $51 million of additional consideration paid in the Merger or to be paid as part of the Settlement.  Thus, the requested fee and expense award represents approximately 6% of the total monetary benefit received by the Class in connection with the prosecution of the Litigation.

---

[7]    The time and expense Declarations are being concurrently filed herewith.

97.     The contingent nature of Plaintiffs' Counsel's representation also favors the approval of the attorneys' fee and expense amount. This litigation was undertaken by Plaintiffs' Counsel on a wholly-contingent basis with the understanding that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of their being compensated for the investment of time and money that the case would require. Plaintiffs' Counsel also incurred significant expenses in litigating for the benefit of the Class. Any fee award or expense reimbursement to Plaintiffs' Counsel has always been at risk and completely contingent on the result achieved.

98.     Because of the nature of a contingent practice where cases routinely last several years, not only are contingent litigation firms required to pay regular overhead, but they also must advance the expenses of litigation as they arise. With an average lag time of three to four years for such cases to be resolved, even longer for this case, the financial burden on counsel being paid on a contingent basis is far greater than on a firm that is paid on an hourly and on-going basis.

99.     Lawsuits such as this are exceedingly expensive to litigate successfully. Those unfamiliar with the efforts required to litigate complex shareholder class actions often focus on the aggregate fees awarded while ignoring the fact that those fees must fund the enormous overhead expenses incurred during the course of many years, and are used to pay the monthly salaries of the firms' attorneys and staff, and when reduced to a bottom line, are far less imposing to each individual firm involved than the gross fee awarded appears.

100.    Moreover, as this Court is well aware, it is incorrect to assume that a law firm handling a complex, contingent fee litigation always wins. There are numerous cases where plaintiffs' counsel in contingent cases such as this, after the expenditure of hundreds or thousands of hours, have received no compensation. Plaintiffs' counsel who litigate cases in good faith and receive no fees whatsoever are often the most diligent members of the plaintiff's bar. The fact that

- 29 -

Defendants and their counsel know that the leading members of the plaintiff's bar are actually able to, and will, go to trial, even in high-risk cases, gives rise to meaningful settlements in actions such as this. The losses suffered by class counsel in other actions where insubstantial settlement offers are rejected, and class counsel ultimately receive little or no fee, should not be ignored. Plaintiffs' Counsel know from personal experience that despite the most vigorous and competent of efforts, the attorneys' success in contingent litigation, such as this, is never assured.

101.     Plaintiffs' Counsel's efforts were performed on a wholly contingent basis. After an extensive effort and in the face of significant risks and determined opposition, Plaintiffs' Counsel were able to obtain substantial benefits for Class Members. Under all the circumstances present here, the attorneys' fee and expense amounts are fair and reasonable.

102.     Finally, the Court-appointed Lead Plaintiff, Lawrence Lane, requests $4,725 for his time and effort in representing the Class. If approved, this amount will not reduce the amount received by the Class. This amount is fair and appropriate. Mr. Lane has been the quintessential class representative in this case, actively participating in, and providing oversight throughout, the Litigation. Mr. Lane invested approximately 270 hours of his own time over the course of the this Action preparing the pleadings, meeting with counsel, attending ten hearings, sitting for his deposition, producing thousands of pages of documents and responding to discovery requests, attending many of the Defendants' depositions, participating in the full-day mediation, and actively engaging with counsel during the parties' extended settlement negotiations.

- 30 -

## VI.    CONCLUSION

103.    We respectfully submit that the terms of the Settlement are fair, reasonable and adequate and should be approved in all respects.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 27th day of January 2012, at San Diego, California.

DARREN J. ROBBINS

680449_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 27, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 27, 2012.

s/ DARREN J. ROBBINS
DARREN J. ROBBINS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:   darrenr@rgrdlaw.com

- 32 -

# Mailing Information for a Case 1:06-cv-01071-JB-ACT

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Christopher W. Ahart**
  ahartc@gtlaw.com

- **Yusuf A. Bajwa**
  bajway@gtlaw.com,worshamj@gtlaw.com,bryankat@gtlaw.com

- **Randall J Baron**
  rbaron@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Paul R. Bessette**
  bessettep@gtlaw.com,worshamj@gtlaw.com,daviskg@gtlaw.com,cisnerosc@gtlaw.com,auslitdock@gtlaw.com

- **Jacqueline E. Davis**
  jedavis@hollandhart.com,rsougstad@hollandhart.com,intaketeam@hollandhart.com

- **Kimberly G. Davis**
  daviskg@gtlaw.com,worshamj@gtlaw.com,bryankat@gtlaw.com

- **Paul M. Fish**
  pfish@modrall.com,michelle@modrall.com

- **Juan L Flores**
  jflores@stelznerlaw.com,jd@stelznerlaw.com,jgarcia@stelznerlaw.com

- **Jay D Hertz**
  jdh@sutinfirm.com,njf@sutinfirm.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com,hlindley@kendalllawgroup.com

- **Nicholas Koluncich**
  nkoluncich@newmexicoclassactions.com,lisay@newmexicoclassactions.com

- **John D. Lovi**
  jlovi@steptoe.com

- **Frank Martin**
  rsandoval@branchlawfirm.com

- **Kristina Martinez**
  kemartinez@rothsteinlaw.com,lstroud@rothsteinlaw.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com

- **Brian K Nichols**
  bkn@modrall.com,doloress@modrall.com

- **Brian O. O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michelle M. Oliver**
  moliver@steptoe.com

- **Michelle Ostrye**
  mko@sutinfirm.com,njf@sutinfirm.com,tlr@sutinfirm.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Lara E. Romansic**
  lromansic@steptoe.com

- **Richard A Sandoval**
  Rick@richardsandovallawoffice.com

- **Douglas G Schneebeck**
  dschneebeck@modrall.com,victoriaa@modrall.com,jlovi@steptoe.com,ericp@modrall.com

- **Mark F. Sheridan**
  msheridan@hollandhart.com,rsougstad@hollandhart.com,intaketeam@hollandhart.com

- **Andrew J. Simons**
  ajs@sutinfirm.com,amp@sutinfirm.com

- **Jesse Z. Weiss**
  weissjz@gtlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Lani A Adler
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022-6030
```