IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LAWRENCE LANE, On Behalf of Himself,
and All Others Similarly Situated,

      Plaintiff,

vs.                                                                    No. CIV 06-1071 JB/ACT

BARBARA PAGE, SOSIMO S. PADILLA, JOE S.
CHAVEZ, JOSIE CASTILLO, CHARLES V. PENA,
GEORGIA BACA, TROY K. BENAVIDEZ, RAY
MARES, JR., RANDOLPH M. SANCHEZ,
WESTLAND DEVELOPMENT COMPANY, INC.,
SUNCAL COMPANIES GROUP, THE D.E. SHAW
GROUP, D.E. SHAW & CO. L.P., D.E. SHAW
REAL ESTATE PORTFOLIOS 1, LLC, ("DESCO
REAL ESTATE"), D.E. SHAW & CO., LLC, D.E.
SHAW & CO., INC., D.E. SHAW INVESTMENT
GROUP, LLC, D.E. SHAW & CO. II, INC.,
GEORGE RIZK, ANNE DINNING, SCC NM
MEMBER LLC, SCC WESTLAND VENTURE
LLC, WESTLAND HOLDCO, INC, SCC
ACQUISITION CORP, SCC ACQUISITIONS INC.,
WESTLAND SPE GP, LLC, WESTLAND DEVCO,
LP, and WESTLAND DEVCO, LLC,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Lead Plaintiff's Notice of Motion and

Motion for Final Approval of Class Action Settlement, filed January 27, 2012 (Doc. 370)("Motion

for Approval of Class Settlement"); (ii) Miller Barondess, LLP's Objection to Use of Settlement

Funds in Court Registry for Settlement, filed February 14, 2012 (Doc. 380)("Barondess Objection");

(iii) Stephens Property Co. LLC's Objection to Use of Funds in Court Registry for Settlement, filed

February 17, 2012 (Doc. 383)("Stephens Objection"); (iv) Interlegis, Inc.'s Motion to Extend the

Deadline to File Objections to the January 9, 2012 Notice of Use Funds in Court Registry for Settlement (Document 367), filed March 1, 2012 (Doc. 395)("Interlegis Motion"); (v) Interlegis, Inc.'s Objection to the January 9, 2012 Notice of Use of Funds in Court Registry for Settlement (Doc. 367), filed March 1, 2012 (Doc. 396)("Interlegis Objection"); (vi) Diana Armijo's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 384)("D. Armijo Objection"); (vii) Barbara Armijo's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 385)("B. Armijo Objection"); (viii) Joshua Moralez' Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 386)("J. Moralez Objection"); (ix) Patricia Baros' Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 387)("Baros Objection"); (x) Lori Moralez' Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 388)("Lori Moralez Objection"); (xi) the Agnes B. Sanchez Revocable Trust UTA, Peter A. Sanchez, Trustee, Objection, filed February 17, 2012 (Doc. 389)("Sanchez Trust Objection"); (xii) Larry Moralez' Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 390)("Larry Moralez Objection"); (xiii) Anita Lucero's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 391)("Lucero Objection"); (xiv) Angela Otero's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 392)("Otero Objection"); (xv) Chris Lujan's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 393)("Lujan Objection"); and (xvi) Requests for Exclusion from Settlement filed March 15, 2012 (Doc. 409)("Exclusion Requests"). The Court held a hearing on March 20, 2012. The primary issues are: (i) whether the parties' settlement of this case is fair, reasonable, and adequate; (ii) whether the Court should approve the parties' agreement regarding attorney's fees and expenses; (iii) whether the Court should authorize a payment of $4,725 to Lane; and (iv) whether the Court should use some portion of the settlement funds to pay Miller Barondess, LLP, Stephens Property Co. LLC, or Interlegis, Inc. the money they allege they are owed. The Court will grant the

Interlegis Motion and will consider the Interlegis Objection as timely filed.  The Court will overrule the Barondess Objection, the Stephens Objection, and the Interlegis Objection.  The Court will also overrule all of the individual objections and will grant the Motion for Approval of Class Settlement. The Court finds that the settlement is fair, adequate, and reasonable, and will approve the Stipulation of Settlement, filed December 19, 2011 (Doc. 363).  The Court also finds that the attorney's fees and expenses, and the award to Lane are reasonable.  Accordingly, the Court approves the settlement of: (i) $3,793,509.25 to the class; (ii) $3,100,000.00 in attorney's fees and $650,000.00 in expenses; and (iii) $4,725.00 in reasonable costs and expenses to Lane, to be obtained from the attorney's fees award.

## FACTUAL BACKGROUND

Lane brings this shareholder class action on behalf of himself and the holders of common stock of Defendant Westland Development Company, Inc., against Westland Development, certain of its senior officers and directors, its merger partner, Defendant SunCal Companies Group and its affiliates, and the DESCO Defendants,[1] who Lane contends were involved in planning, executing, and consummating the SunCal Merger.  See Third Amended Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 ¶ 1, at 2, filed June 17, 2010 (Doc. 206)("TAC").  Lane alleges that, on or about September 20, 2006, the Defendants mailed to Westland Development shareholders a Proxy Statement that misrepresented and/or omitted material facts, and that this Proxy Statement was used to obtain shareholder approval of the sale of Westland Development to the SunCal Companies Group.  See TAC ¶¶ 1, 3, at 2; SEC Schedule 14A

---

[1] The DESCO Defendants are Defendants D. E. Shaw Group, D. E. Shaw & Co. L.P., D.E. Shaw Real Estate Portfolios 1, LLC, D. E. Shaw & Co., LLC, D. E. Shaw & Co., Inc., D. E. Shaw Investment Group, LLC, D. E. Shaw & Co. II, Inc., George Rizk, and Anne Dinning.

Definitive Proxy Statement for Westland Development Co., Inc. at 6 (issued September 20, 2006), filed June 17, 2010 (Doc. 206-1)("Proxy Statement").

### 1.   <u>Westland Development.</u>

In 1692, when the area around Albuquerque, New Mexico was part of the Spanish empire, King Charles II of Spain conveyed more than 55,000 acres of land to a few of his loyal subjects. <u>See</u> TAC ¶¶ 2, 6, at 2, 5 (quoting Peter C. Beller, <u>Insider Deal on the Mesa</u>, <u>Forbes</u>, Sept. 3, 2007); Director Defendants', Westland's, and Suncal's Joint Opposition to Plaintiff's Motion for Class Certification at 4, filed February 4, 2009 (Doc. 141)("Opposition to Class Certification"). This land, known as the Atrisco Land Grant, was originally part of the town of Atrisco, and now lies in and around western Albuquerque. <u>See</u> TAC ¶¶ 2, 6, at 2, 5 (citation omitted); Opposition to Class Certification at 3. The Atrisco Land Grant is an eighty-six-square-mile parcel of real estate, which includes tens of thousands of acres of undeveloped property, master planned communities, retail properties, water rights, and untapped oil and gas rights in and around Albuquerque. <u>See</u> TAC ¶¶ 2, 6, at 2, 5 (citation omitted).

The heirs of the original grantees formed Westland Development in 1967, transferring their interests in the land to the corporation. <u>See</u> TAC ¶ 2, 6, at 2, 6 (citation omitted); Opposition to Class Certification at 4. The heirs became the shareholders of the new corporation, receiving tradable stock proportional to their ancestors' land holdings. <u>See</u> TAC ¶ 6, at 6. For most of Westland Development's existence, its articles of incorporation prohibited the transfer of Westland Development stock to anyone other than an heir to the Atrisco Land Grant, and Westland Development stock was not publicly traded. <u>See</u> Opposition to Class Certification at 4; Proxy Statement at 6.

Westland Development owned about 46,400 acres of land from the Atrisco Land Grant,

including the mineral, oil, and gas rights.  See Proxy Statement at 6.  Westland Development also owned another 10,000 acres of land located north of the original Atrisco land grant, but did not own the mineral rights to that land.  See Proxy Statement at 6.  Westland Development was in the business of selling and developing portions of the land it held, and it also leased retail property to businesses in Albuquerque and in El Paso, Texas.  See Proxy Statement at 6.

> 2.      **Prior Merger Offers.**

Various parties approached Westland Development about acquiring either Westland Development or a significant portion of its assets.  See Proxy Statement at 16.  None of the inquiries ever materialized into a viable proposal, but Westland Development's Board of Directors engaged an independent company to value Westland Development's stock in 2001 and again in February of 2005.  See TAC ¶ 47, at 27; Proxy Statement at 16.  The first valuation determined that Westland was worth about $70 million, or approximately $87.00 per share, while the second valuation four years later produced a figure of approximately $180.00 per share.  See TAC ¶ 47, at 27; Proxy Statement 16.  According to Lane, the first valuation reached a figure of $70 million only after Defendant Barbara Page, Westland's president, chief executive officer, and chief financial officer, contacted the valuation company and ordered that the valuation be reduced.  See TAC at ¶ 48, at 28.

Sometime in early June or late July of 2005, Page met with Philip Aries, the head of Tucson, Arizona, based Aries Realty.  See TAC ¶ 6, at 7 (citations omitted); Proxy Statement at 17.  Aries Realty was a representative of a group of investors interested in acquiring Westland Development. See TAC ¶ 6, at 7 (citations omitted); Proxy Statement at 17.  The investment group and Westland Development embarked on a series of negotiations that ultimately resulted in terms that Westland Development's Board of Directors approved on August 17, 2005.  See TAC ¶ 6, at 7 (citations omitted); Opposition to Class Certification at 3; Proxy Statement at 18.  The terms provided for the

acquisition of Westland Development by way of merger into a newly formed company named ANM Holdings, Inc., with Westland Development shareholders being cashed out for $200.00 per share. See TAC ¶ 6, at 7 (citations omitted); Opposition to Class Certification at 3; Proxy Statement at 18. The terms also permitted Westland Development to consider other offers in a post-signing market-check -- a so-called fiduciary out. See Opposition to Class Certification at 3; Proxy Statement at 18. On September 19, 2005, Westland Development's Board of Directors approved the merger agreement. See Proxy Statement at 19.

Westland Development proceeded to consider a series of unsolicited offers that it received in the wake of publicity about the merger discussions, and of its filing with the Securities and Exchange Commission ("SEC") in connection with the proposed merger. See TAC ¶ 6, at 8-9; Opposition to Class Certification at 4; Proxy Statement at 19. Westland Development determined that two of the offers it received, from Sedora Holdings, LLC and Atrisco Heritage, were genuine "acquisition proposals" under the merger agreement with ANM Holdings, which Westland Development could consider under the fiduciary out. See TAC ¶ 48(b), at 29; Proxy Statement at 21. Westland Development entered into negotiations with the companies making the offers and ultimately concluded that Sedora Holdings' offer of $255.00 per share was superior to either ANM Holdings' or Atrisco Heritage's offers. See Opposition to Class Certification at 4; Proxy Statement at 22. Westland Development exercised its rights under the fiduciary out, and ANM Holdings decided not to counter Sedora Holdings' offer. See Opposition to Class Certification at 4; Proxy Statement at 22. Westland canceled its merger agreement with ANM Holdings and entered into a merger agreement with Sedora Holdings. See Opposition to Class Certification at 4; Proxy Statement at 22. The new merger agreement with Sedora Holdings, like the one with ANM Holdings, had a fiduciary out clause. See Opposition to Class Certification at 4; Proxy Statement

-6-

at 22.

###        3.        The Merger with SunCal Companies Group.

On May 23, 2006, the SunCal Companies Group entered the picture and made a proposal to acquire Westland Development for $280.00 per share.  See Proxy Statement at 23.  On May 31, 2006, Westland Development's Board of Directors determined that the SunCal Companies Group's offer was superior to Sedora Holdings' offer, and gave Sedora Holdings until June 5, 2006 to revise its offer.  See Proxy Statement at 23.  After Westland Development's determination that the SunCal Companies Group's offer was superior, Westland Development continued to receive additional offers, and Sedora Holdings also amended its offer in an effort to regain its status as the preferred buyer.  See Proxy Statement at 24.  Bidding continued, and the SunCal Companies Group increased its offer twice, ultimately arriving at a figure of $315.00 per share, an amount with which Sedora Holdings declined to compete.  See TAC ¶ 37, at 19; Opposition to Class Certification at 4; Proxy Statement at 24.  Westland Development and the SunCal Companies Group formally entered into a merger agreement on July 19, 2006.  See TAC ¶ 37, at 19; Opposition to Class Certification at 4; Proxy Statement at 25.

Under the terms of the merger agreement, each of the 794,927 issued and outstanding shares of Westland Development common stock would be converted into the right to receive $315.00 in cash, with an acquisition company created by the SunCal Companies Group becoming the owner of all of Westland Development's outstanding stock.  See TAC ¶ 37, at 19; Opposition to Class Certification at 4; Proxy Statement at 26.  Additionally, the merger agreement entitled Westland Development's shareholders to receive an ownership interest in a newly formed company called Atrisco Oil and Gas LLC ("Atrisco LLC"), which would be a vehicle for providing income from Westland Development's mineral rights to Westland Development's shareholders.  See Opposition

to Class Certification at 4-5; Proxy Statement at 24-25. Atrisco LLC would receive all the income from Westland Development's existing oil-and-gas leases, plus half the income from future mineral leases on Westland Development property. See Opposition to Class Certification at 4-5; Proxy Statement at 24-25. The agreement also provided for the creation of the Atrisco Heritage Foundation ("Atrisco Foundation"), a non-profit organization that was to be devoted to promoting and preserving the cultural heritage of the Atrisco heirs. See Opposition to Class Certification at 5; Proxy Statement at 24, 26-27.

On September 20, 2006, Westland Development filed its definitive Proxy Statement for the merger with the SEC and mailed the Proxy Statement to all Westland Development's shareholders. See TAC ¶ 3, at 1; Proxy Statement at 3. A shareholder meeting was convened on November 6, 2006, and on November 21, 2006, Westland Development announced that shareholders had approved the merger. See TAC ¶ 5, at 5. Shareholders voted on the proposal, with 72.4% of Westland Development's common shares and 97.75% of Westland Development's Class B shares ultimately voting in favor of the SunCal Merger. See TAC ¶ 5, at 5. On December 7, 2006, Westland "announced the consummation of the" merger. TAC ¶ 5, at 5. As a result of the merger, approximately 6,100 Westland heirs got an average of $37,000.00 apiece, while the nine members of Westland Development's Board of Directors received $15 million. See TAC ¶ 6, at 9.

### 4.    **Westland Development's Proxy Statement.**

Lane contends that the Defendants used the allegedly false and misleading Proxy Statement, which was disseminated to each Westland Development shareholder, to secure the votes needed to consummate the SunCal Merger. Lane asserts that, in an attempt to convince Westland Development's shareholders of the legitimacy of the process used to sell Westland Development and the adequacy of the consideration given in exchange for Westland Development's assets, the Proxy

-8-

Statement falsely stated that "Westland's board of directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland."  TAC ¶ 4, at 3 (quoting Proxy Statement at 27).  Lane also asserts that the Defendants caused the Proxy Statement to omit material facts necessary to make the statements made therein not false or misleading.  <u>See</u> TAC at ¶ 4, at 3.  These statements and omissions form the heart of this case.  <u>See</u> TAC ¶¶ 38-58, at 19-39.

        **a.**      **<u>Conflicts of Interest</u>.**

Lane alleges that the Proxy Statement failed to fully disclose several conflicts of interest involving a number of Westland Development directors.  The Proxy Statement disclosed that "some of Westland's officers and directors have various relationships with Westland or interests in the merger that are different from your interests as a shareholder and that may present actual or potential conflicts of interest," TAC ¶ 39, at 20 (quoting Proxy Statement at 29), revealing that two of Westland Development's board members had contracts that would result in severance payments for involuntary dismissal, <u>see</u> TAC ¶ 39, at 20 (quoting Proxy Statement at 30).  According to the Proxy Statement, Page was "employed as Westland's president and chief executive officer under a renewable six year employment agreement" that also provided for seven times her annual salary as a severance payment if her employment were involuntarily terminated.  TAC ¶ 39, at 20 (quoting Proxy Statement at 30).  The Proxy Statement also states that Defendant Sosimo Padilla, Westland Development's chairman and executive vice president, had a consulting agreement with severance terms similar to those in Page's contract.  <u>See</u> TAC ¶ 39, at 20 (quoting Proxy Statement at 30).

The Proxy Statement states that, in addition to money due under those contracts, the existing Westland directors could receive future positions on the board of Atrisco LLC and as trustees of the Atrisco Foundation.  <u>See</u> Proxy Statement at 31.  The existing Westland Development Board of

Directors was given the power to appoint the Atrisco Foundation's trustees from among Westland Development's shareholders, and it was considered likely that "one or more" of Westland Development's directors would be chosen as a trustee. Proxy Statement at 31. Atrisco LLC's Board of Directors was to be drawn from the Westland Development Board of Directors, although which directors would be picked was said to be undecided. See Proxy Statement at 31.

According to Lane, the Proxy Statement fails to mention that Page and Padilla's contracts were of recent vintage, having been secretly modified to secure their support for the merger. See TAC ¶¶ 40-41, at 21. Lane also asserts that the Proxy Statement fails to disclose that "at least four Westland directors were promised lifelong trusteeships" at the Atrisco Foundation or on the board of Atrisco LLC, and that, instead of receiving "customary fees" for their service, they were going to receive outsized "lucrative annual retainers." TAC ¶ 42, at 22.

b.    **Page's Vote Against the Merger.**

Lane's TAC states that the Proxy Statement contains nothing about the fact that Page voted against the merger at a board meeting on July 18, 2006, and that Defendant Troy Benavidez abstained from voting at the same meeting. See TAC ¶¶ 44-45, at 24-25. The Proxy Statement states only, Lane notes, that Westland Development's Board of Directors recommends that the shareholders approve the merger and plan to vote their shares for the merger. See TAC ¶¶ 43-44, at 23-24 (quoting Proxy Statement at 5-12). Moreover, in a question-and-answer section about the merger, the Proxy Statement states that "Westland's directors and officers plan to vote their shares in favor of the approval of the merger agreement." Proxy Statement at 10. According to Lane, despite this representation, four of the nine directors on Westland Development's board -- Benavidez, Defendant Ray Mares, Jr., Defendant Charles Pena, and Defendant Randolph Sanchez -- did not vote their Class A shares in favor of the merger, while a fifth director -- Defendant Joe

Chavez -- voted only 100 of his 310 Class A shares in favor of the merger.  See TAC ¶ 45 & n. 4, at 24-25.

### c.     The Market-Check Process.

The Proxy Statement indicates that Westland Development was employing a market-check process in connection with the merger and that "Westland's board of directors had every reason to believe the post-signing market check would be effective in maximizing shareholder value by finding the best acquisition proposal for Westland."  Proxy Statement at 27.  The market check consisted primarily of the consideration of various offers to acquire the company.  See Proxy Statement at 19-27.  According to Lane, Westland Development never actively solicited prospective bidders to secure the best value for the company or otherwise determined the value of the shares at the time of the sale.  See TAC ¶ 46, at 25-27.  Lane further alleges that the negotiations with ANM Holdings detailed in the Proxy Statement "are either false or confirm that defendants falsified internal Westland documents because during the relevant period none of the Board minutes mention any negotiations with ANM."  TAC ¶ 46(a), at 25.

### d.     The Valuation of Westland Development.

Lane alleges that there were two important flaws in the Proxy Statement's disclosure of the valuations made of Westland.  The Proxy Statement mentions two separate valuations that the same independent valuation firm conducted -- one performed in 2001, and the other in 2005.  The 2001 opinion valued Westland Development at about $87.00 per share, see Proxy Statement at 16, while the 2005 opinion valued Westland Development at about $180.00 per share, see Proxy Statement at 27.  Lane alleges that the Proxy Statement fails to disclose that the 2001 valuation originally assessed Westland Development at $249.00 per share, but that Page ordered the company performing the valuation to manipulate the valuation downward to $87.00 per share.  See TAC ¶ 48,

at 28.  Lane also alleges that the 2005 valuation is undermined by the Proxy Statement's failure to mention an internal appraisal by Westland Development's vice president of sales, Brent Lesley, which valued Westland Development at $474.00 per share, more than twice that of the 2005 valuation.  See TAC ¶ 48(a), at 28.

       e.       **The Westland Development's Board of Directors' Statement of Fairness.**

According to the Proxy Statement, Westland Development's Board of Directors thought the merger was "advisable and fair to, and in the best interests of Westland and Westland's shareholders."  TAC ¶ 49, at 30 (quoting Proxy Statement at 26).  The Proxy Statement also states that Westland Development's Board of Directors held this belief, "in part, because the cash consideration to be received by holders of Westland common stock is fair, from a financial point of view, to the Westland shareholders."  TAC ¶ 49, at 30 (quoting Proxy Statement at 6).  Lane contends that these statements are subjectively and objectively materially false and/or misleading, because the offer was below Lesley's valuation, the directors did not have an independent valuation of the land, and Westland Development's Board of Directors did not know the value of the land's mineral rights, and some of the directors had expressed that they thought the offer was insufficient to justify selling part of their heritage.  See TAC ¶ 49, at 30-32.

       f.       **The Tax-Increment Development District ("TIDD").**[2]

In discussing Westland Development's Board of Directors' views on the merger, the Proxy Statement asserts that Westland Development was a somewhat "unattractive" acquisition target,

---

[2]A TIDD is a district formed for the purpose of tax increment development projects -- a financing method which uses the "additional tax dollars generated by a completed development to pay for development costs such as land acquisition and site improvements."  City of Albuquerque, Tax Increment Development Districts (TIDDS) Information Memo, available at http://www.cabq.gov/council/documents/tidds (last visited May 4, 2012).

because it held a "vast amount of undeveloped land" that would be very expensive and time consuming to develop.  TAC ¶ 50, at 32 (quoting Proxy Statement at 27).  Additionally, the Proxy Statement asserts that Westland Development was facing "significantly increasing costs . . . to develop its own land," because the City of Albuquerque would not bear the infrastructure costs associated with recent Westland Development developments, such as the Petroglyphs.[3]  TAC ¶ 50, at 32 (quoting Proxy Statement at 28).  Lane alleges the Proxy Statement, however, fails to mention that Westland Development had expertise in and was pursuing public financing, including hiring consultants and lobbyists.  See TAC ¶ 51, at 33-34.  Lane also contends that the Defendants failed to disclose that "SunCal had arranged to take advantage of an October 2006 TIDD which allowed SunCal to utilize tax dollars to fund the infrastructure costs associated with the development of Westland."  TAC ¶ 51, at 33-34.

### g.    Mineral Rights and Atrisco LLC.

Lane alleges that the Proxy Statement made four omissions regarding the mineral resources available to Westland Development and the creation of Atrisco LLC.  The Proxy Statement represents that Westland Development had no opinion as to the value of Class A stock in Atrisco LLC, and stated that Westland Development's management did not know if there was "oil, natural gas, coal bed methane gas or any other natural resource under Westland's land," and was "not aware of any commercially successful drilling on the property."  TAC ¶ 52, at 34 (quoting Proxy Statement at 7).  Lane contends this statement ignores four important facts that should have been disclosed: (i) that Westland Development's Board of Directors had been informed that between 100 and 500

---

[2] The Petroglyphs are a Westland Development project for new home construction. Westland Development was required to build the water infrastructure for the Petroglyphs and transfer title to the infrastructure to the City of Albuquerque.  See TAC ¶ 50, at 32.

million barrels of oil could be located on Westland Development's property; (ii) that Sanchez had expressed his concern at an August 29, 2005, board meeting about losing valuable water and mineral rights; (iii) that Westland Development had received an offer from Savant Resources to lease all of Westland Development's property for oil-and-gas exploration; and (iv) that Tecton Energy LLC had offered to expand its existing oil-and-gas-exploration lease from 7,000 to 30,000 acres.  See TAC ¶ 52, at 35.

     **h.**  **Participants in the Merger.**

    The Proxy Statement represents that Westland Development was furnishing the Proxy Statement in connection with the solicitation of proxies by Westland Development's Board of Directors, and that "Westland and its directors and executive officers [we]re participating in the solicitation of proxies from Westland's shareholders with respect to the matters described in this proxy statement.  SunCal may also be deemed a participant in the solicitation of such proxies." TAC ¶ 55, at 36 (quoting Proxy Statement at 13).  The Proxy Statement further states that Westland Development, Defendant SCC Acquisition Corp., and Defendant SCC Acquisitions, Inc. were the "Participants in the Merger."  TAC ¶ 55, at 37 (citing Proxy Statement at 13).  Lane contends that these statements were misleading, because they omitted a number of relevant entities.  An organizational chart filed with the SunCal Companies Group's October 31, 2007 TIDD application represented that, immediately before the merger, the SunCal Companies Group and its affiliates consisted of SCC NM Member LLC and D.E. Shaw Real Estate Portfolios 1, LLC ("DESCO Real Estate"), which are 7.5% and 92.5% owners, respectively, of SCC Westland Venture LLC (the parent of Westland Holdco, Inc.).  See Westland Organizational Chart, filed February 9, 2009 (Doc. 145-2)("Organizational Chart").  Westland Holdco, Inc. is, in turn, the parent of SCC Acquisition Corp., the entity that was merged into Westland.  Additionally, SCC Acquisition Corp. owned and/or

controlled two of its subsidiaries, Westland SPE GP, LLC and Westland DevCo, LP.   See Organizational Chart at 1.

### i.     Proxy Statement Solicitors.

The Proxy Statement included a segment dealing with Proxy Statement solicitors, which stated that "Westland expects to make arrangements with and compensate approximately 90 individuals to assist in the solicitation" of the proxies.  TAC ¶ 57, at 39 (quoting Proxy Statement at 16).  Westland Development did not hire any Proxy Statement solicitors.  See TAC ¶ 58, at 39. Lane alleges that the Defendants were aware that Westland Development never hired any Proxy Statement solicitors, and that SCC Acquisition Corp. retained all the Proxy Statement solicitors, "who secretly received lucrative payments for delivering votes in favor of the" merger.  TAC ¶ 58, at 39.

### 5.     The State Litigation.

On February 21, 2006, Rachel M. Stubbs filed a complaint in connection with the Board of Directors agreement to merge with ANM Holdings in the Second Judicial District Court, Bernalillo County, State of New Mexico.  See Declaration of Darren J. Robbins in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement ¶ 15, at 6, filed January 27, 2012 (Doc. 372)("Robbins Decl."); Stipulation of Settlement at 11, filed December 9, 2011 (Doc. 363)("Settlement").  In that case,[4] Stuffs alleged that the Individual Defendants[5] violated their fiduciary duties and stood to gain twenty-six million dollars -- including $3.2 million in golden

---

[4]The case was captioned Stubbs v. Page, No. D-202-CV-2006-01453.  See Stubbs v. Page, D-202-CV-2006-01453, available at http://www2.nmcourts.gov/caselookup/app.

[5]The Individual Defendants are Page, Padilla, Chavez, Castillo, Pena, Baca, Benavidez, Mares, Jr., and Sanchez.

parachute termination payments and "$7 million via 35,000 'change in control' Class B shares they issued to themselves in anticipation of the merger."  Robbins Decl. ¶ 15, at 6.  Three other shareholder actions were filed in the Second Judicial District Court soon thereafter: (i) on March 2, 2006, Rael v. Page, No. D-202-CV-2006-01756; (ii) on March 13, 2006, Lane v. Page, No. D-202-CV-2006-02055; and (iii) on March 16, 2006, Apodaca v. Page, No. D-202-CV-2006-02144. See Settlement at 6, 11; Robbins Decl. ¶ 15, at 6.  "In the interests of efficiency and judicial economy, the parties deemed the Rael Action the lead case in the State Actions."  Settlement at 11. See Robbins Decl. ¶ 17, at 9.  Coughlin Stoia Geller Rudman & Robbins, LLP[6] of San Diego, California represented Maria Elena Rael in the state action.  See Rael v. Page, No. D-202-CV-2006-01756, Filing Affidavit of Darren J. Robbins (dated March 14, 2006) available at http://www2.nmcourts.gov/caselookup/app; Rael v. Page, 147 N.M. 306, 306, 222 P.3d 678, 679 (Ct. App. 2009).  After the filing of the Rael v. Page action, Westland Development amended its merger agreement to clarify that the 35,000 Class B change-in-control shares would not be issued, which increased the per share price from $255.00 to $266.23.  See Robbins Decl. ¶ 18, at 9.  On June 21, 2006, the defendants in Rael v. Page -- the Individual Defendants and Westland Development -- filed a motion to dismiss the complaint and on June 28, 2006, after receiving another offer, moved to stay discovery until a new proxy was filed.  See Settlement at 11.  Rael unsuccessfully opposed the defendants' efforts to stay discovery and filed an amended complaint on September 27, 2006.

---

[6]When this action was originally filed in federal court the law firm representing the class was named Lerach Coughlin Stoia Geller Rudman & Robbins LLP, but the firm notified the Court of its change in name, to Coughlin Stoia Geller Rudman & Robbins LLP.  See Notice of Firm Name Change at 2, filed September 14, 2007 (Doc. 49).  On March 19, 2010, the firm notified the Court of its change in name from Coughlin Stoia Geller Rudman & Robbins LLP to Robbins Geller Rudman & Dowd LLP.  See Notice of Firm Name Change at 2, filed March 19, 2010 (Doc. 197). When the Court refers to class counsel, the Court will refer to Robbins Geller Rudman & Dowd LLP.

See Settlement at 11-12. Rael deposed various parties and prepared and served expert reports.

See Settlement at 12. Discovery involved thirteen boxes, approximately 33,000 pages of document

reviews, and five depositions. See Robbins Decl. ¶ 22, at 10-11. On November 2, 2006, the district

court issued a one-page order granting the defendants' motion to dismiss. See Settlement at 12.

Rael successfully appealed the dismissal, and the Court of Appeals of New Mexico reversed the

state court's holding. See Settlement at 12-13; Rael v. Page, 147 N.M. at 308, 222 P.3d at 680. The

defendants then filed a writ of certiorari to the Supreme Court of New Mexico, which the Supreme

Court of New Mexico denied on September 30, 2006. See Settlement at 14.

After the case was remanded to the state trial court, Rael filed a second amended complaint

to include additional parties and refine her post-merger allegations. See Settlement at 15. The

parties engaged in discovery, including serving deposition notices and requests for production. See

Settlement at 15. "Certain of the defendants answered the complaint, while others filed motions to

dismiss which required full briefing by the parties." Robbins Decl. ¶ 41, at 15. The defendants also

moved to stay the state action in favor of this case, which Rael opposed. See Robbins Decl. ¶ 41,

at 15. In April 2011, the state court stayed Rael v. Page in favor of this action. See Robbins Decl.

¶ 41, at 15.

### 6.   **Remaining Merger Consideration.**

In the Agreement and Plan of Merger (dated July 19, 2006), filed March 13, 2012 (Doc. 401-

1)("Merger Agreement"), the parties to the merger agreed:

> At any time which is more than six (6) months after the Effective Time, the
> Surviving Corporation, will be entitled to require the Paying Agent to deliver to it
> any funds which had been deposited with the Paying Agent and have not been
> disbursed in accordance with this Article III (including, without limitation, interest
> and other income received by the Paying Agent in respect of the funds made
> available to it), and after the funds have been delivered to the Surviving Corporation,
> Persons entitled to payment in accordance with this Article III will be entitled to look

> solely to the Surviving Corporation (subject to abandoned property, escheat or other
> similar Laws) for payment of the Cash Merger Consideration upon surrender of the
> Certificates held by them, without any interest thereon; provided, that such Persons
> will have no greater rights against the Surviving Corporation than may be accorded
> to general creditors of the Surviving [Corporation] . . . .

Merger Agreement at 4 (emphasis original). Since the Paying Agent, Mellon Investor Services,

LLC, began the disbursement of funds, some shareholders of Westland Development have not come

forward to claim their funds. See Notice of Deposit into Court Registry at 1-2, filed June 6, 2011

(Doc. 353). In the Disbursing Agent Agreement, filed June 6, 2011 (Doc. 353-1), the parties to the

merger agreed that, "[a]t the request of the Surviving Corporation, Mellon shall deliver to the

Surviving Corporation or its designee all unexchanged securities and related unclaimed property for

the Surviving Corporation one year after the Effective Time." Disbursing Agent Agreement ¶ 12,

at 5. The Remaining Merger Consideration is the $2,278,702.41 in unpaid shareholder proceeds

remaining after the SunCal Merger. See Settlement at 7. On May 23, 2011, the Court ordered, in

conformance with the parties' stipulation, that the Remaining Merger Consideration be transferred

to the Court registry pending the outcome of the litigation. See Stipulated Order at 3, filed May 23,

2011 (Doc. 352).

7.     **Financial State of the Defendants**.

On April 5, 2010, Westland DevCo, LP filed a petition for bankruptcy relief under Chapter

11 of Title 11 of the United States Code. See In re Westland DevCo, LP, Case No. 10-bk-11166-

CSS (D. Del. Bankr.), Declaration of Bruce V. Cook in Support of Debtor's Chapter 11 Petition ¶ 2,

at 2 (dated April 5, 2010), filed April 9, 2010 (Doc. 200-1)("Cook Decl."). Commercial property

values dropped approximately forty percent in value nationwide between October 2007 and April

2010, and commercial property values in Albuquerque dropped approximately twenty-seven percent

during the same period. See Richard Metcalf, "Real Estate Moves at Fire-Sale Prices; As Values

Slump, Market for Commercial Properties Tilts Heavily in Favor of Buyers," <u>Albuquerque Journal</u> (dated April 5, 2010), filed April 9, 2010 (Doc. 200-2).[7]  The 54,000 acres acquired in the SunCal Merger have been foreclosed upon.  <u>See</u> Lead Plaintiff's Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement at 10, filed January 27, 2012 (Doc. 371)("Memo Seeking Approval").

**PROCEDURAL BACKGROUND**

Lane filed his initial Complaint on November 3, 2006, in which he asserted class-action claims under § 14(a) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a through 78oo ("Exchange Act").  Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed November 3, 2006 (Doc. 1)("Complaint").  Lane filed his Request for Hearing on Motion and Memorandum of Law in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue contemporaneously with his Complaint.  <u>See</u> Doc. 3 ("Motion for TRO").  Lane asked that the Court enjoin the scheduled November 6, 2006 shareholder vote "until shareholders receive the material information they need to make an informed decisions on whether or not to divest themselves of their historic ownership in the Atrisco Land Grant."  Motion for TRO at 5.  After a five hour hearing, the Court denied the Motion for TRO.  <u>See</u> Clerk's Minutes at 1 (dated November 3, 2006), filed December 13, 2006 (Doc. 25).  The Court held that Lane had not met his high burden of establishing "a clear and unequivocal right," or that there was a "substantial likelihood" that he

---

[7]In September 2010, Western Albuquerque Land Holdings foreclosed on Westland DevCo, LP and ended the SunCal Companies Group's efforts to develop that land.  <u>See</u> Steve Ginsberg, "Westland's Foreclosure Reverberated Nationally," <u>New Mexico Business Weekly</u>, D e c e m b e r  3 1 ,  2 0 1 0 ,  <u>a v a i l a b l e   a t</u> http://www.bizjournals.com/albuquerque/print-edition/2010/12/31/westlands-foreclosure-reverb erated.html?page=all.

would prevail.  Clerk's Minutes at 2.  The Court agreed with Lane that the public interest is served "by complete and full information," but found that Lane had not established that there were misrepresentations or that any such misrepresentations were material.  Clerk's Minutes at 4.

On September 17, 2007, Lane filed a first amended complaint.  See Amended Complaint for Violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed September 17, 2007 (Doc. 50)("First Amended Complaint").  On December 3, 2007, the Defendants filed motions to dismiss the First Amended Complaint.  See Motion to Dismiss and Joinder in Director Defendants' Motion to Dismiss, filed December 3, 2007 (Doc. 52); Motion to Dismiss, filed December 3, 2007 (Doc. 53).  The Court granted in part and denied in part those motions on September 15, 2008.  See Order, filed September 15, 2008 (Doc. 81); Memorandum Opinion, filed September 24, 2008 (Doc. 83)("September 24, 2008 MO").  The primary issues that the Court addressed were: (i) whether Lane's allegations were "so dependent upon alleged corporate mismanagement under New Mexico state law that they [could not] support a federal claim under § 14(a)"; (ii) whether the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA") imposed "heightened pleading requirements on Lane's allegations and whether Lane's pleadings [met] those requirements"; (iii) whether the omissions and misrepresentations which Lane alleged that the Defendants' proxy solicitation contained were material; and (iv) whether Land had "properly stated a § 20(a) control person claim."  September 24, 2008 MO at 1.  The Court found that: (i) Lane's claims fit § 14(a)'s parameters, and that his allegations did not turn on state law; (ii) the PSLRA applied in part to Lane's allegations, but that Lane's pleadings were sufficient to satisfy the PSLRA's requirements; and (iii) that Lane had properly stated a § 20(a) claim.  See September 24, 2008 MO at 2.  The Court also found that: (i) Westland Development's conflict-of-interest disclosures were not misleading and any omissions not material; (ii) the market-check

procedures described in the Proxy Statement were not materially false or misleading; (iii) the failure to disclose the internal valuation was not material; (iv) the statement that Westland Development's Board of Directors thought the SunCal Merger was in the best interests of Westland Development's shareholders was not materially false or misleading; (v) the failure to disclose information regarding the TIDD was not material; (vi) the failure to disclose oil-reserve information was not material; and (vii) the failure to disclose that only the SunCal Companies Group hired proxy solicitors was not material.  See September 24, 2008 MO at 38-57.  Accordingly, the Court dismissed without prejudice those claims related to omissions or statements that the Court found to be true or immaterial.  See September 24, 2008 MO at 58-59.

On December 1, 2008, Lane filed a motion to amend his First Amended Complaint.  See Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, filed December 1, 2008 (Doc. 105). The Court granted that motion on February 5, 2010.  See Order Granting Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure at 1, filed February 5, 2009 (Doc. 144). Pursuant to the order granting the motion, Lane filed his Second Amended Complaint.  See Second Amended Complaint for Violations of §§ 14(a) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9, filed February 9, 2009 (Doc. 145)("Second Amended Complaint").   Various Defendants filed motions to dismiss the Second Amended Complaint.  See Director Defendants' Motion to Dismiss Second Amended Complaint, filed February 5, 2009 (Doc. 142); Defendants Westland's and SunCal's Motion to Dismiss and Joinder in the Director Defendants' Motion to Dismiss, filed February 5, 2009 (Doc. 143); and the D.E. Shaw Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, filed February 26, 2009 (Doc. 152).  The Court granted in part and denied in part those motions.  See Memorandum

Opinion and Order at 82-83, filed July 17, 2009 (Doc. 177)("July 17, 2009 MOO").  In the July 17,

2009 MOO, the Court was deciding: (i) whether the Court should allow allegations in the Second

Amended Complaint which the Court did not expressly give leave to add; (ii) whether Lane

sufficiently pled the alleged damages of the Westland Development shareholders; (iii) whether the

allegations in the Second Amended Complaint were material under § 14(a); (iv) whether the statute

of limitations barred the claims against the D.E. Shaw Defendants; and (v) whether Lane adequately

pled the claim against the D.E. Shaw Defendants under § 20(a).  See July 17, 2009 MOO at 2.  The

Court found that Lane's allegations regarding economic loss were conclusory.  See July 17, 2009

MOO at 2.  The Court also found that most of Lane's amendments were insufficient to cure the

deficiencies that the Court identified in the September 24, 2009 MO, with the exception of the

allegations related to proxy solicitors and the fairness statement, which the Court found had been

sufficiently supplemented to support a claim.  See July 17, 2009 MOO at 2-3.  With respect to loss

causation,[8] the Court stated that the "flaw requiring dismissal is relatively technical and likely to be

easily remedied," and that the Court would not enter judgment for ten days to give Lane an

opportunity to file a motion to amend and cure that deficiency.  See July 17, 2009 MOO at 21.  The

Court noted that the Supreme Court of the United States, in Dura Pharmaceuticals, Inc. v. Broudo,

544 U.S. 336 (2005), altered the landscape of securities law.  See July 17, 2009 MOO at 28.  It

stated that an adequate pleading of economic loss would indicate what the loss contemplated is and

the basic causal connection for the loss, which Lane failed to do.  See July 17, 2009 MOO at 30.

---

[8]Loss causation "refers to the causal connection between the wrongful conduct and the
economic loss from which the plaintiff seeks relief, resembles a form of proximate cause."  Lane
v. Page, 727 F.Supp.2d 1214, 1228 (D.N.M. 2010)(Browning, J.)(citing Grace v. Rosenstock, 228
F.3d 40, 46 (2d Cir. 2000); Koppel v. 4987 Corp., 167 F.3d 125, 137 (2d Cir. 1999)).

On July 15, 2009, Lane filed a motion to amend his Second Amended Complaint.  See Lead Plaintiff's Opposed Motion for Leave to Amend Complaint Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure (Doc. 176).  On March 31, 2010, the Court issued an Order granting Lane's motion to amend, see Doc. 199, and, on June 8, 2010, the Court issued its Memorandum Opinion more fully explaining its decision, see Doc. 204 ("June 8, 2010 MO").  The Court found that Lane had sufficiently alleged both causation and damages.  See June 8, 2010 MO at 23.  The Court noted that many of the Defendants' arguments were better aimed at a motion for summary judgment and that, taking the alleged facts as true, Lane stated a plausible claim for relief.  See June 8, 2010 MO at 31.  On June 17, 2010, Lane filed his TAC.  On July 1, 2010, the SunCal Companies Group filed its Answer to the Third Amended Complaint by SunCal ("SunCal TA").  Doc. 208.  The party identified as responding to the TAC was "SunCal, improperly named as SunCal Companies Group." SunCal TA at 1.  One day later, on July 2, 2010, the SunCal Companies Group amended its Answer to respond on behalf of "Defendant SCC Acquisition Corp. ('SCC'), improperly named as SunCal Companies Group."  Amended Answer to the Third Amended Complaint by SCC Acquisition Corp., filed July 2, 2010 (Doc. 211)("SunCal TAA").  On March 31, 2010, the Court issued an Order granting Lane's Motion to Amend. See Doc. 199. On June 17, 2010, Lane filed his TAC. The core of Lane's claims is that Westland Development's shareholders received too low a price for their shares. See TAC ¶ 64, at 40-41; June 8, 2010 MO at 17-19, 23-24, (stating that Lane had adequately pled damages).

On January 10, 2011, the Court joined eight entities to the case: (i) SCC NM Member LLC; (ii) SCC Westland Venture LLC; (iii) Westland Holdco, Inc.; (iv) SCC Acquisition Corp.; (v) SCC Acquisitions Inc.; (vi) Westland SPE GP, LLC; (vii) Westland DevCo, LP; and (viii) Westland DevCo, LLC.  See Memorandum Opinion and Order at 1, filed January 10, 2011 (Doc. 283).  In a

separate memorandum opinion and order, filed the same day, the Court also: (i) certified a class of

all persons who held the outstanding shares of Westland no par value Class A common stock as of

the close of business on September 18, 2006, excluding the Defendants;[9] (ii) certified Lane as the

class representative; (iii) appointed Robbins Geller Rudman & Dowd LLP as class counsel; and (iv)

defined the class claims as: (a) against all the Defendants for violations of § 14(a) of the Exchange

Act and rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; and (b) against the Individual

Defendants, the SunCal Companies Group, and the D.E. Shaw Group for violations of § 20(a) of the

Exchange Act.  See Memorandum Opinion and Order at 43-44, filed January 10, 2011 (Doc.

284)("January 10, 2011 MOO").  In a forty-six page opinion, the Court concluded that rule 23's

requirements were satisfied, see January 10, 2011 MOO at 28, and that Lane could serve as a class

representative, despite some "troubling" issues from his past, January 10, 2011 MOO at 39.

---

[9] Excluded from the class are:

(i) Defendant Westland Development Company, Inc.; (ii) Defendants Barbara Page, Sosimo S. Padilla, Joe S. Chavez, Josie Castillo, Charles V. Pena, Georgia Baca, Troy K. Benavidez, Ray Mares, Jr., and Randolph M. Sanchez; (iii) SunCal, which is comprised of SCC Acquisition Corp., a Delaware corporation, formed solely for the purpose of acquiring Westland, its parent SCC Acquisitions, Inc., a California corporation, and the affiliates of the SunCal Companies Group; and (iv) Defendant D.E. Shaw Group, which is comprised of several affiliated entities including, among other affiliates, D.E. Shaw & Co., L.P., D.E. Shaw Real Estate Portfolios 1, LLC, D.E. Shaw & Co., LLC, D.E. Shaw & Co., Inc., D.E. Shaw Investment Group, LLC and D.E. Shaw & Co. II, Inc.; also excluded are all of the officers and directors of the aforementioned Defendants, their immediate families and their legal representatives, heirs, successors and/or assigns and any entity in which any defendant has a controlling interest.

Memorandum Opinion and Order at 43 n.3, filed January 10, 2011 (Doc. 284).

-24-

1.      **Stipulation of Settlement.**

On December 9, 2011, the parties filed the Stipulation of Settlement.  See Doc. 363.  The Settlement notes that the Defendants "have denied and continue to deny each and all of the claims and contentions alleged by Lead Plaintiff in the Litigation."  Settlement at 16.  Nonetheless, the Defendants "have concluded that further conduct of the Litigation could be protracted and expensive and that it is desirable that the Litigation be fully and finally settled."  Settlement at 17.  Lane asserts that the class claims have merit, but acknowledges that "the expense and length of continued proceedings necessary to prosecute the Litigation" and "have taken into account the uncertain outcome and the risk of any litigation."  Settlement at 17.  The parties stipulate and agree that, subject to Court approval of the Settlement, all claims that have or could have been brought in relation to this action are released.  See Settlement at 17.  The cash settlement consists of $3.8 million comprised of: (i) a cash payment of $1,500,000.00 by the DESCO Defendants; and (ii) $2,278,702.41 in the Remaining Merger Consideration -- plus any accumulated interest.  See Settlement at 18.  The Individual Defendants acknowledge that the Rael v. Page action influenced their decision to: (i) waive their claim to 35,000 "change-in-control" shares; (ii) transfer the Santa Clara, San Jose de Armijo, and Evangelico cemeteries and the La Capillita Antigua church to the Atrisco Foundation; (iii) produce Westland Development's corporate books and records to shareholders; and (iv) convene an annual shareholder meeting on June 8, 2006.  Settlement at 17. The Individual Defendants acknowledge that SCC Acquisition Corp.'s $315.00 per share offer on which the Westland Development shareholders voted on at the November 6, 2006 meeting was $60.00 per share higher than the $255.00 per share offer that the Individual Defendants agreed to on February 24, 2006.  See Settlement at 17-18.  Westland DevCo, LLC also acknowledges that it was aware of the Rael v. Page action and considered the allegations therein when it made its offers.

See Settlement at 18.  The parties assert that the Remaining Merger Consideration was paid into the federal court registry through Lane's efforts in cooperation with Westland DevCo, LLC, the SunCal Companies Group, and the DESCO Defendants.  See Settlement at 18.  As part of the Settlement, Lane and Robbins Geller Rudman & Dowd LLP promise to use reasonable efforts to identify, locate, and make payment of the $315.00 per share cash consideration to class members who failed to tender their shares and/or were not located at the time of the SunCal Merger.  See Settlement at 18.

Through the Settlement, Lane and each class member shall be deemed to have "fully, finally, and forever released, relinquished, and discharged" their claims against the Defendants.  Settlement at 24.  The Defendants shall also be deemed to have "fully, finally, and forever released" any claims against Lane, class counsel, or the class members related to this action.  Settlement at 24.  The Claims Administrator, Gilardi & Co. LLC, will administer and calculate the class members' claims and oversee the disbursement of funds to any authorized claimant.  See Settlement at 25.  The Remaining Merger Consideration will then be distributed to the class members on a pro rata basis.  See Settlement at 25.  The $1.5 million paid by the DESCO Defendants will not be used to compensate the unpaid class members.  See Settlement at 26.  If, after six months, there is any remaining balance, Lane will reallocate the balance among the authorized claimants.  See Settlement at 27.

With respect to attorney's fees and expenses, the Individual Defendants' insurance carrier will reimburse Robbins Geller Rudman & Dowd LLP for expenses incurred up to $650,000.00.  See Settlement at 27.  The insurance carrier will also pay attorney's fees of $3.1 million.  See Settlement at 27.  The Settlement provides that the attorney's fees are not part of the Settlement and that the Court should consider them separately.  See Settlement at 28.

-26-

On December 19, 2011, the Court entered an Order Preliminarily Approving Settlement and Providing for Notice.  See Doc. 366 ("Order Preliminarily Approving Settlement").

### 2.    **Motion for Approval of Class Settlement.**

On January 27, 2012, Lane filed the Motion for Approval of Class Settlement.  See Doc. 370. In the Memo Seeking Approval, Lane asserts that, "[a]fter five years of hard-fought litigation and extensive settlement negotiations, the parties agreed on the terms of a Settlement."  Memo Seeking Approval at 8.  He represents that the Settlement resolves all claims against all Defendants in this action as well as breach of fiduciary duty claims pending in the Second Judicial District Court. See Memo Seeking Approval at 8.  Lane asserts that the class will receive a "$60 per share increase in cash consideration from what was to be paid to Westland shareholders in connection with [SunCal] merger, as well as an additional $3,793,509.25 in cash."  Memo Seeking Approval at 8. Lanes states that the Settlement was not reached until he:

> (i) moved for a preliminary injunctions and temporary restraining order on the eve of the shareholder vote; (ii) successfully opposed two rounds of defendants' motions to dismiss; (iii) convinced the New Mexico Court of Appeals, through extensive briefing and oral argument, to reverse the State Court's dismissal of the Rael Action and successfully opposed defendants' Petition for Writ of Certiorari to the New Mexico Supreme Court; (iv) obtained class certification over defendants' aggressive opposition; (v) conducted extensive discovery, including reviewing and analyzing over 250,000 pages of documents produced by defendants and non-party witnesses; (vi) prepared for and conducted 38 fact witness depositions; (vii) responded to discovery propounded by defendants and produced thousands of pages of documentation in response to defendants' document requests; (viii) prepared lengthy, detailed responses to contention interrogatories and requests for admission; (ix) successfully litigated numerous complex discovery motions; (x) produced expert reports for three testifying experts for Lead Plaintiff; and (xi) began preparing for trial, including creating a trial plan and selecting the exhibits and testimony to be used at trial.

Memo Seeking Approval at 9-10.  He argues that the Settlement takes into account the specific risks of continued litigation, including that the 54,000 acres acquired in the SunCal Merger have been

foreclosed upon and that several of the entities involved in the purchase of Westland Development are no longer financially viable.  See Memo Seeking Approval at 10.  Lane states that, as a result of negotiations between class counsel and the Individual Defendants' insurance carrier, the insurance carrier agreed to pay class counsel in the amount of: (i) up to $650,000.00 in expenses; and (ii) $3.1 million in fees.  See Memo Seeking Approval at 11.  He also states that he would receive reimbursement for his time in the amount of $4,725.00, as permitted under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4.  See Memo Seeking Approval at 11. Lane requests that the Court enter an order: (i) determining that the Settlement is fair; (ii) granting final approval of the Settlement and entering final judgment; (iii) approving the payment of attorney's fees and expenses; and (iv) authorizing a payment to Lane for his time.  See Memo Seeking Approval at 11.

Lane argues that the Settlement was fairly and honestly negotiated.  See Memo Seeking Approval at 18.  He contends that this action has been "hotly contested" with over 360 docket entries over the course of the past five years.  Memo Seeking Approval at 18.  Lane asserts that the parties have extensively briefed numerous complex issues and that the settlement agreement took many months to negotiate.  See Memo Seeking Approval at 18 (citing Lucas v. Kmart Corp., 234 F.R.D. 688, 693 (D.Colo. 2006)).  Additionally, Lane points out that all parties were represented by "multiple counsel with expertise on the [securities laws] and complex class litigation."  Memo Seeking Approval at 18-19 (alteration original)(quoting Lucas v. Kmart Corp., 234 F.R.D. at 693). He argues that where, as here, the settlement resulted from arm's length negotiations, the Court may presume the settlement to be fair, adequate, and reasonable.  See Memo Seeking Approval at 19. Lane further asserts that serious questions of law and fact exist that create a significant risk of obtaining a more favorable result after continued litigation.  See Memo Seeking Approval at 19.

-28-

He contends that class counsel obtained sufficient information to weigh the benefits of settlement against the risks of continued litigation.  See Memo Seeking Approval at 19.  As to the risks, Lane points out that the Defendants have strenuously argued at every stage of the litigation that the class' claims lack merit and the Court's rulings denying the Defendant's motions to dismiss "provide no guarantee that [the class] will prevail on the merits."  Memo Seeking Approval at 19 (citing McNeely v. Nat'l Mobile Health Care, LLC, No. CIV-07-933-M, 2008 WL 4816510, at *13 (W.D. Okla. Oct. 27, 2008)).  He emphasizes that the parties have vigorously contested whether the element of loss causation could be established.  See Memo Seeking Approval at 20 (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 343 (2005); Lane v. Page, 727 F.Supp.2d 1214 (D.N.M. 2010)(Browning, J.)).  Lane represents that the SunCal Merger was consummated at the peak of a "major real estate bubble" and that subsequent appraisals of the Westland Development land show a "marked decrease in value since the closing of the Merger."  Memo Seeking Approval at 20.  He argues that damages would also have been hotly contested and that, in the end, this element would have been reduced to a "battle of experts."  Memo Seeking Approval at 20 (citing In re Veeco Instruments Inc. Sec. Litig., No. 05 MDL 0165 (CM), 2007 WL 4115809, at *10 (S.D.N.Y. Nov. 7, 2007); In re Warner Commc'ns Sec. Litig., 618 F.Supp. 735, 744 (S.D.N.Y. 1985) aff'd 798 F.2d 35 (2d Cir. 1986)).

Lane asserts that the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation.  See Memo Seeking Approval at 21.  He reiterates that this litigation has been pending for five years and that significant time investments will be necessary before a trial, including motions for summary judgment, motions in limine, and motions

under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).[10]  <u>See</u> Memo Seeking Approval at 21.  He contends that the lack of financial viability of key Defendants will render collection on a monetary judgment difficult to obtain.  <u>See</u> Memo Seeking Approval at 22.  He argues that, "[b]y contrast, the proposed settlement agreement provides the class with substantial guaranteed relief" now.  Memo Seeking Approval at 22 (quoting <u>Lucas v. Kmart Corp.</u>, 234 F.R.D. at 694)(citing <u>McNeely v. Nat'l Mobile Health Care, LLC</u>, 2008 WL 4816510, at *13).  Lane asserts that class counsel has significant experience and expertise in securities and other complex class action litigation.  <u>See</u> Memo Seeking Approval at 22.  He contends that class counsel "used that expertise and experience to effectively prosecute this litigation, reaching a favorable result."  Memo Seeking Approval at 23.  He argues that all of these facts support granting approval of the Settlement.

With respect to attorney's fees and expenses, Lane contends that it is "axiomatic that a 'request for attorney's fees should not result in a second major litigation'" and that "ideally, of course, litigants will settle the amount of a fee."  Memo Seeking Approval at 23 (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 437 (1983)(Powell, J.)).  He represents that class counsel and the Individual Defendants' insurance carrier separately negotiated the fee and expense portion of the Settlement.  <u>See</u> Memo Seeking Approval at 23.  He argues that the attorney's fees and expenses will not reduce the class award.  <u>See</u> Memo Seeking Approval at 23-24 (citing <u>In re Resorts Int'l S'holder Litig.</u>, No. 9470, 1990 WL 154154, at *6 (Del. Ch. Oct. 11, 1990)).  Lane asserts that the $3.1 million fee and $650,000.00 expense amount is fair and reasonable, because it "represents a

_____

[10]The Supreme Court of the United States, in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, held that the Federal Rules of Evidence assign to trial judges the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the issue before the court.  <u>See</u> 509 U.S. at 589.

significant discount to the lodestar invested in this Litigation by Plaintiffs' Counsel."  Memo Seeking Approval at 24.  He states that, during the course of the litigation, class counsel have devoted more that 18,000 hours of attorney and para-professional time resulting in a lodestar of $9.1 million.  See Memo Seeking Approval at 24.  Lane argues that the attorney's fee represents only six percent of the more than $51 million in cash consideration benefits to the class members.  See Memo Seeking Approval at 24.  He asserts that this includes the two to five dollars per share to be paid pursuant to the Settlement and the $60.00 per share increased consideration received as a result of the state actions in which the plaintiffs alleged director self-dealing and failure to maximize shareholder value.  See Memo Seeking Approval at 24.

Lane contends that the applicable twelve-factor test, developed in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), and which the United States Court of Appeals for the Tenth Circuit adopted, see Gottlieb v. Barry, 43 F.3d 474, 483 & n.4 (10th Cir. 1994), weighs heavily in favor of approving the award of attorney's fees and reimbursement of expenses.  See Memo Seeking Approval at 25.  He argues that the time and labor invested to adequately and successfully prosecute this litigation supports the fees and expenses, because class counsel prosecuted the litigation for "five years on a contingency basis without payment and advanced all costs and expenses incurred on behalf of the Class without any assurances of a fee or even reimbursement."  Memo Seeking Approval at 25.  He asserts that the negotiated fee amount is "less than one-third of what Plaintiffs' Counsel invested in litigating the case over the past five years." Memo Seeking Approval at 25 (emphasis original).  Moreover, Lane contends that class counsel have incurred expenses, and will likely incur more expenses, in the prosecution of the litigation in an amount which exceeds the $650,000.00 request.  See Memo Seeking Approval at 25.  He argues that class counsel's efforts have yielded substantial economic benefits to the class.  See Memo

-31-

Seeking Approval at 25.  Lane asserts that, in cases such as this one, where class counsel provides both substantial economic and non-economic benefits, courts often assess the attorney's fees as a percentage of any increase in price to assess its reasonableness.  See Memo Seeking Approval at 27 (citing In re Nationwide Fin. Servs. Litig., No. 2:08-CV-00249, 2009 U.S. Dist. LEXIS 126962, at *37-38 (S.D. Ohio Aug. 18, 2009)).  He further asserts that, here, "the final offer price of $315 per share was increased from $255, a $60 difference" and that multiplying that figure "by the 794,927 Westland shares outstanding at the time of the Merger yields a total value of $47,695,620."  Memo Seeking Approval at 27.  Lane contends that the two to five dollar per share payment on top of this increase renders the attorney's fees less than ten percent of the benefit that the class will receive. See Memo Seeking Approval at 25, 27.

Lane argues that this litigation is complex, and has raised significant legal and factual issues. See Memo Seeking Approval at 27.   He points out that the parties appeared before the Court on sixteen occasions, many of which were half or full-day hearings.  See Memo Seeking Approval at 28.  Lane asserts that, to address these difficult questions, class counsel exercised a high degree of skill, and that he sought class counsel with experience and a reputation for handling similar cases. See Memo Seeking Approval at 28.  He contends that counsel "had to possess the requisite skill to obtain certification of the Class in the face of vigorous opposition by the Defendants."  Memo Seeking Approval at 28 (quoting Feerer v. Amoco Prod. Co., No. 95-0012, 1998 U.S. Dist. LEXIS 22248, at *30 (D.N.M. May 28, 1998)(Conway, C.J.))(citing Lane v. Page, 272 F.R.D. 558, 577 (D.N.M. 2011)(Browning, J.)).  He argues that class counsel's ability to obtain favorable pre- and post-merger results in the face of such formidable opposition confirms the quality of counsel, and contends that class counsel's experience, skill, and acumen support the attorney's fee and expense amount.  See Memo Seeking Approval at 29.  Lane asserts that the "time spent by Plaintiffs'

Counsel on the Litigation was at the expense of time counsel could have devoted to other matters." Memo Seeking Approval at 29.  He contends that courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorney's fees and that class counsel undertook this matter on a contingent basis.  See Memo Seeking Approval at 29.  He argues that class counsel undertook a significant risk.  See Memo Seeking Approval at 30.  Lane emphasizes that the litigation has provided substantial economic and non-economic benefits. See Memo Seeking Approval at 30.  He also points to the Court's comment, upon appointing class counsel, that "the members of the class will receive high caliber legal representation."  Memo Seeking Approval at 30 (quoting Lane v. Page, 250 F.R.D. 634, 647 (D.N.M. 2007)(Browning, J.)). He argues that, at the lead plaintiff stage, "not a single motion was filed by any other Class Member or law firm seeking to represent the class," and notes that, without class counsel, "it is likely that none of the benefits the Class received . . . would have been achieved."  Memo Seeking Approval at 31.  He asserts that, because the attorney's fees and expenses were negotiated at arm's length, the negotiated amount mirrors the private marketplace.  See Memo Seeking Approval at 31 (citing Robles v. Brake Masters Sys., Inc., No. 10-135, 2011 U.S. Dist. LEXIS 14432, at *55 (D.N.M. Jan. 31, 2011)(Browning, J.)).

Lane also asks that the Court approve an expense award under the PSLRA.  See Memo Seeking Approval at 32.  He requests payment of $4,725.00, and represents that he has devoted approximately 270 hours to "the oversight of, and participation in, this action, including reviewing pleadings, preparing for and giving his deposition, complying with defendants' discovery requests and consulting with counsel."  Memo Seeking Approval at 32.  He argues that courts "routinely award such costs and expenses to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages."  Memo Seeking Approval at 32 (citing Hicks v.

Morgan Stanley & Co., No. 01-10071, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005)).  He

asserts that any expense award will not reduce the amount available to the class members.

See Memo Seeking Approval at 32.

       Lane and class counsel also filed several declarations in support of the Motion for Approval

of Class Settlement.  See Robbins Decl.; Declaration of Lawrence Lane in Support of Motion for

Final Approval of Class Action Settlement, filed January 27, 2012 (Doc. 373)("Lane Decl.");

Declaration of Carole K. Sylvester Re A) Mailing of Notice of Pendency of Settlement of Class

Action and the Proof of Claim and Release Form, B) Publication of the Summary Notice, and C)

Internet Posting, filed January 27, 2012 (Doc. 374)("Sylvester Decl."); Declaration of Jeffrey D.

Light Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Award of Attorneys'

Fees and Expenses, filed January 27, 2012 (Doc. 375)("Light Decl."); Declaration of Nicholas

Koluncich Filed on Behalf of the Law Offices of Nicholas Koluncich III, LLC in Support of Award

of Attorneys' Fees and Expenses, filed January 27, 2012 (Doc. 376)("Koluncich Decl.");

Declaration of Frank J. Johnson Filed on Behalf of Johnson & Weaver, LLP in Support of Award

of Attorneys' Fees and Expenses, filed January 27, 2012 (Doc. 377)("Johnson Decl."); Declaration

of Joe Kendall Filed on Behalf of Kendall Law Group, LLP in Support of Award of Attorneys' Fees

and Expenses, filed January 27, 2012 (Doc. 378)("Kendall Decl.").  Darren J. Robbins, a founding

partner of class counsel Robbins Geller Rudman & Dowd LLP, asserts that, beginning in March

2006 and in the Rael v. Page action, class counsel served document requests, interrogatories, and

deposition notices, and that discovery in that action required numerous meet-and-confer sessions

as well as litigation of multiple motions.  See Robbins Decl. ¶ 20, at 10.  He states that the existence

of the Rael v. Page action was a factor in Westland Development's Board of Director's decision to

convene an annual shareholder meeting on June 8, 2006 and that SCC Acquisition Corp. considered

the allegations in the <u>Rael v. Page</u> action in connection with its May 23, 2006 $280.00 per share offer, its June 6, 2006 $308.00 per share offer, and its June 30, 2006 $315.00 per share offer. <u>See</u> Robbins Decl. ¶¶ 21, 29, at 10, 12 (citing Settlement at 17-18).  Robbins represents that, in connection with the <u>Rael v. Page</u> action, class counsel received and reviewed 38 boxes of discovery documents and took eleven depositions.  <u>See</u> Robbins Decl. ¶¶ 22, at 10.  When the state trial court dismissed the <u>Rael v. Page</u> action for, among other grounds, lack of standing, class counsel successfully appealed the case to the Court of Appeals of New Mexico and proceeded through further discovery until the state trial court stayed that action in favor of this case.  <u>See</u> Robbins Decl. ¶¶ 37-41, at 14-15.  Robbins asserts that, with regard to this case, class counsel received and reviewed over 250,000 pages of documentary evidence and conducted 38 fact witness depositions. <u>See</u> Robbins Decl. ¶¶ 60, at 20.  He states that between April and November of 2011 the parties worked to resolve the litigation.  <u>See</u> Robbins Decl. ¶¶ 64, 67, at 21-22.

Robbins represents that, in deciding to settle the litigation, Lane and class counsel considered the significant risks associated with continuing to prosecute the class claims including that they may be unable to demonstrate loss causation or damages, because "the Merger price, $315 per share, was a dramatic premium over the $20 per share price Westland's shares had traded at in the years leading up to the Merger and a premium of more than 50% to the initial ANM merger consideration." Robbins Decl. ¶ 74, at 23.  He states that another consideration is the "present-day backdrop in which the former Westland property had been foreclosed upon, entities involved in the purchase of Westland were no longer financially viable and the southwest region continues to suffer through one of the weakest property markets in recent history."  Robbins Decl. ¶ 74, at 23.  Robbins asserts that, since entering into the Settlement, class counsel has used reasonable best efforts to identify, locate, and make payment of the $315 per share cash consideration to the unpaid class members.  <u>See</u>

Robbins Decl. ¶ 78, at 24.  He states that class counsel was provided with a list of the 287 unpaid class members and that, of those 287, 87 were listed as deceased.  See Robbins Decl. ¶ 78, at 24. He argues that the Settlement represents a favorable outcome for the class and that class counsel's reputation as zealous advocates willing to prosecute a meritorious claim allowed Lane to be in a strong position throughout all aspects of the litigation.  See Robbins Decl. ¶¶ 79-80, at 25.  Mr. Robbins further asserts that the notice of settlement was sent to all identifiable class members, that class counsel have used reasonable best efforts to contact the unpaid class members, and that the notice has been published in the Albuquerque Journal and the Los Angeles Times.  See Robbins Decl. ¶¶ 81-83, at 25-26.  Mr. Robbins then reiterates substantially the same arguments raised in the Memo Seeking Approval in support of the Settlement, and in support of the attorney's fees and expenses award.  See Robbins ¶¶ 84-103, at 26-33.

In his declaration, Lane asserts that, at the time he commenced this case, he held 48 Westland Development shares.  See Lane Decl. ¶ 2, at 2.  He states that he has spent approximately 270 hours prosecuting this case including:

(a)     meeting and working with counsel until midnight on November 2, 2006 to prepare the initial Complaint and Application for Temporary Restraining Order ("TRO") filed on November 3, 2006;

(b)     attending and testifying at the five-hour TRO hearing on November 3, 2006;

(c)     seeking appointment as Lead Plaintiff and serving as the Court-appointed Lead Plaintiff and Class Representative;

(d)     working with counsel to prepare each of the complaints filed in this case;

(e)     actively participating in the litigation and providing input into the prosecution of the case, including by personally appearing at ten hearings and status conferences in this action over the past five years, actively responding to discovery, sitting for [his] deposition in 2008, and attending many of the depositions of the defendants that occurred in Fall of 2010;

(f)     keeping informed of the progress of the case and routinely communicating and conferring with counsel;

(g)     reviewing and/or discussing most of the pleadings and motions filed in this action, including those filed in connection with the settlement;

(h)     periodically evaluating plaintiffs' claims and defendants' defenses with counsel as the case progressed and providing input with respect to our litigation and settlement strategy;

(i)     participating in the settlement negotiations by, among other things, attending the June 2008 mediation session; and

(j)     approving of the settlement in this case.

Lane Decl. ¶ 3, at 2-3.  Lane states that he believes "this settlement represents a favorable recovery on behalf of the Class and is a fair, reasonable and adequate compromise of the Litigation."  Lane Decl. ¶ 6, at 3.

Carole K. Sylvester, who is employed with the claims administrator[11] -- Gilardi & Co. LLC -- states that, in accordance with the Order Preliminarily Approving Settlement, Gilardi & Co.: (i) obtained a list of persons who held outstanding shares of Westland Development stock as of September 18, 2006, and mailed notice of the settlement to the 287 names with usable mailing addresses;[12] (ii) prepared a second mailing list from the list of shareholders that Mellon Investor

---

[11]The claims administrator is "subject to such supervision and direction of the Federal Court or Lead Counsel as may be necessary or as circumstances may require, shall administer and calculate the claims of Class Members and shall oversee distribution of the Escrow Account to the Authorized Claimants."  Settlement at 26.  None of the settlement documents provided to the Court indicate who selected Gilardi & Co. as the claims administrator or from what source Gilardi & Co. will be paid.  In the Court's experience, class counsel selects the claims administrator and that the costs associated with distributing the funds are part of the expenses.  The Court, in considering whether the Settlement is fair, proceeds on this basis.

[12]These 287 individuals are those class members who "failed to tender their share and/or were not located pursuant to § 3.4 of the Merger Agreement and who therefore did not receive the $315 per share cash consideration in connection with the Merger."  Settlement at 10.  Those names were received from Mellon Investor Services, LLC, who tracked those persons with outstanding

-37-

Services, LLC provided and mailed notice of the settlement to the other 7,120 class members; (iii) established a toll-free number to accommodate potential class member inquiries; (iv) posted copies of the notice and a Spanish translation on its website; and (v) published the notice in the Albuquerque Journal and the Los Angeles Times. See Sylvester Decl. ¶¶ 3-9, at 2-3. Sylvester also attached copies of the notice of settlement, the proof of claim and release, and copies of the newspaper notices to her declaration. See Notice of Pendency of Settlement of Class Action, filed January 27, 2012 (Doc. 374-1); Proof of Claim and Release, filed January 27, 2012 (Doc. 374-2); Larkspur Design Group Affidavit of Publication, filed January 27, 2012 (Doc. 374-3); Albuquerque Publishing Company Affidavit of Publication, filed January 27, 2012 (Doc. 374-3). Jeffrey D. Light, an attorney with Robbins Geller Rudman & Dowd LLP, states that his firm incurred more than $607,476.97 in expenses in connection with the litigation. See Light Decl. ¶ 5, at 2. He represents that the expenses are: (i) $109,903.31 for meals, hotels, and transportation; (ii) $120,893.36 on photocopies, including $43,091.75 on in-house copying at $0.25 per page; (iii) $1,009.63 on postage; (iv) $3,248.50 on telephone and facsimile usage; (v) $10,904.52 on messenger and overnight delivery services; (vi) $13,743.77 on filing, witness, and other fees; (vii) $76,461.23 on court reporter services; (viii) $67,517.42 on LexisNexis, Westlaw, and other online library research; (ix) $17,939.41 on mediation services, including $6,889.41 for the services of Susan M. Conway and $11,050.00 for the services of JAMS Inc.; (x) $185,698.52 on eleven experts, consultants, and investigators; and (xi) $157.29 on miscellaneous offsite document storage expenses. See Light Decl. ¶ 5, at 2-3. Attached to Mr. Light's declaration was a summary of the work that

shares. See Sylvester Decl. ¶ 3, at 2. Mellon Investor Services also maintained a list of the 7,120 class members who had exchanged their shares for the $315.00 per share cash consideration. See Sylvester Decl. ¶ 4, at 2.

Robbins Geller Rudman & Dowd LLP does and attorney biographies. See Report on Robbins Geller Rudman & Dowd LLP, filed January 27, 2012 (Doc. 375-1)("Report"). Robbins Geller Rudman & Dowd LLP has also been appointed in several other notable class actions, including: (i) In re Enron Corp. Sec. Litig., No. H-01-3624 (S.D. Tex.); (ii) In re UnitedHealth Grp. Inc. PSLRA Litig., No. 06-CV-1691 (D.Minn.); and (iii) In re AT&T Corp. Sec. Litig., MDL No. 1399 (D.N.J.). See Report at 3-8.

Nicholas Koluncich, of the Law Offices of Nicholas Koluncich III in Albuquerque, submitted a declaration in support of the attorney's fees and expenses as well. See Koluncich Decl. ¶ 1, at 2. He states that his firm spent 7,000.17 hours on the ligation, which establishes a lodestar amount of $3,519,402.00, and that the firm incurred expenses of $86,720.49. See Koluncich Decl. ¶ 3, at 2. He asserts that the firm's expenses include: (i) $15,981.58 on meals, hotels, and transportation; (ii) $61,021.45 on photocopying; (iii) $132.15 on postage; (iv) $3,626.50 on telephone and facsimile usage; (v) $1,692.33 on messenger and overnight delivery services; (vi) $857.91 on filing, witness and other fees; (vii) $208.80 on court reporter services; and (viii) $3,199.77 on LexisNexis, Westlaw, and other online library research. See Koluncich Decl. ¶ 3, at 2. Frank J. Johnson, a partner with Johnson & Weaver, LLP of San Diego, California, states that his firm spent 245.20 hours on the litigation and that the lodestar amount for attorney, paralegal, and professional staff time is $140,200.00. See Johnson Decl. ¶ 4, at 2. He asserts that his firm incurred expenses of $4,441.20. See Johnson Decl. ¶ 5, at 2. Joe Kendall, managing partner of the Kendall Law Group, LLC of Dallas, Texas, states that his firm spent 91.6 hours on this case and that the lodestar amount for attorney and paralegal time is $50,590.00. See Kendall Decl. ¶ 4, at 2. He asserts that his firm incurred expenses of $91.46 related to messenger and overnight delivery services. See Kendall Decl. ¶ 5, at 2.

-39-

3.      **Miller Barondess, LLP's And Stephens Property Co. LLC's Objection.**

On February 14, 2012, Miller Barondess, LLP filed the Barondess Objection. <u>See</u> Doc. 380. Miller Barondess asserts that it performed legal services for "Westland Development Company" in April and May of 2010, and that the bills for its services remain unpaid. Barondess Objection at 2.[13] It requests that the Court order that the $62,242.19 balance be paid from the $2,293,509.25 deposited in the Court registry. <u>See</u> Barondess Objection at 2. Miller Barondess represents that in 2010, it determined the existence of potential claims against certain parties and then developed a litigation strategy for Westland Development Company. Barondess Objection at 2. It argues that, in April 2010, it performed 94.70 hours of work and had $1,192.50 in expenses, for a total of $57,927.00, and that, in May 2010, it performed 6.20 hours of work and had $369.80 in expenses, for a total of $4,315.19. <u>See</u> Barondess Objection at 4. Miller Barondess asserts that it has not been paid for its legal services and that the work for Westland Development Company benefitted the Westland Development Company shareholders. <u>See</u> Barondess Objection at 4. In support of the Barondess Objection, founding partner, Louis R. Miller, filed a declaration. <u>See</u> Declaration of Louis R. Miller in Support of Miller Barondess, LLP's Objection to Use of Settlement Funds in Court Registry for Settlement, filed February 14, 2012 (Doc. 381)("Miller Decl."). Miller's declaration makes

---

[13]The Barondess Objection describes the entity for which it performed work as "Westland Development Company" and then subsequently referred to that entity as "Westland." Barondess Objection at 2. In his declaration, Louis R. Miller, founding partner of Miller Barondess, refers to the entity for which his law firm performed work as "Westland Development Corporation" and then subsequently referred to that entity as "Westland." Declaration of Louis R. Miller in Support of Miller Barondess, LLP's Objection to Use of Settlement Funds in Court Registry for Settlement ¶ 2, at 2, filed February 14, 2012 (Doc. 381). None of the Westland entities appear to include "corporation" in its name. For the purposes of summarizing the content of its objection, the Court will refer to that entity as "Westland Development Company."

substantially the same arguments and representations as the Barondess Objection.  See Miller Decl.

¶¶ 2-12, at 2-4.

On February 17, 2012, Stephens Property Co., LLC filed the Stephens Objection.  See Doc.

383.  Stephens Property objects to the use of the Court registry funds as part of the settlement and

asserts that, as of September 1, 2010, Westland DevCo, LLC owed Stephens Property $5,450.91 for

unpaid "Shopping Center Common Area Costs ('CAM Charges'), utility charges and finance

charges."  Stephens Objection ¶ 1, at 1.  It asserts that it filed and recorded a Claim of Lien in the

amount of $5,450.91 with the Bernalillo County Clerk's office on September 1, 2012 and attached

a copy of the Claim of Lien.  See Stephens Objection ¶ 2, at 1 (citing Claim of Lien, filed February

17, 2012 (Doc. 383-1)).  It represents that, since the filing of the Claim of Lien, Westland DevCo,

LLC incurred additional charges for the months of October, November, and December of 2010 in

the amount of $3,948.46.  See Stephens Objection ¶ 3, at 2.  Stephens Property asserts that the total

amount owing is $9,399.37 and that it, as a creditor of Westland DevCo LLC, is entitled to payment

before the funds are used for the settlement.  See Stephens Objection ¶¶ 3, 5, at 2.

On March 13, 2012, Lane filed the Lead Plaintiff's Response to (1) Stephens Property Co.

LLC's Objection to Use of Funds in Court Registry for Settlement and (2) Miller Barondess, LLP's

Objection to Use of Settlement Funds in Court Registry for Settlement.  See Doc. 402 ("Response

to Stephens Property and Miller Barondess").  Lane asserts that the $2,293,509.25 are funds that

Westland Development did not pay to shareholders, which the paying agent, Mellon Investor

Services, was holding pending direction from Westland DevCo, LLC.  See Response to Stephens

Property and Miller Barondess at 2.  He states that, on May 20, 2011, the funds were transferred to

the Court registry.  See  Response to Stephens Property and Miller Barondess at 2.  He argues that,

"[d]espite the fact that Westland DevCo LLC was entitled to use these remaining funds as it saw fit,"

Stephens Property and Miller Barondess now object to the use of those proceeds to fund the Settlement.  See  Response to Stephens Property and Miller Barondess at 2.  He contends that these objections should be overruled, because:

> (1) neither Stephens Property nor Miller Barondess are parties to this action, and therefore lack standing to object; and (2) neither Stephens Property nor Miller Barondess have a valid claim against the Surviving Entity -- Westland DevCo, LLC -- which might otherwise have entitled either entity to claim an interest in the disbursement of the remaining unpaid merger proceeds.

Response to Stephens Property and Miller Barondess at 2.  Lane argues that the Tenth Circuit has held that "non-class members have no standing to object."  Response to Stephens Property and Miller Barondess at 3 (quoting Heller v. Quovadx, Inc., 245 F.App'x 839, 842 (10th Cir. 2007)).  He asserts that neither Stephens Property nor Miller Barondess is a class member, and that neither has attempted to intervene in the litigation.  See Response to Stephens Property and Miller Barondess at 3.

With respect to Miller Barondess' claims, Lane asserts that it does not have a claim against the surviving entity -- Westland DevCo, LLC -- because Miller's declaration indicates that Miller Barondess provided services for the "SunCal Companies," and because the statement regarding services rendered was sent to Bruce V. Cook, General Counsel of the SunCal Companies.  Response to Stephens Property and Miller Barondess at 3 (citing Miller Decl. ¶ 2, at 2; Statement as of April 30, 2010, filed February 14, 2012 (Doc. 381-1)).  He also argues that Miller Barondess' claim that its services benefitted the Westland Development shareholders is "facially suspect," because the legal services were performed in 2010 -- four years after the SunCal Merger.  Response to Stephens Property and Miller Barondess at 4, n.3.  With respect to Stephens Property, Lane contends that it is not apparent that Stephens Property is owed anything, because the Real Property Deed, filed March 13, 2012 (Doc. 402-2), between Cook, on behalf of Westland DevCo, LLC, and an individual

-- O.B. Stephens -- granted the real estate "for consideration paid" and "in lieu of foreclosure." Response to Stephens Property and Miller Barondess at 4-5.  Lane represents that the relationship between O.B. Stephens and Stephens Property is unclear, but that O.B. Stephens, Jr. is the general partner of Stephens Properties I, Limited Partnership.  See Response to Stephens Property and Miller Barondess at 5 (citing Stephens Properties I, Limited Partnership Certificate, filed March 13, 2012 (Doc. 402-3)("Stephens Certificate")).  He further asserts that: (i) the address for O.B. Stephens is 225 N. Leggett Drive, Abilene, Texas 79603, and the address for O.B. Stephens, Jr. is also 225 N. Leggett Drive; and (ii)  the agent for service of process for Stephens Property I, Limited Partnership is Alan R. Wilson of Albuquerque, New Mexico and Mr. Wilson filed Stephens Property's objection.  See Response to Stephens Property and Miller Barondess at 5.  Lane suggests that O.B. Stephens is now the purported owner of the property and that he received satisfaction of any alleged debt.  See Response to Stephens Property and Miller Barondess at 5.

Stephens Property did not file a reply.  On March 14, 2012, Miller Barondess filed its Reply in Support of Miller Barondess, LLP's Objection to Use of Settlement Funds in Court Registry for Settlement.  See Doc. 405 ("Barondess Reply").  Miller Barondess asserts that it performed services for Westland DevCo, LLC, not for the SunCal Companies, and that the term "SunCal Companies" is the overall trade name for a large land developer who acts as the managing company for various single purpose entities.  Barondess Reply at 2.  It argues that a unique billing number is created to identify each single-purpose entity and that all bills are sent to Cook.  See Barondess Reply at 2.  Miller Barondess contends that its work benefitted Westland DevCo, LLC and that the "total balance due, $62,242.19, should be paid to Miller Barondess from the $2,293,509.25 in Westland DevCo, LLC funds on deposit with the Court registry because the services rendered were for the benefit of that entity."  Barondess Reply at 3.  Miller Barondess states that it is not objecting to the settlement,

but that, as a creditor, it was invited to object to the use of funds in the Court registry and that, as

a creditor of Westland DevCo, LLC, it is entitled to payment for services rendered.  See Baroness

Reply at 3 (citing Notice of Deposit into Court Registry, filed July 1, 2011 (Doc. 357); Notice of

Use of Funds in Court Registry for Settlement, filed January 9, 2012 (Doc. 367)("Notice of Use of

Funds")).

### 4. Interlegis Objection.

On March 1, 2012, Interlegis, Inc. filed the Interlegis Motion.  See Doc. 395.[14]  Interlegis,

Inc. asks that the Court extend the deadlines for filing objections to the Notice of Use of Funds in

Court Registry for Settlement.  See Interlegis Motion at 1.  It asserts that, on April 29, 2011,

Interlegis, Inc. obtained a final default judgment against SCC Acquisitions, Inc. d/b/a SunCal

Companies in Case No. DC-11-02112, 160th Judicial District, Dallas County, State of Texas for

$119,594.44 plus post-judgment interest.  See Interlegis Motion ¶ 1, at 1.  Interlegis, Inc. further

asserts that, on August 26, 2011, the Texas judgment was entered as against SCC Acquisitions in

Case No. BS133182, Superior Court, Los Angeles County, State of California in the amount of

$124,994.44.  See Interlegis Motion ¶ 2, at 1.  It asserts that it was only on January 26, 2012, that

Interlegis, Inc. received the Notice of Use of Funds in Court Registry for Settlement.  See Interlegis

Motion ¶ 3, at 1.  It asserts that its failure to comply with the February 17, 2012, deadline for

---

[14]Interlegis, Inc. was previously involved in this case during a discovery dispute.  The SunCal
Companies Group was unable "to obtain the documents it claimed as privileged on its 7,954 entry
privilege log," because a third-party vendor, Interlegis, Inc., in Dallas, Texas, was the entity that
held the documents.  Notice of Filing Regarding Subpoena to Third-Party Interlegis, Inc. at 2, filed
February 3, 2011 (Doc. 307)("Notice Interlegis Subpoena").  Lane issued a subpoena on Interlegis,
Inc. on January 20, 2011 and, on January 28, 2011, Interlegis, Inc. filed a motion to quash in the
United States District Court for the Northern District of Texas.  See Notice Interlegis Subpoena at
2.  The Northern District of Texas entered an ordering quashing the subpoena on March 17, 2011.
See Notice of Entry of Order Granting Third Party Interlegis' Motion to Quash Subpoena in N.D.
Tex. at 2, filed March 18, 2011 (Doc. 344).

objections was excusable neglect and that extending the deadline will not prejudice the parties involved in the suit.  See Interlegis Motion ¶¶ 4, 7-8, at 2.  Contemporaneously, Interlegis, Inc. filed the Interlegis Objection.  See Doc. 396.  Interlegis, Inc. states that it is not a party to the litigation, but believes that it received the Notice of Use of Funds because it is a judgment creditor of SCC Acquisitions.  See Interlegis Objection ¶ 3, at 2.  As a judgment creditor, Interlegis, Inc. objects to "any payments to any parties in any actions if any such payment derive from funds of SCC." Interlegis Objection ¶ 4, at 2.  It argues that any such payments from SCC Acquisitions would have the effect of preferring creditors over Interlegis, Inc., a valid judgment creditor.  See Interlegis Objection ¶ 4, at 2.  Interlegis, Inc. attached the Notice of Entry of Judgment on Sister-State Judgment and Final Default Judgment.  See Interlegis, Inc. v. SCC Acquisitions, Inc. d/b/a Suncal Companies, No. BS133182, Los Angeles Superior Court, Notice of Entry of Judgment on Sister-State Judgment (dated October 27, 2011), filed March 1, 2012 (Doc. 396-1); Interlegis , Inc. v. SCC Acquisitions, Inc. d/b/a Suncal Companies, 160th Judicial District, Dallas County, Final Default Judgment (dated April 29, 2011), filed March 1, 2012 (Doc. 396-1).

On March 13, 2012, Lane filed the Lead Plaintiff's Response to Interlegis, Inc.'s Objection to January 9, 2012 Notice of Funds in Court Registry for Settlement.  See Doc. 401 ("Interlegis Response").  Lane argues that, "[d]espite the fact that Westland DevCo LLC was entitled to use these remaining funds as it saw fit," Interlegis, Inc. now objects to the use of the of the remaining merger proceeds in the settlement.  Interlegis Response at 2.  He asserts that the Court should overrule this objection because:

> (1) it is untimely; (2) Interlegis is not a party to this action, and therefore lacks standing to object; and (3) Interlegis does not have a valid claim against the surviving entity -- Westland DevCo, LLC -- which might otherwise have entitled it to claim an interest in the disbursement of the unpaid merger proceeds.

-45-

Interlegis Response at 2.  Lane first contends that Interlegis' Objection was inexplicably almost two weeks late and that Interlegis, Inc. offers no reason for its delay in filing.  See Interlegis Response at 3-4.  He argues that Interlegis, Inc. was aware of this litigation, because the parties attempted to gain access to records which Interlegis, Inc. kept and that Interlegis, Inc. moved to quash the subpoena.  See Interlegis Response at 5.  He asserts that Interlegis, Inc's "bare assertion" that the delay was the result of "excusable neglect" is insufficient to explain the delay.  Interlegis Response at 5.  Lane further asserts that Interlegis, Inc. does not have a judgment against Westland DevCo, LLC, the surviving entity.  See Interlegis Response at 5.  He contends that it is SCC Acquisitions, Inc., and not Westland DevCo, LLC, that owes Interlegis, Inc. for services rendered.  See Interlegis Response at 5.  He argues that Interlegis Inc.'s claim for payment cannot be imposed on the class or Westland DevCo, LLC, but should be directed to SCC Acquisitions, Inc. in a more appropriate forum, such as in California or in Texas.  See Interlegis Response at 6.  He asserts that, "[g]iven that the funds at issue derive from Westland DevCo, LLC, Interlegis does not have a legitimate claim against the unpaid shareholder proceeds and its Objection should be overruled."  Interlegis Response at 6.

On March 16, 2012, Interlegis, Inc. filed Interlegis, Inc.'s Reply to Lead Plaintiff's Response to Objections to the January 9, 2012 Notice of Use of Funds in Court Registry for Settlement.  See Doc. 410 ("Interlegis Reply").  It asserts that its objection was not late, because its objection was filed in advance of the hearing and in time to permit Lane to respond.  See Interlegis Reply at 1.  Interlegis, Inc. argues that, while Lane set a "deadline," there was no Court order which governed the filing of third-party objections, and the "excusable neglect" requirement is satisfied, because no Court order establishes a deadline.  See Interlegis Reply at 1.  It contends that its objection was "inferentially solicited" and that "Plaintiff's objection to its purportedly late filing is waived by the

filing of its Response."  Interlegis Reply at 1.  Interlegis, Inc. also asserts that it objects only "to the

extent it has standing" and that it renews its objection to the extent that the funds are derived from

SCC Acquisitions, Inc.  See Interlegis Reply at 2.

     **5.**      **Individual Objections.**

On February 17, 2012, ten class members filed objections to the Settlement.  See D. Armijo

Objection at 1; B. Armijo Objection at 1; J. Moralez Objection at 1; Baros Objection at 1; Lori

Moralez Objection at 1; Sanchez Trust Objection at 1; Larry Moralez Objection at 1; Lucero

Objection at 1; Otero Objection at 1; Lujan Objection at 1.  All ten objections are substantially the

same.  These class members object to the amount of attorney's fees requested and to the amount of

expense reimbursement sought.  See, e.g., D. Armijo Objection ¶ 1, at 1.  They assert that the

amount of attorney's fees is unreasonable and excessive, particularly in light of the fact that it

represents more than forty-five percent of the combined class settlement fund, and in light of the fact

that "a significant portion of the combined class settlement fund is being obtained from the

'Remaining Merger Consolidation [$2,278,702.41]', which is a preexisting fund which Class

Counsel did not create or obtain to resolve the claims asserted in this litigation."  D. Armijo

Objection ¶ 1, at 1.  They further object to the Settlement because "the structure of the Settlement

is such that there is an inherent conflict between the members of the Settlement Class who are

described in the Class Settlement Notice as 'Unpaid Class Members' and the members of the

Settlement Class who are not 'Unpaid Class Members.'" D. Armijo Objection ¶ 2, at 2.  These class

members assert that none of the named Plaintiffs are Unpaid Class Members and that, as such, "it

appears the named Plaintiffs are not adequate representatives for the 'Unpaid Class Members'

referred to in the Class Settlement Notice."  D. Armijo Objection ¶ 2, at 2.  They contend that the

Class Settlement Notice does not provide sufficient protection to the Unpaid Class Members "in

terms of specific procedures which would be implemented to best achieve the identification and location of such Class Members."  D. Armijo Objection ¶ 2, at 2.  They argue that the Settlement does not adequately ensure that the best efforts will be made to identify all class members, the amount of settlement remains unknown, and the Settlement will likely result in a very minimal payment to class members.  See, e.g., D. Armijo Objection ¶¶ 3-5, at 2.  These class members assert that any settlement monies should instead be turned over to the established not-for-profit Atrisco Foundation to benefit all former Westland Development shareholders.  See, e.g., D. Armijo Objection ¶ 5, at 2.

On March 13, 2012, Lane filed his Reply Memorandum of Law in Further Support of Motion for Final Approval of Class Action Settlement.  See Doc. 400 ("Further Support of Class Action Settlement").  He asserts that, of the more than 7,400 notices mailed to former Westland Development shareholders in connection with the Settlement, ten shareholders have filed "what appear to be carbon copy objections."  Further Support of Class Action Settlement at 6.  He argues that none of the objections have any basis in fact or support in the law, and that the Court should overrule them.  See Further Support of Class Action Settlement at 6.  Lane contends that a "[s]ettlement merits a presumption of fairness where it was the culmination of a complicated litigation over the course of several years between 'experienced, capable counsel after meaningful discovery'" and emphasizes that the Settlement was achieved only after class counsel:

> (i) moved for a temporary restraining order and preliminary injunction on the eve of a shareholder vote; (ii) successfully opposed two rounds of motion to dismiss briefing; (iii) convinced the New Mexico Court of Appeals, through extensive briefing and oral argument, to reverse the State Court's dismissal of the Rael Action and successfully opposed Defendants' Petition for Writ of Certiorari to the New Mexico Supreme Court; (iv) obtained certification of the Class over Defendants' aggressive opposition; (v) conducted extensive discovery, including reviewing and analyzing over 250,000 pages of documents produced by Defendants and non-party witnesses; (vi) conducted 38 fact witness depositions; (vii) responded to discovery

> propounded by Defendants and produced thousands of pages of documents in response to Defendants' document requests; (viii) prepared lengthy, detailed responses to contention interrogatories and requests for admissions; (ix) successfully litigated numerous complex discovery motions; (x) produced expert reports for three testifying experts; and (xi) commenced trial preparation, including the selection of exhibits and testimony to be used at trial.

Further Support of Class Action Settlement at 7-8 (quoting <u>Blessing v. Sirius XM Radio Inc.</u>, No. 09 CV 10035, 2011 WL 3739024, at *1 (S.D.N.Y. Aug. 24, 2011)(citing Robbins Decl. ¶¶ 7, 13-67, at 5, 7-22).

Lane argues that the Settlement structure does not create a conflict. <u>See</u> Further Support of Class Action Settlement at 8. He notes that the individual objectors do not articulate what the "inherent conflict" is or why the fact that Lane was paid in the Merger renders him an unfit "class representative[] for the 'Unpaid Class Members.'" Further Support of Class Action Settlement at 9 (quoting D. Armijo Objection ¶ 2, at 2). Lane asserts that "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." Further Support of Class Action Settlement at 9 (quoting <u>Lowery v. City of Albuquerque</u>, No. 09-0457, 2012 WL 394392, at *20 (D.N.M. Jan. 24, 2012)(Browning, J.)). He contends that the individual objectors have not only failed to identify the conflict, but that they have not explained how that conflict goes to the heart of the litigation. <u>See</u> Further Support of Class Action Settlement at 9. He further argues that none of the individual objectors are unpaid class members, and, thus, they suffer from the same defects as Lane. <u>See</u> Further Support of Class Action Settlement at 9. He points out that the individual objectors did not identify a "single, concrete fact showing how Lead Counsel did not use their reasonable best efforts to locate the Unpaid Class Members." Further Support of Class Action Settlement at 9. Lane asserts that class counsel undertook straightforward procedures, and spent more than 130 hours attempting to locate and personally inform the Unpaid Class Members of the

renewed opportunity to exchange their shares for payment.  <u>See</u> Further Support of Class Action

Settlement at 9.  He argues that the individual objectors do not identify any steps that he or class

counsel <u>should</u> have taken.  <u>See</u> Further Support of Class Action Settlement at 9.  Lane contends that

the only difference between the class members is when the $315.00 per share Merger consideration

was paid and that there is no legitimate basis to object to the Settlement based on a conflict of

interest.  <u>See</u> Further Support of Class Action Settlement at 10.

 Lane further asserts that best efforts were used to identify all members of the class.  <u>See</u>

Further Support of Class Action Settlement at 10.  He points out that "the Objectors do not, and

cannot, articulate how the Court-approved methods of providing Notice to the Class were deficient."

Further Support of Class Action Settlement at 10 (citing <u>McNeely v. Nat'l Mobile Health Care</u>, 2008

WL 4816510, at *14).  He argues that the Tenth Circuit has held that rule 23(e) does not require

actual notice to each party who could be bound.  <u>See</u> Further Support of Class Action Settlement at

11 (citing <u>Gottlieb v. Wiles</u>, 11 F.3d 1004, 1013 (10th Cir. 1993), <u>overruled on other grounds by</u>

<u>Devlin v. Scardelletti</u>, 536 U.S. 1 (2002)).  Lane notes that the <u>Albuquerque Journal</u> and the <u>Los</u>

<u>Angeles Times</u> published the notice, and that the Claims Administrator mailed the Notice and Claim

Form to all persons who held outstanding shares of Westland Development common stock as of

September 18, 2006 -- 7,409 packages in total.  <u>See</u> Further Support of Class Action Settlement at

12.  He asserts that direct mailings and publications have previously been found to provide "the best

notice practicable under the circumstances, including individual notice to all members who can be

identified through reasonable effort."  Further Support of Class Action Settlement at 12 (quoting

<u>DeJulius v. New England Health Care Emps. Pension Fund</u>, 429 F.3d 935, 943-45 (10th Cir. 2005)).

Lane represents that, to date, class counsel have received in excess of 600 telephone calls in

connection with the Settlement, affirmatively asked for updated addresses, translated forms into

Spanish, and posted notices regarding the settlement hearing.  See Further Support of Class Action Settlement at 12-13.   He asserts that these efforts are all above-and-beyond Court-ordered requirements.  See Further Support of Class Action Settlement at 13.  He argues that

> Lead Counsel was provided a list of the 287 Unpaid Class Members' names, last known addresses, and number of shares held as of 2006.   Of these 287, approximately 87 were listed as deceased.   Using various services . . . [class counsel was] able to locate telephone numbers for 88 of the Unpaid Class Members who were not identified as deceased.  Using the telephone numbers [class counsel] identified, [class counsel] then called the numbers for all 88 former shareholders. . . . Lead Counsel's representatives successfully contacted approximately 18 Unpaid Class Members who collectively held approximately 391 shares of Westland stock worth roughly $123,165 who acknowledged that they did not exchange their share certificates for payment in 2006.

Further Support of Class Action Settlement at 13 (quoting Robbins Decl. ¶ 78, at 24-25).  He represents that each of the 287 identified as Unpaid Class Members were also mailed a claim package.  See Further Support of Class Action Settlement at 14.  Lane contends that, "[b]y all objective accounts, the extensive notice program implemented in this Settlement exceeds the reasonableness and adequacy requirements under the Federal Rules and Tenth Circuit authority," and that the Court should overrule the objections.  Further Support of Class Action Settlement at 14.

In response to the individual objectors' argument that the amount of the Settlement is unknown, Lane asserts that the amount of the Settlement is fixed and finite.  See Further Support of Class Action Settlement at 14.  He argues that the settlement creates a fund of approximately $3.78 million.  See Further Support of Class Action Settlement at 14.  Although a class member's share will depend on how many shares they owned and how many class members submit valid claim forms, Lane contends that "there can be no dispute that" the class was informed how their settlement share would be calculated and an estimate of their expected settlement share.  Further Support of Class Action Settlement at 15 (citing Buccellato v. AT&T Operations, Inc., No. C10-00463-LHK,

2011 WL 4526673, at *2 (N.D. Cal. June 30, 2011)).  He asserts that the Tenth Circuit has held that "[i]t is not necessary to give all of the details of the settlement, but only to 'fairly apprise' the class members of the terms of the settlement."  Further Support of Class Action Settlement at 15 (citing Gottlieb v. Wiles, 11 F.3d at 1013).  He argues that the notices were sufficient for the purpose of apprising the class members of the Settlement's terms, because they informed the class members of the Settlement's total amount as well as the range of possible payouts.  See Further Support of Class Action Settlement at 16.  Lane contends that the individual objectors' argument that the Settlement amount is "unknown" is "meritless."  Further Support of Class Action Settlement at 16.

Lane argues that the Court should not divert the class' property interest in the Settlement fund to a third party.  See Further Support of Class Action Settlement at 16.  He asserts that, "[i]t is hard to accept the legitimacy of an argument that, on the one hand claims $3.78 million is 'minimal,' yet on the other claims it should be reduced to zero."  Further Support of Class Action Settlement at 16.  He points out that over 99.8% of the former shareholders do not object to the Settlement and notes the potential conflict of interest in diverting the Settlement funds to the Atrisco Foundation, because four of the Individual Defendants have sat on the Atrisco Foundation's Board since the SunCal Merger.  See Further Support of Class Action Settlement at 16.  Lane asserts that the individual objectors cite no authority for the proposition that the Court can re-write the terms of the Settlement and direct the funds to the Atrisco Foundation.  See Further Support of Class Action Settlement at 16.  To the contrary, Lane argues that there are "foundational limitations on a district court's discretion as it administers a class-action settlement."  Further Support of Class Action Settlement at 16-17 (citing Klier v. Elf Atochem N. Am., Inc., 658 F.3d 468, 475 (5th Cir. 2011)).  He asserts that "[e]ach class member has a constitutionally recognized property right in the claim or cause of action that the class action resolves."  Further Support of Class Action Settlement

-52-

at 17 (citing <u>Klier v. Elf Atochem N. Am., Inc.</u>, 658 F.3d at 475; <u>Lucero v. Bureau of Collection Recovery, Inc.</u>, 639 F.3d 1239, 1249 (10th Cir. 2011)).  Lane contends that the individual objectors ask the Court to ignore the Settlement and re-allocate the funds to a third party as cy pres, and that the Court should decline this invitation.  <u>See</u>  Further Support of Class Action Settlement at 17.  He argues that the "Objectors' attempt to wrest millions of dollars away from the Class Members for the benefit of a third party as <u>cy pres</u> after five years' worth of significant effort should be rejected." Further Support of Class Action Settlement at 18.

With respect to the attorney's fees, Lane asserts the individual objectors' contention that the fees represent forty-five percent of the combined class settlement fund is a red herring.  <u>See</u> Further Support of Class Action Settlement at 18.  He argues that the individual objectors ignore that the attorney's fee amount must be assessed on the basis of both the monetary and non-monetary benefits, and that, so framed, the requested attorney's fees represent less than ten percent of the total cash benefit to the class.  <u>See</u> Further Support of Class Action Settlement at 18.  Lane notes that the class has obtained the benefit of increased consideration and the cancellation of 35,000 change-in-control shares, in addition to the millions of dollars it will receive via the Settlement.  <u>See</u> Further Support of Class Action Settlement at 19.  He contends that the individual objectors were able to criticize the fee award only because they excluded class counsel's substantial efforts to obtain fifty-one million dollars in pre-merger compensation to the class.  <u>See</u> Further Support of Class Action Settlement at 19.  Lane argues that the $3.1 million attorney's fees represent only six percent of the total cash benefit and that the percentage is substantially below the range approved in securities class actions.  <u>See</u> Further Support of Class Action Settlement at 20.  Furthermore, Lane asserts that the attorney's fees and expenses "are not being paid from a common fund, but were separately negotiated with the [Individual] Defendants' D&O Insurer."  Further Support of Class Action

Settlement at 21.  He contends that the attorney's fees and expenses will not reduce the amount of money available to the class and that the individual objectors' complaint seems to misapprehend the settling parties' agreement.  See  Further Support of Class Action Settlement at 21 (citing In re Motor Fuel Temperature Sales Practices Litig., 271 F.R.D. 263, 294 (D.Kan. 2010)).  Lane argues that the Court should overrule the individual objectors' objections and approve the Settlement.  See Further Support of Class Action Settlement at 22.

On March 15, 2012, the individual objectors filed the Memorandum in Support of Various Class Members' Objections to the Proposed Class Settlement.  See Doc. 407 ("Objectors' Memo").  The individual objectors assert that they object, because more "than sixty percent of the purported 'Class Settlement Fund' consists of the $2,278,702.41 which was an escrow account established to compensate only those shareholders ('the Unpaid Class Members')" of Westland Development who have not yet been paid the $315.00 per share cash consideration to which they are entitled. Objectors' Memo at 4.  They assert that the Settlement will negatively impact class members who are Unpaid Class Members and that the Unpaid Class Members should be designated as a separate subclass.  See Objectors' Memo at 4.  They note that there is no person who is an Unpaid Class Member acting as a named plaintiff and that, "for this reason alone, the proposed Class Settlement is flawed, and should be rejected."  Objectors' Memo at 4.  The individual objectors argue that the Settlement is substantively unfair to the Unpaid Class Members, because it will convert the $2,278,702,41 into a class settlement fund for all class members.  See Objectors' Memo at 4.  The individual objectors also object that the Settlement is unfair, because the "requested attorneys' fees of $3,100,000 are more than twice the amount of the 1.5 million dollar amount which Class Counsel have obtained for the benefit of the Class Members in this litigation."  Objectors' Memo at 5.

The individual objectors assert that the Settlement does not specify what "reasonable best efforts" will be used to identify the Unpaid Class Members and points out that only a ninety-day window existed "from the date of the proposed settlement's execution for Lead Plaintiff and Lead Counsel to find the Unpaid Class Members and for the Unpaid Class Members to exchange their Westland shares at a rate of $315 per share." Objectors' Memo at 9-10. They argue that Lane is the only class representative and that he will be able to file a claim and recover sums from "the remaining $2,278,702.41." Objectors' Memo at 10. They contend that "a close review" of the Settlement reveals a conflict between the paid shareholders and the unpaid shareholders, because, under the Settlement, the Unpaid Class Members will lose their ability to receive compensation in exchange for their Westland Development shares. Objectors' Memo at 10. The individual objectors argue that, had Lane never filed this class action, the Unpaid Class Members would still have been able to receive compensation for their shares at a rate of $315 per share. See Objectors' Memo at 10. They assert that, under the Settlement, the $2,278,702.41 will be used to pay all class members. See Objectors' Memo at 10. They contend that, because the Unpaid Class Members have not had a voice in the Settlement negotiations, the Settlement cannot bind them. See Objectors' Memo at 11.

The individual objectors further assert that, when the Court takes a closer look at class counsel's valuation of the alleged class benefit, the Court "will realize that the vast majority of the claimed benefit is illusory." Objectors' Memo at 12. They argue that the "parties in this case have negotiated a common-fund settlement in which Lead Counsel seek to recover their attorneys' fees as a percentage of the settlement fund" and that "the entire settlement amount comes from the same source, i.e. Defendants in this litigation." Objectors' Memo at 12 (citing Johnston v. Comerica Mort. Corp., 83 F.3d 241, 246 (8th Cir. 1996)). They contend that, when a "large attorneys' fee

-55-

means a smaller recovery, a significant conflict of interest is created and the absence of individual clients controlling the litigation for their own benefit creates opportunities for collusive agreements." Objectors' Memo at 12-13.  The individual objectors assert that, "[t]hough Plaintiff and Lead Counsel purport to represent and seek to bind paid and Unpaid Class Members, they seek monetary awards only for themselves."  Objectors' Memo at 13.  They further assert that the request for attorney's fees and expenses represents seventy-one percent of the total amount of the common fund.  See Objectors' Memo at 13.  They contend that class counsel mislead the Court when they suggest that they obtained a benefit of approximately $47,000,000.00, because class counsel fail to provide any evidence demonstrating that their efforts in the litigation resulted in the sixty-dollar per share increase.  See Objectors' Memo at 13.  The individual objectors argue that this case was not filed until almost four months after the SunCal Merger was approved.  See Objectors' Memo at 13. They assert that class counsel "ignore the fact that negotiations between competing entities who were attempting to purchase Westland, not any pending litigation, caused the $60 per share increase."  Objectors' Memo at 14.  They contend that, even if the Defendants were aware of the Rael v. Page action, class counsel "fail to mention that they were not representing the Rael plaintiffs during the time period in which Westland negotiated the sale of its shares."  Objectors' Memo at 15. Additionally, they argue that the $2,278,702.41 will benefit only the paid class members. See Objectors' Memo at 15.

**6.      Requests for Exclusion.**

Approximately forty class members ask to be excluded from the Settlement, and they represent approximately 7,652 Westland Development shares.  See Letter from Robert A. Trujillo to the Court, filed January 31, 2012 (Doc. 379)("Trujillo Letter"); Requests for Exclusion from Settlement, filed March 15, 2012 (Docs. 409, 409-1, 409-2).

7.      **March 20, 2012 Settlement Hearing**.

On March 20, 2012, the Court held a settlement hearing.  Lane spoke in support of the Settlement.  See Transcript of Hearing at 5:23-25 (March 20, 2012)(Robbins)("Tr.").[15]  He summarized the procedural history of the case and noted that the Court has issued over 400 pages of decisional authority addressing the complex issues involved in the case.  See Tr. at 6:1-7:1 (Robbins).  With respect to the proceedings in the state court, Lane explained that there were four actions filed in state court in February 2006, alleging breaches of fiduciary duty, inadequate share prices, and inappropriate personal benefits being paid to the Individual Defendants.  See Tr. at 7:19-8:6 (Robbins).  He asserted that those lawsuits followed an announcement that Westland Development would sell for $200 per share, and after the filing of the first action, the price rose to $255 per share.  See Tr. at 8:7-18 (Robbins).  He represented that he and two other plaintiffs filed separate suits as well and challenged the personal benefits which the Individual Defendants would receive and sought the termination of the Individual Defendants' 35,000 Class B shares.  See Tr. at 8:19-19:7 (Robbins).  He stated that, after the termination of those 35,000 Class B shares, the share price increased by eleven dollars per share.  See Tr. at 9:7-10 (Robbins).  Lane stated that additional agreements were reached at $305.00 per share, before the final agreement of $315 per share.  See Tr. at 9:11-15 (Robbins).  The Court then asked when class counsel entered the state actions.  See Tr. at 9:16-17 (Court).  Lane responded that class counsel filed the Rael v. Page action in March of 2006 and were part of that case from its inception.  See Tr. at 9:18-25 (Court, Robbins).  Lane argued that class counsel's efforts in the state litigation should be compensable, because the Settlement in this case also resolves the state litigation and involves the same issues.  See Tr. at

---

[15]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

11:18-21 (Robbins).  He asserted that class counsel's efforts in the <u>Rael v. Page</u> action are inextricably linked to this litigation.  <u>See</u> Tr. at 11:21-12:4 (Robbins).  Lane contended that courts will regularly award fees where state and federal litigation proceeds side-by-side.  <u>See</u> Tr. at 12:10-13:1 (Robbins).  The Court then asked whether class counsel's fees incurred in the federal case would exceed the $3.1 million they are seeking in fees.  <u>See</u> Tr. at 13:7-10 (Court).  Lane responded that the fees stemming from the federal action would exceed the fee request by a factor of two and that over two-thirds of the work done was in the federal case.  <u>See</u> Tr. at 13:11-18 (Robbins).  Lane asserted that the hourly rates for the class varied from around $200.00 per hour to $700.00 per hour for Mr. Robbins' time.  <u>See</u> Tr. at 14:15-18 (Robbins).

With respect to settlement negotiations, Lane stated that, initially, the insurance carrier took the position that it would not pay for any settlement, although it would continue to pay for defense costs, and that this position was a considerable stumbling block to negotiations.  <u>See</u> Tr. at 15:11-16:6 (Robbins).  The Court stated that it appeared that the Defendants were saying we are not putting any money on the table, but that they continued incurring litigation costs.  <u>See</u> Tr. at 16:9-11 (Court).  Lane agreed, and asserted that the insurance carrier paid the costs of the defense and that there was a "decaying" policy in place, where there is coverage but defense costs are taken out first.  Tr. at 16:12-15 (Robbins).  The Court asked whether it was a pac-man policy,[16] and Lane agreed that it was and that the insurance carrier's position throughout the litigation was that it would not pay damages.  <u>See</u> Tr. at 16:16-22 (Court, Robbins).  He argued that, in addition to the elimination of

---

[16]Insurance policies in which defense costs are included within the policy limits are often referred to as "wasting" or "pac-man" policies, because their limits are reduced as defense costs are incurred. John M. Palmeri & Franz Hardy, <u>Protecting Your Law Practice: Malpractice Insurance Basics</u>, 34 Apr. Colo. Law 45, 46 (2005).  For example, if there is a ten million dollar policy and the attorney's fees for the defense are three million dollars, then there is seven million dollars left.

the 35,000 class B shares and the increase in the Merger share price, the Settlement secures $1.5 million from the D.E. Shaw entities and $2.3 million from Westland DevCo.  See Tr. at 17:17-23 (Robbins).  Lane argued that the $2.3 million was something that class counsel discovered during the course of the litigation process and that class counsel brought it to the attention of the Defendants.  See Tr. at 17:24-18:1 (Robbins).  He asserted that the merger agreement provided that, six months after the consummation of the merger, those assets became the property of Westland DevCo and the money sat in an account for five years.  See Tr. at 18:2-7 (Robbins).  He explained that, after the SunCal Merger, Westland DevCo, LLC was the surviving entity, and he suggested that § 4.3 of the merger agreement provides that, after a period of time, the money became the property of Westland DevCo, LLC.  See Tr. at 18:20-19:4 (Robbins).  Lane represented that Westland DevCo, LLC is an ongoing entity with insignificant assets other than the Remaining Merger Consideration.  See Tr. at 19:7-12 (Court, Robbins).  The Court asked Mr. Robbins whether it was his opinion that Westland DevCo, LLC was free to do as it wished with the Remaining Merger Consideration, and Mr. Robbins responded that, in the absence of the Settlement, he believed that Westland DevCo, LLC had that ability.  See Tr. at 21:9-14 (Court, Robbins).  The Court asked whether the Unpaid Class Members have greater rights under the Settlement than under the merger agreement.  See Tr. at 23:21-24:1 (Court).  Mr. Robbins responded that the Unpaid Class Members would be like a business creditor if they wanted to seek relief and obtain a judgment.  See Tr. at 24:2-5 (Robbins).  The Court clarified that the Unpaid Class Members would not have a claim to the Remaining Merger Consideration, in the absence of the Settlement, and Mr. Robbins agreed with that statement.  See Tr. at 24:14-18 (Court, Robbins).  Lane then reiterated his position with respect to the Tenth Circuit's four-part test for determining whether a class action is fair, and emphasized that, because of changes in the market, the case was likely not as strong in 2012 as it was in 2006.

-59-

See Tr. at 25:2-30:11 (Court, Robbins).  He noted that his expert established that the class had damages in the amount of $46 per share, rather than the $150 per share damages that the class expected when it filed the case, which also diminished their present expectations for a large recovery.  See Tr. at 26:23-27:9 (Court, Robbins).  Lane asserted that, if Court approves the Settlement, the rate of recovery will be somewhere in the range of five to eight dollars per share. See Tr. at 30:3-11 (Robbins).

Lane stated that individuals representing about 7,000 shares have opted out and that will increase the recovery to the class members about one percent, but that the larger variable is how many class members submit a claim.  See Tr. at 31:7-13 (Robbins).  He asserted that, because of the extensive notice program, he believes that the claim rate will be high, but that it is unlikely to be one hundred percent.  See Tr. at 31:16-22 (Robbins).  The Court asked why there was a need for a claims administrator and for class members to submit a form, rather than using the same procedures used to give notice to the class to distribute the funds.  See Tr. at 31:24-32:5 (Court).  Lane argued that there is a benefit to the claims procedures, because it has lower administrative costs and avoids "shenanigans."  Tr. at 32:6-12 (Robbins).  He asserted that a claims process subjects individuals to the Court's jurisdiction and that such security was necessary given that: (i) the Remaining Merger Consideration was misplaced or forgotten for several years; and (ii) that there are still individuals who possess outstanding share certificates.  See Tr. at 32:12-16 (Robbins).  Lane argued that Mellon Investor Services was required to exchange original certificates for the cash consideration, but that to avoid problems regarding the validity of claims he believed a claims administrator is a prudent safeguard.  See Tr. at 32:16-20 (Robbins).  In response to the Court's question why someone would not submit a claim, Lane asserted that some of it was emotional, because some class members feel strongly that the SunCal Merger was not the correct course of action and want nothing to do with

it. <u>See</u> Tr. at 33:8-34:7 (Court). He further asserted that the some class members also might not take advantage of their claim if checks were mailed to class members and that the claims administrator avoids false claims. <u>See</u> Tr. at 34:8-22 (Court, Robbins). Lane contended that, when determining whether to settle, he and class counsel also took into account that several of the SunCal entities have filed for bankruptcy and that, although the Individual Defendants are worth about $10 million, it is difficult to go after individuals' property to fulfill a judgment. <u>See</u> Tr. at 34:24-35:10 (Robbins).

The Court then asked whether the proposed payment to Lane is consistent with the Court's earlier opinions. <u>See</u> Tr. at 36:18-19 (Court). Lane asserted that he believed that the application here is consistent, because this case is under the PSLRA and because his involvement in the litigation was an extraordinary undertaking. <u>See</u> Tr. at 36:20-37:3 (Robbins). He represented that he attended all but one hearing, sat in on every deposition, attended mediations, reviewed documents, and engaged in substantive discussions on discovery issues. <u>See</u> Tr. at 37:6-11 (Robbins). The Court asked from where the money for Lane was coming. <u>See</u> Tr. at 37:12-13 (Court). Lane responded that his award would reduce class counsel's fees and would not reduce the class' recovery. <u>See</u> Tr. at 37:14-20 (Robbins).

The Court then asked what it should do with respect to the corporate objectors. <u>See</u> Tr. at 37:21-38:2 (Court). Lane responded that the relief for which the corporate objectors ask is extraordinary -- only one of the objectors has a court judgment -- and they ask that the Court give them money based on a previous business relationship. <u>See</u> Tr. at 38:3-15 (Robbins). Lane asserted that he believes the Defendants acted out of an abundance of caution to notify possible creditors that they were using this money, but argued that this action is not the proper vehicle for them to receive any payment. <u>See</u> Tr. at 38:16-23 (Robbins). He argued that two of the corporate objectors do not have a judgment and that the one corporate objector with a judgment does not have a judgment

against Westland DevCo, LLC.  See Tr. at 38:24-39:9 (Court, Robbins).  Lane contended that it is

his understanding that the judgment is against SCC Acquisitions Inc., which is wholly owned by an

entity separate and apart from Westland DevCo LLC.  See Tr. at 39:22-40:2 (Mitchell).  He also

noted that the Interlegis Objection was filed late.  See Tr. at 40:3-10 (Mitchell).  Turning to the

individual objectors, Lane asserted that class counsel has sent out over 7,000 packages to former

Westland Development shareholders and one tenth of one percent of those individuals -- ten people

-- filed objections, representing a total of 216 shares.  See Tr. at 41:16-22 (Robbins).  He noted that

there were about 750,000 total Westland Development shares.  See Tr. at 41:23-24 (Court, Robbins).

Lane pointed out that Peter A. Sanchez, the Atrisco Foundation's Chief Executive Officer, owns

ninety of the objectors' shares, and suggested that his objection is related to his role on the Atrisco

Foundation.  See Tr. at 41:25-42:4 (Robbins).  Lane stated that class counsel sent Sanchez a letter

asking about his role as trustee of the Agnes B. Sanchez Revocable Trust, because class counsel has

no record of such a trust.  See Tr. at 42:13-21 (Robbins).  The Court clarified that this objecting

group was satisfied with the SunCal Merger, but wished that the Settlement funds would go to the

Atrisco Foundation.  See Tr. at 43:17-19 (Court).  Lane asserted that it is very unusual for an

objector to argue both that the Settlement is inadequate and unfair, and that the solution is to give

the class members nothing.  See Tr. at 43:23-44:7 (Robbins).  He contended that, since 2007, the

Atrisco Foundation has received millions of dollars and that most of that money is spent on

compensation for people like Sanchez.  See Tr. at 44:8-12 (Robbins).

   With respect to the Objectors' Memo, Lane argued that all objections and briefs in support

were due as of February 17, 2012, and noted that the Objectors' Memo was submitted on March 15,

2012.  See Tr. at 45:1-15 (Robbins).  He asserted that the notice program, which the individual

objectors attack, conforms with the standards of Gottlieb v. Wiles and  DeJulius v. New England

Health Care Emps. Pension Fund.  See Tr. at 45:16-19 (Robbins).  He contended that there can be no notice issue where class counsel sent out over 7,000 mail packages, posted the notice online, and had people manning the telephones.  See Tr. at 45:20-24 (Robbins).  Lane then recounted the efforts class counsel took to locate the Unpaid Class Members.  See Tr. at 46:17-47:21 (Court, Robbins).  Lane also noted that these procedures were on top of the procedures that Mellon Investor Services took to find the Unpaid Class Members at the time of the SunCal Merger, which included mail communication and paid inducements to locate shareholders.  See Tr. at 47:22-48:7 (Court, Robbins).  Westland Development asserted that there were two efforts before the merger to obtain proxies and that information was provided to class counsel.  See Tr. at 48:8-23 (Court, Fish).  Lane argued that class counsel have performed an exhaustive search for the Unpaid Class Members and that the starting point was Westland Development's list of shareholders.  See Tr. at 49:9-51:10 (Court, Robbins, Myers).  He contended that the individual objectors' argument that the shareholders do not know how much they will receive is without merit, because, with any class action, if less than one-hundred percent of class members file claims, the class could receive more.  See Tr. at 51:22-52:4 (Robbins).  Lane also asserted that there is a substantial likelihood that the class members will receive between five and eight dollars per share.  See Tr. at 52:5-9 (Robbins).  He argued that, under the Merger Agreement, the Unpaid Class Members were no longer entitled to the $2,278,702.41 and that the individual objectors' arguments on that issue do not reflect reality, because the Unpaid Class Members are better off under the Settlement than without it.  See Tr. at 52:10-15 (Robbins).

With respect to the attorney's fees, Lane contended that $3.8 billion is "hardly" an illusory benefit.  Tr. at 52:22-24 (Robbins).  He further asserted that it was only after the complaints in the state actions that the Atrisco Foundation was included in merger agreements and the Defendants admit that those complaints were a factor in accepting a Merger Agreement which was sixty dollars

per share higher than the original merger offer.  See Tr. at 52:25-54:4 (Robbins).  He argued that the courts have recognized that, when there are multiple causative factors, the burden is on the objectors to show lack of causation.  See Tr. at 54:5-20 (Robbins).  Lane noted that the Settlement and the attorney's fees were negotiated separately, because class counsel first negotiated with the Defendants for the class recovery and then negotiated with the insurer as to the attorney's fees.  See Tr. at 55:4-16 (Court, Robbins).  Lane then argued the Johnson v. Georgia Highway Express, Inc. factors in substantially the same manner as his Memo Seeking Approval.  See Tr. at 55:22-58:19 (Robbins).  He asserted that he viewed the litigation as a common-benefit and common-fund case, because it has elements like the termination of the Class B shares and the shareholder meeting, and because the attorney's fees represent something less than ten percent of the total benefit viewed in that light.  See Tr. at 59:5-19 (Robbins).

Westland Development then addressed the Remaining Merger Consideration.  It first stated that it is unusual to give notice to a defendant's creditors, but when the money was put in the Court registry, the three corporate objectors were notified.  See Tr. at 62:1-9 (Fish).  The Court asked whether the corporate objectors would be able to recover, if they do not receive some portion of the Settlement, and Westland Development indicated that they would be unlikely to recover.  See Tr. at 62:17-21 (Court, Fish).  The Court then asked whether there would be any fraudulent conduct in permitting the class to recover over these creditors.  See Tr. at 62:24-63:3 (Court).  Westland Development responded that the Settlement is not fraud, because Westland DevCo, LLC is settling a claim against it.  See Tr. at 63:4-12 (Fish).  It asserted that there was no problem in preferring the class creditors over other creditors.  See Tr. at 63:18-64:5 (Fish).  It represented that Westland DevCo, LLC preferred the class creditors, because it wanted to end this protracted litigation.  See Tr. at 64:8-14 (Fish).  Westland Development argued that the Settlement does not prejudice the

Unpaid Class Members, because it essentially gives them another bite at the apple and because Westland DevCo, LLC had no obligation to track down or pay any shareholder who had not yet come forward.  See Tr. at 67:17-68:18 (Court, Fish).  Westland Development also contended that the Interlegis, Inc. judgment is against SCC Acquisitions, Inc, which is a California corporation, and as of March 5, 2012, is still in good standing.  See Tr. at 71:15-72:10 (Fish).  It asserted that there are three corporate claimants, none of whom have a judgment against Westland DevCo, LLC, and none of whom have a right to ask the Court for compensation.  See Tr. at 72:11-18 (Fish).

The Individual Defendants asserted that the litigation was hard fought and that there were several disputes about the Settlement's language.  See Tr. at 75:5-16 (Bessette).  They represented that the negotiations were fairly typical in that, after the class claims are settled, the plaintiffs will turn to the insurance carrier to negotiate the attorney's fees.  See Tr. at 75:17-25 (Bessette).  The Individual Defendants stated that there was a specific exclusion within their insurance policy that excluded funds used to increase compensation in a transaction from the definition of a loss, but that defense costs were included.  See Tr. at 76:8-15 (Bessette).

The individual objectors asserted that, with respect to the timing of the Objectors' Memo, they looked at paragraph 18 of the notice and relied on that information to timely submit letters objecting, and that the brief was the only document that they filed after February 17, 2012.  See Tr. at 79:12-23 (Court, Barton).  They indicated that some of the individual objectors are associated with the Atrisco Foundation and so are familiar with the issues surrounding the SunCal Merger.  See Tr. at 80:15-22 (Barton).  The individual objectors asserted that the Unpaid Class Members are a sub-class.  See Tr. at 81:1 (Barton).  The Court asked what more could be done for the Unpaid Class Members.  See Tr. at 81:8 (Barton).  The individual objectors indicated that the Atrisco Foundation has some names and addresses with respect to persons it believes are Unpaid Class Members and

-65-

that the Atrisco Foundation's data has not yet been accessed.  See Tr. at 81:12-16 (Barton).  They argued that the Atrisco Foundation's resources represent the best chance to reach the Unpaid Class Members.  See Tr. at 81:17-23 (Barton).  They asserted that the number of Unpaid Class Members could be significantly higher than 287, but that they did not have a specific number.  See Tr. at 82:6-13 (Barton).  The individual objectors argued that there was a class conflict between the Unpaid Class Members and the rest of the class, and that it might behoove all parties to have a trustee appointed.  See Tr. at 82:18-83:10 (Barton).  The Court asked why the individual objectors and their counsel did not locate an Unpaid Class Member to demonstrate what more could be done, and to show that class counsel were not using adequate efforts to locate the Unpaid Class Members.  See Tr. at 83:14-19 (Court).  The individual objectors asserted that, at a minimum, there should be some procedure employed to ensure that the Unpaid Class Members' interests are protected.  See Tr. at 83:21-84:14 (Barton).  They argued that Westland DevCo, LLC did not make a request of Mellon Investor Services within one year of the effective date for it to deliver the Remaining Merger Consideration to Westland DevCo, LLC.  See Tr. at 85:22-86:2 (Barton).  The Court stated that it seemed that Mellon Investor Services ended up with money that nobody is claiming.  See Tr. at 86:22-23 (Court).  The individual objectors asserted that the process of paying the Remaining Merger Consideration into the Court registry is part of the process of returning the money to Westland DevCo, LLC and then the Unpaid Class Members can look to Westland DevCo, LLC for their $315 per share payment.  See Tr. at 87:8-88:6 (Barton).

The individual objectors argued that some procedures should be in place to make sure that the Unpaid Class Members are protected and that there is a significant question whether all appropriate efforts have been made to reach the Unpaid Class Members.  See Tr. at 88:7-13 (Barton).  They contended that the Atrisco Foundation has a list of names that it believes are Unpaid

Class Members and, at a minimum, that list demonstrates that not all has been done that could be. See Tr. at 88:14-18 (Barton). The Court then asked whether the Atrisco Foundation has an incentive to locate the Unpaid Class Members if the Atrisco Foundation is asking that the Settlement funds go to it. See Tr. at 89:15-18 (Court). They responded that the Court's assessment was "arguably correct." Tr. at 89:19-20 (Barton). The individual objectors stated that they are concerned with the internal class conflict and believe that the Court should appoint a trustee. See Tr. at 90:1-10 (Barton). They admitted that the Atrisco Foundation may not completely have the Unpaid Class Members interests at heart, but that the Atrisco Foundation has a lot of shareholder information. See Tr. at 90:11-21 (Barton). They argued, however, that this case presents an unusual situation, because there was an escrow fund set up for the Unpaid Class Members, and that the Settlement asks that the Court release those funds for the benefit of all class members. See Tr. at 90:22-91:6 (Barton). The individual objectors asserted that there has been no court adjudication of what rights the Unpaid Class Members have to these funds. See Tr. at 92:1-5 (Barton). The Court asked whether the money would return to Westland DevCo, LLC, if the Court rejects the Settlement. See Tr. at 92:9-11 (Court). The individual objectors agreed that the Court's assessment was likely correct. See Tr. at 92:12-14 (Barton). The Court then asked, if that scenario is likely the case, whether the Unpaid Class Members are in the same position as the other objectors -- they are general creditors. See Tr. at 92:15-18 (Court). The individual objectors agreed, but argued that the same fundamental issue exists -- how do the parties make the best effort to locate the Unpaid Class Members. See Tr. at 92:18-25 (Barton). The Court then asked whether the Unpaid Class Members would be in a better position if the Court approves the Settlement. See Tr. at 93:1-5 (Court). The individual objectors agreed that the Unpaid Class Members are in a better position if the Court approves the Settlement. See Tr. at 93:5 (Barton).

-67-

With respect to the request for attorney's fees, the individual objectors asserted that the Defendants were always willing to pay the $2,278,702.41 to the Unpaid Class Members. See Tr. at 94:3-6 (Barton). They argued that the net funds that class counsel obtained was $1.5 million, which raised red flags when the attorney's fees are $3.1 million. See Tr. at 94:6-12 (Barton). They contended that, even if the Court finds that all of these funds should be considered a benefit to the class, that would be a total of $6.8 million and that class counsel should receive somewhere between thirty and thirty-eight percent of that figure. See Tr. at 94:20-95:5 (Barton). The Court asked whether it was appropriate to include the $3.1 million in that pool, because it comes from the insurer. See Tr. at 95:11-18 (Court). The individual objectors suggested that the fact that the fees were negotiated separately raises concerns. See Tr. at 95:19-23 (Barton). They asserted that the Court has to consider this negotiation in the context of a settlement where a significant portion of the recovery was pre-existing for the benefit of a portion of the class and that to then exclude the attorney's fees from the common fund is suspect. See Tr. at 96:7-20 (Barton). The Court asked whether it mattered from where the money came. See Tr. at 97:9-12 (Court). The individual objectors argued that it matters, because the Remaining Merger Consideration was a pre-existing fund that was in place for the benefit of a portion of the class and now it is being converted for the benefit of all, without any adjudication of the Unpaid Class Members' rights to that money. See Tr. at 97:13-98:11 (Barton).

Miller Barondess then argued in support of its objection. Miller Barondess asked that the Court do equity and acknowledge that Miller Barondess performed work for Westland DevCo, LLC in 2010. See Tr. at 99:15-21 (Gunderson). Miller Barondess asserted that no one has challenged the veracity of the bills that Miller Barondess submitted and noted that, until the litigation, no one was aware the Remaining Merger Consideration existed. See Tr. at 99:22-100:1 (Gunderson).

-68-

Miller Barondess stated that it wanted to be paid for services rendered in 2010. See Tr. at 100:2-8 (Gunderson). The Court then asked how it could determine that this work was performed for Westland DevCo, LLC. See Tr. at 100:12-15 (Court). Miller Barondess explained that the SunCal entities are the overall management company and that there is a specific billing code for Westland DevCo, LLC to identify that individual entity. See Tr. at 100:16-101:3 (Gunderson). Miller Barondess indicated that each of the bills contain the Westland DevCo, LLC billing code. See Tr. at 101:3-6 (Gunderson). Miller Barondess also represented that Westland DevCo, LLC reflects these debts in its books. See Tr. at 101:23-25 (Gunderson). Miller Barondess asserted that the notice it received was the first time it became aware that Westland DevCo, LLC had funds sufficient to satisfy its bills. See Tr. at 102:15-19 (Gunderson). The Court then asked why, from an equitable standpoint, Miller Barondess should benefit from the class and its counsel's work. See Tr. at 102:20-25 (Court). Miller Barondess asserted that it was simply asking that the Court do equity, because, in 2010, when the work was done, there were no assets to the pay the bills. See Tr. at 103:10-17 (Court, Gunderson).

The Court then asked if anyone was present at the hearing for Stephens Property, and, after receiving no response, allowed Interlegis, Inc. to argue in support of its objection. See Tr. at 104:25-105:10 (Court). Interlegis, Inc. asserted that it was before the Court because it was invited to do so by the SunCal entities, which includes SCC Acquisitions, Inc. See Tr. at 106:15-19 (Rappaport). It stated that it was given notice that certain funds would be used to satisfy the Settlement and that it was asked if there were any objections. See Tr. at 106:22-107:3 (Rappaport). Interlegis, Inc. argued that no party has questioned the validity of its two judgments. See Tr. at 107:4-5 (Rappaport). In response to the Court's question, Interlegis informed the Court that its judgments are against SCC Acquisitions, Inc. See Tr. at 107:6-8 (Rappaport). The Court asked about the

argument that there is a California entity known as SCC Acquisitions, Inc.  <u>See</u> Tr. at 107:9-13 (Court).  Interlegis, Inc. stated that it was unaware that there was such an entity before the hearing and asserted that it does not know whether SCC Acquisitions, Inc. is a shareholder of Westland DevCo, LLC, but noted that Cook is a signatory to the SunCal Merger as well as the contract with Interlegis, Inc.  <u>See</u> Tr. at 108:2-7 (Rappaport).  Interlegis, Inc. clarified that, to the extent that the funds run back to SCC Acquisitions, Inc., Interlegis, Inc. objects to their use in the Settlement rather than to pay its judgment.  <u>See</u> Tr. at 108:16-20 (Rappaport).

The Individual Defendants later clarified that, with respect to the attorney's fees provision in the Settlement, the fees were negotiated separately with their insurance carrier and that, if the Court reduces the fees in any way, those funds would go back to the insurance carrier, and not increase the class funds.  <u>See</u> Tr. at 113:13-22 (Bessette).  The Court then stated that it did not appear to be a benefit to the class members if the Court reduces the attorney's fees, and the Individual Defendants agreed.  <u>See</u> Tr. at 113:23-25 (Court, Bessette).

With respect to the Baroness Objection, class counsel asserted that it appeared that the work Miller Baroness performed was for Westland DevCo, LLP and not Westland DevCo, LLC.  <u>See</u> Tr. at 117:6-12 (Mitchell).  With respect to the individual objectors, Westland Development stated that it would hope that the Atrisco Foundation would supply class counsel with the Atrisco Foundation's list of the Unpaid Class Members.  <u>See</u> Tr. at 111:6-10 (Fish).  Lane asserted that he and class counsel were in agreement with the individual objectors that the parties were looking for the best possible opportunity to locate and pay the Unpaid Class Members.  <u>See</u> Tr. at 119:20-22 (Robbins).  He asserted, however, that there was no subclass.  <u>See</u> Tr. at 119:23-24 (Robbins).  Lane argued that, if the Atrisco Foundation has names and addresses, and will turn them over, class counsel will begin going through that information immediately.  <u>See</u> Tr. at 120:4-10 (Robbins).  He

also asked why no Unpaid Class Member was before the Court, if the Atrisco Foundation has such easy access to the Unpaid Class Members.  See Tr. at 120:10-16 (Robbins).  With respect to the suggestion that the Court appoint a trustee, Lane argued that the Atrisco Foundation would be an inappropriate trustee, because the fiduciaries of the Atrisco Foundation have been paid extraordinary compensation and that the class should not be a vehicle for adding persons or entities who may attempt to extract economic gain under the guise of assisting the class.  See Tr. at 123:7-22 (Robbins).  Lane stated that he would be glad to exchange information regarding the Unpaid Class Members with the Atrisco Foundation.  See Tr. at 124:6-10 (Robbins).  The Atrisco Foundation asserted that it did not have the man power to go through its data and that it would have to assess whether turning over its information was feasible.  See Tr. at 125:19-126:13 (Garcia).  The Atrisco Foundation agreed to send the Court a letter indicating its position on the exchange of information. See Tr. at 127:9-12 (Court, Barton).

### 8.  **Post-Hearing Filings.**

On March 21, 2012, Westland DevCo, LLC submitted its Supplemental Brief Regarding Settlement Approval.  See Doc. 414 ("Supplemental Brief").  Westland DevCo, LLC asserts that, at the hearing, it had informed the Court that, unless a bankruptcy is filed within ninety days of a transfer, there was nothing improper about preferring the class over other creditors. See Supplemental Briefing at 1.  It argues that, in Collier on Bankruptcy, the "first sentence in the 'Overview of Section 547' states, 'A debtor may ordinarily prefer one or more of its creditors, so long as the transfer or payment is to pay or secure a legitimate debt and violates no statute.'" Supplemental Brief at 1 (quoting A. Resnick & H. Sommer, Collier on Bankruptcy § 547.01, at 547-48 (16th ed. 2010)).  Westland DevCo, LLC also points to Kenan v. Fort Worth Pipe Co. (In re Rodman, Inc.), 792 F.2d 125 (10th Cir. 1986) for support.  See Supplemental Brief at 2.  It contends

-71-

that it was the party that issued the proxy which is alleged to be wrongful and that the release of claims against it is valid consideration for the transfer. See Supplemental Brief at 2.

On March 22, 2012, Miller Barondess filed its Supplemental Reply in Support of Miller Barondess, LLP's Objection to Use of Funds in Court Registry for Settlement. See Doc. 415 ("Supplemental Reply"). Miller Barondess argues that "Section 547 is not applicable here because Miller Barondess is a creditor, and the class members are shareholders," and that Westland DevCo, LLC "is wrong under the law." Supplemental Reply at 2. Miller Barondess asserts that it is a basic principle of corporate law that creditors are paid ahead of shareholders. See Supplemental Reply at 2 (citing 16 W. Fletcher, et al., Fletcher Cyclopedia of the Law of Private Corporations § 7941 (West perm. Ed., rev. vol. 2012)). Miller Barondess contends that this "absolute priority rule" is a fundamental principle of American bankruptcy law and that "[t]he absolute priority rule requires that certain classes of claimants be paid in full before any member of a subordinate class is paid." Supplemental Reply at 2 (quoting In re Geneva Steel Co., 281 F.3d 1173, 1180 (10th Cir. 2002)). It further asserts that, "[u]nder this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." Supplemental Reply at 3 (quoting In re Geneva Steel Co., 281 F.3d at 1181 n.4). Miller Barondess argues that, as a creditor, it is entitled to payment for services rendered to Westland DevCo, LLC before its remaining assets are distributed to the class members, who are shareholders. See Supplemental Reply at 3. Miller Barondess contends that the Remaining Merger Consideration is the only asset of Westland DevCo, LLC from which Miller Barondess can be compensated for its outstanding bills. See Supplemental Reply at 3. Miller Barondess asserts that it would be unfair and inequitable to "disregard basic corporate law and deprive the firm of recovery of amounts admittedly due and owing." Supplemental Reply at 3. It argues that there is no equity "in the position espoused by the

-72-

shareholders," because the shareholders "want everything, every penny, on their alleged and unproven claims, while seeking to deny Miller Barondess any payment in its status as a bona fide creditor who rendered valuable services."  Supplemental Reply at 4.

On April 13, 2012, the individual objectors filed the Notice of Correspondence to the Honorable James O. Browning, see Doc. 417 ("Objectors' Notice"), and the Letter from Peter Sanchez to the Court, see Doc. 417-1 ("Sanchez Letter").  In the Objectors' Notice, they maintain their objections to the Settlement and ask that the Court deny final approval of the Settlement. See Objectors' Notice at 1.  They assert that, without waiving their objections, they are providing correspondence from the Atrisco Foundation in response to the Court's inquiry at the hearing. See Objectors' Notice at 1.  In the Sanchez Letter, Sanchez, the Atrisco Foundation's Executive Director, asserts that, in the course of accomplishing its mission, the Atrisco Foundation acquired the list of shareholders as of the date of the SunCal Merger and "all of the genealogical records for the heirs to the grantees for the Atrisco Land Grant."  Sanchez Letter at 1.  He also represents that the Atrisco Foundation has "updated its records regarding the current heirs to the former shareholders of Westland and the current heirs to the Atrisco Land Grant."  Sanchez Letter at 1 (emphasis original).  Sanchez argues that the Atrisco Foundation has identified approximately 20,000 heirs whose parents or grandparents sold their shares before the sale, or are not yet shareholders, and that, to his knowledge, no other entity or person has those records.  See Sanchez Letter at 1.  He contends that class counsel's efforts to contact "heirs of former Westland shareholders will not be complete without having [the] current data and information of the former Westland shareholders and their heirs."  Sanchez Letter at 1-2.  He asserts that the Atrisco Foundation "has known about the fund for former a Westland shareholder that was held by Mellon Investor Services, LLC (Mellon) from the beginning of its operations."  Sanchez Letter at 2.

-73-

Sanchez argues that the SunCal entities were aware of the existence of the fund and that "any suggestion by anyone that Plaintiffs' efforts led to the discovery of this fund is not supported by the facts." Sanchez Letter at 2 (citing Electronic Mail Transmission from Michelle Johnson to Will Steadman (dated July 27, 2007), filed April 13, 2012 (Doc. 417-1)("Johnson Email")). He asserts that Mellon Investor Services has made payments to the Unpaid Class Members as late as 2011 and that, during its existence, the Atrisco Foundation has directed former Westland Development shareholders to Mellon Investor Services to redeem their Westland Development shares. See Sanchez Letter at 2 (citing Electronic Mail Transmission from Keelan Deshields to Carolyn Ortega (dated April 3, 2012), filed April 13, 2012 (Doc. 417-1)("4:42 p.m. April 3, 2012 Deshields Email"); Electronic Mail Transmission from Keelan Deshields to Carolyn Ortega (dated April 3, 2012), filed April 13, 2012 (Doc. 417-1)("3:34 p.m. April 3, 2012 Deshields Email")).

With respect to class counsel's assertion at the hearing that most class members reside in New Mexico or California, Sanchez notes that twenty-seven percent or 1,809 former Westland Development shareholders live outside of New Mexico or California. See Sanchez Letter at 2. He argues that, if class counsel "only directed their efforts to locate former Westland shareholders to New Mexico and California, they missed a substantial number of former Westland shareholders and shareholder heirs." Letter at 2. He asserts that, if the Court approves the Settlement, the Atrisco Foundation is willing to help locate former Westland Development shareholders and their heirs. See Sanchez Letter at 3. Sanchez states that the Atrisco Foundation proposes a two-step process. See Letter at 3. First, the Atrisco Foundation would compare the lists of former Westland Development shareholders who have not redeemed their Westland Development shares, because 270 Unpaid Class Members seems low to Sanchez, and that, depending on the amount the parties want to reimburse the Atrisco Foundation, the Atrisco Foundation could also make one or more direct

-74-

mailings to the mailing list of 8,000 former shareholders and website publication.  See Sanchez
Letter at 3.  Second, the Atrisco Foundation would be willing to dedicate a full time Atrisco
Foundation staff member to research, locate, and contact the former Westland Development
shareholders and their heirs.  See Sanchez Letter at 3.  Sanchez asserts that this program should
initially run for six months at a reimbursement rate of $50,000.00 per year plus costs.  See Sanchez
Letter at 3.  Sanchez also states that the Atrisco Foundation would be willing to utilize the company
-- Raymond James Financial Services -- which it uses to manage Atrisco Foundation funds to
manage to the Settlement funds on a restricted basis with all earned interest to be paid as the Court
directs.  See Sanchez Letter at 3.

On April 20, 2012, Lane filed the Lead Plaintiff's Response to the Objectors' Notice of
Filing.  See Doc. 418 ("Notice Response").  Lane first notes that, at the hearing, the individual
objectors -- whose counsel also represents the Atrisco Foundation -- expressed concern that the
Atrisco Foundation had a list of Westland Development shareholders which included individuals
not on the list which class counsel obtained from Mellon Investor Services.  See Notice Response
at 2.  Lane states that the Court asked the individual objectors or the Atrisco Foundation to submit
a letter within ten days to inform the Court whether the Atrisco Foundation has a list of class
members who did not receive payment.  See Notice Response at 2.  He points out that the individual
objectors did not submit the Objectors' Notice until twenty-four days after the hearing and that it
confirms that the Atrisco Foundation "does not have a list identifying Class Members who did not
receive payment and that it never had any such information."  Notice Response at 2 (emphasis
original).  He argues that the Atrisco Foundation's purported concern about class counsel's best
efforts "appears to have been ill-founded, at best."  Notice Response at 2.  Lane contends that any
assertion that 170 to 270 Unpaid Class Members "seems low" is without support and that the list

which class counsel obtained from Mellon Investor Services confirms that there are 287 Unpaid Class Members. Notice Response at 3 n.2. He argues that the Atrisco Foundation now "purports to have an inventory of 'current heirs to the former shareholders of Westland and the current heirs to the Atrisco Land Grant,'" and that such a vast collection of names is not the list that the individual objectors told the Court the Atrisco Foundation possessed at the hearing. Notice Response at 3 (emphasis original). Lane emphasizes that the class is made up of those who held outstanding shares of Westland Development common stock as of the close of business on September 18, 2006, and asserts that the "fact that the [Atrisco Foundation] identified approximately 20,000 heirs whose parents or grandparents sold their shares years prior to the sale or are not yet shareholders,' is not relevant for the purposes of this Settlement." Notice Response at 3 (emphasis original). He points out that the Atrisco Foundation still has not, or cannot, identify any class member who did not receive payment "despite the various records it claims to possess." Notice Response at 4. Lane contends that class counsel did not confine its notice to California and New Mexico, but mailed 7,409 claims packages to potential class members nationwide and that the "motives underlying [the Atrisco Foundation's] proposal are self-evident." Notice Response at 4, 6.

## LAW REGARDING APPROVAL OF CLASS-ACTION SETTLEMENTS

Rule 23 of the Federal Rules of Civil Procedure requires judicial approval of a class action. See Fed. R. Civ. P. 23(e)("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."). A district court considering a proposed class-action settlement must determine whether the proposed settlement is fair, reasonable, and adequate. See In re Integra Realty Res., Inc., 354 F.3d 1246, 1266 (10th Cir. 2004). "It is well-settled, as a matter of sound policy, that the law should favor the settlement of controversies." Grady v. De Ville Motor Hotel, Inc., 415 F.2d 449, 451 (10th Cir. 1969). The Tenth

Circuit, in Jones v. Nuclear Pharmacy, Inc., 741 F.2d 322 (10th Cir. 1984), established a four-factor

test for assessing whether a proposed settlement is fair, reasonable, and adequate, which includes:

(i) whether the proposed settlement was fairly and honestly negotiated; (ii) whether serious

questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (iii) whether

the value of an immediate recovery outweighs the mere possibility of future relief after protracted

and expensive litigation; and (iv) the parties' judgment that the settlement is fair and reasonable.

See 741 F.2d at 324.  In Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180 (10th Cir. 2002),

the Tenth Circuit addressed objections to a class-action settlement, which the district court had

approved.  See 314 F.3d at 1187.  The objectors argued that the class representatives and class

counsel failed to adequately represent the class members, and/or suffered conflicts of interest.

See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  The objectors also challenged the

fairness and reasonableness of the settlement.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314

F.3d at 1188.  The Tenth Circuit found that the adequacy requirement of rule 23(a)(4) of the Federal

Rules of Civil Procedure was satisfied, because each subgroup had its own class representative

during settlement negotiations.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.

With respect to the fairness and reasonableness of the settlement, the Tenth Circuit found that the

district court did not abuse its discretion in determining that the settlement, "from which an

extremely small percentage of class members opted out, was fair, reasonable, and adequate." Rutter

& Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1189.

    In DeJulius v. New England Health Care Emps. Pension Fund, the Tenth Circuit addressed

the adequacy of class notice procedures.  It held that due process "does not require actual notice to

each party intended to be bound by the adjudication of a representative action." DeJulius v. New

England Health Care Emps. Pension Fund, 429 F.3d at 944.  For due-process purposes, Tenth

Circuit precedent focuses upon whether the district court gave "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort." In re Integra Realty Res., Inc., 262 F.3d 1089, 1110 (10th Cir. 2001).  With respect to the fairness and reasonableness of a settlement, the Tenth Circuit has held that a district court did not abuse its discretion in approving a class settlement from which an "extremely small percentage of class members opted out." Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.

        In Robles v. Brake Masters Systems, Inc., No. 10-0135, 2011 U.S. Dist. LEXIS 14432 (D.N.M. Jan. 31, 2011)(Browning, J.), the Court granted in part and denied in part the parties' joint motion for approval of a class action settlement. See 2011 U.S. Dist. LEXIS at *1.  The Court denied the distribution of an incentive award to the class representative. See Robles v. Brake Masters Sys. Inc., 2011 U.S. Dist. LEXIS at *26.  The Court held that the class representative was not entitled to an incentive award because he did not put forth more effort or incur more risk than any other plaintiff. See Robles v. Brake Masters Sys. Inc., 2011 U.S. Dist. LEXIS at *26.  The Court found that, other than the incentive award, the class-action settlement was fair and approved the settlement agreement. See Robles v. Brake Masters Sys. Inc., 2011 U.S. Dist. LEXIS at *51. Recently, the Court found that a settlement was unfair where the named plaintiffs, who were class representatives, received a large lump sum award of $30,000.00, but the rest of the class received a pro rata award of the remainder that could be as little as $1,066.38. See Lowery v. City of Albuquerque, 2012 WL 394392, at *23.  The Court found troubling: (i) the disparity between the amount that the class representatives would receive, as opposed to the rest of the class; (ii) the set amount guaranteed to the class representatives; and (iii) that the amount for the class representatives decreased the award to the other class members and came out of the class fund, rather than the attorney's fees. See Lowery v. City of Albuquerque, 2012 WL 394392, at *24.

## LAW REGARDING THE CY PRES DOCTRINE

The cy pres doctrine is an equitable doctrine under which courts "distribute unclaimed portions of a class-action judgment or settlement funds to a charity that will advance the interests of the class." Black's Law Dictionary 444 (9th ed. 2009). It derives from the French expression "cy pres comme possible," which means "as near as possible," and developed out of the law of trusts. M. Redish, P. Julian, & S. Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: a Normative and Empirical Analysis, 62 Fla. L. Rev. 617 (2010).

> "Cy pres" is an equitable doctrine, designed to save testamentary charitable trusts that would otherwise fail because their beneficiaries are no longer capable of receiving the funds the trust held for them. The Cy pres doctrine allows trust funds to be applied to the next best use that would most closely satisfy the testator's intent.

5 J. Moore, J. Solovy, R. Marmer, T. Chorvat, and D. Feinberg, Moore's Federal Practice, § 23.171, at 23-599 (3d ed. 2011). "The doctrine, or rather something parading under its name, has been applied in class action cases . . . , but for a reason unrelated to the reason for the trust doctrine." Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 784 (7th Cir. 2004)(Posner, J.). "Use of the cy pres doctrine in the class action context can be traced largely to a pioneering student Comment, published in the University of Chicago Law Review in 1972." M. Redish, P. Julian, & S. Zyontz, 62 Fla. L. Rev. at 631 (citing Stewart R. Shepard, Comment, Damage Distribution in Class Actions: The Cy Pres Remedy, 39 U. Chi. L. Rev. 448 (1972)). That student argued that "[w]hen distribution problems arise in large class actions, courts may seek to apply their own version of cy pres by effectuating as closely as possible the intent of the legislature in providing the legal remedies on which the main cause of action was based." S. Shepard, Comment, 39 U. Chi. L. Rev. at 452. Courts resort to cy pres where funds remain after distributing a class award and the court wishes to avoid: (i) returning the funds to a defendant who has been found liable, or agreed it was liable, in

that amount; and (ii) increasing the pro-rata share of the class members who file claims, potentially

giving those class members a windfall.  <u>See</u>  M. Redish, P. Julian, & S. Zyontz, 62 Fla. L. Rev. at

619.  In the context of a class action, a court may employ the cy pres doctrine to "put the unclaimed

fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the

class."  <u>Masters v. Wilhemina Model Agency, Inc.</u>, 473 F.3d 423, 436 (2d Cir. 2007).

 The Court found no case from the Tenth Circuit discussing the validity of the cy pres

doctrine with respect to class actions.  In <u>Robles v. Brake Masters Systems, Inc.</u>, the Court noted

that recent academic debate has "called into question the constitutionality of certain class action

remedies, in part because some remedies transform the underlying substantive law." 2011 U.S. Dist.

LEXIS 14432, at *46 (citing M. Gilles & G. Friedman, <u>Exploding the Class Action Agency Costs</u>

<u>Myth: the Social Utility of Entrepreneurial Lawyers</u>, 155 U. Pa. L. Rev. 103 (2006); M. Redish, P.

Julian, & S. Zyontz, 62 Fla. L. Rev. 617; S. Yospe, <u>Cy Pres Distributions in Class Action</u>

<u>Settlements</u>, 2009 Colum. Bus. L. Rev. 1014 (2009)).  In <u>In re Thornburg Mortgage, Inc. Securities</u>

<u>Litigation</u>, No. CIV 07-0815, the Court recently granted preliminary approval of a class settlement.

<u>See</u> <u>In re Thornburg Mortg. Sec. Litig.</u>, No. CIV 07-0815, Order Preliminarily Approving Settlement

and Providing for Notice, filed April 23, 2012 (Doc. 387)("<u>Thornburg</u> Order").  In the <u>Thornburg</u>

Order, the Court noted its view that the cy pres doctrine is not a "sound judicial doctrine" and

declined to approve a provision in which any unclaimed balance went to the Center for Civic Values

in Albuquerque.  <u>Thornburg</u> Order at 15.  The Court believes that funds which are part of a class

settlement should either be distributed to the class members or returned to the defendants and that

a class action should not be "a free-standing device to do justice."  <u>Thornburg</u> Order at 15.

 The Court has a basic disagreement with the application of this doctrine for several reasons:

(i) class actions are disputes between parties and the money damages should remain among the

parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

With respect to the Court's first criticism, several Circuit Court Judges have discussed a similar view.  The Honorable Richard A. Posner, United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, has commented on the unsoundness of the rationale underlying the application of the cy pres doctrine. Writing for the Seventh Circuit, he noted that "[t]here is no indirect benefit to the class from the defendant's giving the money to someone else" and noted that the badly named "'cy pres' remedy" is "purely punitive." Mirfasihi v. Fleet Mortg. Corp., 356 F.3d at 784.  The Honorable Joseph F. Weis, Senior United States Circuit Judge for the United States Court of Appeals for the Third Circuit, concurring and dissenting in In re Pet Food Products Liability Litigation, 629 F.3d 333 (3d Cir. 2010), also stated that he was "not persuaded that application of the cy pres doctrine is appropriate in the class action setting," and that "any funds remaining at the conclusion of the claims process should be distributed to class members where possible or escheated to the government."  629 F.3d at 359 (Weis, J., concurring and dissenting). Discussing the fundamental differences between a testator's wishes -- at which the cy pres doctrine was originally aimed -- and class actions, Judge Weis noted that, "[t]his lawsuit is not charitable," and that "[t]here are no individuals whose wishes need to be considered and there is no intent to benefit charitable purposes that can be attributed to the class members or the lawyers who established the fund." In re Pet Food Prods. Liab. Litig., 629 F.3d at 363 (Weis, J., concurring and dissenting).  He commented that "[w]e deal here with charitable contributions to which members

of the class never voiced any interest or approval and a procedure subject to criticism as an inappropriate judicial function." In re Pet Food Prods. Liab. Litig., 629 F.3d at 363 (Weis, J., concurring and dissenting)(footnote omitted).  The Court agrees with the position that Judge Weis advances.  Parties do not initiate class actions so that class action damages can be distributed to third parties not involved in the litigation and without standing to sue for the damages they receive through court intervention.  Traditionally, the argument in favor of cy pres awards has been that it prevents both plaintiffs and defendants from receiving a windfall.  This rationale, however, does not justify an award to parties outside the litigation.  In the Court's experience, there is unlikely to be a large windfall to the class members, because, even if not all class members file claims, the class is usually sufficiently numerous that distributing the remaining class funds to those class members does not substantially increase their individual awards.  Also, rarely do plaintiffs get one-hundred percent of the damages or losses in a settlement; often they are dealing with financially strapped defendants, who force the plaintiffs to take a serious haircut in settlement.  On the other side of the equation, the defendant's arguably have a strong equitable claim to the funds, as it provided the funds in the expectation that compensating the class would exhaust the funds and, if that purpose is not fulfilled, the defendant does not experience a windfall when the money is returned -- it simply demonstrates that the parties misjudged the class size or interest in recovery.  See Wilson v. Southwest Airlines, Inc., 880 F.2d 807, 810-813 (5th Cir. 1989).  The Honorable Edith H. Jones, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, has expressed similar sentiments.  In a concurring opinion, she stated: "It is inherently dubious to apply a doctrine associated with the voluntary distribution of a gift to the entirely unrelated context of a class action settlement, which a defendant no doubt agrees to as the lesser of various harms confronting it in litigation." Klier v. Elf Atochem N. Am., Inc., 658 F.3d at 480 (Jones, J.,

-82-

concurring).  The defendant usually just wants to the case to go away, and does not care where the money goes if the case will disappear.  With cy pres, the plaintiff's lawyers get fees and costs, and if there are remaining funds, a sizable contribution to his or her favorite charity.

The Court also believes that distributions to third parties presents issues regarding the appearance of impropriety, because judges are engaging in the selective distribution of funds to parties not before it.  There are no principled rationales for how a court goes about choosing from among charitable organizations when there is no indication that the parties contemplated that these funds might be distributed to a third-party entity.  There is no mechanism for how charitable organizations come before the court to be considered for such an award.  Three national newspapers have all indicated the suspect nature of judges engaging in such awards.  In an article for the <u>New York Times</u>, Adam Liptak[17] quoted Samuel Issacharoff, a law professor at New York University, as stating that the practice of awarding cy pres awards is "getting out of hand" and former federal judge David F. Levi, now dean of the Duke University School of Law, as stating that "allowing judges to choose how to spend other people's money 'is not a true judicial function."  Adam Liptak, <u>Doling Out Other People's Money</u>, N.Y. Times, Nov. 26, 2007, at A14.  Liptak noted that "[j]udges are turning into grant administrators, and some of them are starting to enjoy it.  Who wouldn't?"  A. Liptak, N.Y. Times, at A14.  In an editorial, the <u>Washington Post</u> expressed the opinion that, "[i]n all but the rarest of circumstances, [cy pres] funds should be made available to individual plaintiffs and not to outside organizations -- no matter how worthy," because "giving the money away to favorite charities with little or no relation to the underlying litigation is inappropriate and

---

[17]Adam Liptak is an attorney and is the Supreme Court correspondent for the <u>New York Times</u>.  <u>See</u> Columnist Biography: Adam Liptak, <u>New York Times</u>, http://www.nytimes.com/ref/us/bio-liptak.html (last visited May 19, 2012).

borders on distasteful." Editorial, When Judges Get Generous: A Better Way to Donate Surpluses from Class-Action Awards, Wash. Post, Dec. 17, 2007, at A20. The Wall Street Journal describes cy pres awards as distributing "the money, in an ad hoc manner, to people who are not even in the class, who would not have had standing to sue, and who were never even alleged to have been wronged." George Krueger & Judd Serotta, Op-Ed., Our Class-Action System is Unconstitutional, Wall St. J., Aug. 6, 2008, at A13. It noted that "[j]udges, in their unlimited discretion, have occasionally been known to order a distribution to some place like their own alma mater or a public interest organization that they happen to favor." G. Krueger & J. Serotta, Wall St. J., Op-Ed. One commentator notes that "[j]udges often do not explain or justify their cy pres decision and there are very few instances in which cy pres distributions have been overturned on appeal," and that the "broad range of discretionary decisions" involved "gives trial judges enormous power." S. Yospe, 2009 Colum. Bus. L. Rev. at 1037. The broad range of discretion that trial judges have to distribute funds and the possibility that such distributions will be viewed as selfish decisions made to charitable organizations with which a judge is involved tarnishes the judiciary's image and creates the appearance of impropriety. The class members or public might see that the court may become more interested in being a bigshot in his or her community than really making certain that the class members get every penny to which they are entitled. As these articles indicate, to have judges making these kinds of decisions is inappropriate, and the Court does not want to engage in such unlimited, unprincipled decision-making.

Furthermore, courts are often not in the best position to make these decisions and any efforts to become better informed about the range of charitable organizations available is likely to result in lobbying for distributions from the Court. Courts should not be placed in the tenuous position of making a false choice about which organizations will convey the greatest "indirect" benefit to

class members who are not present and have no real voice in determining who should receive the funds. Judges "often use their discretion to approve charities proposed by class counsel" and "many cy pres distributions are channeled to organizations that support the work done by plaintiffs' attorneys." S. Yospe, 2009 Colum. Bus. L. Rev. at 1028. It thus appears that courts do not, in any meaningful way, search for the organization that is the "next-best" recipient of the funds, and are not in the best position to further the unpaid class member's interests, but approve a distribution to the organization whose name is put before it. Courts are likely in the habit of approving distributions to organizations that the class counsel proffer, because courts have limited time and resources to search for alternative options. Also, it is unclear how a court, with its limited resources, would solicit charitable organizations which might be the "next-best" recipient without engaging in ex parte shopping. An additional bias that some commentators have noted, with respect to cy pres awards, is a geographic bias. Even where a class is national in scope, cy pres awards tend to be distributed to charities within the district in which the case was brought. See S. Yospe, 2009 Colum. Bus. L. Rev. at 1030-31. To put themselves in a better position to receive awards, groups have now started lobbying for cy pres distributions where it appears there might be funds remaining. For example, "the New York Bar Association recently published a manual promoting the use of cy pres and appointed a working group 'to develop an effective educational and marketing strategy' with the goal of steering money awards towards the bar association's legal services departments." S. Yospe, 2009 Colum. Bus. L. Rev. at 1035. In his article, Liptak also noted that "[t]he process is starting to become institutionalized, and legal services organizations that represent poor people have begun relying on class-action settlements to finance their work." A. Liptak, N.Y. Times at A14. This seems far afield from the purposes of the class action litigation, from the cy pres doctrine, and

from the traditional functions of the courts.  Courts address cases and controversies; they are not fora

in which to reorder society or push social agendas.

Professor Martin H. Redish of Northwestern University School of Law has expressed

concerns about the constitutionality of cy pres awards and, while the Court does not need to rest, and

does not rest, its disapproval on a finding that such practices are unconstitutional,[18] the Court notes

that this may be another problem casting doubt on the validity of cy pres awards.  Professor Redish

has said:

> Use of cy pres simultaneously violates the constitutional dictates of separation of
> powers by employing a Federal Rule of Civil Procedure to alter the compensatory
> enforcement mechanism dictated by the applicable substantive law being enforced
> in the class action proceeding.  It has somehow become common practice among
> many courts, scholars, and members of the public to view the modern class action
> as a free-standing device, designed to do justice and police evildoers.  As nothing
> more than a Federal Rule of Civil Procedure, however, the class action device may
> do no more than enforce existing substantive law promulgated either by Congress or,
> in diversity suits, by applicable state statutory or common law.  Yet in no instance
> of which we are aware does the underlying substantive law sought to be enforced in
> a federal class action direct a violator to pay damages to an uninjured charity.

M. Redish, P. Julian, & S. Zyontz, 62 Fla. L. Rev. at 623 (footnote omitted).  Professor Redish

asserts that cy pres distributions violate the Rules Enabling Act, 28 U.S.C. §§ 2071 to 2077, because

such distributions use a wholly procedural device to transform substantive law "from a

compensatory remedial structure to the equivalent of a civil fine."  M. Redish, P. Julian, & S.

Zyontz, 62 Fla. L. Rev. at 623.  He argues that there is an Article III problem, because cy pres

awards transform "the judicial process from a bilateral private rights adjudicatory model into a

---

[18]The Court has an obligation to avoid deciding constitutional issues not necessary to the
disposition of a case.  See Burton v. United States, 196 U.S. 283, 295 (1905)("It is not the habit of
the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of
a case.");  United States v. Rodriguez, No. 11-2158, 2011 WL 6739498, at *32 (D.N.M. Dec. 8,
2011)(Browning, J.).

trilateral process" and violate Article III standing requirements.  M. Redish, P. Julian, & S. Zyontz, 62 Fla. L. Rev. at 641.

Ultimately, the Court's rejection of the validity of cy pres awards does not rest on any constitutional holding.  The Court believes, however, the cy pres awards are inappropriate, because they inject a third party into the litigation, do not adequately reflect the best interests of absent class members, create an appearance of impropriety, and are not the best use of the Court's time and resources.  The class action device in twenty-first century American society pushes due process and the conventional civil litigation model to the limits of how to compensate for mass harm.  See Phillip Morris USA Inc. v. Scott, 131 S.Ct. 1, 4 (2010)("The extent to which class treatment may constitutionally reduce the normal requirements of due process is an important question.  National concern over abuse of the class-action device induced Congress to permit removal of most major class actions to federal court . . . .").  While often an unwieldy and rough mode of delivering justice, there are at present no other acceptable substitutes short of special legislation and regulation, which creates other problems and issues.  On the other hand, it should not be expanded to include charitable gifts to non-parties at the expense of the parties and especially the class members.  While the practice of law might at times be more enjoyable for attorneys if they did not have clients, in the end, litigation is not about the bar, but about the client.  Cy pres moves the focus too much away from the class members' welfare, which the Court must jealously protect if the class action device is to remain a legitimate means of advancing justice.  The Court can be cautious and prudent in using the class action device without touching the extreme limits of what the judiciary can do.

## LAW REGARDING CLASS ACTIONS AND ATTORNEY'S FEES

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "The duty to

investigate the provisions of any proposed compromise or settlement of a class action 'includes the obligation to explore the manner in which fees of class counsel are to be paid and the dollar amount for such services.'" W. Rubenstein, A. Conte, and H. Newberg, Newberg on Class Actions, § 14:1 (4th ed.). "A request for attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee."  Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)(Powell, J.). "In class actions, the district court has broad authority over awards of attorneys' fees."  Law v. National Collegiate Athletic Ass'n, 4 F.App'x 749, 751 (10th Cir. 2001)(unpublished)(citing Hayes v. Haushalter (In re FPI/Agretech Sec. Litig., 105 F.3d 469, 472 (9th Cir. 1997)).  The Tenth Circuit has adopted a test that the United States Court of Appeals for the Fifth Circuit adopted in Johnson v. Georgia Highway Express, Inc., which analyzes the following twelve factors: (i) the time and labor required; (ii) the novelty and difficulty of the question presented in the case; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) any time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the undesirability of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.  See Gottlieb v. Barry, 43 F.3d at 483 & n.4. "[R]arely are all of the Johnson factors applicable."  Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 854 (10th Cir. 1993).  The Tenth Circuit has also noted that, while the simultaneous negotiation of attorney's fees and costs and the merits is potentially troubling, courts have focused on the results of those negotiations and the overall fairness to the parties.  See In re Integra Realty Res., Inc., 262 F.3d at 1112.

-88-

### LAW REGARDING INCENTIVE AWARDS TO CLASS REPRESENTATIVES

While the Tenth Circuit has not had much occasion to consider the propriety of providing incentive awards to class representatives, in a case addressing whether an incentive award was appropriate for a party objecting to class certification, the Tenth Circuit in UFCW Local 880 -- Retail Food Employers Joint Pension Fund v. Newmont Mining Corp., 352 F. App'x 232 (10th Cir. 2009), stated that incentive awards for class representatives are justified when a class representative is not forthcoming, and "may" be justified when the class representative undertakes risk, provides additional effort, or contributes expertise to prosecuting a class action:

> "Incentive awards [to class representatives] are justified when necessary to induce individuals to become named representatives," but there is no need for such an award "if at least one [class member] would have stepped forward without the lure of an 'incentive award.'" Moreover, a class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class.

352 F. App'x at 235-36 (alteration in original)(citations omitted).

Other Courts of Appeals have addressed when incentive awards are appropriate. The Courts of Appeals consistently assert that incentive awards for class representatives are justified to give incentive to a class representative to come forward when none are forthcoming, and to compensate a class representative for risks they take and work they perform on behalf of the class. In Rodriguez v. West Publishing Corp., 563 F.3d 948 (9th. Cir. 2009), the United States Court of Appeals for the Ninth Circuit held that "incentive agreements entered into as part of the initial retention of counsel" created impermissible conflicts of interest, because they "bind counsel to apply for an award." 563 F.3d at 959. The Ninth Circuit contrasted incentive agreements with incentive awards, stating:

> Incentive awards are fairly typical in class action cases. See 4 William B. Rubenstein et al., Newberg on Class Actions § 11:38 (4th ed. 2008); Theodore Eisenberg & Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 U.C.L.A. L. Rev. 1303 (2006)(finding twenty-eight percent of

settled class actions between 1993 and 2002 included an incentive award to class representatives). Such awards are discretionary, see In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 463 (9th Cir. 2000), and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general. Awards are generally sought after a settlement or verdict has been achieved.

563 F.3d at 958-59 (emphasis in original).

In Hadix v. Johnson, 322 F.3d 895 (6th Cir. 2003), the United States Court of Appeals for the Sixth Circuit affirmed a district court's denial of a prisoner's motion for an incentive award as class representative, because the settlement agreement did not provide for an award, stating: "Although we think there may be circumstances where incentive awards are appropriate, we need not resolve the difficult issue of detailing precisely when they are appropriate." 322 F.3d at 898.

The Sixth Circuit elaborated:

Incentive awards are typically awards to class representatives for their often extensive involvement with a lawsuit. Numerous courts have authorized incentive awards. See Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998); In re U.S. Bancorp Litig., 291 F.3d 1035, 1038 (8th Cir.), cert. denied, 537 U.S. 823 . . . (2002); In re Mego Fin. Corp. Sec. Litig., 213 F.3d at 463; see also In re S. Ohio Corr. Facility, 175 F.R.D. 270, 273 & n. 3 (S.D. Ohio 1997) (collecting cases). These courts have stressed that incentive awards are efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class. Yet applications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain. See 2 Herbert Newberg & Alba Conte, Newburg on Class Actions § 11.38, at 80-81 (3d ed.1992)(noting that "[t]he propriety of 'incentive' awards to named plaintiffs has been rigorously debated"); see also Cohen v. Resolution Trust Corp., 61 F.3d 725, 728 (9th Cir.1995) (holding that "'[w]hen a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness'")(citation omitted).

322 F.3d at 898 (emphasis added).

In <u>Cook v. Niedert</u>, 142 F.3d 1004 (7th Cir. 1998), the United States Court of Appeals for the Seventh Circuit set forth factors a district court should consider when determining whether to approve an incentive award:

> Having resolved the issues surrounding the attorney's fees, we address the final matter raised by the Fund -- the propriety of Archie Cook's $25,000 incentive award. Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit. <u>See</u> <u>In re Continental</u>, 962 F.2d [566,] 571 [(7th Cir. 1992)]. <u>In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation</u>. <u>See</u> <u>Spicer v. Chicago Bd. Options Exchange, Inc.</u>, 844 F. Supp. 1226, 1267 (N.D. Ill.1993).

142 F.3d at 1016 (emphasis added). The Seventh Circuit held that these factors were satisfied by a class representative who reasonably feared workplace retaliation, contributed hundreds of hours, and provided substantial information, and when the case produced a thirteen-million dollar award and reformation of the fund he alleged was mismanaged:

> Here these factors are readily satisfied. Cook brought a suit that resulted in structural reforms to the Health & Welfare Fund as well as a cash recovery of more than $13 million. In findings that were well-supported by the evidence, Special Master McGarr noted that Cook spent hundreds of hours with his attorneys and provided them with an "abundance of information." Most significantly, the special master found that, in filing the suit, Cook reasonably feared workplace retaliation. In light of the benefit Cook bestowed on his class, the risks he faced in bringing the case and the time he spent pursuing it, Judge Manning did not err when she approved a $25,000 incentive award. Accordingly, the case is AFFIRMED.

142 F.3d at 1016.

In <u>Montgomery v. Aetna Plywood, Inc.</u>, 231 F.3d 399 (7th Cir. 2000), the Seventh Circuit held that a district court was within its discretion to deny the lead plaintiff an incentive award, because the class counsel had not made a "serious argument" in favor of an incentive award, the

class notice had not adequately disclosed the incentive award, and the class counsel had not

explained why the incentive award could not be paid out of fees:

> Counsel claims that the circumstances of the lead plaintiff's participation require that
> he be awarded $30,000 out of the settlement fund. Without directly addressing
> whether the lead plaintiff's participation justified an incentive award, the district
> court gave three reasons for refusing to grant such an award: (1) counsel's failure to
> make any serious argument in favor of granting such an award (especially in the
> amount requested); (2) counsel's failure to include in the most recent notice to the
> class adequate information regarding counsel's plan to seek an incentive award; and
> (3) the possibility that counsel could pay an incentive award out of the fees awarded
> it.
>
>     Although the district court's last reason for its ruling is not a particularly
> persuasive one, the other two carry significant weight. Counsel's uncertain and less
> than vigorous efforts to seek an incentive award in the district court can reasonably
> be interpreted as an abandonment of its request for such an award. In any event, the
> case for granting the lead plaintiff in this case an incentive award is not so
> overwhelming as to remove any doubt about whether an award would be appropriate.
> While the lead plaintiff was the only named plaintiff, was subjected to a rough
> deposition, and was portrayed by the Montgomery defendants in an unfavorable light
> during the litigation, it does not appear that he had to devote an inordinate amount
> of time to the case or that, as a former employee, he suffered or risked any retaliation
> by Aetna Plywood. Accordingly, we conclude that the district court did not abuse
> its discretion in refusing to grant the lead plaintiff an incentive award.

231 F.3d at 410 (emphasis added).

Courts "have denied preferential allocation on the grounds that the named plaintiff may be

tempted to settle an action to the detriment of the class or come to expect a 'bounty' for bringing

suit." 4 W. Rubenstein, A. Conte & H. Newberg, supra § 11:38, at 80-81 (footnote omitted). In

Staton v. Boeing Co., 327 F.3d 938 (9th Cir. 2003), the Ninth Circuit reversed a district court's

approval of a settlement agreement based in part on incentive awards to the class representatives.

The Ninth Circuit was concerned that the incentive award was unjustified, might reflect collusion,

and might create an undesirable incentive for parties to seek to be class representatives solely to

increase the amount they receive in a settlement:

Awards to Named and Unnamed Class Members

One other aspect of the settlement agreement also raises serious concerns as to its fairness, adequacy and reasonableness.  The 237 people who are [individually identified recipients ("IIRs")] (and have not opted out) would each receive, on average, sixteen times greater damages than each of the unnamed class members; the subgroup of IIRs who are class representatives would receive even more relative to the class as a whole.  While a point-based formula is used to distribute the damages fund among the rest of the class members who make claims, no such objective standards were applied in determining who would be paid as an IIR or in what amount.  We find no sufficient justification in the record for this differential in the amount of damage awards and the process for awarding them.

The district court "considered this disparity carefully because excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion."  Indeed, "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard."  Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co., 76 F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

. . . .

[S]pecial rewards for counsel's individual clients are not permissible when the case is pursued as a class action.  Generally, when a person "join[s] in bringing [an] action as a class action . . . he has disclaimed any right to a preferred position in the settlement."  Officers for Justice [v. Civil Service Commission of the City and County of San Francisco, 688 F.2d 615, 632 (9th Cir. 1928).  Were that not the case, there would be considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations.

. . . .

Nevertheless, named plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments.  The district court must evaluate their awards individually, using "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation."  Cook, 142 F.3d at 1016.

-93-

Staton v. Boeing Co., 327 F.3d 938, 975-77.

In Robles v. Brake Masters Systems, Inc., the Court addressed the propriety of an incentive award. There, the Court held that the Tenth Circuit's statements concerning incentive awards should be "interpreted narrowly rather than broadly." 2011 U.S. Dist. LEXIS 14432, at *35. The Court noted that "[a]lmost all class plaintiffs spend more time on the lawsuit than do other class members." Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *35. It stated that it was reluctant to "interpret the Tenth Circuit's language to mean [that] any additional effort greater than other class members' efforts" qualified a class representative for an award, because otherwise "all class cases would justify an incentive award." Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *35. The Court found that the "better construction of the Tenth Circuit's language is that the Tenth Circuit authorizes an incentive award when the class representatives' efforts are greater than the typical class representative's efforts and/or greater than the efforts a class representative would have incurred if his or her action were an individual action." Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *35-36 (internal quotation marks omitted). Robles v. Brake Masters Systems, Inc. did not involve the PSLRA. The PSLRA does not permit incentive awards and provides that "[t]he share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of the class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class." 15 U.S.C. § 78u-4(a)(4). On the other hand, the PSLRA permits district courts to award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class." 15 U.S.C. § 78u-4(a)(4).

## ANALYSIS

The Court will overrule the Barondess Objection, the Stephens Objection, and the Interlegis Objection.  The Court will also overrule the individual objectors' objections.  The Court will approve the Settlement.  The Court finds that the Settlement is fair and reasonable.  The Court will also approve the attorney's fees and expenses, because the Court concludes that they are reasonable and that the work class counsel performed in this case supports such an award.  The Court also concludes that the $4,725.00 award to Lane for reasonable costs and expenses is appropriate.

## I.   THE COURT WILL OVERRULE THE CORPORATE OBJECTIONS.

Miller Barondess objects to the Settlement to the extent that it uses funds from Westland DevCo, LLC to pay the Westland Development shareholders rather than the $62,242.19 that it is owed in legal fees.  See Barondess Objection at 5.  In its Supplemental Reply, Miller Barondess argues that, "[a]s a creditor of Westland DevCo, LLC, Miller Barondess is entitled to payment for services rendered to Westland DevCo, LLC before its remaining assets are distributed to the class members, who are shareholders."  Supplemental Reply at 3 (emphasis original). Miller Barondess asserts that equity requires that it be paid before the Remaining Merger Consideration is used for the Settlement. See Supplemental Reply at 3.  Stephens Property asserts that Westland DevCo, LLC owes it $9,399.37 and that it is entitled to payment before the funds are used for the Settlement.  See Stephens Objection at 2.  Interlegis, Inc. contends that it has a judgment against SCC Acquisitions, Inc. doing business as Suncal Companies in the amount of $124,994.44 and objects to the Settlement to the extent that any funds derive from SCC Acquisitions, Inc.  See Interlegis Objection at 1-2.

### A.   THE COURT WILL OVERRULE THE BARONDESS OBJECTION.

The money owed to Miller Barondess is for work performed in April and May 2010, see Barondess Objection at 4, approximately four years after this lawsuit was filed, see Complaint at 1.

Miller Barondess argues that it "is a basic principle of corporate law that <u>creditors</u> are paid ahead of <u>shareholders</u>." Supplemental Reply at 2 (emphasis original)(citing <u>Fletcher Cyclopedia of the Law of Private Corporations</u> § 7941). Miller Barondess also cites <u>In re Geneva Steel Co.</u> in support of its argument that it should receive priority in the distribution of the Remaining Merger Consideration, ahead of the former Westland Development shareholders. <u>See</u> Supplemental Reply at 2 (citing <u>In re Geneva Steel Co.</u>, 281 F.3d at 1180). Westland DevCo, LLC asserts that, unless a bankruptcy petition is filed within ninety days of the transfer, there is nothing improper about preferring one creditor over another. <u>See</u> Supplemental Brief at 1. Section 547 of Title 11 of the United States Code provides that a bankruptcy trustee may void any transfer of an interest of the debtor made on or within 90 days before the date of the bankruptcy petition's filing. <u>See</u> 11 U.S.C. § 547(b)(4)(A). The Court notes that preferences under § 547 are voidable and not void. <u>See</u> <u>Fischer v. Pauline Oil & Gas Co.</u>, 309 U.S. 294, 301 (1940). Westland DevCo, LLC asserted at the hearing that the transfer of funds to the Court registry occurred outside of the preference period and that there is nothing wrong with the preference. <u>See</u> Tr. at 63:18-64:5 (Fish).

Miller Barondess asserts, without providing any support, that the Remaining Merger Consideration are the "only assets of Westland DevCo LLC from which Miller Barondess can be compensated for its outstanding bills" and argues that equity requires that Westland DevCo, LLC settle its outstanding bill with Miller Barondess before using the funds for the Settlement. The Court does not, however, believe that equity requires that the Court pay Miller Barondess from the Settlement funds. Other than the citations to <u>In re Geneva Steel Co.</u> and <u>Fletcher Cyclopedia of the Law of Private Corporations</u>, which state general principles of corporate law, Miller Barondess provides no authority that would support the Court awarding some portion of the Settlement to it. The Court has no information about what occurred in the bankruptcy proceeding, other than the

information provided in the Cook declaration, or whether Miller Barondess would be a creditor entitled to recover under bankruptcy law.  It appears, from the argument at the hearing, that Miller Barondess has not sought a judgment against Westland DevCo, LLC in any court and, other than its objection here and sending a bill, does not appear to have diligently pursued compensation for its work. The evidence that Miller Barondess submitted in support of its request for compensation includes the Miller Declaration, Statement as of April 30, 2010 Statement No. 2634, filed February 14, 2012 (Doc. 381-1)("April Statement"), and Statement as of March 31, 2010 Statement No. 2714, filed February 14, 2012 (Doc. 381-2)("May Statement").  In the Miller Declaration, Miller refers to the entity for which Miller Barondess did work as "Westland Development Corporation ('Westland') . . . a SunCal Company," Miller Decl. ¶ 2, at 2, while the Barondess Objection refers to the entity for which Miller Barondess performed work as "Westland Development Company," Barondess Objection at 2.  The April Statement and May Statement reflect that the work was billed to "1001-022: Westland" and lists as a billing address "SunCal Companies, Bruce V. Cook, General Counsel, 2392 Morse Avenue, Irvine CA 92614."  April Statement at 2; May Statement at 2.  Miller Barondess argues that a unique billing number is created to identify each single-purpose entity and that all bills are sent to Cook.  See Barondess Reply at 2.  At the hearing, Miller Barondess further explained that the SunCal entities are the overall management company and that there is a specific billing code for Westland DevCo, LLC to identify that individual entity. See Tr. at 100:16-101:3 (Gunderson).  Miller Barondess indicated that each of the bills contain the Westland DevCo, LLC billing code.  See Tr. at 101:3-6 (Gunderson).  Miller Barondess also argued that Westland DevCo, LLC reflects these debts in its books.  See Tr. at 101:23-25 (Gunderson).  The Court notes, however, that there are several Westland entities listed as defendants in this case, including: (i) Westland Development Company, Inc.; (ii) SCC Westland Venture Inc.; (iii) Westland

HoldCo, Inc.; (iv) Westland SPE GP, LLC; (v) Westland DevCo, LP; and (vi) Westland DevCo, LLC.  Nothing in the filings submitted to the Court provides the Court with a basis for determining that Miller Barondess performed legal services for Westland DevCo, LLC.  Furthermore, at the hearing, Lane suggested that Miller Barondess performed its services for Westland DevCo, LP, which he asserted went into bankruptcy in late 2009 or early 2010 -- around the same time that Miller Barondess performed work related to potential bankruptcy claims.  See Tr. at 116:8-117:12 (Mitchell).

The Court finds that equity does not require that the Court use any part of the Remaining Merger Consideration to compensate Miller Barondess.  The materials before the Court do not adequately establish that the work Miller Barondess performed was for Westland DevCo, LLC and not for one of the other Westland entities.  All parties appear to agree that Westland DevCo, LLC is the only entity which has control over the Remaining Merger Consideration.  Accordingly, because the Court cannot determine whether Miller Barondess performed work for Westland DevCo, LLC, the Court does not believe it would be equitable to use funds from the Settlement to compensate Miller Barondess for its work.  Moreover, the Court believes it would be inequitable for the Court to redistribute funds from the Settlement to Miller Barondess where Miller Barondess does not have a judgment entitling it to such funds and does not appear to have diligently pursued compensation for its services.  In contrast, Lane has instigated two lawsuits in an attempt to preserve his rights and the rights of those similarly situated, and it was the work of class counsel which brought the Remaining Merger Consideration to the Defendants' attention.  Furthermore, Miller Barondess' assertion that its work benefitted the class is unfounded.  See Miller Decl. ¶ 11, at 4 ("The work Miller Barondess performed for Westland benefitted the shareholders of Westland, because it evaluated potential claims against lenders and proposed foreclosure prevention

strategies."). The work Miller Barondess undertook could not have benefitted the class, even if the work was performed for Westland DevCo, LLC, because it rendered legal services approximately four years <u>after</u> the SunCal Merger. Accordingly, this work would not have benefitted the former Westland Development shareholders, because, at that point, the SunCal Merger had taken place and they no longer had an interest in any of the Westland entities. Because Miller Barondess has not established that it is entitled to funds derived from Westland DevCo, LLC, has not proven that it diligently attempted to recoup its funds through other means, and has not established that it cannot recover the money it is owed through other means, the Court finds that equity does not require that the Court use the Settlement funds to compensate Miller Barondess.

Westland DevCo, LLC is entitled, absent a pending bankruptcy proceeding, to pay whom it wants. It may pick among creditors, including former shareholders, who have unliquidated claims against it. It is unclear whether Miller Barondess has any claim against Westland DevCo, LLC, and, even if it does, Miller Barondess has not established that it should enjoy the benefit of the class' work. To pay Miller Barondess would decrease the award to the class. Equity does not counsel that such reduction is appropriate. Accordingly, the Court will overrule the Barondess Objection.

## B.    THE COURT WILL OVERRULE THE STEPHENS OBJECTION.

Stephens Property asserts that Westland DevCo, LLC owes it $9,399.37 and that it has filed a Claim of Lien with Bernalillo County. <u>See</u> Stephens Objection at 1-2. The Claim of Lien is for $5,450.91 and is dated September 1, 2010. <u>See</u> Claim of Lien at 1-2. Lane asserts that a Real Property Deed was executed between Cook and O.B. Stephens, the general partner of Stephens Property, in lieu of foreclosure. <u>See</u> Response to Stephens Property and Miller Barondess at 4-5 (citing Real Property Deed at 2-4; Stephens Certificate at 2-3). The Real Property Deed was

executed on January 10, 2011.  See Real Property Deed at 2.  Stephens Property did not file a reply or appear at the March 20, 2012 hearing.

Stephens Property offers no legal theory that would support the Court using the Settlement funds to compensate it.  Like Miller Barondess, Stephens Property does not have a court judgment against Westland DevCo, LLC.  The Court assumes that Stephens Property bases its objection on an equity theory.  The Court concludes that equity does not require or counsel that the Settlement funds be used to compensate Stephens Property.  It appears, from the Real Property Deed, that Stephens Property has already been compensated for the debt owed to it and that the Real Property Deed was made with O.B. Stephens, the apparent general partner of Stephens Property, in lieu of foreclosure.  See Real Property Deed at 2-4; Stephens Certificate at 2-3.  Stephens Property has also not established that there are no other assets from which it could be compensated.  Given that Stephens Property did not refute Lane's arguments in the Response to Stephens Property and Miller Barondess, the evidence presented does not establish that there is a debt left to be paid.  Because the Court cannot find by a preponderance of the evidence that Westland DevCo, LLC continues to owe $9,399.37 to Stephens Property, the Court concludes that equity does not require that it use the Settlement funds to compensate Stephens Property.  There is no sound basis to take money from the class members, who have created this Settlement, and shift some of it to Stephens Property.  Accordingly, the Court will overrule the Stephens Objection.

### C.    THE COURT WILL GRANT THE INTERLEGIS MOTION, BUT IT WILL OVERRULE THE INTERLEGIS OBJECTION.

In its motion, Interlegis, Inc. asks that the Court extend the deadline for and accept its objections.  See Interlegis Motion at 1-2.  Interlegis, Inc. asserts that it was unclear, from the Notice of Use of Funds that it received, whether the Court had adopted the February 17, 2012 deadline.

-100-

See Interlegis Motion at 2.  Interlegis, Inc. filed its motion and objections on March 1, 2012 --
approximately thirteen days after the Court's February 17, 2012 deadline.  See Order Preliminarily
Approving Settlement at 6.  The Notice of Use of Funds, states that "Westland contends that any
objection to use of the Funds as part of the settlement must be presented to the Court on or before
February 17, 2012."  Notice of Use of Funds at 2.  The Notice of Funds did not, however, direct any
possible objectors to page six of the Court's Order Preliminarily Approving Settlement, where the
Court set the February 17, 2012 deadline for objections.  The Supreme Court has held that excusable
neglect is "a somewhat 'elastic concept' and is not limited to omissions caused by circumstances
beyond the control of the movant."  Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'Ship., 507
U.S. 380, 392 (1993).  Here, it appears that confusion resulted from the phrasing of the notice that
"Westland contends that any objection . . . must be presented to the Court on or before February 17,
2012."  Notice of Use of Funds at 2 (emphasis added).  The period of delay here was short,
excusable, and did not result in prejudice to Lane or the class.  Lane was able to file a response and
to respond to the Interlegis Objection at the hearing.  Because the Court believes that the delay was
excusable, the Court will treat the Interlegis Objection as timely filed.  Accordingly, the Court will
grant the Interlegis Motion.

In the Interlegis Objection, Interlegis, Inc. objects to the extent that any of the Remaining
Merger Consideration derives from SCC Acquisitions.  See Interlegis Objection ¶ 4, at 2.  Lane
asserts that "Interlegis' claim for payment cannot be imposed upon the Class or Westland DevCo,
LLC."  Interlegis Response at 6.  He argues that, because the "funds at issue derive from Westland
DevCo, LLC, Interlegis does not have a legitimate claim against the unpaid shareholder proceeds."
Interlegis Response at 6.  At the hearing, Westland Development argued the Interlegis judgment is
against SCC Acquisitions, Inc., which is a California corporation, and as of March 5, 2012 is still

in good standing.  See Tr. at 71:15-72:10 (Fish). The Agreement and Plan of Merger establishes that, "[a]t any time which is more than six (6) months after the Effective Time, the Surviving Corporation will be entitled to require the Paying Agent to deliver to it any funds which had been deposited with the Paying Agent and have not been disbursed."  Agreement and Plan of Merger (dated July 19, 2006), filed March 13, 2012 (Doc. 401-1)("Merger Agreement").  In a stipulated order, Westland DevCo, LLC identified an escrow account overseen by the United States District Court for the District of New Mexico as the "designee" of the Remaining Merger Consideration.  Stipulated Order, filed May 23, 2011 (Doc. 352).  The Remaining Merger Consideration thus derives from Westland DevCo, LLC and not from SCC Acquisitions, Inc.  Because Interlegis, Inc. has judgments only against SCC Acquisitions Inc. and because Interlegis, Inc. only objects to the Settlement to the extent the funds derive from SCC Acquisitions, Inc., the Court concludes that Interlegis, Inc. is not entitled to compensation from the funds which derive from Westland DevCo, LLC.  Accordingly, the Court will overrule the Interlegis Objection.

## II.     THE COURT WILL APPROVE THE SETTLEMENT AND WILL OVERRULE THE INDIVIDUAL OBJECTIONS TO IT.

The individual objectors argue that Lane is the "only named Class Representative and is a paid Class member who will be able to file a claim and recover sums from the remaining $2,278,702.41."  Objectors' Memo at 10.  They further assert that the terms of the Settlement reveal a "conflict between the paid shareholders and unpaid shareholders," because "the $2,278,702.41 set aside under the Merger Agreement to pay the Unpaid Class Members will not be paid to the other subclass of paid Class members, including Lead Plaintiff."  Objectors' Memo at 10.

A district court considering a proposed class-action settlement must determine whether the proposed settlement is fair, reasonable, and adequate.  See In re Integra Realty Res., Inc., 354 F.3d

at 1266.  The Tenth Circuit, in <u>Jones v. Nuclear Pharmacy, Inc.</u>, established a four-factor test for assessing whether a proposed settlement is fair, reasonable, and adequate, which includes: (i) whether the proposed settlement was fairly and honestly negotiated; (ii) whether serious questions of law and fact exist placing the ultimate outcome of the litigation in doubt; (iii) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (iv) the parties' judgment that the settlement is fair and reasonable. <u>See</u> 741 F.2d at 324.  Analyzing these factors and the Settlement, the Court concludes that the Settlement is fair, reasonable and adequate, and will overrule the individual objections to it.

### A.   THE COURT FINDS THAT THE SETTLEMENT WAS FAIRLY AND HONESTLY NEGOTIATED.

When examining whether a settlement was fairly and honestly negotiated, district courts within the Tenth Circuit often examine whether the parties "have vigorously advocated their respective positions throughout the pendency of the case." <u>Wilkerson v. Martin Marietta Corp.</u>, 171 F.R.D. 273, 284 (D. Colo. 1997).  The Court is also concerned with the protection of class members whose rights may not have been given "adequate consideration during the settlement negotiations." <u>Childs v. Unified Life Ins. Co.</u>, No. 10-CV-23-PJC, 2011 WL 6016486, at *12 (N.D. Okla. Dec. 2, 2011) (citing <u>Wilkerson v. Martin Marietta Corp.</u>, 171 F.R.D. at 283; 7B C. Wright, A. Miller & M. Lane, <u>Federal Practice & Procedure</u> § 1979.1 (3d ed. 2005)).

Class counsel were able to obtain a $1.5 million settlement from the DESCO Defendants and $2,278,702.41 from Westland DevCo, LLC.  Although the individual objectors challenge the validity of using the $2,278,702.41 for the Settlement, the Merger Agreement demonstrates that, six months after the SunCal Merger, the Remaining Merger Consideration became Westland DevCo, LLC's money and any Unpaid Class Member would have to file a claim with Westland DevCo,

LLC.  See Merger Agreement at 4.  After six months passed, the Unpaid Class Members became like any other Westland DevCo, LLC creditor.  See Merger Agreement at 4.  The Court does not believe that there is any conflict between Lane and the Unpaid Class Members.  "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status."  Lowery v. City of Albuquerque, 2012 WL 394392, at *20 (citing 7A Federal Practice & Procedure, § 1768, at 389-93).  The individual objectors assert that the Settlement is unfair, because Lane is not an Unpaid Class Member and because the Remaining Merger Consideration is money that should have originally gone to the Unpaid Class Members.  See Objectors' Memo at 10-11.  It has now been almost six years since the SunCal Merger, when Mellon Investor Services attempted to contact all shareholders, and now class counsel have also made efforts to contact the Unpaid Class Members.  Westland DevCo, LLC was no longer required to keep this money available to the Unpaid Class Members, and the Settlement -- with provisions requiring reasonable efforts to contact the Unpaid Class Members and payment of the Remaining Merger Consideration to those Unpaid Class Members first -- provides additional protection to those Unpaid Class Members that would not otherwise be available.  See Settlement at 19.  Also, it seems fair to the class that the Unpaid Class Members get the same payout as all other class members in total.  There is no conflict or unfairness; only the greed of some of the class would keep all class members from receiving the same compensation per share from the merger.

There is good reason to believe that if, after two efforts and many years, the Unpaid Class Members have not sought to exchange their shares, it is because there are many emotional factors at play and they do not wish to exchange their shares.  See Trujillo Letter at 2 ("This was an illegal taking of a registered land grant by unscrupulous directors.  In my opinion the courts should not be a party to the continued stripping of land grant rights of the heirs.").  Class counsel have detailed

their extensive efforts to locate the Unpaid Class Members.  See Robbins Decl. ¶ 78, at 24.

Moreover, the individual objectors and the Atrisco Foundation have not come forward with an

Unpaid Class Member who objects to the Settlement and does not have a list of Unpaid Class

Members which could be used to locate those individuals.  See Sanchez Letter at 1-3.  The Sanchez

Letter also suggests that the Court establish a program at the Atrisco Foundation wherein a Atrisco

Foundation staff member would be charged with tracking down the former Westland Development

shareholders at a cost of $50,000.00 per year.  See Sanchez Letter at 3.  While the Court is greatly

concerned that the Unpaid Class Members be paid, the Court believes taking such steps would have

the undesired effect of decreasing the fund available to the class and the Sanchez Letter provides

no basis for the Court to find that such efforts would be more successful in reaching any class

members, including the Unpaid Class Members.  Without any assurance that more Unpaid Class

Members will be found, it appears that Sanchez ensures that there will be less money available to

the class and does not offer any realistic likelihood of finding any other class members.  The Tenth

Circuit has held that due process "does not require actual notice to each party intended to be bound

by the adjudication of a representative action."  DeJulius v. New England Health Care Emps.

Pension Fund, 429 F.3d at 944 (emphasis original).  Here, however, class counsel has sent over

7,000 individual claims packages to the Westland Development shareholders in addition to posting

notifications online, in the Albuquerque Journal, and in the Los Angeles Times.  For due-process

purposes, Tenth Circuit precedent focuses upon whether the district court gave "the best notice

practicable under the circumstances including individual notice to all members who can be identified

through reasonable effort."  In re Integra Realty Res., Inc., 262 F.3d 1089, 1110 (10th Cir. 2001).

Many of the Unpaid Class Members have ties to New Mexico and others in the class; the Court

believes that there has been both formal and informal notice about the SunCal Merger and this

litigation. The Court thinks that the remaining Unpaid Class Members either are deceased, do not exist, or are uninterested in participating, and exchanging their shares, for unknown reasons. Class counsel have expended reasonable efforts in an attempt to contact all class members, and the Sanchez Letter suggests methods which would be duplicitous and costly without providing any information concerning whether they would be more successful. While the Court would like to have the Atrisco Foundation use its resources to find the remaining Unpaid Class Members, it is not convinced that the class should have to pay rather rich amounts to hire a Atrisco Foundation staff member to locate them.

This case is not one where money is being taken from the Unpaid Class Members to pay the other class members. The Unpaid Class Members no longer had an automatic right to the Remaining Merger Consideration and yet the Settlement was structured to ensure that the Unpaid Class Members received another opportunity to exchange their shares. Moreover, no Unpaid Class Member has objected to the Settlement, and class counsel's efforts have shown that at least eighteen Unpaid Class Members have been located. See Robbins Decl. ¶78, at 24. That Lane is not an Unpaid Class Member is of no consequence, because there is no conflict of interest. See Deiter v. Microsoft Corp., 436 F.3d 461, 467 (4th Cir. 2006)(holding that rule 23's typicality requirement does not require that "the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned"). The Unpaid Class Members have a period in which to obtain the same consideration for their shares that they could have received five years earlier and, after that period expires, all class members receive the same damages per share. Lane and the rest of the class do not receive a premium over the Unpaid Class Members. See Lowery v. City of Albuquerque, 2012 WL 394392, at *23-25 (holding that a proposed settlement was not fair, adequate, or reasonable where the class representatives received significantly more than the rest of the class and received a

-106-

guaranteed, rather than pro rata, share).  All that happens is all class members are treated equally in the merger.

The Court notes that this litigation has been ongoing for five years and has been vigorously litigated.  There are over 400 docket entries in this case, including several motions to dismiss and at least twelve memorandum opinions and orders.  Furthermore, the backdrop against which this Settlement was achieved also demonstrates the adequacy of this Settlement.  In 2006, when this lawsuit was originally filed, the economy was in a much better place than it stands today.  Since that time, the real estate market has plummeted, and several of the Defendants have filed for bankruptcy. See Tr. at 34:24-35:10 (Robbins).  It is against that backdrop that Lane and class counsel have achieved an additional benefit to the class of five to eight dollars per share, which, although lower than their expert's estimate of damages of forty-six dollars per share avoids the high risk of engaging in further protracted litigation and receiving nothing.  See Tr. at 26:23-27:9 (Court, Robbins); id. at 30:3-11 (Robbins).  Here, the parties engaged in lengthy settlement negotiations spanning several months and were involved one failed attempt at mediation.  See Memo Seeking Approval at 18-19.  At least one court has held that, where a settlement "result[s] from arm's length negotiations between experienced counsel after significant discovery had occurred, the Court may presume the settlement to be fair."  Lucas v. Kmart Corp., 234 F.R.D. at 693.  Even without any presumption, there is no evidence that these negotiations were not fair, and there is evidence that they were robust and vigorous.  Furthermore, there are only ten class members objecting and only approximately forty class members opting out in a class of thousands.  The Tenth Circuit has held that a district court did not abuse its discretion in approving a class settlement from which an "extremely small percentage of class members opted out."  Rutter & Wilbanks Corp. v. Shell Oil

Co., 314 F.3d at 1188.  Here, the objectors and persons opting out equal less than one percent of all class members.  See Tr. at 31:7-13 (Robbins).

This case was vigorously litigated, achieved $5 to $8 per share in damages, and allows the class to recover in circumstances where recovery is less than certain.  The Court finds that the Settlement is adequate, fair, and reasonable.  Accordingly, the Court finds that this factor weighs in favor of approving the Settlement.  Additionally, the Court will overrule the individual objections to the extent that they assert that the Settlement is unfair or unreasonable.

### B.   SERIOUS QUESTIONS OF LAW AND FACT EXIST THAT PUT THE ULTIMATE OUTCOME OF THE LITIGATION IN DOUBT.

No party or objector asserts that there are not serious questions of law and fact which put the outcome of the litigation in doubt.  The Defendants have strenuously argued that the class' claims lack merit and that, even if meritorious, the class did not suffer any damages.  See, e.g., Director Defendants' Answer to Third Amended Complaint for Violations of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, filed July 6, 2010 (Doc. 212).  In previous opinions, the Court has warned that Lane's "claims might ultimately be found untimely on summary judgment or during a trial down the road."  Lane v. Page, 649 F.Supp.2d 1256, 1304 (D.N.M. 2009)(Browning, J.).  Although the Court denied several rounds of motions to dismiss, "that ruling provides no guarantee that the [plaintiff] will ultimately prevail on the merits."  McNeely v. Nat'l Mobile Health Care, LLC, 2008 WL 4816510, at *13.

The Court agrees that whether Lane could have prevailed on the merits at trial is questionable.  The Defendants vigorously disputed that Lane could establish loss causation, which is a "difficult task."  In re Daou Sys., Inc., 411 F.3d 1006, 1026 (9th Cir. 2005).  Loss causation in this case would have been difficult given the timing of the SunCal Merger -- at the peak of the real

estate market bubble -- and "subsequent appraisals of the Westland land showed a marked decreased in value since the closing of the Merger." Memo Seeking Approval at 20. Damages also would have been reduced to a "battle of the experts," and "it is virtually impossible to predict with any certainty which testimony would be credited." In re Warner Commc'ns Sec. Litig., 618 F.Supp. at 744. It is evident from this case's long and complex history that any jury trial could have resulted in many different outcomes, and that a class victory was uncertain. There were numerous factual and legal questions yet to be addressed in the litigation.

### C.   THE VALUE OF IMMEDIATE RECOVERY OUTWEIGHS THE MERE POSSIBILITY OF FUTURE RELIEF.

There is an "overriding Public interested in settling class action litigation," In re Pet Food Prods. Liability Litig., 629 F.3d 333, 351 (3d Cir. 2010), especially where "substantial judicial resources can be conserved by avoiding formal litigation," Ehrheart v. Verizon Wireless, 609 F.3d 590, 595 (3d Cir. 2010). This litigation has been pending for five years, and all parties have incurred significant expenses in pursuing the litigation thus far. Pursuing the litigation further would require significant judicial and party resources to complete motions for summary judgment, motions under Daubert v. Merrell Dow Pharmaceuticals, and motions in limine. Any of those decisions could then be appealed to the Tenth Circuit along with any jury verdict that might be returned. See Feerer v. Amoco Prod. Co., 1998 U.S. Dist. LEXIS 22248, at *30 ("[E]ven if a favorable jury verdict had been obtained, inevitably an appeal would have followed and, conservatively, would have resulted in a delay of, at least, two years before any relief would have been available to the class."). Moreover, given the vigorous nature of the litigation thus far, the Court believes that the pre-trial motions would be numerous and time-consuming. Additionally, without the Settlement, there is no guarantee that there will be funds available to satisfy any jury verdict that might be returned in the

class' favor.  Several Defendants have been in financial difficulty and, as the corporate objections indicate, have other creditors who have yet to be compensated for services they provided.  <u>See</u> Memo Seeking Approval at 22.  The financial difficulties facing the Defendants makes it even less likely that the class would receive compensation from any judgment in the near future.  Westland DevCo, LLC is under no obligation to keep the Remaining Merger Consideration for the Unpaid Class Members, <u>see</u> Merger Agreement at 4, and, if it sees fit, it could withdraw those funds from the Court registry and use them to pay other obligations.  Without the Remaining Merger Consideration, it may be difficult to obtain a better settlement for the class or to enforce a judgment against the Defendants.

"To most people, a dollar today is worth a great deal more than a dollar ten years from now." <u>Reynolds v. Beneficial Nat'l Bank</u>, 288 F.3d 277, 284 (7th Cir. 2002).  Here, the parties would be without the guarantee of receiving even a dollar if this suit were to be resolved at a later time.  The Settlement provides the class with "substantial, guaranteed relief."  <u>Lucas v. Kmart Corp.</u>, 234 F.R.D. at 694.  The uncertainties in this case, which go beyond the normal uncertainties of recovery before a jury, convince the Court that the value of immediate recovery outweighs the mere possibility of future relief.  While the class may not receive everything that it desired, such is the nature of a compromise, and the Court finds that this factor weighs in favor of approving the Settlement.

**D.      THE PARTIES' JUDGMENT IS THAT THE SETTLEMENT IS FAIR AND REASONABLE.**

The Honorable Richard D. Rogers, Senior United States District Judge for the District of Kansas has noted: "Counsels' judgment as to the fairness of the agreement is entitled to considerable weight."  <u>Marcus v. Kan. Dep't of Revenue</u>, 209 F.Supp.2d 1179, 1183 (D.Kan. 2002).  Class

counsel has significant experience and expertise in securities and class action litigation.  Robbins Geller Rudman & Dowd LLP has been appointed class counsel in several other notable class actions including: (i) In re Enron Corp. Sec. Litig., No. H-01-3624 (S.D. Tex.); (ii) In re UnitedHealth Grp. Inc. PSLRA Litig., No. 06-CV-1691 (D.Minn.); and (iii) In re AT&T Corp. Sec. Litig., MDL No. 1399 (D.N.J.).  See Report at 3-8.  In his declaration, Mr. Robbins asserts that the Settlement was the product of arm's length negotiations between adversaries, and that he believes that the Settlement "is fair, reasonable, and adequate in all respects."  Robbins Decl. ¶¶ 89-90, at 28.  Lane also states, in his declaration, that, "in light of what [he] understand[s] to be the liability, damages, risks, and statute of limitations issues presented in the Litigation, this settlement presents a favorable recovery on behalf of the class."  Lane Decl. ¶ 6, at 3.  Accordingly, this factor weighs in favor of approving the Settlement.

### E.  EVEN IF THE COURT DID NOT BELIEVE THAT THE SETTLEMENT WAS FAIR, ADEQUATE, AND REASONABLE, THE COURT WOULD NOT AWARD THE SETTLEMENT FUNDS TO THE ATRISCO FOUNDATION.

In their objections, the individual objectors assert that, because the awards to individual class members are likely to be small, "[a]ny Settlement monies should instead be turned over to the established not-for-profit foundation to benefit all of the former shareholders of Westland Development Corporation, which is the Atrisco Heritage Foundation."  D. Armijo Objection at 2. The individual objectors also assert that the class does not adequately protect the rights of the Unpaid Class Members.  As the Court has discussed, the cy pres doctrine is not a "sound judicial doctrine," and cy pres awards to third-parties not involved in the litigation are inappropriate. Thornburg Order at 15.  "There is no indirect benefit to the class from the defendant's giving the money to someone else."  Mirfasihi v. Fleet Mortg. Corp., 356 F.3d at 784.  The Court cannot presume that the Unpaid Class Members or other class members who do not file claims, which no

one -- including the Atrisco Foundation -- can locate, will benefit from a distribution to the Atrisco Foundation. Indeed, the Atrisco Foundation was created as part of the SunCal Merger, which some class members assert was an "illegal taking of a registered land grant by unscrupulous directors." Trujillo Letter at 2. Persons who wish to be excluded, like Robert A. Trujillo, may find a distribution to the Atrisco Foundation as distasteful as the Court distributing the awards to themselves. As Judge Weis noted in another case, this lawsuit is not charitable. See In re Pet Food Prods. Liab. Litig., 629 F.3d at 363 (Weis, J., concurring and dissenting). Lane instituted this lawsuit to recover for the class funds to which the class was entitled, but were denied because of alleged misrepresentations. To make a cy pres award to the Atrisco Foundation, based upon the objections of a few class members, is not appropriate.

In Klier v. Elf Atochem N. Am., Inc., the Fifth Circuit addressed circumstances and arguments as those before the Court. There, the defendant proposed that the court make a cy pres award to a scholarship fund it had established or two museums, because the unclaimed funds were primarily related to one subclass and it would be unfair for the funds to go to the other subclass. See 658 F.3d at 473, 480. The defendant argued that "equity weigh[ed] in favor of a cy pres distribution because distributing the unclaimed funds to members of Subclass A would deprive Subclass B of its settlement benefits." Klier v. Elf Atochem N. Am., Inc., 658 F.3d at 480. The Fifth Circuit rejected this argument and called it a "straw man," because all of the parties agreed that "additional distributions to the members of Subclass B were not economically viable." Klier v. Elf Atochem N. Am., Inc., 658 F.3d at 480. Accordingly, the Fifth Circuit found that the choice was not between "a distribution to Subclass A and a distribution to Subclass B," but a choice between "a distribution to Subclass A and a distribution to charity"; it found that because the settlement agreement provided that the funds be reallocated among the class, a cy pres award was

inappropriate.  Klier v. Elf Atochem N. Am., Inc., 658 F.3d at 480.  Here, the individual objectors argue that it is unfair to redistribute funds among those who make claims after a certain period of time, because such a reallocation undermines the rights of the Unpaid Class Members.  Neither the individual objectors nor the Atrisco Foundation, however, offered any other economically feasible means of locating the Unpaid Class Members.  When making a choice between allocating the funds among those class members who have submitted a claim, and were wronged, and the Atrisco Foundation, the Court believes the more appropriate decision is to distribute the funds among the class members.  Even if the Court found that the Settlement was unfair, the Court would not make a cy pres award to the Atrisco Foundation and give nothing to the class.

The Court finds that each of the Jones v. Nuclear Pharmacy, Inc. factors weighs in favor of approving the Settlement.  The Court believes that the Settlement is fair, reasonable, and adequate, especially in light of the parties vigorous pursuit of the litigation and the real concerns regarding possible recovery at a trial.  The Court also concludes that there are not any conflicts between class members.  Because the Settlement is fair and reasonable, the Court will approve the Settlement.

## III.   THE COURT WILL APPROVE THE ATTORNEY'S FEES AND COSTS, AND WILL OVERRULE THE INDIVIDUAL OBJECTIONS TO THEM.

The individual objectors assert that "[t]he parties in this case have negotiated a common-fund settlement in which Lead Counsel seeks to recover their attorneys' fees as a percentage of the settlement fund."  Objectors' Memo at 12.  They argue that "the entire settlement amount comes from the same source" and that, when a large attorney's fee award means a smaller recovery, a conflict arises between counsel and the class.  Objectors' Memo at 12.  The individual objectors further assert class counsel's request for attorney's fees is unreasonably high and harms all class members.  See Objectors' Memo at 13.  They argue that the attorney's fees and costs represent

seventy-one percent of the total amount recovered.  See Objectors' Memo at 13.  The individual objectors contend that "Lead Counsel misleads the Court when they contend that they obtained a benefit of approximately $47,000,000 for the Class as a result of the $60 per share increase in the merger offer made on February 9, 2006, and the Final Merger Agreement," because this litigation was filed almost four months after the SunCal Merger was approved.  Objectors' Memo at 13.  They contend that class counsel were not involved in any of the events that led to the sixty dollar per share increase and that, even if class counsel had not filed the litigation, the class would have received $315.00 per share.  See Objectors' Memo at 15.

The Tenth Circuit has adopted a test that the Fifth Circuit adopted in Johnson v. Georgia Highway Express, Inc., which analyzes the following twelve factors: (i) the time and labor required; (ii) the novelty and difficulty of the question presented in the case; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment because of acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) any time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the undesirability of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. See Gottlieb v. Barry, 43 F.3d at 483 & n.4.  "[R]arely are all of the Johnson factors applicable." Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d at 854.  Applying the relevant factors, the Court finds that it should approve the award of attorney's fees and costs.

### A.   THE TIME AND LABOR INVOLVED IN THIS LAWSUIT SUPPORT THE ATTORNEY'S FEES AND COSTS AWARD.

The litigation has been ongoing for five years.  Over those five years, class counsel prosecuted the litigation without payment and advanced all costs.  Class counsel asserts that the

negotiated fee is "<u>less than one-third of what Plaintiff's Counsel invested in litigating the case over</u>

<u>the past five years</u>."  Memo Seeking Approval at 25 (emphasis original).  Mr. Robbins states that

class counsel spent, in aggregate, over 18,000 hours of attorney and para-professional time in the

prosecution of the litigation, which would result in a lodestar of more than nine million dollars.  <u>See</u>

Robbins Decl. ¶ 94, at 30.  In the Light declaration, Light asserted that Robbins Geller Rudman &

Dowd LLP spent 11,800 and that the lodestar amount for attorney and para-professional time was

$6,021,427.75.  <u>See</u> Light Decl. ¶ 4, at 2.  These hours cover:

> successfully opposing two rounds of motions to dismiss; certifying a class over
> Defendants' determined opposition; conducting extensive discovery, including the
> review and analysis of over 250,000 pages of documents and conducting 38 fact
> witness depositions; successfully litigating numerous discovery motions; assisting
> in producing three testifying expert reports; preparing for the upcoming trial; and
> engaging in extensive arm's-length negotiations with Defendants' counsel.

Robbins Decl. ¶ 94, at 29-30.  Lane asserted that the hourly rates for class counsel varied from

around $200.00 per hour to $700.00 per hour for Mr. Robbins' time.  <u>See</u> Tr. at 14:15-18 (Robbins).

Even if every attorney and paralegal who worked on this case billed at the relatively low rate of

$200 per hour, the attorney's fees would be in excess of the attorney's fee award requested.

Additionally, if every attorney at Robbins Geller Rudman & Dowd LLP billed the 11,800 hours they

spent on this case at a rate of $300.00 per hour, the fees would exceed the $3.1 million award.

Given the complexity of the case and the number of motions, documents, depositions, and hearings,

the Court does not believe that 11,800 hours is excessive.  In <u>Anderson v. Merit Energy Co.</u>, Nos.

07-cv-00916-LTB-BNB, 07-cv-1025-REB-MJW, 2009 WL 3378526 (D.Colo. Oct. 20, 2009), the

United States District Court for the District of Colorado approved attorney's fees in the amount of

$5,900,000.00 where counsel similarly "devoted over ten thousand hours to the prosecution of th[e]

Class litigation" and expended similar efforts.  2009 WL 3378526, at *2.  In another case, the United

States District Court for the Western District of Oklahoma approved an award of $4,008,103.52 where counsel expended over 15,000 hours on the litigation.  See Ponca Tribe of Indians of Okla. v. Continental Carbon Co., No. 05-445, 2009 WL 2836508, at *3 (W.D. Okla. July 30, 2009). Furthermore, with respect to the expenses that class counsel have submitted, the individual objectors do not point to any expense that they believe is excessive or unwarranted.  Class counsel limited their recoverable expenses to $650,000.00.  In reality, however, the costs of the litigation are in excess of $698,730.12.  See Light Decl. ¶ 5, at 2-3; Koluncich Decl. ¶ 3, at 2; Johnson Decl. ¶ 5, at 2; Kendall Decl. ¶ 5, at 2.

The time and labor expended in pursuit of the litigation were extensive and justifiable.  The Court further notes that class counsel continues to expend time and incur expenses, because the settlement hearing lasted approximately four hours and parties submitted several post-hearing briefs. Accordingly, the Court finds that this factor weighs in favor of the requested attorney's fee award.

**B.     THE NOVELTY AND DIFFICULTY OF THE QUESTIONS PRESENTED SUPPORT THE ATTORNEY'S FEES AND COSTS AWARD.**

There are "few simple class action cases involving securities law," and this case is no exception.  In re Qwest Commc'n Int'l, Inc. Sec. Litig., 625 F.Supp.2d 1143, 1149 (D. Colo. 2009). The Honorable Robert E. Blackburn, United States District Judge for the District of Colorado, has held that securities law is "complex and difficult," and noted that the "PSLRA requires great specificity in pleading such claims."  In re Qwest Commc'n Int'l Inc. Sec. Litig., 625 F.Supp.2d at 1149.  Similarly, this case involves complex loss causation and statute-of-limitations questions.  See Memo Seeking Approval at 19-20.  The Court's September 24, 2008 MO, at 581 F.Supp.2d 1094, has been cited in other district courts within the Tenth Circuit, including Britton v. Parker, Nos. 06-cv-1797, 06-cv-1922, 06-2017, 2009 WL 3158133, at *10 (D.Colo. Sept. 23, 2009), and In re

SemGroup Energy Partners, L.P., 729 F.Supp.2d 1276, 1294 (N.D. Okla. 2010), in over fifteen secondary sources, and over thirty trial motions and memoranda. That other parties and courts are relying on the Court's decision in this case demonstrates the novelty of the issues presented in this case. That the Court has written over 400 pages of decisional authority in at least twelve separate memorandum opinions and orders addressing the issues involved in the case also demonstrates the complexity of the case. See Tr. at 6:1-7:1 (Robbins). The sheer number of documents and depositions taken in the case, over 250,000 pages of discovery and 38 depositions, further confirms the serious issues that class counsel had to investigate to prosecute the case. See Memo Seeking Approval at 9. See also Anderson v. Merit Energy Co., 2009 WL 3378526, at *3 ("The process of evaluating the production data, taking numerous depositions of Merit's employees and Merit's third party purchaser/processors, and working with a retained certified public account to determine the amount of the alleged royalty underpayments, was a very time-consuming process . . . ."). The changing economic background against which this case was litigated also increased the complexity of the case. See In re Smith, 435 B.R. 637, 643 (9th Cir. 2010)("These appeals have arisen during the current difficult economic time which is being referred to as 'The Great Recession.'"). Class counsel was therefore faced with the difficulties and novelties of a securities action which took place at the peak of the real estate bubble and was being litigated during "The Great Recession," in which real estate prices plummeted.

The Court believes that these complexities and this factor weigh in favor of the attorney's fee and expenses award.

C.   **THE SKILL REQUISITE TO PERFORM THE LEGAL SERVICES PROPERLY AND THE EXPERIENCE AND SKILL OF CLASS COUNSEL, SUPPORT THE ATTORNEY'S FEES AND COSTS AWARD.**

Because factors three and nine are closely related, the Court analyzes together the skill requisite to perform the legal services properly, and the experience and skill of class counsel.  See In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 625 F.Supp.2d at 1150.  Class Counsel are highly skilled and specialized attorneys who use their substantial experience and expertise to prosecute complex securities class actions.  In possibly one of the best known and most prominent recent securities cases, Robbins Geller Rudman & Dowd LLP served as sole lead counsel -- In re Enron Corp. Sec. Litig., No. H-01-3624 (S.D. Tex.).  See Report at 3.  The Court has previously noted that the class would "receive high caliber legal representation" from class counsel, and throughout the course of the litigation the Court has been impressed with the quality of representation on each side.  Lane v. Page, 250 F.R.D. at 647.  Class counsel have extensive experience in litigating securities class actions nationwide.  Accordingly, the Court finds that class counsel's skill and reputation weigh in favor of the requested attorney's fee and expense award.

Class counsel brought their skill and experience to this case, successfully litigating many motions.  Furthermore, the Court agrees that "[f]ew plaintiffs' law firms could have devoted the kind of time, skill, and financial resources over a five-year period necessary to achieve the pre- and post-Merger benefits obtained for the Class here."  Memo Seeking Approval at 31.  It is unlikely that many other counsel would have been able to continue funding the litigation for it to reach this point or that many other counsel would have been able to so successfully prosecute the litigation.  See In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 625 F.Supp.2d at 1150 ("This factor carries significant weight because the plaintiff class likely would not have obtained any relief . . . without the assistance of counsel with a high level of skill and expertise.  Further, lead counsel should be

-118-

rewarded for the successful application of their skill and expertise."). Where "Class Counsel's knowledge and experience . . . significantly contributed to a fair and reasonable settlement" this factor supports a large request for attorney's fees. Anderson v. Merit Energy Co., 2009 WL 3378526, at *3. Given the high quality of defense counsel, "there was simply no way that this case could have been prosecuted successfully without a high level of skill exhibited on the part of Class Counsel." Feerer v. Amoco Prod. Co., 1998 U.S. Dist. LEXIS 22248, at *31. Accordingly, the Court finds that these two factors weigh in favor of the requested attorney's fees. Class Counsel are both skilled and experienced, and used those skills and experience for the benefit of the class.

### D.   CLASS COUNSEL WERE PRECLUDED FROM WORKING ON OTHER CASES BECAUSE OF THE ONGOING LITIGATION.

Class Counsel assert that the time spent on this case was at the expense of time counsel could have devoted to other matters. See Memo Seeking Approval at 29. Although class counsel do not specifically provide that they had to turn work away, the amount of time and effort that class counsel have expended over the five-year course of the litigation would certainly effect other work and the amount of work they could take. "Because of the number of hours that class counsel have been required to devote to this case, class counsel necessarily were precluded from handling other litigation matters during that time." Lucken Family Ltd. P'ship, LLP v. Ultra Res., Inc., No. 09-cv-01543, 2010 WL 5387559, at *5 (D. Colo. Dec. 22, 2010). While the Court does not believe that this factor carries great weight, to the extent that it factors into the Court's decision, it weighs in favor of the requested attorney's fees and expenses award.

### E.   THE AMOUNT INVOLVED AND THE RESULTS OBTAINED SUPPORT THE ATTORNEY'S FEES AND COSTS AWARD.

Courts have consistently held that the most important factor within this analysis is what results were obtained for the class. See Hensley v. Eckerhart, 461 U.S. at 436. Lane asserts that the

attorney's fees represent only six percent of the more than fifty-one million dollars in cash consideration from which the class benefitted as a direct result of class counsel's efforts.  See Memo Seeking Approval at 24.  He argues that class counsel's efforts were responsible for the final sixty dollars per share increase in price and for the cancellation of the 35,000 change-in-control shares.  See Memo Approval of Class Settlement at 27.

In Mills v. Electric Auto-Lite Co., 396 U.S. 375 (1970), the Supreme Court recognized that "courts increasingly have recognized that the expenses incurred by one shareholder in the vindication of a corporate right of action can be spread among all shareholders through an award against the corporation, regardless of whether an actual money recovery has been obtained in corporation's favor."  396 U.S. at 394.[19]  In In re Nationwide Fin. Servs. Litig., the United States

_____

[19]The Ninth Circuit has explained that:

> The general American rule is that attorneys' fees are not recoverable.  An established exception exists where a plaintiff produces a "common fund" for a group of others as well as for plaintiff.  Modernly this exception extends to situations where a "substantial benefit has been conferred upon the members of ascertainable class, despite the fact the benefit is not monetary.

Loring v. City of Scottsdale, Ariz., 721 F.2d 274, 275 (9th Cir. 1983)(citations omitted).  Generally, the common-benefit doctrine applies to permit litigants or lawyers to obtain reasonable attorney's fees out of the common fund or to spread the cost of the litigation to its beneficiaries.  See In re Zyprexa Prods. Liab. Litig., 594 F.3d 113, 129 (3d Cir. 2010); Rosenbaum v. MacAllister, 64 F.3d 1439, 1444 (10th Cir. 1995)(holding that the common benefit doctrine applies where "the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionally among them.'").  Here, the benefits to the class members have traits of both a common-fund class action, the $3,793,509.25 in cash consideration, and a common-benefit class action, the termination of the 35,000 change-in-control shares.  Although both of these categories of class actions permit the parties to spread the costs of the attorney's fees among the class as beneficiaries, here, the class will not pay for or have their award reduced by the attorney's fees, because the attorney's fees were separately negotiated with the insurance carrier.  The Court may, however, based on the common-benefit doctrine, consider non-economic benefits to the class when determining whether the attorney's fees are appropriate.

District Court for the Southern District of Ohio found that a settlement provided an economic benefit to the class, because the final per share offer price was $5.05 greater than the original offer price. See 2009 U.S. Dis. LEXIS 126962, at *37.  Here, the Defendants admit that the sixty dollars per share increase occurred, in part, as a result of class counsel's efforts in the Rael v. Page action. See Settlement at 19.

> Westland DevCo, LLC, as successor to SCC Acquisition Corp., likewise acknowledges that SCC Acquisition Corp. was aware of the Rael Action and considered the allegations therein in connection with its May 23, 2006 $280 per share offer, its June 6, 2006 $308 per share offer, and its June 30, 2006 $315 per share offer.

Settlement at 19.  The sixty dollars per share increase multiplied by 794,927 shares establishes a $47,695,620.00 benefit for Westland Development shareholders.  See Memo Seeking Approval at 27.  Furthermore, the "Director Defendants acknowledge that the existence of the Rael Action was a factor in the Westland Board's decision to . . . waive the Director Defendants' claim to 35,000 'change-in-control' shares, which had the effect of increasing the consideration payable to Westland's common shareholders from $255 per share to $266.23 per share."  Settlement at 18. This increase in share price resulted in $8,927,030.21 to the class.

Although $3,778,702.41 may not be as large a Settlement fund as members of the class hoped to receive, and is probably less than class counsel wanted upon filing this action, it is significant given the real likelihood that the class could receive nothing.  Class counsel had to work around the Defendants' various financial difficulties.  The Defendants have contentiously fought the litigation, and it is likely that, had the case not settled, the class may have been unable to enforce any judgment it may have received.  That class counsel was able to obtain close to $3.8 million is impressive, when one considers that there are other creditors to whom individual defendants have been unwilling to pay much smaller debts.  Class counsel's task was made more deeply depressed

by the difficult real estate market in which the litigation has taken place.  The non-economic benefits to the class from the cancellation of the "change-in-control" shares and the increase in share price in addition to the approximately $3.8 million in damages provides a substantial benefit to the class. The reality is that the class sold at the height of the market and is receiving more; they have little about which they should complain.  Furthermore, even if the Court reduces the attorney's fees award, the funds would return to the insurance carrier and would not be added to the class award. The Individual Defendants asserted that the attorney's fees were negotiated separately with the insurance carrier and that, if the fees were reduced in any way, those funds would not increase the class funds.  See Tr. at 113:13-22 (Bessette).

Accordingly, the Court finds that this factor weighs in favor of the requested attorney's fees and expenses award.

### F.   THE ATTORNEY'S FEES AND COSTS ARE IN ACCORDANCE WITH CUSTOMARY ATTORNEY'S FEE AWARDS AND AWARDS IN SIMILAR CASES AND WERE CONTINGENT.

The attorney's fees in this case were contingent.  This factor weighs in favor of the requested attorney's fees award, because "[s]uch a large investment of money [and time] place[s] incredible burdens upon . . . law practices and should be appropriately considered."  Feerer v. Amoco Prod. Co., 1998 U.S. Dist. LEXIS 22248, at *33.  See Been v. O.K. Indus., Inc., No. CIV-02-285-RAW, 2011 WL 4478766, at *9 (E.D. Okla. Aug. 16, 2011)("Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success.").  Class counsel assumed the risk that the litigation would yield no recovery and for five years have received no compensation for the time and expenses they have spent during the course of the litigation.  The Court has recognized in other cases that "[f]ees in the range of 30-40% of any amount recovered are common

in complex and other cases taken on a contingent fee basis." <u>Robles v. Brake Masters Sys., Inc.</u>, 2011 U.S. Dist. LEXIS 14432, at *55.

$3.1 million in addition to $650,000.00 in expenses is a large award.  The Court notes that this money is not coming from the class fund.  <u>See</u>  Further Support of Class Action Settlement at 20.  The attorney's fees were separately negotiated, with a separate entity -- the Individual Defendants' insurance carrier.  <u>See</u> Memo Seeking Approval at 24.  The insurance carrier had a "pac-man" policy in place and would pay attorney's fees, but, because of how the policy defined loss, would not pay for damages.  <u>See</u> Tr. at 16:16-22 (Court, Robbins); <u>id.</u> at 76:8-15 (Bessette). Accordingly, the attorney's fees do not reduce the amount available to the class and any judicial reduction to the attorney's fees does not increase the funds available to the class, but reverts to the insurance carrier.  <u>See</u> Tr. at 113:13-22 (Bessette).  The Court still examines, however, the fees in relation to the Settlement.  The Court finds that class counsel was able to obtain significant benefits for the class, especially in light of the financial difficulties facing the Defendants.  The Supreme Court directs the Court to consider the cancellation of shares as a benefit to the class, <u>see</u> <u>Mills v. Electric Auto-Lite Co.</u>, 396 U.S. at 394 ("A successful suit of this type, resulting in cancellation of the shares, does not bring a fund into court or add to the assets of the corporation, but it does benefit the holders of the remaining shares by enhancing their value."), and the Defendants admit the class counsel's conduct contributed to their decision to forego those shares, <u>see</u> Settlement at 18.  In addition to the class fund, this benefit leads to a $12,705,732.62 benefit to the class.  Using this figure, the attorney's fees represent twenty-four percent of the total benefit to the class.  When the Court adds the increases in share price made as a result of the <u>Rael v. Page</u> action, the benefits to the class amount to $60,401,352.62, and the attorney's fees represent approximately five percent of the total benefits.  These percentages are below the average percentage of the class fund that courts

award.  "Fees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingency fee basis."  Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *55.  See Anderson v. Merit Energy Co., 2009 WL 3378526, at *3 ("The customary fee to class counsel in a common fund settlement is approximately one-third of economic benefit bestowed on the class.").  Furthermore, the Court finds that the award is comparable to other awards where similar hours have been expended.  See Anderson v. Merit Energy Co., 2009 WL 3378526, at *2; Ponca Tribe of Indians of Okla. v. Continental Carbon Co., 2009 WL 2836508, at *3.

Moreover, when the Court examines the requested attorney's fees in the context of how much class counsel put into the case, the Court finds that the requested attorney's fees are appropriate.  Even if every attorney and paralegal who worked on this case billed at the relatively low rate of $200 per hour,[20] the attorney's fees would be in excess of the attorney's fee award requested.  Additionally, if every attorney at Robbins Geller Rudman & Dowd LLP billed the 11,800 hours they spent on this case at a rate of $300.00 per hour, the fees would exceed the $3.1 million award.  Class counsel estimates that Robbins Geller Rudman & Dowd LLP spent 11,800 hours on this case, and that the lodestar amount for attorney and para-professional time was $6,021,427.75.  See Light Decl. ¶ 4, at 2.  Accordingly, class counsel's services have been subject to a steep discount.  Class counsel, who are experts in their field, have put more effort into this litigation than the awarded fees reflect.  Additionally, the fees do not reflect the time spent at the March 20, 2012,

---

[20]While the Court realizes that paralegals do not routinely charge $200.00 per hour in New Mexico, the state's top attorneys charge above that amount, see Jackson v. Los Lunas Center, 489 F.Supp.2d 1267, 1273 & n.4 (D.N.M. 2007)(Park, S.J.)(discussing fees of up to $305.25 per hour and finding those fees reasonable); Kelley v. City of Albuquerque, No. 03-5007, 2005 WL 3663515, at *16 (D.N.M. Oct. 24, 2005)(Browning, J.)(finding that $250 per hour for Albuquerque attorneys is a reasonable fee), and New Mexico is a relatively poor state, with some of the lowest hourly rates in the country.

hearing or responding to the post-hearing filings.  This award is surely less than the attorney's fees

that class counsel hoped to receive when they instituted this litigation and estimated the damages

at $150 per share.  <u>See</u> Tr. at 26:23-27:9 (Court, Robbins).  Circumstances forced the class to be

more realistic in terms of what damages it would likely receive and class counsel has likewise

discounted their services to bring the fees in line with the recovery.  This case has not been a home

run for class counsel, even though the dollar amount of the fees is significant.

Because the fees were contingent, and are at or below the customary fee and awards in

similar cases, the Court finds that this factor weighs in favor of the requested attorney's fees and

costs.

## G.   THE UNDESIRABILITY OF THE CASE SUPPORTS THE ATTORNEY'S FEES AND COSTS AWARD.

The Court notes that, at the class certification stage, no other class member or law firm

sought to represent the class.  <u>See</u> <u>Lane v. Page</u>, 250 F.R.D. at 646.  Additionally, the time and effort

that this case has taken would make it undesirable to many attorneys.  <u>See</u> <u>Been v. O.K. Indus., Inc.</u>,

2011 WL 4478766, at *10.  The Court also considers, however, that there were several state cases

proceeding against these Defendants on different theories before this case was filed.  The state suits

establish that there were several plaintiffs willing to pursue actions against these Defendants in state

court, but either were satisfied with Lane representing the class in the federal suit or did not wish

to represent the class in a federal suit.  Although there was a motion to intervene early in the

litigation, the Court found that Frank Martin had not moved to be named lead plaintiff and dismissed

the motion as moot.  <u>See</u> Memorandum Opinion and Order at 14, filed July 2, 2007 (Doc. 43).

Accordingly,  the Court finds that, because no other party or counsel stepped forward to represent

the class, this factors weighs in favor of the attorney's fees, but is not a strong consideration.

### H.   THE COURT FINDS THAT THE ATTORNEY'S FEES AND EXPENSES ARE APPROPRIATE.

The Court will award attorney's fees of $3.1 million and expenses of $650,000.00. All of the relevant Johnson v. Georgia Highway Express, Inc. factors counsel, to some extent, in favor of the fee award. The individual objectors have not made any specific objections to billing rates, times, or costs. The attorney's fees represent a fraction of the benefit conveyed to the class and a fraction of the total lodestar amount. Furthermore, the attorney's fees and expenses were separately negotiated after the Settlement was negotiated and with the Individual Defendant's insurance carrier, rather than with the Defendants. See Tr. at 55:4-16 (Court, Robbins). While the individual objectors criticize these separate negotiations, see Tr. at 95:19-23 (Barton), that the fees were negotiated after the Settlement reduces the risk of any improper bargaining, such as reducing the class award so that the attorney can be paid quickly. See McKenna v. Sears, Roebuck & Co., 116 F.3d 1486, 1997 WL 349024, at *1 (9th Cir. June 25, 1997)(unpublished table decision)("Here, the fee agreement was negotiated after the class settlement was negotiated after the class settlement, a fact that reduces the danger of an improper quid pro quo detrimental to the class."). Even if the Court were to reject the attorney's fees arrangement, the funds would not go to the class and would not increase the class fund in any way. This litigation has been vigorously litigated over a period of five years. The Court finds that the attorney's fees and expenses are reasonable and fair. While the attorney's fees are a lot in isolation, in comparison to what class counsel put into the case, they did not hit a home run. Accordingly, the Court approves the award of $3.1 million in attorney's fees and $650,000.00 in expenses.

IV.     **THE COURT WILL APPROVE THE AWARD TO LANE.**

Lane asks that the Court award him $4,725.00 in reasonable costs and expenses related to his service as the class representative.  See Memo Seeking Approval at 32.  The PSLRA provides that "[t]he share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of the class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class."  15 U.S.C. § 78u-4(a)(4).  It also provides, however, that the Court may award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class."  15 U.S.C. § 78u-4(a)(4).  The Court has recently discussed its general disapproval of incentive awards.  See Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *49 (holding that Congress made deliberate choices among enforcement mechanisms and that the "courts must be careful not to second guess Congress' selection through incentive awards, thereby illegitimately transforming the underlying substantive law from a compensatory model to a bounty hunter model.").  The Tenth Circuit allows incentive awards in some circumstance, and the Court has narrowly interpreted that language as "authoriz[ing] an incentive award when the class representatives' efforts are greater than the typical class representative's efforts and/or greater than the efforts a class representative would have incurred if his or her action were an individual action." Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *35-36 (internal quotation marks omitted).  Robles v. Brake Masters Systems, Inc., was not brought pursuant to the PSLRA and sought a $9,869.79 incentive award for the named Plaintiff.  See 2011 U.S. Dist. LEXIS 14432, at *9.  The parties, however, have structured this award under the PSLRA as a reimbursement for reasonable costs and expenses and, in such a way, so as to allay many of the concerns that the Court noted in Robles v. Brake Masters Sys., Inc.  Specifically, the money from the attorney's fees will

-127-

be used to fund the award to Lane and the award to Lane will not reduce the total funds available to the class.

       Lane asserts that he has devoted approximately 270 hours to the prosecution of this suit. See Lane Decl. ¶ 3, at 2.  An award of $4,725.00 for 270 hours is approximately $17.50 per hour. The Court recalls Lane attending nearly every hearing before it and being very involved in this case. Here, in the context of the overall Settlement, the award is small.  The award will not be at the expense of the class, and notice was given to the class of the award.  See Robles v. Brake Masters Sys. Inc., 2011 U.S. Dist. LEXIS 14432, at *49-50 (rejecting an incentive award where the "parties did not notify the Collective Action Settlement Members of the proposed incentive award" and where the "proposed incentive award would be taken proportionally from other Collective Action Settlement Members' awards and thus benefitting Robles at their expense").  The award to Lane will reduce the available attorney's fees and will not reduce the award to the class.  See Tr. at 37:14-20 (Robbins).  In the Notice of Pendency of Settlement of Class Action, filed December 19, 2011 (Doc. 366)("Notice of Pendency"), class counsel informed the class that they would seek an award to Lane of $4,725.00 and that "these amounts will not reduce the $3,778,702.41 available for Class Members and Class Members are not personally liable for any such fees and expenses."  Notice of Pendency at 18 (emphasis original).  The parties gave notice of the award to the class and, despite some strenuous objections to the Settlement, no objector challenged the award to Lane.  While the Court is cautious about incentive awards in general, this is not an incentive award -- it does not reward Lane simply for stepping forward to represent the class.  See In re Heritage Bond Litig., Nos. 02-ML-1475, CV 01-5752, CV 02-382, CV 02-993, CV 02-2745, CV 02-6484, CV 02-9221, CV 02-6512, 2005 WL 1594403, at *14 (C.D. Cal. June 10, 2005)("[T]he Court is mindful to distinguish between 'reasonable costs and expenses,' and what appears to be a 'compensation' or 'incentive'

-128-

award.")  This award is to reimburse Lane for time spent and expenses incurred in pursuit of this

litigation.[21]  Other courts have similarly awarded expenses in PSLRA cases where the lead plaintiff's

efforts went beyond the average class representative duties.  See In re Flag Telecom Holdings Ltd.

Sec. Litig., No. 02-CV-3400, 2010 WL 4537550, at *31 (S.D.N.Y. Nov. 8, 2010); In re MetLife

Demutualization Litig., 689 F.Supp.2d 297, 369-70 (E.D.N.Y. 2010)("The approved compensation

payments are awarded in recognition of lead plaintiffs' services rendered on behalf of the class and

in support of class counsel's efforts to prosecute this litigation.").

          Although the award to Lane is not an incentive award, rather it is for the purposes authorized

under the PSLRA, see 15 U.S.C. § 78u-4(a)(4), the Court finds a comparison to incentive awards

cases instructive.  Additionally, the Tenth Circuit has stated:

> "Incentive awards [to class representatives] are justified when necessary to induce
> individuals to become named representatives," but there is no need for such an award
> "if at least one [class member] would have stepped forward without the lure of an
> incentive award."  In re Synthroid Mktg. Litig. 264 F.3d 712, 722-23 (7th Cir. 2001).
> Moreover, a class representative may be entitled to an award for personal risk
> incurred or additional effort and expertise provided for the benefit of the class.
> See Parker v. Time Warner Entm't Co., L.P., 632 F.Supp.2d 242, 279 (E.D.N.Y.
> 2009) . . . .

---

[21]Although it will not bar an award of reasonable costs and expenses in this case, because
the Court is convinced that this award is appropriate under the PSLRA, the Court notes that in future
cases it would be the good practice and prudent path to provide details regarding the costs and
expenses incurred.  Lane's declaration asserts that he spent 270 hours on this case and lists the
documents that he helped prepare as well as the litigation events that he attended.  See Lane Decl.
¶ 3(a)-(j).  No party or objector argues that an award to Lane is inappropriate.  In other cases,
however, courts have required that class representatives seeking an award under the PSLRA provide
details regarding their losses and out-of-pocket expenses.  See In re Merrill Lynch & Co., Inc.
Research Reports Sec. Litig., Nos. 02 MDL 1484, 02 Civ. 3176, 02 Civ. 7854, 02 Civ. 10021, 2007
WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007)("Although [lead plaintiff] Manton claims to have spent
time during her work day performing her duties as lead plaintiff, she nevertheless fails to claim any
actual expenses incurred, or wages or business opportunities she lost, as a result of acting as lead
plaintiff.  Under the [PSLRA], it is simply not enough for Manton to assert that she took time out
of her work day and that her time is conservatively valued at $500 per hour.").

UFCW Local 800 - Retail Food Emp'rs Joint Pension Fund v. Newmont Mining Corp., 352 F.App'x 232, 235-36 (10th Cir. 2009)(unpublished). There is some evidence that no other representative would have stepped forward to represent the class in Lane's absence, because, at the class certification stage, no other class member or law firm sought to represent the class. See Lane v. Page, 250 F.R.D. at 646. With respect to the additional effort category, the Court has construed this language as authorizing an incentive award "when the class representatives efforts are greater than the typical class representative's efforts and/or greater than the efforts a class representative would have incurred if his or her action were an individual action and not a class action." Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *35-36. At the hearing, Mr. Robbins, speaking in support of the award to Lane, stated that he had represented as many or more lead plaintiffs than any other securities lawyer in the country, and that he has never had a case where the lead plaintiff was as dedicated as Lane. See Tr. at 37:3-10 (Robbins). He described Lane's level of involvement as "unprecedented." Tr. at 37:11 (Robbins). This praise is remarkable coming from experienced class counsel. The Court believes that Lane's efforts are beyond those of the ordinary class member, because of the time commitment he has devoted to this class action, spending hundreds of hours pursuing this case over the past five years. See Robles v. Brake Masters Sys., 2011 U.S. Dist. LEXIS 14432, at *34-35 (rejecting incentive award where lead plaintiff "spent forty to sixty hours working on this case, working with counsel, giving a deposition, and attending mediation"). Lane attended almost every hearing, testified at the hearing on whether the Court should grant a TRO, assisted in developing the pleadings, produced thousands of pages of discovery, participated in mediation, engaged in extended settlement negotiations, and attended the depositions of other witnesses. See Robbins Decl. ¶ 102, at 32.

-130-

The Court finds that an award of $4,725.00 to Lane is lawful and appropriate. The amount is reasonable compensation for the hours that Lane has devoted to this case over a five-year period. The Court believes, and class counsel have vigorously argued, that Lane's efforts on behalf of the class went beyond what is normally expected of class representatives. Additionally, class counsel have supported their argument with action, because the award to Lane will reduce the attorney's fees. See Tr. at 37:14-20 (Robbins). Furthermore, the class had notice of the award and no class member objected to it. The Court believes that this award is appropriate compensation for reasonable costs and expenses under the PSLRA. Accordingly, the Court will approve the award of $4,725.00 to Lane.

**IT IS ORDERED** that: (i) the Lead Plaintiff's Notice of Motion and Motion for Final Approval of Class Action Settlement, filed January 27, 2012 (Doc. 370), is granted; (ii) Miller Barondess, LLP's Objection to Use of Settlement Funds in Court Registry for Settlement, filed February 14, 2012 (Doc. 380), is overruled ; (iii) Stephens Property Co. LLC's Objection to Use of Funds in Court Registry for Settlement, filed February 17, 2012 (Doc. 383), is overruled; (iv) Interlegis, Inc.'s Motion to Extend the Deadline to File Objections to the January 9, 2012 Notice of Use Funds in Court Registry for Settlement (Document 367), filed March 1, 2012 (Doc. 395), is granted; (v) Interlegis, Inc.'s Objection to the January 9, 2012 Notice of Use of Funds in Court Registry for Settlement (Doc. 367), filed March 1, 2012 (Doc. 396), is overruled; (vi) Diana Armijo's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 384), is overruled; (vii) Barbara Armijo's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 385), is overruled; (viii) Joshua Moralez' Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 386), is overruled; (ix) Patricia Baros' Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 387), is overruled; (x) Lori Moralez' Objection to Proposed Class Settlement, filed

-131-

February 17, 2012 (Doc. 388), is overruled; (xi) the Agnes B. Sanchez Revocable Trust UTA, Peter A. Sanchez, Trustee, Objection, filed February 17, 2012 (Doc. 389), is overruled; (xii) Larry Moralez' Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 390), is overruled; (xiii) Anita Lucero's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 391), is overruled; (xiv) Angela Otero's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 392), is overruled; and (xv) Chris Lujan's Objection to Proposed Class Settlement, filed February 17, 2012 (Doc. 393), is overruled.  The Court approves the Stipulation of Settlement, filed December 9, 2011 (Doc. 363), including the awards of: (i) attorney's fees in the amount of $3.1 million; (ii) litigation expenses not to exceed $650,000.00; and (iii) reimbursement to Plaintiff Lawrence Lane in the amount of $4,725.00.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joe Kendall
Provost Umphrey Law Firm, LLP
Dallas, Texas

-- and --

Nicholas Koluncich, III
Law Offices of Nicholas Koluncich
Albuquerque, New Mexico

-- and --

Darren J. Robbins
Brian O. O'Mara
G. Paul Howe
Randall J. Baron
David W. Mitchell
Danielle S. Myers
Robbins Geller Rudman & Dowd LLP
San Diego, California

      *Attorneys for the Plaintiffs*

Paul M. Fish
Douglas G. Schneebeck
Brian K. Nichols
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

      *Attorneys for Defendants Westland Development Company, Inc.,*
         *SCC Acquisition Corp., and SunCal Companies Group*

Paul Bessette
Jesse Z. Weiss
Kimberly G. Davis
Christopher W. Ahart
Yusuf A. Bajwa
Greenberg Traurig, LLP
Austin, Texas

-- and --

Juan L. Flores
Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Albuquerque, New Mexico

      *Attorneys for Defendants Barbara Page, Sosimo S. Padilla, Joe E. Chavez,*
         *Josie Castillo, Charles V. Pena, Georgia Baca, Troy K. Benavidez,*
         *Ray Mares, Jr., and Randolph M. Sanchez*

Mark F. Sheridan
Jacqueline E. Davis
Holland & Hart, LLP
Santa Fe, New Mexico

-- and --

John D. Lovi
Lara E. Romansic
Michelle M. Oliver
Steptoe & Johnson, LLP
New York, New York

     *Attorneys for Defendants D.E. Shaw Group, D.E. Shaw & Co. L.P.,*
        *D.E. Shaw Real Estate Portfolios 1, LLC, D.E. Shaw & Co. LLC,*
        *D.E. Shaw & Co., Inc., D.E. Shaw Investment Group, LLC,*
        *D.E. Shaw & Co. II, Inc., George Rizk, and Anne Dinning*

Matthew A. Rappaport
Miller Stratvert P.A.
Albuquerque, New Mexico

     *Attorney for Objector Interlegis, Inc.*

Alan R. Wilson
Wilson Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Objector Stephens Property Co., LLC*

Veronica S. Gunderson
Miller Barondess, LLP
Los Angeles, California

     *Attorneys for Objector Miller Barondess, LLP*

George A. Barton
Law Offices of George A. Barton, P.C.
Kansas City, Missouri

-- and --

Marcus Garcia
Albuquerque, New Mexico

     *Attorneys for Individual Objectors Diana Armijo, Barbara Armijo*
        *Joshua Moralez, Patricia Baros, Lori Moralez, the Agnes B.*
        *Sanchez Revocable Trust, Larry Moralez, Anita Lucero, Angela*
        *Otero, and Chris Lujan*